# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

TENNESSEE CONFERENCE of the NATIONAL
ASSOCIATION for the ADVANCEMENT of
COLORED PEOPLE, on behalf of itself and its
members, and LAMAR PERRY, CURTIS GRAY Jr.,
JOHN WEARE, BENJAMIN TOURNIER, and
AMANDA LEE MARTIN, for themselves and those
similarly situated,

Plaintiffs,

v.

WILLIAM LEE, in his official capacity as Governor of
the State of Tennessee, TONY C. PARKER, in his
official capacity as Commissioner of the Department of
Correction of the State of Tennessee, MARK GOINS, in
his official capacity as Coordinator of Elections for the
State of Tennessee, and TRE HARGETT, in his official
capacity as Secretary of State of Tennessee, and,
MELISSA HARRELL in her official capacity as
Rutherford County Clerk of Circuit Court,

Defendants.

Civil No. 3:20-cv-01039

JUDGE CAMPBELL
MAGISTRATE JUDGE
FRENSLEY

[Class Action]

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs respectfully submit the following response to State Defendants' Motion to Dismiss.[1] Defendants argue that this Court lacks jurisdiction over Plaintiffs' claims and that Plaintiffs have failed to state a claim. For the reasons discussed below, Defendants' motion should be denied.

## **STANDARD OF REVIEW**

Defendants seek to dismiss this case under Rule 12(b)(1), arguing that Plaintiffs lack standing and that their claims are barred by the Eleventh Amendment, and under Rule 12(b)(6) for failure to state a claim. Defs.' Mem. in Supp. of Mot. to Dismiss ("Mot.") at 2, ECF No. 25-1.

A motion to dismiss under Rule 12(b)(1) "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). Defendants do not dispute the facts Plaintiffs allege in their complaint. As such, their attack is facial; the Court must take Plaintiffs' allegations as true and examine only whether they are sufficient to invoke this Court's jurisdiction. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a 12(b)(6) motion, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015) (citation omitted). A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

---

[1] This Motion to Dismiss is only on behalf of State Defendants Lee, Parker, Goins, and Hargett. This brief will refer to these individuals collectively as "Defendants." Defendant Harrell, the Rutherford County Clerk, is not party to this motion and has yet to respond to this lawsuit.

1

would entitle him to relief." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (citation omitted).

<u>**ARGUMENT**</u>

**I.     Plaintiffs Have Standing to Pursue Each of their Claims.**

Plaintiffs have standing when they allege (1) an "injury in fact," (2) "a causal connection" between the injury and the challenged conduct that is "fairly . . . traceable" to the defendants' actions, and (3) that the injury will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). These same three elements apply to organizational plaintiffs. *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013). But organizational plaintiffs may establish standing in either of two ways, by alleging either that they have organizational standing in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), or by asserting associational standing on behalf of their members, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

In cases involving multiple plaintiffs, courts need not consider the standing of co-plaintiffs as long as one plaintiff has sufficiently alleged standing for each claim asserted and form of relief requested. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n. 2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) ("Since at least one Plaintiff in this action has standing, there is no need to consider whether the education association Plaintiffs also have standing.").

Because all five Individual Plaintiffs and the organizational plaintiff, the Tennessee Conference of the NAACP ("TN NAACP"), sufficiently allege all three elements of standing for each of their claims, this Court has subject matter jurisdiction.

Case 3:20-cv-01039   Document 29   Filed 01/27/21   Page 3 of 38 PageID #: 158

### A. Plaintiffs Sufficiently Allege Injuries in Fact.

#### 1. Individual Plaintiffs (Counts 1-3)

To demonstrate injury in fact, plaintiffs must allege "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted).

Individual Plaintiffs have sufficiently plead injuries in fact. Each Individual Plaintiff sought and failed to obtain a Certificate of Restoration of Voting Rights ("COR"), which they are entitled to seek under Tennessee law. Compl. ¶¶ 22, 40-44. That is enough. Moreover, in seeking a COR, each Individual Plaintiff was forced to navigate an error-ridden process that lacks uniform application procedures, *id.* ¶¶ 51-63, access to impartial decisionmakers, *id.* ¶¶ 51-53, standardized guidance on how to interpret and apply statutory eligibility criteria, *id.* ¶¶ 51-53, 74-83, a final decision on their requests, *id.* ¶¶ 64-66, written explanations of denials, *id.* ¶¶ 51-53, 67-73, and a means of appeal, *id.* ¶¶ 51-53, 84-85.

Plaintiffs allege that this process fails to comport with the minimum requirements of due process, which include notice of rules and decisions and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319 n.4 (1976) (citing *Goldberg v. Kelley*, 397 U.S. 254, 267–71 (1970)); Compl. ¶¶ 40-44, 112, 117-21, 125 (Counts 1 and 2). In addition, Defendants' standardless, decentralized process for requesting CORs has also subjected each Individual Plaintiff to the whims of various state and local officials, resulting in arbitrary and unequal access to the franchise (Count 3). *Id.* ¶¶ 130-31. These are actual and concrete harms to the legally protected interests of each Individual Plaintiff, which are shared by those similarly situated. *Id.* ¶¶ 104, 110.

Defendants argue that Plaintiffs have asserted no cognizable injury, relying solely on one inapposite case that was not about standing at all but the merits: *Johnson v. Bredesen*, 624 F.3d

742, 746 (6th Cir. 2010) (upholding Tennessee's law conditioning voting rights restoration on the repayment of child support and restitution). Defendants' reliance on *Johnson* is misplaced.

First, Defendants confuse standing and the merits. Plaintiffs have no doubt suffered injuries in fact: they have traced byzantine rules and procedures to receive a COR and come up empty-handed. Defendants' assertion that they are not entitled to relief on the merits does not deprive them of standing. *CHKRS, LLC v. City of Dublin*, 2021 WL 21808 at *4 (6th Cir. Jan. 4, 2021) (overturning a "holding [that] conflated the merits of [plaintiff's] claim with [plaintiff's] standing to bring it") ("[J]ust because a plaintiff's claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it. 'If that were the test, every losing claim would be dismissed for want of standing.'" (citations omitted)).

Second, even on the merits, *Johnson* is of no assistance to Defendants here.[2] The *Johnson* plaintiffs did not meet Tennessee's requirements to have their rights restored and register to vote. 624 F.3d at 745. Accordingly, the Sixth Circuit did not address whether the statutory interest in a COR or liberty interest in restoration of the right to vote triggers the protections of the due process clause. *Id.* Moreover, the constitutional claims in that case are meaningfully different from the claims here. The *Johnson* plaintiffs challenged the substantive criteria for rights restoration, whereas here Plaintiffs challenge only the arbitrary and unconstitutional *process* that erroneously prevents eligible citizens from obtaining a COR and regaining the right to vote. *See id.* at 744-45.

Defendants nevertheless waive *Johnson* like a magic wand, incorrectly arguing that Individual Plaintiffs have no right to vote and cannot allege injury because their claims are all "predicated on a deprivation of the right to vote." Mot. at 3. As noted above, with respect to Counts

---

[2] The sufficiency of Plaintiffs' claims on the merits at this stage of the litigation are discussed in more detail *infra* at Parts III-IV.

4

1 and 2, Individual Plaintiffs have alleged a violation of their *due process* rights; this is sufficient to allege an injury in fact. *See Wright v. Day*, 706 F.3d 769 (6th Cir. 2013) (holding that a plaintiff's claim for "procedural protections that he otherwise could not get . . . is enough for Article III standing so long as the procedures sought would lead to a concrete, particularized, and actual benefit").[3] Likewise, Defendants' reliance on *Johnson* for the proposition that Individual Plaintiffs cannot assert an injury relevant to their equal protection claim in Count 3 misses the mark. Defendants' failed COR process also results in a lack of uniform statewide standards, inflicting on each Individual Plaintiff the concrete harm of unequal treatment before the law in accessing the franchise. *See infra* Part IV.

Finally, Defendants' assertion that Individual Plaintiffs have no injury in fact is absurd on its face. According to Defendants, erroneous denials of rights restoration due to faulty procedures impose *no factual injury* at all on those denied because the legislature *could have* chosen not to re-enfranchise them (even though it did not, it chose to restore their rights). Individual Plaintiffs have sufficiently alleged injuries in fact with respect to Counts 1-3.

### 2. Plaintiff TN NAACP (Counts 1-7)

Organizational plaintiffs may sufficiently allege an injury in fact arising from either organizational or associational injuries, either of which are independent sufficient grounds to assert standing. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). In this case, TN NAACP asserts organizational injuries in fact sufficient to establish standing to sue on its own behalf. To

---

[3] Whether Plaintiffs would succeed in vindicating their interests if the State had adequate due process in place is not the question before this Court in deciding standing because the "right to procedural due process . . . does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *Wright*, 706 F.3d at 772-73 (citing *Goldberg*, 397 U.S. at 256 n.2) ("[L]itigant can suffer an injury-in-fact from the denial of procedural protections even if, when applied, the procedures might not result in relief.").

demonstrate injury in fact, an organization may show a "concrete and demonstrable injury to [an] organization's activities" or a "drain on the organization's resources." *Havens*, 455 U.S. at 379; *see Miami Valley*, 725 F.3d at 576. TN NAACP suffers organizational injuries on both accounts.

First, TN NAACP alleges that Defendants' failed administration of Tennessee's COR program has forced TN NAACP to "divert[] significant resources from its other activities related to its core mission in order to assist its constituents and other community members with the voting rights restoration process." Compl. ¶ 37. Specifically, TN NAACP alleges it must "expend additional money and time helping individuals navigate a process that is designed to fail," "hold[] public education workshops trying to explain the COR process," undertake efforts to "tailor these [educational] events to what they understand the 'process' to be in each county," and "mak[e] phone calls and taxi[] [their] members between county offices," all in order to counteract the systemic barriers that currently exist and to give its members and constituents an opportunity to seek CORs. *Id.* ¶ 37. Thus, "[a]ssisting individuals seeking a COR may take dozens of hours and be spread across many months." *Id.* These injuries are exacerbated in Rutherford County by the Clerk's insistence that COR applicants pay a fee, adding yet another impediment to their local chapter's efforts to help restore their constituents' voting rights in that county. *See id*. At the motion to dismiss stage, these allegations, which the Court must accept as true, are more than sufficient to establish standing for Counts 1-3 and 7.

TN NAACP has also alleged sufficient injuries for Counts 4-6. One of TN NAACP's core activities is voter registration, which requires them to distribute, use, and explain the state's voter registration form. *Id.* ¶ 38. The simple requirement that TN NAACP use an inaccurate form injures TN NAACP as a voter registration organization. Moreover, because Defendants have failed to issue usable registration forms that accurately reflect voter eligibility rules, TN NAACP "is injured

when a person they identify and help register to vote is rejected despite being eligible," because such erroneous denials cause them to divert significant time and resources to correct the error. *Id.*

Second, the injury resulting from these substantial diversions of time and resources amount to "concrete and demonstrable injur[ies] to [TN NAACP's] activities." *Havens*, 455 U.S. at 379. TN NAACP's organizational purpose is to eliminate race-based discrimination by securing, among other things, political rights for all persons, which it achieves in part through voter registration efforts. Compl. ¶¶ 29, 38. Its ability to register voters and integrate them into the political process is concretely impeded when its constituents must request a COR and risk erroneous deprivation of that right through an arbitrary and unconstitutional process, *id.* ¶¶ 35-37, or have their registration form rejected even though they are eligible to vote, *id.* ¶¶ 38-39. TN NAACP alleges "far more than simply a setback to the [its] abstract social interests." *Havens*, 455 U.S. at 379.

Ignoring these allegations, Defendants assert that TN NAACP's injuries are based on "speculative fears of future harm" and are therefore self-inflicted. Mot. at 7. Not so. TN NAACP is a service provider in this context. It expends resources directly in response to current and ongoing issues that it confronts as it works to support its COR-eligible and re-enfranchised members and constituents. *Cf. Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir.), *cert. denied*, 141 S. Ct. 257 (2020) (noting the plaintiffs suffered from "an imminence problem" because the "allegations with respect to injury all boil down to [past problems]"). TN NAACP also alleges, in detail, why the Defendants' violations of law have forced them to expend additional resources to serve COR-eligible and re-enfranchised citizens, far beyond what it must spend to serve other Tennesseans.[4] *Compare* Compl. ¶¶ 35-39 (describing the resources required

---

[4] There is no rule that the diversion of resources theory of standing only applies to challenges to "newly enacted provisions." Mot. at 7. *Ne. Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016), did not create such a rule. Such a rule would be entirely unmoored from the concept

to ascertain and comply with county specific policies and procedures, seek assistance to remedy erroneous failures to issue CORs, and follow up on erroneous denials of voter registration forms) *with Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) (finding no injury because "any likely redress by this court would simply substitute a different procedure" for the one a civic engagement group already used in its training and educational materials).

Defendants' argument that TN NAACP failed to adequately specify where its resources are being diverted from overlooks allegations in the complaint and misapprehends the law. Mot. at 7. TN NAACP alleged that "[t]he time and money spent navigating the COR process" and remedying erroneous rejections of voter registrations "detracts from the core work of the TN NAACP," including broader efforts to "eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons," "empower the African American community in Tennessee[,] and pass policy reforms that improve the lives of its constituents." Compl. ¶¶ 29, 37-39. These allegations are more than sufficient to show that TN NAACP has to direct resources towards serving COR-eligible and re-enfranchised citizens that it would otherwise spend on its other priorities.

Moreover, the fact that voter education and engagement is a core part of TN NAACP's mission does not disqualify its claim to standing. Rather, Defendants' failure to adequately administer Tennessee's COR and voter registration systems has "perceptively impaired" TN NAACP's ability to carry out that existing work. *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (finding injury in fact where a

---

of standing, which is concerned with the existence of an injury, whether it be new or old. While *N.E. Ohio Coalition for the Homeless* suggests that the question of whether a law is existing or newly enacted *may* help the court analyze the complained-of injury, the key question remains whether the injury is traceable to the defendant's conduct.

challenged law made an organization's "overall task more difficult," including by "increas[ing] the number of people in need of [assistance]" and "reduc[ing] the effectiveness of any given level of outreach efforts" (citing *Havens*, 455 U.S. at 379)). The Eleventh Circuit's opinion in *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), is instructive. In *Browning*, the plaintiff had to "divert personnel and time" to compensate for defendants' legal violations, raising the average amount the organization had to spend to register each voter, draining its limited resources. *Id.* at 1166. The same is true of TN NAACP here. Compl. ¶¶ 37-39. The burden that Defendants' failures to lawfully administer Tennessee's COR and voter registration system imposes on TN NAACP is especially significant because of whom TN NAACP serves. A staggering one in five Black voting-age Tennesseans is disenfranchised because of a previous felony conviction. *Id.* ¶ 33. That means, on average, roughly 20 percent of the people TN NAACP attempts to register to vote will require extra time and resources, either to assist in the COR process, chasing down decades-old paperwork to support voter registration, and/or any of the numerous issues that Individual Plaintiffs and others have confronted. *Id.* ¶¶ 33, 37-38, 40-44.

Were Defendants to administer a uniform statewide COR process that provided applicants with notice and an opportunity to be heard and minimized erroneous rejections, TN NAACP would not have to spend as much time and money to assist each applicant, freeing up resources for voter registration activities and other core components of its mission. *Id.* ¶¶ 37-39. Were the registration forms and policies consistent with the NVRA and not unduly burdensome, TN NAACP would not have to spend any time or money helping members and constituents chase down decades old paperwork to prove their eligibility. *Id.* ¶¶ 38-39. In short, TN NAACP's significant diversion of time and money gives it standing in its own right to bring each claim asserted.

### B. Plaintiffs' Injuries Are Fairly Traceable to Defendants' Conduct.

Plaintiffs also satisfy the causation element of Article III standing. To have standing, a plaintiff's injury must be "fairly traceable" to the defendant's challenged conduct. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). At the pleading stage, this burden is "relatively modest." *Id.* at 171. For suits against public officials, plaintiffs need only allege a "'meaningful nexus' between the defendant and the asserted injury." *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018) (citations omitted). This nexus between a plaintiff's injuries and a defendant's unlawful acts or omissions need not be proximate and may be indirect. *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 713 (2015). "[T]hat a defendant was one of multiple contributors to a plaintiff's injuries does not defeat causation." *Id.* at 714. Nor does challenged conduct have to be the "very last step in the chain of causation." *Bennett*, 520 U.S. at 169. The touchstone for Article III traceability is "more than speculative but less than but-for" causation. *Parsons*, 801 F.3d at 714.

Plaintiffs' allegations easily meet this threshold. The "meaningful nexus" here is straightforward: Tennessee law charges Defendants with administering the rights restoration laws whose application Plaintiffs challenge. Tenn. Code Ann. § 40-29-203 gives COR applicants a right to request (and, if eligible, be issued) a COR from the "pardoning authority" or various officials within the "incarcerating" or "supervising authority." Compl. ¶ 24. Defendant Governor Lee is the pardoning authority. Compl. ¶¶ 24, 46; Tenn. Const. art. III, § 6. Defendant Parker supervises all officials within the Tennessee Department of Corrections ("TDOC"), which is the state's incarcerating and supervising authority. Compl. ¶¶ 24, 47; Tenn. Code Ann. §§ 40-29-203(a), 4-6-107, 4-3-602. Defendant Goins is "required to create the COR form along with a statement adequately explaining the form and procedure for voting rights restoration." Compl. ¶¶ 25, 48; Tenn. Code Ann. § 40-29-205. He has a duty to verify the information on submitted CORs. Tenn.

Code Ann. § 40-29-203(d). Defendant Hargett supervises the Coordinator of Elections. Compl. ¶ 50; Tenn. Code Ann. § 2-11-201(a). Defendants' acts and omissions in carrying out these duties are a direct cause of Plaintiffs' deprivations of due process and unequal treatment.

With respect to Counts 1-3, Defendants caused Plaintiffs' due process and equal protection injuries by setting up a wholly arbitrary process for requesting CORs, one in which "[t]he only apparent way . . . to 'request' and 'be issued' a COR is to print out blank copies of the COR from the Secretary's website, and then hunt for one or more officials . . . to fill out the required information." Compl. ¶ 57. Individual Plaintiffs all attempted to request CORs using this "process." *Id.* ¶ 40-44. None succeeded because Defendants' system lacks the most basic constitutionally-mandated safeguards against erroneous deprivation and non-arbitrary treatment. *Id.* ¶¶ 52-85. These allegations satisfy the "relatively modest" burden of demonstrating Article III causation at this stage of litigation. *Bennett*, 520 U.S. at 167; *see also Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014) (holding that the causation and redressability requirements are "relaxed" where plaintiffs allege procedural injuries to protect concrete interests).

Defendants wrongly insist that "not one" of the Individual Plaintiffs can fairly trace their injuries to "the conduct of Defendants" because other parties are the cause of Plaintiffs' failure to obtain CORs. Mot. at 3. But this argument betrays a fundamental misunderstanding of Individual Plaintiffs' asserted injuries and the traceability standard. Plaintiffs do not allege just deprivation of a statutory right to a COR or fundamental right to vote, but a deprivation of those rights without due process and in a manner that results in arbitrary and unequal treatment. Compl. ¶¶ 112, 125, 130. Plaintiffs allege that these procedural injuries arise from Defendants' "fail[ure] in their duty to administer a standardized, accurate, and navigable" COR process. *Id.* ¶ 51. Plaintiffs' Complaint is not, as Defendants argue elsewhere "about the alleged failures of various *county* clerks . . . to

comply" with the COR statutes. Mot. at 19. Indeed, Plaintiffs' Complaint is replete with allegations of various *state* officials' failures to administer a functional COR system. For example, in many counties, probation and parole officers, who are all *state* officials supervised by Defendant Parker, have a policy not to issue CORs at all or to only complete sections of a COR. Compl. ¶¶ 59-60. Thus, Defendants and their agents are *at least* one cause of Plaintiffs' injuries; that others may have also contributed to these injuries does not defeat causation. *Parsons*, 801 F.3d at 714. With this in mind, Defendants' specific objections to Individual Plaintiffs' standing ring hollow.

Defendants claim that Plaintiffs Perry and Gray cannot satisfy causation because "a county official, who is not named as a Defendant, erroneously denied their requests for a COR." Mot. at 4. Plaintiffs Perry and Gray requested that the Shelby County Clerks of Criminal Court fill out at least some portion of their COR forms, Compl. ¶¶ 40-41, because Shelby County probation officers—who are *state* employees supervised by Defendant Parker, *id.* ¶ 47— unlawfully "refuse to fill out CORs," *id.* ¶¶ 40, 21. In addition, Defendants' instructions on the Secretary of State's website directed Plaintiffs Perry and Gray to seek out criminal court clerks, even though criminal court clerks have no duty to issue CORs under Tenn. Code Ann. § 40-29-203(a). *Id.* ¶ 56. The back side of the COR form also has instructions directed to "the Agent Completing the [COR]" (including criminal court clerks) about how to fill out the form. *Id.* Ex A. Thus, even though the criminal court clerk's refusal to fill out a COR form effectively denied Plaintiff Perry's and Gray's COR requests, these refusals were not an "independent act breaking the chain of causation" but an obvious result of Defendants' failure to administer a functional COR process with adequate instructions to officials who were delegated responsibility for filling out CORs. *Parsons*, 801 F.3d at 714 (quoting *City of Detroit v. Secretary of Commerce*, 4 F.3d 1367, 1373 (6th Cir. 1993)) (holding that a plaintiff "satisfie[d] the requisite standard" for causation by alleging that a

12

defendant "motivated" injurious third-party officials' actions by disseminating certain information). Defendants also offered Plaintiffs Perry and Gray no appeals process to correct these refusals. Compl. ¶ 84.

Defendants wage a similar attack against Plaintiffs Weare and Tournier, but to no avail. Plaintiff Weare has felonies from Arizona, where he completed all carceral and supervisory terms of sentence. *Id.* ¶ 42. The only COR-issuing authority under Tenn. Code Ann. § 40-29-202 from which Plaintiff Weare could reasonably request a COR, therefore, is the pardoning authority, but Governor Lee has not established any mechanism to request a COR. *Id.* Plaintiff Tournier was also convicted of felonies in Arizona, but completed his supervisory terms of sentence under TDOC supervision in Tennessee. *Id.* ¶ 43. When he requested a COR from a TDOC probation office, he was unlawfully refused, incorrectly told to fill out the top section of the form himself, and erroneously directed to a county official who would not have the necessary information to complete the rest of the form. *Id.* Indeed, both Plaintiffs contacted out-of-state officials to fill out their COR forms but only because Defendants' rights restoration process offers no mechanism to request a COR from one of the pardoning, incarcerating, or supervisory authorities listed in Tenn. Code Ann. § 40-29-202. *Id.* ¶¶ 42-43.[5] Defendants also provided no appeals process. *Id.* ¶ 84.

Finally, Defendants also incorrectly contend that Plaintiff Martin's injuries are "attributable to [her own] decisions—not to the State." Mot. at 5. After completing probation for a federal felony offense, Plaintiff Martin followed the same deficient process set out by Defendants on the COR and the State website. Compl. ¶¶ 44, 56. She received a COR form partially completed

---

[5] No Plaintiff is suing the Governor for failing to "exercise his discretionary power to grant clemency." Mot. at 4. Plaintiffs only raise the Governor's clemency powers to demonstrate that the Governor is "the pardoning authority" under the COR statute and therefore has a duty to issue CORs upon request pursuant to the statute. Compl. ¶¶ 42-43, 122.

13

by her federal supervisory authority, and then took the form back and forth between two court clerk's offices before finally getting the requisite information regarding her outstanding LFOs. *Id.* She then submitted the filled out COR to her county's Election Commission only to be denied and told to seek out the same information from the same officials all over again. *Id.* She would not have faced these "arbitrary and unjustifiable administrative roadblocks" but for Defendants' inexplicable policy of requiring COR applicants to direct their requests to various officials who have no explicit duty to issue CORs. *Id.* ¶ 57. Her fear that her COR will be denied after another round of Sisyphean effort does not "doom [her] claims," Mot. at 5, but rather is well founded based on her prior experience. Compl. ¶ 57. And Defendants have not provided an appeals process where Plaintiff Martin could turn. *Id.* ¶ 84. Plaintiff Martin's actions do not break the clear causal link between Defendants' inadequate process and her procedural and unequal-treatment injuries. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (noting that plaintiffs fail to meet the traceability standard by their own actions only if their injury is "so completely due to [their] own fault as to break the causal chain" (citation omitted)).[6]

In short, Defendants' traceability objections ignore allegations in Plaintiffs' complaint that draw a direct line from their injuries to Defendants' conduct. Plaintiffs satisfy Article III causation.

---

[6] With respect to Counts 4-7, Defendants do not, nor could they, contest traceability. As the chief election officer, Defendant Goins is responsible for coordinating implementation of the NVRA, including requirements related to voter registration forms. Compl. ¶ 17. Goins also has a duty to issue instructions for completion of CORs. *Id.* ¶ 151. Defendant Goins, under supervision of Defendant Hargett, implements the unlawful policy of rejecting all voter registration applications by applicants with felony convictions. *Id.* ¶¶ 49, 95. Neither Defendant Goins nor Hargett has issued rules, instructions, or policies barring the imposition of fees for filling out portions of a COR. *Id.* ¶ 151. TN NAACP's injuries underlying Counts 4-7 are thus directly traceable to Defendants Goins and Hargett.

**C. Plaintiffs' Requested Relief Would Redress Their Injuries.**

Plaintiffs also satisfy the redressability element of standing, which Defendants do not contest. An injury is redressable if "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" by providing "substantial and meaningful relief." *Parsons*, 801 F.3d at 715.

With respect to Counts 1-3, an injunction ordering Defendants to "implement constitutionally required safeguards" would provide substantial and meaningful relief for Plaintiffs. Compl. ¶ 43. As this Circuit has made clear, this requirement is met in cases alleging constitutional procedural injuries so long as "a favorable decision . . . puts Plaintiffs one step closer to regaining their [asserted rights]." *Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019). Here, the harm for which Plaintiffs seek redress is the lack of a constitutionally-sound process to determine entitlement to a COR. The remedy Plaintiffs seek—implementation of such a process— would plainly redress that injury. And that process would result in restoration of their voting rights. Should they somehow be denied, however, the process would still enable Plaintiffs to request CORs from the state officials with a statutory obligation to issue CORs, receive formal decisions based on uniform rules as well as reasons for denials, and appeal erroneous decisions. Plaintiffs, and those similarly situated, would indeed be several steps closer to vindicating their right to a COR. Moreover, this would redress the TN NAACP's injuries from having to divert limited organizational resources to assisting individuals through every step of the COR process and contesting unlawful refusals and erroneous denials along the way. *Browning*, 522 F.3d at 1166.

With respect to Counts 4-7, Plaintiffs' request for an injunction requiring Defendants Goins and Hargett to "create registration forms and policies that comply with the NVRA" and to cease "rejecting valid voter registration applications from eligible voters" would unquestionably cure

15

their injuries. Compl. at 44. Likewise, "requiring Defendant Goins to issue instructions prohibiting charging of administrative fees for the issuance of CORs" would likely end the poll tax endured by TN NAACP's constituents in Rutherford and other counties. *Id.*

For the above reasons, Plaintiffs satisfy the redressability requirement of standing and sufficiently allege Article III standing.

**D. There is no prudential bar to Plaintiff TN NAACP's claims.**

Defendants raise a cursory claim that even if TN NAACP satisfies Article III standing, which it does, this Court should not hear its claims because of prudential concerns. This argument is misplaced. Prudential discretion exists to ensure that the party has "appropriate incentive" to challenge a government action and can "do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). TN NAACP meets these standards.

To argue otherwise, Defendants misinterpret a case involving a voting-rights organization suing on behalf of nonmember third parties to mean that TN NAACP lacks a "close relationship" to its constituents. Mot. at 9 (quoting *Fair Elections Ohio*, 770 F.3d at 461). But *Fair Elections Ohio* is inapposite. Unlike *Fair Elections Ohio*, TN NAACP seeks to vindicate the rights and interests of its members and constituents, with whom it has a strong identity of interests, giving it the appropriate incentive to zealously represent them. Compl. ¶¶ 34-39. Moreover, the TN NAACP's interests and goals in this case are perfectly aligned with those third parties—all seek a COR process with adequate procedural safeguards and equal treatment as well as forms and policies that will allow eligible individuals to register to vote. *Supra* Parts I.A, C. The alignment of interests here is much stronger than what the Supreme Court has found as sufficient to satisfy prudential standing. *See e.g., Pierce v. Soc'y of Sisters,* 268 U.S. 510, 536 (1925) (finding plaintiff

schools, whose interest was in combating decreased enrollment, had standing to assert rights of potential students, whose interest was in freedom to choose the best educational institution).[7]

And contrary to Defendants' assertion, Plaintiffs have also alleged facts sufficient to show that there is a hindrance to individual TN NAACP members or constituents asserting their own interests. The Sixth Circuit has recognized that "systemic practical challenges to pursuing one's own rights" are a sufficient hindrance to allow for third-party standing. *Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017). Here, the hindrance consists of systemic practical challenges that arise from the nature of the violations. Individual members and constituents are thwarted at various points in the COR and registration process but are unlikely to know that their denials are unlawful or that they are part of a systemic procedural due process and equal protection violation. Plaintiffs have pled that Tennesseans seeking CORs are frequently turned away or denied without explanation, Compl. ¶¶ 63, 65-66, giving them no opportunity to evaluate whether the officials' ostensible assessment of their ineligibility was valid, *id.* ¶¶ 68, 72-73. Similarly, because the registration forms fail to accurately state the eligibility requirements to register, *id.* ¶ 88-93, an eligible person who is turned down is likely to accept a denial as an assessment of their eligibility from a place of authority.

Defendants cannot distinguish *Powers v. Ohio*, where the Supreme Court allowed a criminal defendant to raise the rights of prospective jurors against peremptory challenges because the prospective jurors had limited prospective relief, little stake in the systemic problems, and

---

[7] The Sixth Circuit and courts within it have repeatedly held that organizations have standing to bring suits to vindicate the rights of its members whose voting rights have been undermined. *See, e.g., Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004); *League of Women Voters of Mich. v. Johnson*, 352 F. Supp. 3d 777, 797-98 (E.D. Mich. 2018). In any case, this Court need not worry that directly impacted individuals are not adequately represented—there are five present in this case.

17

disincentive to assert their rights given the costs of litigation. 499 U.S. 400, 415 (1991). ("The reality is that a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights."). Here, even if an individual becomes aware that their rights are violated and even if they are willing to shoulder the economic burdens of litigation, they are unlikely to seek broader procedural relief. TN NAACP, as a service provider and membership organization, has the vantage point that its constituents lack to see these patterns for what they are—systemic violations.

The TN NAACP's has a close relationship and aligned interests with those whose rights it asserts, as such it is well-positioned to be a zealous advocate for those rights. Prudential standing is no bar to their claims.

## II.    Plaintiffs' Claims Are Not Barred by the Eleventh Amendment.

The Eleventh Amendment does not bar Plaintiffs' constitutional claims. As Defendants acknowledge, Mot. at 10, claims for prospective relief based upon constitutional violations are not barred by the Eleventh Amendment and may proceed under the *Ex Parte Young* exception. 209 U.S. 123 (1908). To determine whether *Ex Parte Young* applies, courts ask simply whether the plaintiffs have alleged a violation of federal law for which they seek prospective relief. "[T]he inquiry into whether suit lies under *Ex Parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002); *see also Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An *allegation* of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction.") (emphasis added). The Sixth Circuit has emphasized this point, explaining that "[t]he test for determining whether the *Ex Parte Young* exception applies is a 'straightforward' one" in which "[t]he court considers 'whether [the] complaint alleges an ongoing violation of

18

federal law and seeks relief properly characterized as prospective.'" *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008) (quoting *Verizon Md.*, 535 U.S. at 645).

This principle forecloses Defendants' Eleventh Amendment immunity argument. Defendants do not dispute that Plaintiffs have alleged that their conduct violates Plaintiffs' constitutional rights to due process, equal protection, and to be free of a poll tax, nor do they dispute that Plaintiffs seek only prospective relief. *See* Mot. at 10. Instead, Defendants raise two arguments. Neither has merit. First, Defendants contend that there is no liberty interest in voting, and thus Plaintiffs have no cognizable due process claim. *Id.* at 11.[8] This is not an immunity argument but a merits argument—precisely the kind the Supreme Court and the Sixth Circuit have held is an inappropriate consideration for adjudicating an Eleventh Amendment immunity defense. *See*, *Verizon Md.*, 535 U.S. at 646

Second, Defendants recast Plaintiffs' claims as actually alleging violations of state law, contending that the complaint thus runs afoul of *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). *See* Mot. at 12. But Plaintiffs do not bring any state law claims; rather they allege that Defendants have violated their federal constitutional rights. The fact that Defendants might *also* be violating state law does not bar Plaintiffs from raising their federal constitutional claims in federal court. While Defendants' state law violations provide factual background relevant to Plaintiffs' federal claims, Plaintiffs do not assert any state law *claims* in their complaint, and thus Defendants' *Pennhurst* argument is misplaced.

---

[8] Defendants raise an immunity defense to Counts 1, 2, 3, 6, and 7, *see* Mot. at 13, yet limit their argument in support to qualms with Plaintiffs' due process claims (Counts 1 and 2). Defendants offer no explanation for why the Eleventh Amendment would bar Counts 3, 6, and 7.

### III.    Plaintiffs Have Stated Valid Procedural Due Process Claims (Counts 1 and 2).

Plaintiffs have pled a straightforward procedural due process claim. Plaintiffs believe they are entitled to a COR, which in turn would grant them the right to vote again. This implicates both a state-created liberty interest in the COR itself and the associated constitutional liberty interest in the right to vote. Yet, Defendants' process to grant or deny Plaintiffs this liberty interest lacks any of the traditional safeguards required by the Due Process Clause, including, *inter alia*, access to an impartial decision-maker, a decision based on the legal rules, an explanation of the reasons for the decision, guidance to ensure uniform interpretation of the law, and an opportunity to be heard on appeal. Under the traditional *Mathews v. Eldridge* framework—which balances (1) the private interest affected by the official action, (2) the risk of erroneous deprivation through the procedures used and value of additional procedural safeguards, and (3) the Government's interest, 424 U.S. at 335—the COR process fails. Defendants do not contend otherwise but instead argue that *Mathews* should not apply at all. Because Defendants arguments all fail—particularly at the motion to dismiss stage—the Court should deny their motion to dismiss Plaintiffs' procedural due process claims.

Defendants argue that due process does not apply because the COR process does not involve a *deprivation* of rights but a *restoration* of rights. Mot. at 14-15. The Constitution is not so easily elided by word play. A person entitled to a mandatory COR because they meet the eligibility requirements but who is unable to obtain one because of an error-prone process without safeguards has been deprived of that statutory benefit and the accompanying right to vote. Defendants' attempt to evade constitutional scrutiny by simply "relabeling" things is "a sure sign that its . . . distinction is made-to-order." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010).

Likewise, Defendants' insistence that there is no "deprivation" because there is "no 'right' to re-enfranchisement," Mot. at 15, fails as a factual and legal matter.[9] First, it fails as a factual matter because the Tennessee COR statute *does* create an unambiguous right to re-enfranchisement for those who meet the COR eligibility requirements. Second, it fails as a legal matter because due process protections are often triggered when constitutional liberty interests are at stake in an adjudicative process even where the Plaintiffs have no constitutional *right* to the liberty interest in question.

### A. Plaintiffs Have Properly Pled a State-Created Liberty Interest in Obtaining a COR.

Defendants argue that Plaintiffs have no state-created liberty interest in the COR process. But in doing so, Defendants do not engage with the statutory text establishing a mandatory right to a COR for eligible Tennesseans. *See* Tenn. Code § 40-29-203(a) ("A person eligible to apply for a voter registration card and have the right of suffrage restored, pursuant to § 40-29-202, may request, and then *shall be issued*, a certificate of voting rights restoration[.]") (emphasis added). Nor do they engage with the Supreme Court's longstanding precedent that a liberty interest protected by the Due Process Clause "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see also Tony L. By & Through*

_____

[9] Defendants' citations in support of this proposition—that even if Plaintiffs' allegations of an unequal, inaccessible, opaque and error-ridden rights restoration process are true, "no procedural-due-process claim exists, because no 'deprivation' has occurred," Mot. at 15—are inapposite and misrepresented. Their citation to *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1289 (11th Cir. 2020) is to the concurrence of a single judge, not the majority opinion. In any event, Judge Lagoa does not suggest that rights restoration schemes never implicate procedural due process. Instead, she merely explains that in *Jones v. DeSantis,* the Eleventh Circuit held that procedural due process did not apply where the deprivation alleged derived from the statutory scheme itself rather than any failure of adjudicative process. 976 F.3d at 1289 ("'[T]he Supreme Court has long distinguished between legislative and adjudicative action' when deciding 'what the Due Process Clause requires.'") (quoting *Jones v. DeSantis*, 975 F.3d 1016, 1048 (11th Cir. 2020)). The distinction drawn in *Jones* only cements Plaintiffs' claims here.

*Simpson v. Childers,* 71 F.3d 1182, 1185 (6th Cir. 1995) ("Liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'" (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Plaintiffs have properly alleged a liberty interest created by the mandatory COR statute. State law-created liberty interests arise when a state places "substantive limitations on official discretion" by (1) "establishing 'substantive predicates' to govern official decisionmaking," and (2) "mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Tony L.*, 71 F.3d at 1185. The statutory scheme governing CORs plainly meets this test. *See* Tenn. Code § 40-29-202 (setting forth the criteria—i.e. final discharge from custody and supervision, payment of restitution, court costs, and child support—for obtaining a COR); Tenn. Code § 40-29-203(a) (mandating issuance of a COR—i.e. "*shall* be issued"—if eligibility requirements of section 202 are met); *accord Jasinki v. Tyler,* 729 F.3d 531 (6th Cir. 2013) (finding a state-created liberty interest where state law required that the department of child protective services "*shall* submit a petition for authorization" bringing the child within the jurisdiction of the court if the statutory conditions are met).

Defendants' *only* argument[10] that Plaintiffs have failed to plead a state-created liberty interest in the COR statute is their contention that state-created liberty interests are "limited to freedom from restraint." Mot. at 16 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). This arbitrary and atextual proposed rule is demonstrably false and contrary to this Circuit's precedent.

---

[10] In the state-created liberty interest section of their brief, Defendants also argue at length about whether the right to vote is a liberty interest arising from the First and Fourteenth Amendments. *See* Mot. at 17-18. But the question of state-created liberty interests is necessarily distinct from liberty interests that arise from the Constitution. Defendants' failure to analyze these different sources of liberty interests separately muddies the waters and leads their logic astray. Thus, Plaintiffs discuss Defendants' errors on this front in the corresponding section of their brief.

22

*See Meador v. Cabinet for Hum. Res.*, 902 F.2d 474, 477 (6th Cir. 1990) ("We find that these [Kentucky] statutes give the Meador children an entitlement to protective services of which they may not be deprived without due process of law."); *Jasinski*, 729 F.3d at 544 (finding a liberty interest in the child protection statutes in Michigan); *see also Marsh v. County of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012) (holding that state law created a liberty interest "not to have government officials engage in unwarranted reproduction of autopsy photographs or other death images of deceased relatives"); *Taylor By & Through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987) (finding a procedurally protected liberty interest for child safety in foster care).

Defendants' authority for this novel rule essentially boils down to a single district court opinion on a preliminary injunction, *Memphis A. Philip Randolph Institute v. Hargett* ("*MAPRI*"), and an out-of-circuit stay opinion that mimics *MAPRI*'s thin and flawed reasoning. Mot. at 16 (citing *MAPRI*, No. 3:20-cv-00374, 2020 WL 5095459 (M.D. Tenn. Aug. 28, 2020) and *Richardson v. Texas Sec'y of State*, 978 F.3d 220 (5th Cir. 2020)). This court should not follow the same ill-conceived path.

First, as demonstrated above, such a rule is fundamentally incompatible with this Circuit's precedent, which has recognized state-created liberty interests outside freedom of constraint. *See supra*; *contra Richardson*, 978 F.3d at 231 ("And the plaintiffs cite no binding authority indicating that state-created liberty interests exist outside the context of bodily confinement."). As such, it is unsurprising that on appeal, the Sixth Circuit did not affirm the district court's reading of the Due Process Clause but rather affirmed on distinct standing grounds. *MAPRI v. Hargett*, 978 F.3d 378, 382 (6th Cir. 2020) (affirming "the district court's order denying the plaintiffs' requested preliminary injunction on those claims, although we do so on a basis different from that relied on

by the district court"). The only judge to reach the merits, in dissent, disagreed with the district court's reasoning. *Id.* at 406 (Moore, J., dissenting).

*Second*, the reasoning in *MAPRI* and *Richardson* relies entirely on an acontextual and incorrect reading of *Sandin v. Conner*, 515 U.S. 472 (1995). *Sandin*, and other similar cases cited by *MAPRI* and *Richardson*, arise in a specific, and limited, context: prisoner litigation. Prisoner litigation requires a categorically different liberty-interest analysis given the liberty-depriving nature of imprisonment itself. *See, e.g., Bazzetta v. McGinnis*, 430 F.3d 795, 801 (2005) (noting that "[i]n evaluating a claimed liberty interest by prison inmates, courts are mindful that imprisonment necessarily carries with it the circumscription or loss of many significant rights" and "[p]risoners retain a residuum of constitutionally protected liberty" (emphasis added) (internal quotation marks omitted)); *see also id.* at 802 (noting that in *Sandin*, 515 U.S. at 481, the Court "significantly limit[ed] the authority of courts to find liberty interests stemming from positive state law *in the prison context*" (emphasis added)); *MAPRI*, 978 F.3d at 409 ("Sandin did not purport to displace the established standard for determining whether a state law establishes a liberty interest triggering due process requirements outside of the context of prison regulations.").[11]

---

[11] Indeed, the full sentence in *Sandin* relied on by *MAPRI* demonstrates that it is indeed a rule cabined to the prison context: "But these [state-created liberty] interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. By splicing the first half of the sentence from the second, the district court in *MAPRI* improperly exported a prison-specific rule to a general one. In doing so, it adopted a rule that makes no sense. Why would the same Due Process Clause grant a variety of state-created property interests protection while curtailing its protections for similar state-created liberty interests? *See, e.g., Potts v. Gobles Pub. Sch. Dist.*, 676 F. App'x 562 (6th Cir. 2017) (noting that Michigan's Teachers' Tenure Act creates a property interest in continuous tenure); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (noting that "State universities must afford students minimum due process protections before issuing significant disciplinary decisions," and that "[s]uspension 'clearly implicates' a protected property interest"). And why would the same Due Process Clause protect constitutional liberty interests outside freedom of constraint but not state-created ones? *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) ("Without doubt, [liberty guaranteed by the Fourteenth

24

Applying the appropriate *Tony L.* test for ascertaining state-created liberty interests, Tennessee's COR statute certainly qualifies. Thus, Plaintiffs have properly stated a claim upon which relief can be granted.

### B. Plaintiffs Have Properly Pled a Constitutional Liberty Interest in Restoration of Their Voting Rights.

Having shown a protected state-created liberty interest, Plaintiffs are not required to also show that a constitutionally protected liberty interest is also at stake. Nonetheless, they have and Defendants' arguments to the contrary fail.

First, the Supreme Court has routinely described the right to vote as among the liberties protected by the Fourteenth Amendment. *See Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968) (describing "the right of qualified voters . . . to cast their votes effectively" as one of "our most precious freedoms"); *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (describing the right to cast an effective ballot as one of two "interwoven strands of 'liberty'" interests at stake in voting rights cases) (citing *Williams*, 393 U.S. at 30-31); *see also Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973) (recognizing an associational right to vote that is subject to due process); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("It is beyond debate that the freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment."). Thus, when confronted with the question, it is unsurprising that courts have overwhelmingly held that the right to vote *is* protected by

_____

Amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, . . . ."). Nothing in the text of the Constitution, logic, or precedent allows this odd result. This Court should not repeat *MAPRI's* error.

procedural due process.[12] The district court's holding in *MAPRI* (upon which Defendants again heavily rely) is, once again, an outlier.

Second, the Sixth Circuit has never "held that the 'right to vote does not . . . implicate procedural due process.'" Mot. at 17 (quoting *Brunner*, 548 F.3d at 479).[13] Defendants' selective quotation from *Brunner* is misleading. The full sentence merely states that the allegations in *Brunner* about Ohio's voting system did not implicate procedural due process and that allegations sufficient to show a substantive due process violation may not be sufficient to show a procedural violation: "That Ohio's voting system impinges on the fundamental right to vote does not,

---

[12] This has largely arisen in the context of absentee voting and the need for accompanying procedural protections to ensure voters' ballots are not improperly cast aside. *See, e.g., Self Advocacy Sols. N.D. v. Jaeger,* No. 3:20-cv-00071, 2020 WL 2951012, at *8 (D.N.D. June 3, 2020) ("The signature matching requirement found in [North Dakota's code] is likely facially unconstitutional, insofar as the statutes fail—under all circumstances—to provide affected voters with notice and an opportunity to cure a signature discrepancy before a ballot is rejected."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) (holding that [h]aving induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted"); *Ariz. Democratic Party v. Hobbs*, No. CV-20-01143-PHX-DLR, 2020 WL 5423898 (D. Ariz. Sept. 10, 2020) (holding that plaintiffs "have a constitutionally protected liberty interest in having their ballots counted" because the state confers on its voters the right to vote absentee); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection."), *stay denied*, 918 F.3d 1262 (11th Cir. 2019).

[13] In order to hold that *Brunner* forecloses procedural due process claims related to voting, the *MAPRI* court erected a curious constitutional distinction between "liberty interests" that are cognizable for purposes of substantive due process and those that are cognizable for purposes of procedural due process. 2020 WL 5095459 at *9. Such a distinction finds no basis in the text of the Constitution. Both procedural and substantive due process protections arise from the single guarantee that the states shall not deprive someone of "liberty" without due process of law. U.S. Const. amend. XIV. Neither the district court, nor *Brunner*, on which it purportedly relied, provide any authority for the proposition that the definition of a single word in a single clause of the Constitution changes depending on which judge-made doctrine is applied. *Cf.* Antonin Scalia and Bryan A. Gardner, *Reading Law*, at 170-173 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text."). Indeed, it is irrational to say that a liberty interest that is so fundamental to our Constitution so as to create a substantive right to protection under the Due Process Clause is insufficiently important to also demand procedural protections before it is denied. Once again, this Court should not follow in the *MAPRI*'s mistaken footsteps.

26

however, implicate procedural due process, as alleged in count three of the amended complaint." 548 F.3d at 479. In *Brunner*, the plaintiffs alleged a panoply of errors in Ohio's election administration that led to disenfranchisement. The Sixth Circuit held that although the plaintiffs had stated a claim for violation of their fundamental right to vote under substantive due process, it did not follow that the failures of Ohio's voting system implicated procedural due process as well. *Id.* The panel explained that the plaintiffs had failed to allege "a constitutionally protected interest" but rather had "subsume[d] procedural due process into the substantive due process analysis" and only cursorily addressed the claim in their brief. *Id.*

At most, *Brunner* stands for the proposition that a liberty interest protected by procedural due process must be properly plead and briefed and cannot simply be derived ipse dixit from a substantive due process claim.[14] *See id.* Indeed, it is not surprising that the Court in *Brunner* was unable to identify the specific deprivation alleged to violate procedural due process in a case where the plaintiffs largely alleged widespread election administration errors. In that regard, *Brunner* is clearly distinguishable from this action, and thus not controlling. Here, Plaintiffs have adequately and specifically pleaded each element of their due process claim. *MAPRI*, 978 F.3d at 408 (noting that in *Brunner*, "plaintiffs' procedural due process claim duplicated those allegations of widespread error, rather than challenging particular facets of Ohio's voting system and identifying the procedural safeguards due process requires").

Third and finally, Defendants briefly suggest that even if the right to vote is a liberty interest protected by due process, it is not for people with convictions that have been lawfully

---

[14] The *Brunner* panel's discussion of the procedural due process claim is brief and does not cite any authority. 548 F.3d at 479. Only the most capacious reading of *Brunner* would lead to the conclusion that its four-sentence treatment of the plaintiffs' claim announced a novel legal determination that the "liberty interest in voting" is not a "constitutionally protected interest" for purposes of procedural due process. Mot. at 17.

27

stripped of that right. Mot. at 18. But this puts the cart before the horse with respect to a procedural due process claim. In *all* procedural due process claims, the question of whether the individual is ultimately entitled to the interest at stake is distinct from whether the interest itself triggers due process protections. *See Mathews*, 424 U.S. at 330 (noting that the plaintiff's procedural due process challenge was "entirely collateral to his substantive claim of entitlement"). There is no question that the right to vote is at stake here. That Tennessee is not *required* to restore the voting rights of Plaintiffs under the U.S. Constitution is of no moment. When it does dole out the right to vote to people with convictions, the restoration of that constitutional liberty is protected by the Due Process Clause. Thus, Plaintiffs have properly stated a claim upon which relief can be granted.

## IV. Plaintiffs Have Stated a Valid Equal Protection Claim (Count 3).

"A plaintiff may state an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016) ("*NEOCH*"); *see also Brunner*, 548 F.3d at 478. That is because, without statewide standards, election laws can be administered inconsistently across counties and impose arbitrary and disparate burdens on voters across a state. *See Bush v. Gore*, 531 U.S. 98, 106 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

Because Defendants have failed to provide statewide guidance as to even the most basic procedures for Tennessee's COR system—for example how CORs should be issued and which officials are responsible for that task—applicants are left to navigate a maze of haphazard systems and inconsistent ad hoc rules that differ in each county in order to get their rights restored and to register to vote. Compl. ¶¶ 130-31. This system clearly fails to meet the Equal Protection Clause's

"minimum requirement for nonarbitrary treatment" of would-be voters. 531 U.S. at 106. Defendants do not dispute Plaintiffs' account of the egregious failures of Tennessee's COR regime (nor could they at the motion to dismiss stage); instead, they argue that Plaintiffs' equal protection claim must fail because (1) local officials perpetrated the disparate treatment at issue here, not Defendants, Mot. at 21; and (2) there are no fundamental rights at stake here, Mot. at 22. Both arguments, however, must fail.

*First*, it is Defendants—not local officials—who deprive Plaintiffs of equal protection. In equal protection claims such as this one that arise under *Bush v. Gore*'s uniformity doctrine, the constitutional harm "inheres in the absence of specific standards to ensure [the] equal application" of a state's election law. *Bush*, 531 U.S. at 106. *Bush* itself is instructive. In *Bush*, the Court found Florida's recount in the 2000 Presidential Election to be unconstitutional because the State failed to provide counties with a uniform statewide standard to identify "legal votes." *Id.* As a result, recount procedures varied county-to-county, and voters whose ballots were contested were subjected to arbitrary and disparate treatment based on where they lived in violation of their right to equal protection. *Id.* at 107.

Similarly, here, Defendants have failed to provide statewide uniform standards and procedures to ensure the non-arbitrary treatment of COR applicants. *Id.* Without these necessary statewide standards, Plaintiffs will continue to be subject to ad hoc, arbitrary COR rules that vary county-to-county, and the COR system will lack "sufficient guarantees of equal treatment" for applicants across the state. *See id.*; *see also NEOCH*, 837 F.3d at 636 (finding local differences in administration of elections permissible because the "elections boards are guided by clear prescriptive statewide rules that apply equally to all voters"); *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 236 (6th Cir. 2011) (finding a ballot counting procedure unconstitutional

because election boards failed to "apply specific and uniform standards to avoid the 'nonarbitrary treatment of voters'").

*Second*, this case does implicate the fundamental right to vote. It is well-established that "[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Hunter*, 635 F.3d at 234 (quoting *Bush*, 531 U.S. at 104). Courts have repeatedly affirmed that equal protection applies in a breadth of electoral contexts, including voter registration, absentee and early voting, ballot counting and recount procedures, and ballot ordering statutes, among others. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (noting that the broad reach of equal protection is essential in the election context because "[e]ach provision of [an election] code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends'").

Again, *Bush v. Gore* is instructive. The Court was careful to explain that the right to vote in a presidential election is not guaranteed, but nonetheless, once that right is doled out, it must be allocated and implemented in accordance with Equal Protection. *Bush*, 531 U.S. at 104 ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States . . . [but w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental[.]"). Thus, "once a state legislature vests its citizens with election rights, those rights are fundamental and are protectable by the First and Fourteenth Amendments." *Stein v. Thomas*, 672 F. App'x. a565, 569-70 (6th Cir. 2016). If a state provides voters with means of participating in elections, such as absentee voting, states must

30

administer those means in a way that comports with the Constitution. *Id.*; *see also O'Brien v. Skinner*, 414 U.S. 524, 532 (1974).

Voter registration provides another helpful analog. States are not required to enact voter registration systems. However, once a state makes registration a prerequisite for voting, it must administer its registration system in a way that comports with the Constitution. In *Fish v. Schwab*, the Tenth Circuit found that a Kansas voter registration law that required documentary proof of citizenship violated applicants' equal protection rights because, under that system, thousands of otherwise eligible "would-be voters" had their applications denied and were unable to register to vote. 957 F.3d 1105, 1128 (10th Cir. 2020), *cert. denied*, No. 20-109, 2020 WL 7327906 (U.S. Dec. 14, 2020); *see also Browning*, 522 F.3d at 1186 (Barkett, J., concurring) (finding state's voter "registration scheme is 'not a process with sufficient guarantees of equal treatment' because it is completely devoid of specific standards to ensure that the right to vote is available equally to all potential voters").

Plaintiffs in this case, too, include otherwise eligible would-be voters. They have met the age, competency, citizenship, and completion of sentence requirements set out by Tennessee law. Tennessee's legislature has determined that, in order to become eligible voters, returning citizens must not only register to vote but also submit a COR. Defendants cannot then administer the COR system so as to arbitrarily deny them the opportunity to obtain the paperwork they need to register to vote using the means the State has seen fit to provide for them. *Cf. Stein*, 672 F. App'x. at 569-70 (finding that once the State has "granted [voters] a right to a recount . . . it [is] clear that the State could not use arbitrary or unreasonable procedural rules to make that right a nullity").

## V. Plaintiff TN NAACP Has Stated Valid Claims Under the NVRA (Counts 4 and 5).

TN NAACP has stated valid claims that Defendants have failed to comply with requirements of the NVRA. The NVRA requires states to "inform applicants . . . of voter eligibility requirements." 52 U.S.C. § 20507(a)(5). As part of this obligation, states must "specif[y] each eligibility requirement" for applicants on both the federal voter registration form and any state-issued registration forms. 52 U.S.C § 20508(b)(2)(A); *see also* § 20505(a)(2). The NVRA also requires states to "ensure that any eligible applicant is registered to vote" in Federal elections so long as they timely submit a "valid voter registration form." 52 U.S.C. § 20507(a)(1).

Defendants have unquestionably failed to live up to these obligations. First, Defendants have failed to provide Tennesseans with state and federal voter registration forms that contain sufficient, accurate information about voter eligibility. Compl. ¶¶ 88-93. Tennessee's felony disenfranchisement law is complicated, and does not universally disenfranchise voters for felony convictions. Tennessee's state-issued form, however, indicates that all felony convictions are disqualifying. *Id.* ¶ 91. Tennessee's federal form fares only slightly better, providing accurate but incomplete information that falls far short of the NVRA's requirement to inform voters of the specific eligibility criteria that applies in their state. *Id.* ¶ 92. Second, Defendants have created a system that rejects voter registration applications from voters with previous felony convictions, even if those convictions were not disqualifying. *Id.* ¶ 94-99. In order to appeal these erroneous denials, eligible applicants with previous convictions must submit additional paperwork proving their eligibility, delaying their application process and levying an additional documentation requirement on them in violation of the NVRA. *Id.* ¶ 100.

Contrary to the law of this Circuit, Defendants assert that TN NAACP lacks statutory authorization to bring claims under the NVRA. Mot. at 23. In *Harkless v. Brunner*, the Sixth

Circuit held that an organization suing under the NVRA could do so, noting that it could establish

its standing using either a diversion of resources theory or associational standing. 545 F.3d 445,

458-59 (6th Cir. 2008); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349,

1353 (11th Cir. 2005) (finding that a civic engagement organization had standing in its own right

to sue under the NVRA); *Ga. State Conference of N.A.A.C.P. v. Kemp,* 841 F. Supp. 2d 1320,

1334-35 (N.D. Ga. 2012); *Miller v. Blackwell*, 348 F. Supp. 2d 916, 920 (S.D. Ohio 2004); *Nat'l*

*Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845 (D.

Md. 2001).

Defendants also claim TN NAACP did not provide them with sufficient notice of their

legal violations. Mot. at 24. This is plainly untrue. In their August 22, 2018 violation notice, TN

NAACP informed Defendants that their failure to include specific voter eligibility criteria on

Tennessee's federal and state-issued registration forms violated the NVRA, specifically focusing

on the lack of information Defendants provided to voters about "the blanket exception for felony

convictions between January 15, 1973 and May 17, 1981" and "the limited list of offenses

punishable by disenfranchisement prior to January 15, 1973" on the forms. Ex. A (2018 NVRA

Letter) at 3. Whatever changes may have been made to the forms,[15] these issues persist and are the

basis of Counts 4 and 5 of this lawsuit. Defendants have had two and a half years to correct this

---

[15] Defendants assert that the registration form in Plaintiffs' complaint is outdated. Mot. at 25.
Plaintiffs, however, provided the Court with the state-issued registration form that was available
on Defendants' website and current at the time of filing. *See* Compl., Ex. B. Plaintiffs also have
reason to believe the older version of the form is still in wide use by election officials. Indeed, it
can still be found on the Secretary's website and is in distribution at the Davidson County Election
Office and the Elections Division itself. *See* "Tennessee Voter Registration Application," Tenn.
Sec'y of State, https://sos-tn-gov-files.s3.amazonaws.com/forms/ss-3010.pdf (last accessed Jan.
27, 2021 at 2:34 P.M. CT); Ex. B (2021 NVRA Letter) at 4. In any event, Defendants' assertion is
improper at this stage of the litigation, where Plaintiffs' factual assertions should generally be
taken as true. *Parsons*, 801 F.3d at 710. This is particularly important here, where Plaintiffs will
proffer evidence at the appropriate stage that the older form is still regularly utilized.

violation but have failed to do so. Plaintiffs have no obligation to provide them with further notice. *See Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (finding further notice was "futile" and not required because the state "already made clear its refusal to comply with the [NVRA]").

Defendants' second claim—that Plaintiffs did not raise the issue of Defendants' illegal policy of rejecting all forms submitted by individuals with felony convictions and of blocking those individuals from registering online—also holds no water. Defendants have not disputed the truth of Plaintiffs allegations or asserted they have had insufficient time to course correct. *Id.* at 838 (explaining the purpose of the NVRA's notice provision was to "provide states in violation of the Act an opportunity to attempt compliance"). The violations at issue in Count 5 also stem directly from the violations described in the 2018 NVRA letter, namely Defendants' failure to provide registration forms that correctly state the registration requirements and collect the information registrars need to determine whether a person who has been convicted of felony is eligible. Ex. A (2018 NVRA Letter) at 2-3; Compl. ¶ 92. Given the forms and website Defendants created, these rejections were all but inevitable. As such, the notice provided by TN NAACP in 2018 made Defendants aware of these problems and gave adequate time for them to address it.

Even if Count 5 were dismissed because of deficient notice, Plaintiffs have renewed their objections in a revised letter. *See* Ex. B (2021 NVRA Letter). Thus, if the Court agrees with Defendants, it should simply dismiss the allegedly inadequately noticed claims without prejudice so that TN NAACP can amend their complaint after the notice period has once again elapsed.

## VI. Plaintiff TN NAACP Has Stated a Valid Claim for an Undue Burden on the Right to Vote (Count 6).

Defendants again attempt to undermine Plaintiffs' legitimate and properly stated claim by asserting that it is founded on outdated forms and policy. Objectively, this is untrue; as stated

34

above, the so-called "old" form is still in use. See Ex. B (2021 NVRA Letter) at 4. Defendants also purport that Plaintiffs' allegation that the State rejects all voter registrations on which the applicant has checked the box indicating they have been convicted of a felony is unreasonable. Mot. at 27. Defendants do not deny, however, that this has been the State's policy, nor do they assert that this policy has actually changed; they only assert, insincerely, that the form has changed. *Id.* At the motion to dismiss stage, Plaintiff's allegations must be accepted at face value. If in fact, this is not Defendants' policy, they will have ample opportunity to prove it.

## VII.    Plaintiff TN NAACP Has Stated a Valid Poll-Tax Claim (Count 7)

Defendant Goins's arguments that TN NAACP fails to state a poll tax claim simply take a second bite at Defendants' misguided standing objections. Mot. at 28. As explained above, TN NAACP has adequately pleaded an organizational injury in fact on this claim because Rutherford County's unlawful policy requiring individuals requesting CORs to pay a fee directly impedes efforts of TN NAACP's Rutherford County chapter to restore its constituents voting rights in that county. *See supra* at 6. This injury is fairly traceable to Defendant Goins because court clerks rely on *his* instructions on the COR form when filling out CORs, but neither those instructions nor any policy prohibit the imposition of a fee for the completion of CORs. *See supra* at 12 (citing *Parsons*, 801 F.3d at 714). Defendants are correct to point out that TN NAACP does not allege that the COR "statute imposes a poll tax." Mot. at 29. But this has no real bearing on what TN NAACP *does* allege: that Defendants Goins and Harrell have administered the COR statutes in a manner that imposes an unconstitutional poll tax. Compl. ¶¶ 150-51. TN NAACP has stated a valid poll-tax claim.

## <u>CONCLUSION</u>

For the reasons articulated herein, the Court should deny the motion to dismiss.

Dated: January 27, 2021

Respectfully submitted,

/s/ Charles K. Grant

Keeda Haynes, BPR No. 031518
Free Hearts
2013 25th Ave. N,
Nashville, TN 37208
(615) 479-5530
keeda@freeheartsorg.com

Charles K. Grant, BPR No. 017081
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
211 Commerce Street, Suite 800
Nashville, TN 37201
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
cgrant@bakerdonelson.com
dgrant@bakerdonelson.com

Phil Telfeyan
Natasha Baker**
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
nbaker@equaljusticeunderlaw.org

Danielle Lang* BPR No. 86523
Mark P. Gaber*
Aseem Mulji*^
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
(202)-736-2200
Dlang@campaignlegal.org
Mgaber@campaignlegal.org
Amulji@campaignlegal.org

* Admitted pro hac vice
** Application for admission *pro hac vice* forthcoming
^ Licensed in CA only; supervision by Mark P. Gaber, a member of the D.C. Bar

*Counsel for the Petitioners-Plaintiffs and the Putative Classes*

36

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on January, 27,

2021 by operation of the Court's electronic filing system on the following:

Nicholas Clinton Christiansen, #30103
Janet M. Kleinfelter (BPR 013889)
Andrew B. Campbell (BPR 014258)
Matthew D. Cloutier (BPR 036710)
Kelley L. Groover (BPR 034738)

/s/ Charles K. Grant
Charles K. Grant