# **EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
_____

TENNESSEE CONFERENCE of
the NATIONAL ASSOCIATION
for the ADVANCEMENT of
COLORED PEOPLE, on behalf
of itself and its members,
et al.,

            Plaintiffs,


vs.               Civil Action No. 3:20-cv-01039

WILLIAM LEE, in his official
capacity as Governor of the
State of Tennessee, et al,


            Defendants.

_____

VIDEO DEPOSITION OF:

JUANITA SHAW

September 30, 2022

_____

BERES & ASSOCIATES
Licensed Stenographic Court Reporters
Post Office Box 190461
Nashville, Tennessee 37219-0461
(615) 742-2550
beresandassociates.com

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiffs:

 4   Ms. Blair Bowie
     Attorney at Law
 5   Campaign Legal Center
     1101 14th St. NW, Suite 400
 6   Washington, DC 20005
     (202)-736-2200
 7   bbowie@campaignlegal.org

 8

 9   Mr. Denmark J. Grant
     Attorney at Law
10   211 Commerce Street, Suite 800
     Nashville, TN 37201
11   Telephone: (615) 726-5600
     dgrant@bakerdonelson.com
12   LKroll@bakerdonelson.com

13

14   For the Defendants:

15   Mr. Pablo A. Varela
     Ms. Janet Kleinfelter
16   Attorneys at Law
     500 Dr. Martin L. King Jr., Blvd.
17   Nashville, TN 37243
     Pablo.Varela@ag.tn.gov

18

19   Also present:

20   Chris Massey and Charles Powell, Videographers

21   _____

22

23

24

25
```

BEBES & ASSOCIATES COURT REPORTERS

```
 1                        INDEX

 2

 3     Examination by Ms. Bowie ..............   6
       Examination by Mr. Denmark .............  71
 4     Re-Examination by Ms. Bowie ...........   83

 5
```

```
 6     Exhibit A        "Complaint for ...........   9
                        Declaratory and
 7                      Injunctive Relief"
       Exhibit B        COR Form ................  28
 8     Exhibit C        "Restoration of .........  86
                        Offender Voting Rights"
 9     Exhibit D        1/13/22 email from ......  101
                        Mr. Goins to Mr. Roberts
10     Exhibit E        6/17/22 email from ......  101
                        Mr. Goins to Mr. Roberts
11     Exhibit F        Alexander COR Form ......  105
       Exhibit G        Emails and COR Forms ....  105
12                      pertaining to Henry Wells
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

BERES & ASSOCIATES COURT REPORTERS

```
 1                    The video deposition of Juanita

 2   Shaw, taken on behalf of the PLAINTIFFS, at 10:05

 3   A.M., on the 30th day of September, 2022, for all

 4   purposes under the Tennessee Rules of Civil

 5   Procedure, to be used for ALL PURPOSES, in the

 6   above-styled cause, before Katy Beres Melcher, Court

 7   Reporter, at 211 Commerce Street, Suite 800,

 8   Nashville, Tennessee in accordance with the

 9   following stipulation.

10

11   _____

12

13                 S T I P U L A T I O N

14

15                    The formalities as to notice,

16   caption, certificate, transmission, et cetera, are

17   expressly waived.

18                    It is agreed that Katy Beres

19   Melcher, being a Licensed Court Reporter for the

20   State of Tennessee may swear the witness remotely.

21

22               ***      ***      ***

23

24

25
```

```
 1        THE VIDEOGRAPHER:  Here begins the
 2   deposition of Juanita Shaw in the matter of
 3   Tennessee Conference of the National
 4   Association for the Advancement of Colored
 5   People on behalf of itself and all its members,
 6   et al. versus William Lee in his official
 7   capacity as Governor in the State of Tennessee,
 8   et al.  This case is pending in the United
 9   States Court for the Middle District of
10   Tennessee.  The civil action number is
11   3:20-CV-01039.
12        Today's date is September 30th, 2022, and
13   the time on the video monitor is 10:05.  The
14   video operator today is Charles Powell.  This
15   video deposition is taking place at Baker
16   Donelson, 1600 West End Avenue, Suite 2000
17   Nashville, Tennessee 37203.
18        Counsel, please identify yourselves and
19   state whom you represent.
20        MS. BOWIE:  Blair Bowie, counsel for
21   Plaintiffs.
22        MR. GRANT:  Denmark Grant, counsel for
23   Plaintiffs.
24        MR. VARELA:  Pablo Varela and Janet
25   Kleinfelter for the Defendants.
```

BERES & ASSOCIATES COURT REPORTERS

```
 1          THE VIDEOGRAPHER:  Would the court
 2      reporter please swear in the witness.
 3                      - - -
 4
 5                  JUANITA SHAW,
 6  having been first duly sworn, testified as follows:
 7  EXAMINATION BY MS. BOWIE:
 8      Q    Okay.  Good morning.
 9      A    Good morning.
10      Q    How are you today?
11      A    I'm well.
12      Q    All right.  Well, thanks for coming down
13  here.  Again, my name is Blair.  I'm representing
14  the Plaintiffs in this case.
15              So, I'm going to go over just some
16  instructions before we start just so we can set some
17  ground rules and you know what to expect.  But
18  before we begin, I want to tell you why we have
19  asked you here, and I want to be clear it's not
20  because we think you have done anything wrong.  You
21  know, in fact, we know you have been really helpful
22  to folks who are trying to restore their voting
23  rights.  We have asked you here because we are
24  trying to establish some facts around the
25  Certificate of Restoration process, and we know you
```

```
 1   know that process.  So, we want you to help us put
 2   some things on the record, okay?
 3        A    Okay.
 4        Q    All right.  Have you ever sat for a
 5   deposition before?
 6        A    No.
 7        Q    Okay.  So, first time.  All right.  So,
 8   I'll go over the rules just so you understand what
 9   it's like.  So, obviously, I'll be asking you some
10   questions.
11             The court reporter is going to be
12   transcribing everything that you say.  So, to make
13   things easy on her, I want us to try not to speak at
14   the same time.  So, if you are talking, I'll try to
15   be quiet and wait until you finish, and if you could
16   do the same for me, that would be great.  Same when
17   the counsel for the State is speaking.  And just
18   make sure that she can get everything on the record.
19   Just try to please answer everything out loud with
20   words, not nodding or shaking your head or anything
21   like that.
22             If you don't understand a question
23   for any reason, just let me know and I'll try to
24   rephrase it.  If you do answer it, I'll assume that
25   understood the question.  You might hear the
```

1  attorneys for the State object.  They are doing that

2  to put the objection on the record, but you should

3  still answer the question.

4              If you need a break at anytime, you

5  need water, you need coffee, just let us know.

6  We're happy to accommodate that.  I'm hoping we can

7  keep this relatively short.  Does that sound good?

8      A    Sounds great.

9      Q    Okay.  Do you understand that you are

10  under oath today?

11      A    I do.

12      Q    Okay.  And is there any reason why you

13  cannot give truthful answers to any questions today?

14      A    No.

15      Q    Okay.  Are you taking any medications that

16  impair your memory?

17      A    No.

18      Q    Do you have any conditions that impair

19  your memory?

20      A    No.

21      Q    Okay.  Could you please state and spell

22  your full name for the record.

23      A    Juanita Shaw, J-U-A-N-I-T-A S-H-A-W.

24      Q    Thank you.  Before you were asked to

25  testify today, have you -- had you heard about this

1  lawsuit?

2       A    No.

3       Q    Okay.  And since you have been asked to

4  testify, have you become familiar with any of

5  the details of this lawsuit?

6       A    No.

7       Q    Okay.  Well, I'm going to give you

8  something now.

9            MS. BOWIE:  Please mark this as Exhibit A.

10  (The above-referred to document was thereupon marked
   Shaw Exhibit A, and is attached hereto.)

11

12  BY MS. BOWIE:

13       Q    If you could, would you just read the

14  beginning of the caption up at the top here.  So

15  that's starting with the "Tennessee Conference of

16  the National Association for the Advancement of

17  Colored People."

18       A    Okay.  So you want me to read the --

19       Q    Yeah, I just want us to get familiar --

20       A    Okay.

21       Q    -- so we're on the same page.

22       A    "Tennessee Conference of the National

23  Association for the Advancement of Colored People,

24  on behalf of itself and its members, and Lamar

25  Perry, Curtis Gray Jr., John Weare, Benjamin

1  Tournier, and Amanda Lee Martin, for themselves and

2  those similarly situated."

3      Q    Okay.  Thank you.  And then you can just

4  read to yourself the Defendants there.

5      A    Okay.

6      Q    Okay.  And could you read the title for

7  the document please.  You can just read it to

8  yourself.

9      A    (Witness complies.)

10     Q    And then, if you don't mind, over on Page

11 2, would you read paragraph 2 out loud.

12     A    "The primary pathway to voting rights

13 restoration in Tennessee is a Certificate of

14 Restoration of Voting Rights ("COR").  Tennessee law

15 makes clear that an individual who meets certain

16 criteria-including completion of sentence and

17 certain legal financial obligations-has a statutory

18 right to a COR.  The legislature intended the COR

19 system to streamline and make uniform and objective

20 the voting rights restoration process, which had

21 previously primarily depended on judicial

22 discretion.  The legislature assigned Defendants

23 responsibility for managing the COR process.  But

24 due to Defendants' failure to administer the law

25 properly, the process is far from streamlined,

```
 1   uniform, or objective.  It is opaque, decentralized,
 2   inaccurate, and inaccessible."
 3        Q    Thank you.  Are you familiar with any of
 4   the Plaintiffs in this case that are listed on the
 5   first page?
 6        A    I don't believe so.
 7        Q    Okay.
 8        A    Not that I'm -- no.
 9        Q    Okay.  And if you don't mind skipping to
10   paragraph 122, and that's going to be on Page 36.
11        A    Okay.
12        Q    Would you -- you can just read that to
13   yourself.
14        A    Okay.
15        Q    Thank you.  And then, at the very end on
16   Page 45, can you look this over and just let us know
17   if you are familiar with any of the folks on this
18   page.
19        A    I am familiar with Keeda Haynes.
20        Q    Okay.  How do you know Ms. Haynes?
21        A    Ms. Haynes is a representative of the Free
22   Hearts organization.
23        Q    Uh-huh.  And how do you know Free Hearts
24   organization?
25        A    I came to know Free Hearts organization
```

```
1   during the 2020 election year.

2        Q    Okay.  In what capacity?

3        A    As a probation parole manager.

4        Q    Yeah.  And what -- what kind of work have

5   you done with Free Hearts or --

6        A    So, I've assisted with preparation of

7   CORs.

8        Q    Okay.  So, it's your understanding that

9   Free Hearts helps people get their Certificates of

10  Restoration?

11       A    Correct.

12       Q    Okay.  Thank you.  Um, so, have you ever

13  been asked to, um, produce or review any documents

14  for this case?

15       A    No.

16       Q    Okay.  So you have not been asked to

17  search for or produce any records pertaining to

18  Certificates of Restoration for this case?

19       A    No.

20       Q    Okay.  And you have not been asked to

21  search for or produce any communications like emails

22  for this case?

23       A    No.

24       Q    Okay.  How did you prepare for this

25  deposition today?
```

```
 1        A     I didn't.
 2        Q     Okay.  That's totally fine.  So, did you
 3   discuss this deposition with anyone else?
 4        A     No.
 5        Q     Okay.  How did you find out that you were
 6   being asked to sit?
 7        A     I received an email.
 8        Q     Okay.
 9        A     Email notification.
10        Q     Okay.  Who was that email from?
11        A     I believe the email may have come
12   from -- I think his name is Brice.  He may be the
13   legal assistant counsel for our department.
14        Q     Okay.
15        A     I believe.  I'm really not -- yeah, I'm
16   not sure.  I know he was included in the email.
17        Q     Okay.  Got it.  And did you discuss this
18   deposition with your supervisor?
19        A     Well, I made her aware.  Once I received
20   the email, I forwarded the email to her.
21        Q     Got it.
22        A     And so -- yeah.
23        Q     But you didn't discuss any of --
24        A     No.
25        Q     -- the topic of it or anything?
```

```
 1        A     No.

 2        Q     Okay.  All right.  And you haven't

 3   reviewed any documents to prepare for this?

 4        A     No.

 5        Q     Okay.  Anything else that you might have

 6   done to prepare for this deposition?

 7        A     No.

 8        Q     All right.  All right.  Well, let's --

 9   let's change topics --

10             MR. VARELA:  Just for the record, she has

11          discussed this with counsel but beyond that --

12             MS. BOWIE:  Yes, I understand that.

13             MR. VARELA:  Just to clarify that.  Beyond

14          that, she hasn't.

15             MS. BOWIE:  Okay.  Thanks, Pablo.

16   BY MS. BOWIE:

17        Q     All right.  Let's turn to your

18   professional and educational background, if you

19   don't mind.  Can you please start by describing or

20   summarizing your educational background.

21        A     My educational background consists of I

22   have a bachelor's degree in criminal justice,

23   master's degree in criminal justice administration

24   and that's pretty much it.

25        Q     Okay.  And when did you start working at
```

1    the Tennessee Department of Correction?

2        A    I started working for Tennessee Department

3    of Correction maybe March of 1999.

4        Q    Okay.

5        A    So, yeah.

6        Q    Awhile back?

7        A    Well, the department has merged.  So, it

8    was once BOPP.  Now it's one department, so, yeah.

9        Q    Got it.  And so when you started, just to

10   be clear, were you working for Department of

11   Correction or BOPP?

12       A    TDOC.

13       Q    Got it.  And what position did you hold

14   there when you began working?

15       A    So when I was first hired, I, um, started

16   as a correction officer.

17       Q    Okay.  And what were your duties in that

18   role?

19       A    Um, my job responsibility would have been

20   to provide security for, um, a group of inmates in

21   housing units, just various tasks, um, clerical

22   tasks, just all depending --

23       Q    Okay.  Got it.

24       A    -- on what was needed.

25       Q    How long were you in that role?

```
 1      A     I was there for maybe six years.

 2      Q     Okay.

 3      A     Six -- six years.

 4      Q     While you were in that role, did you have

 5   any responsibilities that pertained to the

 6   restoration of voting rights?

 7      A     No.

 8      Q     Okay.  And did you hold any other

 9   positions before you started working at TDOC?

10      A     Um, with -- no.  I have had other jobs

11   prior to working with TDOC.  I've had multiple jobs.

12   So, I mean, do you want me to list all of the jobs I

13   have had?

14      Q     Any that are relevant to correctional

15   work?

16      A     Well, none are relevant.

17      Q     Okay.  And so, after that first position

18   as a correction officer, what was the trajectory of

19   your career with TDOC?

20      A     So, I left the correctional position in

21   July of 2005 and joined BOPP, which would have been

22   the Board of Probation and Parole in 2005.  And I've

23   been there ever since.

24      Q     Okay.  And what positions have you held

25   with BOPP?
```

```
 1        A      Probation Officer One, Probation Officer

 2   Two, Probation Officer Three, Probation Parole

 3   Manager.  I served as an Interim Director.

 4        Q      And does One, Two, and Three, do those

 5   designate levels of the position?

 6        A      It does, yeah.

 7        Q      Okay.  And in those roles, were you

 8   responsible for anything having to do with the

 9   restoration of voting rights of folks with felony

10   convictions?

11        A      As a probation parole manager, yes.

12        Q      Okay.  So, not as an officer but as a

13   manager?

14        A      Correct.

15        Q      And as an Interim Director, as well?

16        A      No.

17        Q      Okay.  Um, in your current position --

18   which is manager, correct?

19        A      Uh-huh.

20        Q      -- what are your duties?

21        A      So, my duties consist of, um, I have

22   oversight of a team of probation officers.

23        Q      Uh-huh.

24        A      I am the voters restoration coordinator

25   for my district.
```

```
 1        Q     Okay.

 2        A     Um, assist with just various tasks

 3   throughout the office but primarily provide an

 4   oversight for the probation officers, supervising a

 5   team of probation officers.

 6        Q     How many probation officers do you

 7   supervise?

 8        A     I currently have a team of five.

 9        Q     Okay.  And is that all of the officers at

10   your location or are there multiple teams there?

11        A     There are multiple teams.

12        Q     Okay.  So, in your role as voter

13   restoration coordinator for the district, would you

14   say that you are primarily responsible for issuing

15   Certificates of Restoration?

16             MR. VARELA:  Object to the form.

17   BY MS. BOWIE:

18        Q     You can answer.

19        A     I'm not primarily responsible.  Each

20   individual officer is responsible for completing a

21   voters restoration --

22        Q     Okay.

23        A     -- for their assigned cases.

24        Q     Do you issue any of the Certificates

25   yourself?
```

```
1        A    I don't issue the Certificates.  So, once

2   the Certificates are completed, they are submitted

3   to another agency.

4        Q    What agency is that?

5        A    The Criminal Court Clerk's Office.

6        Q    So, I'm going to come back to that, and

7   we'll talk more about that later.  But so, I just

8   want to be clear.  The officers that you supervise

9   fill out Certificate of Restoration?

10       A    Correct.

11       Q    And you also fill out Certificates of

12  Restoration?

13       A    I do.

14       Q    Okay.  Are there others in the office that

15  fill out Certificates of Restoration?

16       A    All managers, all officers.

17       Q    Okay.  And when you say that you are the

18  voter restoration coordinator for the district, what

19  does that mean?

20       A    So, basically what that means is that once

21  a Certificate is completed by an officer or a

22  manager, then those Certificates are then submitted

23  to me.

24       Q    Okay.

25       A    And -- and I keep the record of the
```

```
1    Certificates.
2        Q    Okay.  So you keep a copy of all
3    Certificates that are filled out?
4        A    Correct.
5        Q    Okay.  Do you also track those in any
6    other way besides keeping a copy of them?
7        A    No.
8        Q    Okay.  And when you say that you are the
9    voter restoration coordinator for the district, what
10   do you mean by the district?
11       A    So, Tennessee Department has multiple
12   districts.  Um, district -- the District 40 is the
13   middle region district.  That's the district that's
14   located in Nashville.  So, we have districts
15   throughout the state.
16       Q    And what geographical area does District
17   40 cover?
18       A    The middle region.  Well, the Nashville,
19   Davidson County area.
20       Q    Okay.  So just Davidson County?
21       A    Uh-huh.
22       Q    And all of Davidson County?
23       A    Correct.
24       Q    Okay.
25       A    Well, no, not all of Davidson County.
```

```
 1        Q    Not all.  Okay.
 2        A    Just Davidson County probation, Davidson
 3   County probation.
 4        Q    Right.  Geographically, all of Davidson
 5   but just probation?
 6        A    Well, we have a parole office in Davidson
 7   County, as well.  So, that's why I said --
 8        Q    Got it.
 9        A    -- Davidson County probation office, the
10   state probation office in Davidson County.
11        Q    Okay.  Thank you for clarifying that.  All
12   right.  And who is your supervisor?
13        A    Norisha Atkins.
14        Q    And do you know who her supervisor is?
15        A    Ian McCarty.
16        Q    Okay.  And what is Norisha's role?  What
17   is Ms. Atkins's role?
18        A    Norisha is the district director for
19   District 40.
20        Q    Okay.  And you said Ian McCarty?
21        A    Ian.
22        Q    Ann?
23        A    Ian.
24        Q    Ian, okay.
25        A    Ian McCarty.
```

```
 1        Q    And what is their role?

 2        A    Ian McCarty is the correctional

 3   administrator for the middle region.

 4        Q    Okay.  Thank you.  So, now I'm just going

 5   to talk a little bit more about the process

 6   of issuing Certificates of Restoration.

 7        A    Okay.

 8        Q    So, how long have you worked on

 9   Certificates of Restoration?

10        A    I'm going to say approximately four years.

11        Q    Okay.  And so, is that how long you have

12   been a manager?

13        A    No.

14        Q    Okay.

15        A    Um, yeah, no.

16        Q    So, when you were a manager before four

17   years, that just wasn't part of your job

18   responsibilities?

19        A    Correct.

20        Q    Okay.  So when you were delegated or

21   started taking on that role, what sort of training

22   did you receive?

23             MR. VARELA:  Object to the form.  You can

24        answer.

25
```

```
1   BY MS. BOWIE:
2        Q    You can still answer, yeah.
3        A    I didn't necessarily receive any training.
4        Q    Okay.  How did you figure out where to
5   begin?
6        A    Well, the COR is kind of self-explanatory,
7   you know, with basic information for the offenders.
8   So, it's based on information that's within our
9   database.  If it's not there, then, you know, there
10  are other realms that we go about to obtain that
11  information.  So, it wasn't any real training.
12       Q    Were you given any materials?
13       A    No.
14       Q    Okay.  Were you given any policies?
15       A    So, we, TDOC, has policies to address
16  everything that we do.
17       Q    Okay.  So you were given policies on
18  voting rights restoration?
19       A    The policies are available.
20       Q    The policies are available.  Were you
21  asked to look over those?
22       A    No.
23       Q    Okay.  Did you look over them?
24       A    I've read -- yes.
25       Q    Since then or when --
```

```
 1      A    No.

 2      Q    -- started?

 3      A    No.

 4      Q    Okay.  And did they give you -- or how

 5   were you given that role?  Let me ask it that way.

 6      A    I wasn't really given the role.  I kind of

 7   took the role on my -- I took the initiative to take

 8   on the role.

 9      Q    Okay.

10      A    So it wasn't really -- it wasn't delegated

11   to me or anything like that.  It was -- you know, I

12   would say that I'm probably one of the senior

13   managers in the office.  And so, you know, we used

14   to have someone else who handled voters restoration.

15   And I'm familiar with it, so I just took on the

16   process.

17      Q    Got it.  Who handled it before you?

18      A    Charlotte Mann.

19      Q    And how are you familiar with it?

20      A    How am I familiar with?

21      Q    How were you familiar with it when --

22   before you were working on it?

23      A    Well, I mean, we would have to go to

24   Charlotte Mann if there was a question about the

25   voters restoration.
```

BERES & ASSOCIATES COURT REPORTERS

1    Q    Okay.  And before you -- so were you

2 filling them out at the time then?

3    A    No.

4    Q    She was only filling them out?

5    A    Yes.

6    Q    Okay.  So, since then you now have your

7 own probation officers that you are supervising.

8 Have you trained them on how to fill out the

9 Certificates?

10    A    Yes.

11    Q    How do you do that?

12    A    Well, so basically when an offender -- if

13 the situation arises to where a COR is needed, then

14 officers will, you know, come to me, you know, and

15 I'll explain to them the process and how many need

16 to be completed, go through for which cases we

17 complete a COR, and so on and so forth.

18    Q    When does a situation arise that they need

19 to be completed?

20    A    Once an offender has successfully

21 completed supervision.

22    Q    And at that point, what happens?

23    A    A case closure process, a case closure

24 review is completed, the officer documents closing

25 the case, and documents completing a COR.  And then

1    Q    Okay.  Where did that come from?

2    A    I receive lists from Free Hearts, lists

3  from the representative with the Davidson County

4  Criminal Court Clerk's Office.

5    Q    Okay.  Have you received a list from

6  anywhere else?

7    A    No.

8    Q    Okay.  So we have covered, in terms of

9  requests, requests from the individual, requests

10  from sort of a non-profit or the organization that's

11  helping them, and requests from the clerks.  Are

12  there any other types of requests that you have

13  received or requests from other actors?

14    A    Not that I can recall.

15    Q    Okay.  Have you ever been asked to start a

16  Certificate by someone and determined that that

17  request was improper or coming from the wrong

18  person?

19          MR. VARELA:  Object to the form.

20          THE WITNESS:  I'm not aware of a time

21     where I've received such.

22  BY MS. BOWIE:

23    Q    Okay.  Do requests typically come in

24  writing?

25    A    Electronic maybe, email.

```
1        Q     Sometimes email?

2        A     Via email.  I don't ever receive a request

3   in writing, you know, unless you want to refer to an

4   email as in writing.

5        Q     Okay.  And if somebody calls on the phone,

6   do you make a record of that?

7        A     I do.

8        Q     Where do you make that record?

9        A     So, if it's a phonecall and I'm in my

10  office, then I'll take down information on a notepad

11  or a sticky note.

12       Q     Do you put that into an electronic

13  database anywhere?

14       A     No.

15       Q     Okay.  So a sticky note or a notepad.  Do

16  people ever come into the probation's office and ask

17  for a Certificate in person?

18       A     There has been some in the past, yes.

19       Q     Okay.  And is there a record created of

20  that?

21       A     So, if someone comes into the office, in

22  most cases they will either -- if I'm there, they

23  will reach out -- the front desk will call me and

24  will take down the individual's information.  And

25  so, again, I'll document the information on a sticky
```

```
1    note.  If I'm not there, the front desk will

2    document the information, and then they will send me

3    an email letting me know that someone -- the

4    individual has come in to request a copy of their --

5    or request their voters' rights application.

6         Q    Got it.  Do you save the sticky note after

7    you finish?

8         A    No.

9         Q    Okay.  So the sticky notes are a running

10   to-do list?

11        A    Correct.

12        Q    Got it.  I do that, too.  Okay.  And do

13   the officers that you supervise make a record of any

14   requests that they receive?

15        A    So, the officers don't receive requests.

16   I don't know that they receive requests.  That's

17   never been brought to my attention, that the

18   officers received a request.

19        Q    Okay.  So, do your officers directly meet

20   with probationers?

21        A    Yes.

22        Q    Okay.  So, you don't know of any instance

23   where the probationer has asked for their voting

24   rights restorations in a meeting?

25        A    Not to my knowledge.
```