# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE CONFERENCE OF THE** | ) | |
| **NATIONAL ASSOCIATION FOR THE** | ) | |
| **ADVANCEMENT OF COLORED** | ) | |
| **PEOPLE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 3:20-cv-01039** |
| | ) | |
| **v.** | ) | **Judge Campbell** |
| | ) | **Magistrate Judge Frensley** |
| | ) | |
| **WILLIAM LEE, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT .................................................................................................................. 7

    I.     Plaintiffs Lack Standing On All Six Causes Of Action ..................................... 7

          A.    The Individual Plaintiffs suffered no injury in fact in connection with Counts One through Three. ..................................................................... 8

          B.    The NAACP lacks organizational standing to bring Counts One through Six. ...... 9

    II.    Plaintiffs Have Not Been Deprived Due Process In Connection With Their Alleged Statutory Right To A Certificate Of Restoration. .............................. 14

          A.    Plaintiffs have no liberty interest in receiving restoration certificates. ............... 14

          B.    Plaintiffs received constitutionally adequate process in connection with whatever protected interests they may have. ........................................ 19

    III.   Plaintiffs Have Not Been Deprived Due Process In Connection With Their Alleged Constitutional Interest In The Right To Vote ..................................... 22

    IV.   Plaintiffs Have Not Been Denied Equal Protection Of The Law. ................... 22

          A.    The equal protection claim is subject to rational-basis review. ........................... 23

          B.    Tennessee's re-enfranchisement framework satisfies rational-basis review. ....... 24

    V.    Tennessee's Voter Registration Practices Comply with Federal Law. ........................... 26

          A.    Tennessee's voter registration forms adequately notify applicants about state voting eligibility requirements. ........................................................ 26

          B.    Tennessee ensures that eligible applicants are registered to vote. ........................ 29

    VI.   Tennessee Does Not Deprive Eligible Voters Of Their Right To Vote. ........................ 30

    VII.  The Court Should Grant Judgment For Defendants On The Requested Relief. ............. 31

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999)....................................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................................7

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
   570 U.S. 1 (2013)................................................................................................30, 34

*Armour v. City of Indianapolis*,
   566 U.S. 673 (2012)..................................................................................................25

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006)............................................................................................32, 34

*Bannister v. Knox Cnty. Bd. of Educ.*,
   49 F.4th 1000 (6th Cir. 2022) ...................................................................................12

*Bazzetta v. McGinnis*,
   430 F.3d 795 (6th Cir. 2005) ....................................................................................14

*Bd. of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972)..................................................................................................15

*Beaumont v. FEC*,
   278 F.3d 261 (4th Cir. 2002) ....................................................................................26

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
   239 U.S. 441 (1915)............................................................................................19, 20

*Bush v. Gore*,
   531 U.S. 98 (2000) (per curiam)..........................................................................23, 24

*Chao v. Hall Holding Co.*,
   285 F.3d 415 (6th Cir. 2002) .....................................................................................7

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1974)..............................................................................................11, 12

*City of Mayfield Heights v. Woodhawk Club Condo. Owners Assoc.*,
   205 F.3d 1339 (6th Cir. 2000) (per curiam) (unpublished) ....................................25

ii

*Clair v. N. Ky. Indep. Health Dist.*,
    239 F. App'x 997 (6th Cir. 2007) (per curiam) ................................................15

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...................................................................................................7

*Crawford v. Marion County Election Bd.*,
    553 U.S. 181 (2008)................................................................................................31

*Doe v. Mich. Dep't of State Police*,
    490 F.3d 491 (6th Cir. 2007) ................................................................................24

*E. Brooks Books, Inc. v. Shelby County*,
    588 F.3d 360 (6th Cir. 2009) ................................................................................24

*Esshaki v. Whitmer*,
    813 F. App'x 170 (6th Cir. 2020) (order) .............................................................32

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ................................................................................10

*Falls v. Goins*,
    --- S.W.3d ----, 2023 WL 4243961 (Tenn. June 29, 2023)..................1, 2, 5, 8, 9, 23

*Gaylor v. Hamilton Crossing CMBS*,
    582 F. App'x 576 (6th Cir. 2014) .........................................................................11

*Gojcaj v. Gonzales*,
    175 F. App'x 720 (6th Cir. 2006) (per curiam) ....................................................16

*Harvey v. Brewer*,
    605 F.3d 1067 (9th Cir. 2010) ..............................................................................22

*Hasanaj v. Detroit Public Schools Community District*,
    35 F.4th 437 (6th Cir. 2022) .................................................................................18

*Hawkins v. DeWine*,
    968 F.3d 603 (6th Cir. 2020) ................................................................................31

*Horne v. Flores*,
    557 U.S. 433 (2009).................................................................................................32

*Huron Valley Hosp., Inc. v. City of Pontiac*,
    887 F.2d 710 (6th Cir. 1989) ................................................................................21

*Hyman v. City of Louisville*,
    53 F. App'x 740 (6th Cir. 2002) ...........................................................................14

iii

*Johnson v. Bredesen*,
    624 F.3d 742 (6th Cir. 2010) ...............................................................22, 23, 24

*Jon Jon's, Inc. v. City of Warren*,
    700 F. App'x 436 (6th Cir. 2017) ..............................................................16

*Jones v. Governor of Florida*,
    975 F.3d 1016 (11th Cir. 2020) (en banc) ..............................................19, 20, 21

*Jones v. McKinney*,
    172 F.3d 48 (6th Cir. 1998) (unpublished) .............................................22

*Kaminski v. Coulter*,
    865 F.3d 339 (6th Cir. 2017) ..................................................................19

*Kerry v. Din*,
    576 U.S. 86 (2015) (plurality opinion) ..................................................16

*Lewis v. Casey*,
    518 U.S. 343 (1996)...............................................................................33, 34

*Liberty Coins, LLC v. Goodman*,
    748 F.3d 682 (6th Cir. 2014) ..................................................................24

*Lockhart v. Napolitano*,
    573 F.3d 251 (6th Cir. 2009) ..................................................................28

*Loft v. Stationary Eng'rs, Loc. 39 PTF, LLC*,
    87 F. Supp. 3d 1138 (N.D. Cal. 2015) ...................................................31, 32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................................8

*Lyng v. Payne*,
    476 U.S. 926 (1986)...............................................................................15

*Memphis A. Philip Randolph Institute v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) ..................................................................13, 14

*Ne. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ..................................................................31

*Neinast v. Bd. of Tr. of Columbus Metro. Library*,
    346 F.3d 585 (6th Cir. 2003) ..................................................................19

*Phillips v. McCollom*,
    788 F.3d 650 (6th Cir. 2015) ..................................................................14

*Pickney Bros., Inc. v. Robinson*,
   1999 WL 801514 (6th Cir. Sept. 30, 1999) (unpublished) .................................................. 20

*Racine Charter One, Inc. v. Racine Unified Sch. Dist.*,
   424 F.3d 677 (7th Cir. 2005) ............................................................................................ 25

*Reform Am. v. City of Detroit*,
   37 F.4th 1138 (6th Cir. 2022) ........................................................................................... 11

*Richardson v. Ramirez*,
   418 U.S. 24 (1974) ........................................................................................................... 33

*Sanderson v. Village of Greenhills*,
   726 F.2d 284 (6th Cir. 1984) ............................................................................................ 15

*Shelby Advocates for Valid Elections v. Hargett*,
   947 F.3d 977 (6th Cir. 2020) (per curiam) .................................................................. 11, 12

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*,
   641 F.3d 197 (6th Cir. 2011) (en banc) ............................................................................ 19

*Snowden v. Hughes*,
   321 U.S. 1 (1944) ............................................................................................................. 21

*Strehlke v. Grosse Pointe Pub. School System*,
   654 F. App'x 713 (6th Cir. 2016) ..................................................................................... 26

*Thompson v. Alabama*,
   65 F.4th 1288 (11th Cir. 2023) ..................................................................................... 27, 28

*Thompson v. DeWine*,
   959 F.3d 804 (6th Cir. 2020) (per curiam) ....................................................................... 32

*Thompson v. DeWine*,
   976 F.3d 610 (6th Cir. 2020) ............................................................................................ 32

*Tiwari v. Friedlander*,
   26 F.4th 355 (6th Cir. 2022) ........................................................................................ 22, 26

*Town of Chester v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ........................................................................................................... 7

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ........................................................................................................... 8

*Waeschle v. Dragovic*,
   576 F.3d 539 (6th Cir. 2009) ...................................................................................... 16, 22

v

*Walker v. Hughes*,
 558 F.2d 1247 (6th Cir. 1977) ................................................................15

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
 900 F.3d 250 (6th Cir. 2018) .................................................................9

*Wesley v. Collins*,
 791 F.2d 1255 (6th Cir. 1986) ...............................................................22

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990)................................................................................8

*Wilson v. NLRB*,
 920 F.2d 1282 (6th Cir. 1990) ...............................................................32

*Wojcik v. City of Romulus*,
 257 F.3d 600 (6th Cir. 2001) .................................................................16

*Women's Med. Prof'l Corp. v. Baird*,
 438 F.3d 595 (6th Cir. 2006) .................................................................15

**Statutes**

52 U.S.C. § 20501................................................................................26

52 U.S.C. § 20505................................................................................29

52 U.S.C. § 20507........................................................................26, 27, 29

52 U.S.C. § 20508........................................................................26, 27, 28

Tenn. Code § 2-19-143 ...................................................1, 8, 9, 10, 18

Tenn. Code § 40-29-202 .................................................1, 8, 9, 10, 17

Tenn. Code § 40-29-203 ...............................................1, 16, 23, 24, 25

# INTRODUCTION

Like most States, Tennessee disenfranchises convicted felons. But Tennessee also provides disenfranchised felons with an avenue to regain their voting rights once they serve their sentence and satisfy certain financial obligations. Re-enfranchisement exists as a matter of legislative grace—not constitutional imperative. And until recently, the procedures for re-enfranchisement "differ[ed] depending on the year in which the person was convicted." HB 1722, Summary (last visited August 2, 2023), https://wapp.capitol.tn.gov/apps/BillInfo/Default.aspx? BillNumber=HB1722&GA=104.

That changed in 2006 when the General Assembly enacted legislative changes to the re-enfranchisement process. In that legislation, the General Assembly vested specific officers with responsibility for issuing certificate-of-restoration forms which disenfranchised felons need to regain the right to vote. Tenn. Code § 40-29-203(a). Once a disenfranchised felon has a restoration certificate, he or she must submit it to an administrative official who then transmits it to the Coordinator of Elections. *Id.* § 40-29-203(d). The Coordinator reviews the certificate to verify that it was issued in compliance with Tennessee law. *Id.*

Less than two months ago, the Tennessee Supreme Court issued its decision in *Falls v. Goins*, --- S.W.3d ----, 2023 WL 4243961 (Tenn. June 29, 2023). The Court clarified that to regain the right to vote in Tennessee, convicted felons must comply with *both* an exception to the prohibition on voting for individuals with felony convictions pursuant to Tenn Code Ann. § 2-19-143 and the additional requirements set forth in section Tenn. Code Ann. § 40-29-202. *Id*. at *6-8. In doing so, the Tennessee Supreme Court found that voting rights restoration statutes created a "two-step statutory process that is necessary to complete in its entirety before the right of suffrage is restored." *Id*. at *7. In other words, a individuals may only restore their right to vote by (1) obtaining a pardon or restoration of their full rights of citizenship, Tenn. Code Ann. § 2-19-143,

1

and (2) obtaining a certificate of restoration, Tenn. Code Ann. § § 40-29-201 through -205. *See Falls*, 2023 WL 4243961, at *7.

The plaintiffs in this case attack the constitutionality of the re-enfranchisement regime. Although they have not established their eligibility to receive restoration certificates, and in some cases they have not even *applied* for restoration certificates, they nevertheless claim a liberty interest in those certificates that is protected by the Due Process Clause. They also claim that the re-enfranchisement framework violates the Equal Protection Clause and that Tennessee's voter registration practices violate the Constitution and federal statutes.

None of those claims can survive summary judgment. To begin, the plaintiffs lack standing to bring any of the six causes of action alleged in the Amended Complaint. Neither the individual plaintiffs nor the organizational plaintiff have been injured in any legally cognizable way. Plaintiffs' standing deficiencies are especially problematic because they seek the forward-looking remedy of an injunction. Based on the evidence in the record, the plaintiffs have not and cannot demonstrate that they satisfy the injury-in-fact requirement created by Article III.

On merits, the plaintiffs' claims fare no better. Count One asserts that Tennessee has deprived the plaintiffs of their constitutionally protected liberty interest in receiving restoration certificates under state law without due process. But the plaintiffs have no legitimate claim of entitlement to restoration certificates because they have not proven they are *eligible* for those certificates. And in any event, they are not entitled to additional process in connection with whatever liberty interests they do have.

The other constitutional claims are likewise meritless. Concerning Claim Two, which alleges a deprivation of a constitutionally protected interest in the right to vote without due process, plaintiffs' claim fails as a matter of law because disenfranchised felons have no fundamental right

2

to vote. Claim Three alleges that the defendants violate the Equal Protection Clause by administering the re-enfranchisement statute inconsistently. But that claim is subject to rational-basis review, which the law as administered easily passes. The final constitutional claim, Count Five, alleges that Tennessee's voter registration practices deny eligible felons their constitutional right to vote. The discriminatory practices that the plaintiffs allege lack evidentiary support. There is no genuine dispute that Tennessee processes voter applications from felons in a manner consistent with federal law.

Next, the plaintiffs claim that Tennessee's voter registration forms and practices violate the National Voter Registration Act of 1993 ("NVRA"). In addition to the standing problems with those claims, the plaintiffs cannot muster enough evidence to prove that there is even a trialworthy dispute on the legality of Tennessee's forms and practices.

Finally, the plaintiffs seek sweeping injunctions that would effectively re-write Tennessee's re-enfranchisement system and its voter registration forms and practices. Those requested injunctions are improper as a matter of law.

For all those reasons, the court should grant summary judgment for the defendants on all the claims and on the requested relief.

## BACKGROUND

Plaintiffs include the Tennessee Conference of the National Association of the National Association for the Advancement of Colored People ("NAACP") and six disenfranchised felons acting on their own behalf and on behalf of a class of allegedly similarly situated individuals. (Amended Complaint, R. 102, PageID# 610.)

Plaintiffs assert six claims in the Amended Complaint:

> **Count One.** Plaintiffs allege that Defendants deprive the class of their constitutional right to procedural due process in connection with their statutory interest in obtaining certificates of restoration.

> **Count Two.**  Plaintiffs allege that Defendants deprive the class of their constitutional right to procedural due process in connection with their constitutional interest in the fundamental right to vote.
>
> **Count Three.**  Plaintiffs allege that Defendants subject the class to unequal treatment in violation of the Equal Protection Clause.
>
> **Count Four.**  Plaintiffs allege that Tennessee's voter registration forms violate the National Voter Registration Act.
>
> **Count Five.**  Plaintiffs allege that Tennessee's voter registration practices deprive eligible voter applicants of their constitutional right to vote.
>
> **Count Six.**  Plaintiffs allege that Tennessee's voter registration practices violate the National Voter Registration Act.

(Amended Complaint, R. 102, PageID# 648–57.)  The parties engaged in discovery, which closed on May 28, 2023.  (Joint Mot. to Amend Sched. Order, R. 125, PageID# 837–38; Order Granting Mot. in Part, R. 128, PageID# 847–48.)

On July 21, 2023, the Tennessee Secretary of State and the Division of Elections announced policy revisions for the processing of voter-registration applications for individuals with felony convictions before January 15, 1973, and for individuals with felony convictions between January 15, 1973, and May 17, 1981.  (Ex. 1, Goins Dec., at 1–4.)  The Division of Elections issued guidance to the county election commissions in Tennessee to provide clarity and avoid rejection of voter-registration applications for individuals who did not lose their voting rights.  (Ex. 2., Memo on Older Felonies, at 1.)  This guidance instructs county election commissions to process voter-registration applications for individuals in two categories: (1) individuals with pre-January 15, 1973, convictions that did not commit an infamous crime; and (2) individuals with convictions between January 15, 1973, and May 17, 1981.  (*Id.* at 1-2.)  The memorandum also provides a list of infamous crimes for the county election commissions to reference when reviewing a voter-registration application listing a pre-January 15, 1973, felony conviction.  (*Id.* at 2.)  The guidance further describes an updated Voter Registration Rejection

Appeal Form that allows an applicant to file an appeal from a denial of a voter registration application.  (*Id.* at 2; Ex.3, Rejection Appeal Form, at 1.)

Tennessee's voter-registration application provides the following information about applying to vote with a felony conviction:

> If you have had a felony conviction, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction.  To assist in processing your application, provide the required information in box 4 and any responsive documents you have.  For more information about this process, call 1-877-850-4959 or visit sos.tn.gov/restoration.

*Tennessee Mail-In Application for Voter Registration*, Tennessee Secretary of State, https://sos-tn-gov-files.tnsosfiles.com/forms/ss-3010.pdf (last visited July 23, 2021).  Box 4 of the voter-registration application is labeled "Felony Conviction," and it asks, "Have you ever been convicted of a felony?"  *Id.*  It provides a parenthetical explaining, "If expunged, answer 'no.'"  *Id.*  Then, the form provides check boxes for "Yes" and "No."  *Id.*  It further states, "If yes, provide the following information (if known)."  *Id.*  Then, the form provides space for the applicant to list the crimes, dates, and place relating to the felony conviction.  *Id.*  Additionally, the form asks, "Have you received a pardon or had your voting rights restored?"  *Id.*  Immediately following, the form provides check boxes for "Yes" and "No."  *Id.*  Adjacent to the check boxes is an instruction stating, "If yes, provide copy of document."  *Id.*  The form requires an oath or affirmation and a signature of the applicant.  *Id.*  On the "Go Vote TN" online registration portal, an applicant cannot continue to fill out the voter-registration application after checking "Yes" in response to the felony question.  (Ex. 3, Lim Dep., at 163.)  However, the individual will be automatically directed to use the paper voter-registration application.

On July 21, 2023, the Tennessee Secretary of State and the Division of Elections also announced policy revisions regarding the certificate-of-restoration process.  (Ex. 1, Goins Dec., at 1-4.)  Based on the Tennessee Supreme Court's decision in *Falls v. Goins*, No. M2020-01510-SC-

R11-CV, 2023 WL 4243961 (Tenn. 2023), policies were revised to require applicants for certificates of restoration to follow new procedures:

> A person convicted of a felony in a Tennessee court, an out-of-state court, or a federal court must:
>
> 1. Have been pardoned by a Governor, U.S. President, or other appropriate authority of a state _or_ have had full rights of citizenship restored as prescribed by law, **and**
>
> 2. Have paid all restitution to the victim or victims of the offense order by the court as part of the sentence, if any; **and**
>
> 3. Have paid all court costs assessed, if any, unless the court made a finding of indigency; **and**
>
> 4. Is current in all child support obligations, if any.

(Ex. 5, COR Memo, at 1.) Additionally, the certificate-of-restoration form has been updated to reflect this policy change. (Ex. 7, COR Form, at 1.) The Division of Elections also issued a frequently asked questions document to further inform Tennesseans. (Ex. 6, FAQs, at 1.)

The NAACP assists individuals with voter restoration or voting registrations, regardless of whether the individual requesting assistance is a member of the NAACP. (Ex. 4, Morris Dep., at 10-11.) The NAACP goes to events and sets up a table to do voter registration. (_Id._ at 27.) The table is staffed with a NAACP member who volunteers to work the event. (_Id._ at 27.) The NAACP has a tablet at their table where an individual can use Tennessee voter-registration online portal to register to vote. (_Id._ at 28.) However, if an individual is unable to use the tablet to register to vote and the individual discloses that they need information about voting rights, the NAACP provides them with a worksheet created by the Free Hearts organization and a certificate-of-restoration form. (_Id._ at 29, 33.) The NAACP noted that the costs associated with a voter-registration event are only the volunteers' time and the gas getting to the location. (_Id._ at 66.) The NAACP also holds public education workshops on the certificate of restoration process, where they disseminate

6

publicly available information.  (*Id.* at 61-63.)  The NAACP has only held two workshops, and the noted expenses were time and gas money.  (*Id.* at 62.)

However, the NAACP does not keep track of whether any of its members have a felony conviction or document the voting status of its members.  (*Id.* at 24.)  More specifically, the NAACP does track if members were convicted of a felony during the grace period.  (*Id.* at 60.)

## STANDARD OF REVIEW

Summary judgment is appropriate when a party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial.  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  The non-moving party "must do more than show that there is some metaphysical doubt as to the material facts;" rather, it must "present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment."  *Id.*  A fact is "material" if it might affect the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If a reasonable juror could not return a verdict for the non-movant, the Court should grant summary judgment.  *Id.* at 251–52.

## ARGUMENT

## I.     Plaintiffs Lack Standing On All Six Causes Of Action

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  One case-and-controversy requirement is that plaintiffs must establish they have standing to sue.  *Id.*  The burden to establish standing reaches "each claim" that plaintiffs assert along with "each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  Plaintiffs lack standing to bring any of their claims or to secure the relief that they seek.

7

**A.  The Individual Plaintiffs suffered no injury in fact in connection with Counts One through Three.**

The Supreme Court has established three elements that Plaintiffs must satisfy to meet the constitutional requirements for standing.  First, Plaintiffs must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quotation and internal quotation marks omitted).  Second, they must establish "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] some third party not before the court.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation omitted).  Third, they must show a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quotation omitted).

The Tennessee Supreme Court recently clarified the process that felons must go through to restore their voting rights.  In *Falls v. Goins*, --- S.W.3d ----, 2023 WL 4243961, at *6 (Tenn. June 29, 2023), the court interpreted two statutory provisions addressing the same subject—the restoration of voting rights for felons.  The court held that, to regain the right to vote under Tennessee law, felons generally must go through a two-step process.  *Id*. at *7.  First, they must comply with Tenn. Code Ann. § 2-19-143 by securing an order restoring their rights of citizenship—at least, if they have not been pardoned.  But that alone is insufficient for felons to regain their voting rights.  Under *Falls*, felons must also obtain a certificate of restoration under Tenn. Code Ann. §§ 40-29-202 through -205 before they may vote.  *Id*.  A felon cannot vote until both steps are complete.

None of the individual plaintiffs complied with the first step of the process.  As described in *Falls*, plaintiffs must have their full citizenship rights restored or receive a pardon.  The

8

undisputed material facts are that, at the time the Amended Complaint was filed, the individual plaintiffs had not been pardoned or had their full rights of citizenship restored for all their convictions. (Amended Complaint, R. 102, PageID# 621-26; Ex. 8, Weare Dep. at 1-56; Ex. 9, Tournier Dep., at 1-74; Ex. 10, Scott Dep., at 1-97; Ex. 11, Perry Dep., at 1-50; Ex. 12, Hendrix Dep., Vol. I and II, 1-73; Exhibit 13, Gray Dep., at 1-35 ).[1]

Because the individual plaintiffs are not eligible for restoration of the right to vote, they lack standing to assert Claims One through Three and their injuries are conjectural and hypothetical. They have not shown that they suffered an injury in fact or are substantially likely to suffer one. They have not been deprived of the right to have their right to vote restored because they are ineligible for restoration, *Falls*, 2023 WL 4243961 at *7 ("Reading sections 2-19-143(3), 40-29-201, and 40-29-202 *in pari materia* creates a two-step statutory process that is necessary to complete in its entirety before the right of suffrage is restored."), and because they are ineligible to vote. They have not satisfied the requirements of Tennessee Code § 2-19-143. Nor have Plaintiffs shown any substantial likelihood that they will be injured by the application of § 40-29-202—and thus could receive relief under this lawsuit—when they have not shown that they have first fulfilled the requirements of § 2-19-143. Any injury is thus remote, contingent, and hypothetical. It is not concrete, actual, or imminent.

### B. The NAACP lacks organizational standing to bring Counts One through Six.

An organizational plaintiff must follow "th[e] same black-letter rules" that apply to individual plaintiffs. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018). The NAACP does not satisfy those rules for any of the six causes of action.

---

[1]  While John Weare had his citizenship rights restored with regard to one of his convictions, he has not had his citizenship rights restored for both of his convictions. (Ex. 8, Weare Dep., at 50.)

### 1. The NAACP cannot show an injury in fact sufficient to support standing on Claims One through Three.

The NAACP lacks organizational standing. Allegations of shifting resources from the certificate of restoration process to the restoration of citizenship rights or an alleged effect on its political power—as it asserts, (Amended Complaint, R. 102, PageID# 620-21)—do not demonstrate injuries that confer standing. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–61 (6th Cir. 2014) (holding that specific facts are required to support an injury due to diversion of resources at the summary judgment stage and that harm to abstract social interests do not confer standing). Nor has the organization shown that any of its members fully complied with Tennessee Code § 2-19-143 and then were deprived of a voting-restoration right due to an allegedly infirm application of Tennessee Code § 40-29-202. (*See* Ex. 4., Morris Dep., at 24-25, 44-66; Ex. 14, NAACP First Interrogatory Response, at 1-22; Ex. 15, Attachments to NAACP Third Interrogatory Response, 1-8; Ex. 16, NAACP Third Interrogatory Response, at 1- 15.) The NAACP consequently lacks standing to assert Claims One through Three.

### 2. The NAACP cannot show that an injury in fact sufficient to support its request for injunctive relief in connection with Counts Four through Six.

On Counts Four through Six, Plaintiffs seek to enjoin allegedly unlawful voter registration practices. At the pleadings stage, the court found that the NAACP had standing to bring these claims based on a diversion-of-resources theory of injury. The court accepted as true the NAACP's allegation that it was "injured when a person it helps register to vote is rejected despite being eligible because such denials cause it to divert significant time and resources to correct the error." (Memorandum Opinion, R. 83, PageID# 460.) But mere allegations do not establish injury at summary judgment. Because Plaintiffs cannot satisfy the injury requirements necessary for injunctive relief, the court should grant the Defendants judgment for lack of standing.

Plaintiffs seeking "the forward-looking remedy of an injunction," *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1148 (6th Cir. 2022), "must show a present ongoing harm or imminent future harm" to satisfy the injury-in-fact requirement, *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curiam). "The 'threat' of a prospective injury must be real and immediate and not premised upon the existence of past injuries alone." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (quotation omitted).

Although "[p]ast may be precedent," "the Supreme Court has not been sympathetic to claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct." *Shelby Advocates*, 947 F.3d at 981. The foundational case addressing standing in the context of injunctive relief is *City of Los Angeles v. Lyons*, 461 U.S. 95 (1974). There, the plaintiff sought to enjoin police officers who had committed past constitutional violations from doing so again. The Court held that the plaintiff could establish standing only if he alleged "(1) that *all* police officers in Los Angeles *always*" engage in the challenged misconduct, or "(2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105–06. But the plaintiff had nothing more than "conjecture" that "in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse." *Id.* at 108. So the Court agreed that the plaintiff lacked standing for injunctive relief. *See id.* at 110.

The Sixth Circuit recently applied *Lyons* in the context of a voting rights dispute in Tennessee. An organizational plaintiff—Shelby Advocates for Valid Elections ("SAVE")—and individual plaintiffs sued Tennessee election officials. *Shelby Advocates*, 947 F.3d at 979. They alleged that, "in future elections, the defendants will burden their right to vote, dilute their votes, and disenfranchise them" in violation of the Constitution. *Id.* To prove those concerns were valid,

the plaintiffs pointed to past mistakes that had been made during Tennessee's elections. *Id.* at 979–81. The plaintiffs then sought an injunction requiring state and local officials to implement various measures designed to make future elections more secure. *Id.* at 980.

Those plaintiffs suffered no injury in fact. Importantly, "[t]he complaint's allegations with respect to injury all boil[ed] down to prior system vulnerabilities, previous equipment malfunctions, and past election mistakes." *Shelby Advocates*, 947 F.3d at 981. But that past harm stemmed from "human error"—and the "[f]ear that individual mistakes will recur, generally speaking, does not create a cognizable imminent risk of harm." *Id.* Relying on *Lyons*, the court found no standing because the plaintiffs could not plausibly allege that "Shelby County election officials *always* make [the injury-inflicting] mistakes, and they [did] not allege that the government entities ordered the election workers to make any such mistakes." *Id.* SAVE could not establish organizational standing for similar reasons. *Id.* at 982. Although it complained about needing to divert resources to address future problems, those expenditures were based on "speculative fears of future harm" that provided no basis for forward-looking relief. *Id.*

The NAACP suffers from the same problem. It claims the allegedly unlawful practices will force the organization to redirect its resources in the future when a person that it helps register to vote is improperly rejected. If that happens, the NAACP says, it "must conduct extensive follow up" to correct the erroneous denial. (Amended Complaint, R. 102, PageID# 621.) Just like in *Shelby Advocates*, that injury occurs because of human error—that is, when an administrator mistakenly rejects an application that they should have approved. 947 F.3d at 981. That an erroneous denial (and the accompanying diversion of resources) may have happened before does not prove that it will occur again, much less that it will happen "imminent[ly]." *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022). There is no evidence that administrators

"always" deny registration applications from felons. Nor is there evidence that election workers were ordered to deny those applications. *See Infra*, Argument V.

To the contrary, Tennessee recently issued detailed policy revisions to ensure that felons are not improperly deprived of the right to vote. That updated guidance provides "greater clarity" about treatment of voter registration applications from felons in an express effort "to avoid the unnecessary rejection of voter registration applications of individuals who had not lost their voting rights due to a felony conviction." (Ex. 1, Goins Dec., at 3; *See* Ex. 2., Memo on Older Felonies, at 1-2.) As explained, the guidance instructs that many applications from felons are treated the same as an application from those without felony convictions. (*Id.*) Other felons who have restored their rights must simply check a box and provide proof of eligibility for state voter registration applications. The Coordinator of Elections sent that guidance to Tennessee's 95 County Election Administrators. (Ex. 1, Goins Dec., at 3.)

The Sixth Circuit's decision in *Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378 (6th Cir. 2020), confirms the NAACP lacks standing. There, the plaintiffs asserted as the basis for their injury the possibility that Tennessee would erroneously reject absentee ballots in future elections. *See id.* at 387. The plaintiffs claimed that the prospect of future erroneous denials justified injunctive relief. *See id.* at 382. The Sixth Circuit rejected that argument, reasoning that the plaintiffs failed to prove they faced "an actual, concrete, particularized, and imminent threat of harm." *Id.* at 387. The asserted injury rested on "two layers of speculation about the upcoming election"—first, that Tennessee would reject absentee ballots; and second, that some of those rejections would be improper. *Id.* Yet the plaintiffs had no "official data to support their theory that some of the absentee ballots will be incorrectly rejected," nor did they submit adequate proof

of past erroneous rejections. *Id.* Because Tennessee had safeguards to prevent improper denials, it was "far from inevitable that an absentee ballot will be incorrectly rejected." *Id.* at 388.

That reasoning applies here with equal force. As in *Memphis*, the NAACP's theory of injury rests on two levels of speculation. It first speculates that Tennessee will erroneously deny voter registration applications from individuals with felony convictions. And then it speculates that the applications that are erroneously denied will be ones with which the NAACP assisted. Despite bearing the burden of establishing standing, Plaintiffs make the same mistake discussed in *Memphis* by failing to establish the extent of past harm or provide "official data" to support the assertion that future denials are imminent. *Id.*

Given Tennessee's recent guidance and the dearth of evidence from Plaintiffs about future erroneous rejections, "the possibility of future harm" is "conjectural at best," and thus is "not within the purview of disputes that the federal courts are permitted to adjudicate." *Hyman v. City of Louisville*, 53 F. App'x 740, 744 (6th Cir. 2002).

## II. Plaintiffs Have Not Been Deprived Due Process In Connection With Their Alleged Statutory Right To A Certificate Of Restoration.

The Fourteenth Amendment guarantees "due process of law" before the government deprives any person of "liberty or property." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). But Plaintiffs have no "liberty or property interest" at stake, *Phillips v. McCollom*, 788 F.3d 650, 653 (6th Cir. 2015), nor can they show that Tennessee's "procedures" provide inadequate protection, *Bazetta*, 430 F.3d at 801 (citation omitted). Accordingly, the court should grant judgment for Defendants on Count One.

### A. Plaintiffs have no liberty interest in receiving restoration certificates.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

14

59 (1999).  Whether a liberty interest exists "is a question of law," *Walker v. Hughes*, 558 F.2d 1247, 1260 (6th Cir. 1977), and here that question turns on state law because Plaintiffs argue that they have been deprived of their "statutory right to a COR."  (Amended Complaint, R. 102, PageID# 648.)  But as mere applicants for restoration certificates, Plaintiffs have no liberty interest in them whatsoever.  And even if applicants *could* have a liberty interest in those certificates, Plaintiffs lack any protected interest here because they have not shown they satisfy the applicable eligibility criteria.

Applicants for state-created benefits are treated differently than recipients.  The Due Process Clause protects interests "that a person has already acquired in specific benefits."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972).  But the Supreme Court has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment." *Lyng v. Payne*, 476 U.S. 926, 942 (1986); *see also Am. Mfrs. Mut. Ins.,* 526 U.S. at 61 n.13 (1999) (reserving question).  Drawing on that applicant-versus-recipient distinction, the Sixth Circuit has held in various contexts that "first-time applicants" for state-created benefits have "no property or liberty interest" in those benefits.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *see also Clair v. N. Ky. Indep. Health Dist.*, 239 F. App'x 997, 998 (6th Cir. 2007) (per curiam) (agreeing that "plaintiffs—first-time applicants for a food-service permit—did not possess a constitutionally protected property right for purposes of a due process . . . analysis").

As applicants rather than recipients, Plaintiffs likewise lack any protected interest in restoration certificates.  Just like in *Sanderson v. Village of Greenhills*, 726 F.2d 284, 286 (6th Cir. 1984), Plaintiffs here are "initial applicant[s]" for a state-created individual benefit and are thus

"analogous to the original applicant for a liquor license, or the new applicant for food stamps, in that [they] ha[ve] no 'claim' upon the [benefit]." They are "not comparable to that of the welfare recipient who is cut from the rolls, the parolee facing revocation of his parole, or the driver confronting cancellation of his license" because those interests have already vested. *Id.* Plaintiffs' status as applicants belies any present entitlement to restoration certificates. *Cf. Jon Jon's, Inc. v. City of Warren*, 700 F. App'x 436, 444 (6th Cir. 2017) ("Hakim does not have a recognized property interest in the liquor license because she was a new applicant with no existing ownership of the liquor license."); *Wojcik v. City of Romulus*, 257 F.3d 600, 610 (6th Cir. 2001) ("first-time applicants for an entertainment permit are likewise not entitled to due process").

But even if applicants *could* have a liberty interest in restoration certificates, Plaintiffs have none here. "The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Waeschle v. Dragovic*, 576 F.3d 539, 545 (6th Cir. 2009); *see Gojcaj v. Gonzales*, 175 F. App'x 720, 725 (6th Cir. 2006) (per curiam) ("In order to have a liberty interest in a benefit, there must be a legitimate claim of entitlement thereto."). That happens when someone has "a present and legally recognized substantive entitlement" rather than a "judicially unenforceable substantial hope." *Kerry v. Din*, 576 U.S. 86, 98 (2015) (plurality opinion). And so, to prove that present entitlement, Plaintiffs must show they satisfy the certificate-of-restoration eligibility criteria. That much is clear from the relevant statute: the re-enfranchisement law provides that only "a person *eligible*" to "have the right of suffrage restored" "may request"—and "then shall be issued"—a certificate of restoration. Tenn. Code § 40-29-203(a) (emphasis added). Plainly, then, no legitimate claim of entitlement exists absent an affirmative eligibility determination because that is what triggers the obligation to issue the certificate.

There is no genuine dispute that Plaintiffs failed to make that eligibility showing. Throughout this litigation, Plaintiffs have insisted that the court need not consider whether they or the class are entitled to restoration certificates. They argued during class-certification proceedings that their "claim is *not* that each individual class member has been wrongfully denied a COR based on their specific circumstances." Plaintiffs' Response to Defendants' Motion to Stay Pending Appeal at 8, *In re William Lee*, No. 23-0502 (6th Cir. July 21, 2023), ECF No. 15 (emphasis added). They do not seek an order declaring that the class is entitled to restoration certificates or an order requiring certificates to be issued. It is too late in the day for Plaintiffs to argue that they—and the class—are entitled to certificates because they satisfy the eligibility criteria. Even if Plaintiffs want to make that showing, they cannot do so on this record. Plaintiffs argued that "Defendants do not need to conduct discovery on the individual circumstances of each class member" because those circumstances were irrelevant. (*See* Plaintiffs' Response to Motion to Stay, R. 134, PageID# 878.) Unsurprisingly, then, the record does not contain the facts the court would need to consider when deciding whether the entire class meets the statutory eligibility criteria.

Moreover, the record affirmatively demonstrates that some plaintiffs are *ineligible* to receive certificates. Some named plaintiffs have not paid all the necessary financial obligations. *See* Tenn. Code § 40-29-202(b); (Ex. 9, Tournier Dep., at 50 (indicating that restitution had not been paid); Ex. 10, Scott Dep., at 59, 61 (indicating that court costs are owed); Ex. 11, Perry Dep., at 10, 45-46 (indicating that child support is owed); Exhibit 13, Gray Dep., at 21, 24-25 (indicating that court costs are owed); Ex. 8, Weare Dep. at 40, 48 (indicating a lack of documentation that court costs had been paid). Other named plaintiffs testified that they have not even applied for a restoration certificate at all. (Ex. 8, Weare Dep. at 22.) And for whatever it is worth, when

Defendants asked the NAACP to identify individuals who had been erroneously deprived of their statutory right to restoration certificates, they identified only seventeen individuals who "may" have been so deprived—none of whom are named plaintiffs. (Ex. 14, NAACP First Interrogatory Response, at 1-22; Ex. 15, Attachments to NAACP Third Interrogatory Response, 1-8; Ex. 16, NAACP Third Interrogatory Response, at 1- 15.) But, the NAACP provided no evidence that those individuals complied with Tenn. Code Ann. § 2-19-143. (*Id.*) Moreover, Of course, it makes little sense to say that individuals who do not satisfy the eligibility criteria or who have not applied for a certificate nevertheless have a vested liberty interest in those certificates that the Constitution protects.

The Sixth Circuit's decision in *Hasanaj v. Detroit Public Schools Community District*, 35 F.4th 437 (6th Cir. 2022), illustrates why Plaintiffs' failure to make that eligibility showing warrants summary judgment. Mr. Hasanaj worked as a teacher in Michigan. When the school terminated his employment, he brought a lawsuit alleging that the school unlawfully deprived him of his property interest in tenure. *Id.* at 442. The Sixth Circuit disagreed. It explained that, "[i]f a plaintiff is not entitled to tenure under a governing statute, [then] he has no 'legitimate claim' to job tenure." *Id.* at 448. Mr. Hasanaj did not allege that he satisfied the statutory tenure requirements. *See id.* at 448. Because he did not make that eligibility showing, the court concluded that he lacked a constitutionally protected interest in his job. *Id.* at 451. Here, too, Plaintiffs did not show that they satisfied the criteria required to be issued restoration certificates. Their due process claim thus suffers from the same legal defect as the plaintiff in *Hasanaj*.

### B. Plaintiffs received constitutionally adequate process in connection with whatever protected interests they may have.

Even assuming Plaintiffs have a protected interest, they cannot prove that interest was deprived without adequate process. Plaintiffs challenge the constitutional adequacy of the re-enfranchisement framework as enacted. Thus, Plaintiffs deserve no additional process.

"In deciding what the Due Process Clause requires," the "Supreme Court has long distinguished between legislative and adjudicative action." *Jones v. Governor of Florida*, 975 F.3d 1016, 1048 (11th Cir. 2020) (en banc). "The State often deprives persons of liberty or property through legislative action—general laws that apply 'to more than a few people.'" *Id.* (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)). And when that happens, "the affected persons are not entitled to any process beyond that provided by the legislative process." *Id.* That is because "the legislative process provides all the process that is constitutionally due when [an] alleged injury results from a legislative act of general applicability." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216 (6th Cir. 2011) (en banc) (cleaned up); *see*, *e.g.*, *Kaminski v. Coulter*, 865 F.3d 339, 347–48 (6th Cir. 2017) (adequate process when the state terminated healthcare benefits through "broad determinations" about recipients "as a whole" rather than "individualized determinations about specific [beneficiaries]"); *Smith*, 641 F.3d at 216–17 (adequate process where the county terminated teachers by making the "legislative" decision to shut down the school); *Neinast v. Bd. of Tr. of Columbus Metro. Library*, 346 F.3d 585 (6th Cir. 2003) (adequate process where the board of trustees deprived the plaintiff of a liberty interest via a policy "of general applicability").

Because of that distinction between legislative and adjudicative action, the court must determine whether the conduct "involve[s] the kind of individualized determination that triggers due-process protections in the first place." *Kaminski*, 865 F.3d at 347. Certain "hallmarks" set

legislative conduct apart from adjudication. *Smith*, 641 F.3d at 216 (quotation omitted). Legislative actions are "general in [their] scope rather than targeted on a specific individual." *Id.* (quotation omitted). And they often involve "discretionary, policymaking decision[s]" that implicate political priorities about the benefits a government "provides to its constituents." *Id.* (quotation omitted). Such rules of "general applicability" simply do not "trigger due process concerns." *Pickney Bros., Inc. v. Robinson*, 1999 WL 801514, at *4 (6th Cir. Sept. 30, 1999) (unpublished). Adjudicative actions, by contrast, concern a "relatively small number of persons" who are "exceptionally affected, in each case upon individual grounds," by state action. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915).

Plaintiffs raise "system-wide concerns" about how the General Assembly designed the re-enfranchisement framework. R. 134 at 882. They argue that Tennessee's generally applicable process for issuing restoration certificates is inadequate for every single applicant. R. 102, ¶¶ 135–36. But those procedures are "general in [their] scope" because they apply to all applicants, *Smith*, 641 F.3d at 216 (quotation omitted), and the decision about how to structure those generally applicable processes implicates the legislature's "discretionary, policymaking decision" about how to allocate a political privilege that it provides as a matter of legislative grace, *id.* (quotation omitted). Plaintiffs essentially launch a facial challenge on the generally applicable re-enfranchisement regime as enacted by the General Assembly. Their injury thus derives from the legislative decision not to include additional procedures for the re-enfranchisement framework. Because that alleged injury does not stem from any individualized determinations, Plaintiffs are not entitled to additional process. *Id.*

The Eleventh Circuit's decision in *Jones v. Governor of Florida*, 975 F.3d 1016 (11th Cir. 2020) (en banc), is instructive. There, disenfranchised felons sued Florida because its re-

enfranchisement law required them to satisfy certain financial obligations before regaining the right to vote. *Id.* at 1025. They specifically alleged that Florida deprived them of their interest in regaining the right to vote without due process by creating a system in which they "cannot determine the amount of their outstanding financial obligations with diligence," *id.* at 1046—in other words, their statutory interest had been extinguished without due process because Florida's procedures did not provide adequate safeguards. Writing for the en banc court, Judge William Pryor rejected the procedural due process argument. The court concluded that "[t]he felons were deprived of the right to vote through legislative action, not adjudicative action." *Id.* at 1048. And even accepting the argument that the law "deprive[d] felons of the right to vote by conditioning reenfranchisement on the completion of all terms of sentence," the court concluded that "those laws also qualify as legislative acts," and thus the felons received all the process to which they were entitled. *Id.* at 1048–49. Likewise, Plaintiffs here challenge the legislative decision made by the General Assembly to enact an application process that lacks the procedural safeguards to which they believe they are entitled. They too have no right to any additional process.

* * *

At its core, Plaintiffs complain that state officials are not adequately performing their state-law duties. (*See*, *e.g.*, Amended Complaint, R. 102, PageID# 651 (alleging that "TDOC agencies have abdicated [their] responsibility" to administer the felon re-enfranchisement statute).) But the "[m]ere violation of a state statute does not infringe the federal Constitution," *Snowden v. Hughes*, 321 U.S. 1, 11 (1944), and state-law violations are not cognizable in § 1983 actions, *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989). There is no genuine dispute that Count One fails.

**III.     Plaintiffs Have Not Been Deprived Due Process In Connection With Their Alleged Constitutional Interest In The Right To Vote.**

Count Two alleges that Plaintiffs have been denied "the fundamental right to vote without procedural due process."  R. 102 at 652.  But disenfranchised felons do not have a fundamental right to vote.  *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010); *see also Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) (felons "cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted").  Because Plaintiffs have no "legitimate claim of entitlement" to the fundamental right to vote, *Waeschle*, 576 F.3d at 545, their due process claim necessarily fails, *e.g.*, *Jones v. McKinney*, 172 F.3d 48 (6th Cir. 1998) (unpublished) (dismissing a procedural due process claim when the plaintiff had no constitutional liberty interest).

That Plaintiffs assert a statutory interest in Count One is irrelevant.  Count One alleges that Plaintiffs have been deprived of a liberty interest created by state statute. R. 102 at 648–51.  Count Two, by contrast, alleges that Plaintiffs have been deprived of an interest created by the *Constitution*—namely, the fundamental interest in the right to vote.  R. 102 at 651–52.  Count Two cannot proceed unless Defendants deprived Plaintiffs of a constitutional liberty interest.  Because no such interest exists, the claim fails no matter what the court does with the state-created interest asserted in connection with Count One.

**IV.     Plaintiffs Have Not Been Denied Equal Protection Of The Law.**

Count Three alleges that Defendants are violating the Equal Protection Clause by inconsistently administering Tennessee's re-enfranchisement statute.  That claim is subject to rational-basis review.  Because "summary judgment is an apt vehicle for resolving rational-basis claims," *Tiwari v. Friedlander*, 26 F.4th 355, 369 (6th Cir. 2022), and because the law as administered satisfies that standard, the court should grant Defendants judgment on Count Three.

**A. The equal protection claim is subject to rational-basis review.**

Plaintiffs insist that the re-enfranchisement system is subject "to intermediate scrutiny" because it "implicates an individual's fundamental right to vote." (Amended Complaint, R. 102, PageID# 653.)

That is incorrect for reasons already explained. Tennessee's law does not burden disenfranchised felons' fundamental right to vote because they have no such right. *See Johnson*, 624 F.3d at 746. Nor does a certificate of restoration confer that right. Obtaining a certificate is a necessary-but-not-sufficient step in the process that disenfranchised felons must follow to regain their voting rights. *See Falls*, 2023 WL 4243961, at *7 (explaining that felons who have not been pardoned must have their full citizenship rights restored before they are eligible to vote); Tenn. Code § 40-29-203(d) (requiring additional layers of review before individuals with restoration certificates are approved to vote). So, as the Sixth Circuit has already decided with respect to this very statutory framework, rational-basis review applies. *Johnson*, 624 F.3d at 746 (applying rational-basis review to Tennessee's re-enfranchisement law).

For similar reasons, the court need not apply the heightened standard from *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). That case examined whether Florida's recount procedures arbitrarily valued one person's fundamental right to vote over another person's fundamental right. The Court decided that "[t]he recount mechanisms" implemented by Florida did "not satisfy the minimum requirement for nonarbitrary treatment of voters *necessary to secure the fundamental right*." *Id.* at 105 (emphasis added). The non-arbitrariness principle thus derives from the need to safeguard the constitutional interest in the right to vote. But because felons do not have that interest, *Bush* is not on point. In any event, the Supreme Court made clear that its "consideration [was] limited to the present circumstances, for the problem of equal protection in election

23

processes generally presents many complexities." *Id.* at 109. *Bush* therefore does not regulate how Tennessee allocates restoration certificates among disenfranchised felons.

### B. Tennessee's re-enfranchisement framework satisfies rational-basis review.

The "highly deferential" rational-basis test is easy to satisfy—laws flunk that standard "only in rare or exceptional circumstances." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (quotation omitted). So long as the law "rationally relate[s] to legitimate government interests," it withstands scrutiny. *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (quotation omitted). Plaintiffs must prove the lack of a rational basis "either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill will." *Johnson*, 624 F.3d at 747 (quotation omitted). Even a law with a "tenuous" justification or that "works to the disadvantage of a particular group" will be upheld "if it can be said to advance a legitimate government interest." *E. Brooks Books, Inc. v. Shelby County*, 588 F.3d 360, 364 (6th Cir. 2009) (quotation omitted).

Tennessee's re-enfranchisement law divides responsibility for processing restoration certificates among various officials. By statute, the "incarcerating authority" and the "supervising authority" are the primary officers responsible for issuing CORs. Tenn. Code § 40-29-203(a).[2] Those officers work in the Tennessee Department of Corrections ("TDOC") and regularly interface with felons as they begin their reintegration process. Parole and probation officers ("PPOs") fill out and issue certificate of restoration forms to eligible offenders. (Ex. 18, Exhibit 4 to Ricci Dep. at 1-3.) PPOs have detailed instructions about how to fulfill their responsibility to

---

[2] "The pardoning authority" also has authority to issue restoration certificates, Tenn. Code § 40-29-203(a)(1), but most applications are handled by agents of the supervising or incarcerating authority.

"assis[t] eligible offenders in the restoration of their voting rights." (*Id.*) TDOC guidance instructs that "[a]ll offenders" must be provided with a blank certificate-of-restoration form "upon discharge." (Ex. 17, Ricci Dep. at 40, 46.) Applicants who are not immediately eligible upon discharge may later obtain a form once they become eligible. (*See* Ex. 17, Ricci Dep. at 40.) Once an applicant submits the completed certificate to the county election commission, the Elections Division reviews the certificate "to verify that [it] was issued in compliance with" Tennessee law. Tenn. Code § 40-29-203(d).

Structuring the re-enfranchisement framework that way advances legitimate government interests. For starters, it saves taxpayer resources. Tennessee's voting rights restoration process piggybacks off TDOC's preexisting framework—PPO officers already on the government's payroll and operating within TDOC execute certificate-of-restoration responsibilities. By administering the program in that manner, Tennessee avoids the costs that would accompany creating and maintaining a new administrative apparatus to process restoration applications. There is no question Tennessee has a "legitimate interest in reducing its administrative costs." *Armour v. City of Indianapolis*, 566 U.S. 673, 684 (2012); *see City of Mayfield Heights v. Woodhawk Club Condo. Owners Assoc.*, 205 F.3d 1339 (6th Cir. 2000) (per curiam) (unpublished) ("control of the costs in the City's sanitation department amounts to a legitimate government objective"). And although Plaintiffs believe that a centralized process is better policy, the government advances a legitimate interest in avoiding costs by choosing the current system. *See Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 686 (7th Cir. 2005) (recognizing the avoided cost of busing students is a rational basis for a school district to choose to not offer busing services).

Besides saving resources, the current framework also eases administrative burdens on statewide officials and ensures that restoration certificates are handled by officers that regularly

assist felons. PPOs interface with felons and assist with their discharge, so it makes sense for them to be responsible for filling out the restoration certificates. After all, those officers—not an employee working in some centralized agency—are more familiar with the felon's circumstances and are more accessible to the felon if any question about the application process arises. The decentralized framework likewise reduces administrative burdens on officials, including those in the Elections Division, who already must discharge many important statewide responsibilities. *See Strehlke v. Grosse Pointe Pub. School System*, 654 F. App'x 713, 721 (6th Cir. 2016) ("administrative convenience can serve as a rational basis"); *Beaumont v. FEC*, 278 F.3d 261, 27 (4th Cir. 2002) ("administrative convenience constitutes a legitimate state interest"), *overruled on other grounds by FEC v. Beaumont*, 539 U.S. 146 (2003).

Those reasons amply justify Tennessee's re-enfranchisement framework. And because there are "plausible reason[s]" for the law, it "must stand, no matter how unfair, unjust, or unwise the judges may see it as citizens." *Tiwari*, 26 F.4th at 361.

## V. Tennessee's Voter Registration Practices Comply with Federal Law.

Counts Four and Six allege violations of the National Voter Registration Act ("NVRA"). Both claims are deficient as a matter of law, so the court should enter judgment for Defendants.

### A. Tennessee's voter registration forms adequately notify applicants about state voting eligibility requirements.

Congress enacted the NVRA to increase voter turnout and "protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). To advance those goals, States must "inform applicants" of "voter eligibility requirements." *Id.* § 20507(a)(5). Likewise, state mail-in forms must "include a statement" that "specifies each eligibility requirement." *Id.* § 20508(b)(2)(A).

Tennessee's voter registration form accomplishes both goals. As is true for most states, Tennessee forbids individuals convicted of certain felonies from registering to vote. The absence

of a disqualifying felony is thus a "voter eligibility requiremen[t]." 52 U.S.C. § 20507(a)(5). Without question, Tennessee "specifies" that eligibility requirement and "inform[s]" applicants that certain felons are ineligible to vote. *Id.* §§ 20507(a)(5), 20508(b)(2)(A). The mail-in form lists that eligibility requirement and directs applicants towards additional resources:

> If you have had a felony conviction, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction. To assist in processing your application, provide the required information in box 4 and any responsive documents you have. For more information about this process, call 1-877-850-4959 or visit sos.tn.gov/restoration.

*Tennessee Mail-In Application for Voter Registration*, Tennessee Secretary of State, https://sos-tn-gov-files.tnsosfiles.com/forms/ss-3010.pdf (last visited August 1, 2023). The link provided on the form includes thorough guidance about the disqualifying-felonies requirement—including details about which felonies are permanently disqualifying, the dates between which felons were never disenfranchised (and are thus eligible to vote), and the process for disqualified felons to restore their eligibility to vote. And in case those instructions were not sufficiently clear, the form includes a toll-free number for applicants to call and request help.

The NAACP alleges in Count Four that Tennessee's registration form is inadequate because it does not describe "the blanket exception for felony convictions between January 15, 1973 and May 17, 1981" or enumerate the (nearly two dozen) "offenses punishable by disenfranchisement prior to January 15, 1973." R. 102 at 654. Put differently, although the registration form specifies that the absence of a disqualifying felony is an eligibility requirement, the NAACP believes that the form is nevertheless deficient because it could be *more specific*.

Neither of the alleged omissions violate the NVRA. As the Eleventh Circuit recently explained, the NVRA is a "notice statute enacted for the convenience of voting registrants." *Thompson v. Alabama*, 65 F.4th 1288, 1309 (11th Cir. 2023). Tennessee carefully designed its form to maximize "accessibility," "readability," and "usability," (Ex. 3, Lim Depo. at 83–84)—all

27

values that further the NVRA's interest in voter registration. Section 20508(b)'s "specif[ication]" requirement does not mandate that states list *every* disqualifying felony or exhaustively describe the rules underlying each eligibility of Tennessee's four eligibility requirements. *See Thompson*, 65 F.4th at 1308–09 (rejecting the Campaign Legal Center's argument that Alabama's voter registration form must list every disqualifying felony). After all, that would produce the absurd result of making voter registration forms unworkable—they would be unwieldy and unnecessarily complicated. *See* Order Granting Motion to Dismiss at 7, *League of Women Voters of Florida, Inc. v. Cord Byrd*, No. 23-cv-165 (N.D. Fla. July 10, 2023), ECF No. 36 ("if the NVRA required applications to catalog every potential 'precondition to eligibility,' Florida's one-page, front-and-back application form would explode into something hopelessly cumbersome, counter to the NVRA's goal of promoting convenient registration"); *see also Lockhart v. Napolitano*, 573 F.3d 251, 261 (6th Cir. 2009) (rejecting an interpretation that would produce absurd outcomes).

By specifying the eligibility requirement—namely, the absence of a disqualifying felony—and by linking to a website describing what constitutes a disqualifying felony, Tennessee put applicants on notice about who qualifies to successfully register to vote. *See Thompson*, 65 F.4th at 1308–09 ("Alabama's mail-in voting form has provided sufficient notice by informing registrants that persons convicted of disqualifying felonies are not eligible to vote and providing an easily accessible link.").[3] The NVRA requires nothing more.

---

[3] Insofar as the NAACP argues that "[t]he state-specific instructions for Tennessee on the Federal Form" "do not fully inform registrants of state law," that argument fails as a matter of law for the same reasons. The Federal Form is subject to the same requirements as the State Form. *See* 52 U.S.C. § 20508(a)(2), (b)(2).

**B. Tennessee ensures that eligible applicants are registered to vote.**

The NVRA requires states to "ensure that any eligible applicant is registered to vote" in federal elections so long as they timely submit a "valid voter registration form." 52 U.S.C. § 20507(a)(1). The NVRA also requires states to "accept and use" a uniform Federal Form to register voters for federal elections. *See id.* § 20505(a)(1).

Count Six alleges that Defendants employ two practices which violate the NVRA's requirements. The first allegedly unlawful practice is that Tennessee allegedly "reject[s] *all* voter registration forms on which the applicant affirmed that they have a felony conviction." (Amended Complaint, R. 102, PageID# 655 (alleging that policy in Count Five); *id.* at 656 (alleging that same policy in Count Six).) Plaintiffs claim that policy applies even to voters "who never lost their right to vote or had the right restored." *Id.* at 655–56. The second allegedly unlawful practice is a requirement that applicants with felonies submit proof of eligibility to register to vote. *Id.* at 656–57.

As to the allegation about a policy that Tennessee automatically rejects all applications from felons, the undisputed evidence confirms that no such practice currently exists. Recent guidance from the Coordinator of Elections creates safeguards to prevent felons from wrongfully being denied their voting rights. *See generally* Ex. 2. For applicants with felonies from before January 15, 1973, their registration forms are processed just like someone without a felony conviction. *Id.* at 1. For applicants with felony convictions between January 15, 1973, and May 17, 1981, their voter registration forms are also processed just like applicants without felonies "because those individuals never lost the right to vote." *Id.* at 2. And for all other applicants with felony convictions, election officials will not reject their application to vote if they submit proof that their voting rights have been restored. (Ex. 3, Lim Dep. at 195.) Simply put, there is no

29

genuine dispute that Tennessee has no "blanket policy of rejecting or indefinitely delaying voter registration applications" submitted by voters with felonies.  R. 102 at 656.

Even Plaintiffs' expert contradicts the baseless allegation that Tennessee employs that alleged blanket policy.  Dr. Burch submitted an expert report about the voting-rights restoration process in Tennessee.  And by her own estimation, thousands of felons "have had their voting rights restored in Tennessee" since 2006.  (Ex. 19, Dr. Burch Dep. at 135-36.)  Of course, that would be impossible if Plaintiffs were correct that Tennessee rejected or indefinitely delayed all voter applications from individuals with felony convictions.

Nor does Tennessee violate the NVRA by requiring applicants using the state voter registration form to submit proof of eligibility.  In *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013), the Supreme Court held that the NVRA's accept-and-use requirement forbids states from rejecting *Federal Forms* because applicants failed to submit supplemental documentation proving their eligibility to register.  But the NVRA "also authorizes States, *'[i]n addition to* accepting and using the' Federal Form, to create their own, state-specific voter registration forms."  *Id.* at 12 (quotation omitted).  Those forms "may require information the Federal Form does not."  *Id.*  Under the NVRA, "States retain the flexibility to design and use their own registration forms" that create "procedural hurdles" not included on the Federal Form.  *Id.*  Thus, Tennessee does not violate the accept-and-use mandate by requiring state-form applicants to submit proof of voting rights restoration.

## VI.    Tennessee Does Not Deprive Eligible Voters Of Their Right To Vote.

Count Five alleges that Defendants deprive Tennesseans of their constitutional right to vote in violation of the First and Fourteenth Amendments.  That happens, Plaintiffs say, because of the

above-mentioned practice of "reject[ing] *all* voter registration forms on which the applicant affirmed that they have a felony conviction." (Amended Complaint, R. 102, PageID# 655.)[4]

As discussed, Tennessee has no such practice. *Supra* Argument V. Because Tennessee's voter registration process does not burden the right to vote in the manner that the Plaintiffs allege, the court applies rational-basis review to Tennessee's voting process under the *Burdick* framework. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("a rational basis standard applies to state regulations that do not burden the fundamental right to vote"). The State has a legitimate interest in combatting voter fraud, safeguarding voter confidence, and ensuring accurate recordkeeping. *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196–97 (2008). It advances these interests by requiring applicants to disclose whether they have a felony conviction—and, if so, to provide enough information for Tennessee to determine whether they are eligible to vote. *See Hawkins v. DeWine*, 968 F.3d 603, 607 (6th Cir. 2020) (affirming validity of voter restrictions because they advanced election administration interests).[5]

## VII. The Court Should Grant Judgment For Defendants On The Requested Relief.

Plaintiffs seek a court order rewriting state election law. The law does not allow that sweeping remedy, so the court should grant summary judgment foreclosing it. *Loft v. Stationary*

---

[4] To the extent Count Five purports to bring claims on behalf of disenfranchised felons who have *not* had their right to vote restored, summary judgment is appropriate because they have no constitutional right to vote. *See supra* Argument III.

[5] Felons whose voting rights have been restored must so indicate on the voter registration form. They must also provide a copy of their restoration document. *Tennessee Mail-In Application for Voter Registration*, Tennessee Secretary of State, https://sos-tn-gov-files.tnsosfiles.com/forms/ss-3010.pdf (last visited August 1, 2023). Although Plaintiffs have not challenged this as an undue burden on the right to vote under Count Five, this minimal burden is easily justified by Tennessee's interest in combatting voter fraud and safeguarding voter confidence. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196–97 (2008).

*Eng'rs, Loc. 39 PTF, LLC*, 87 F. Supp. 3d 1138, 1146 (N.D. Cal. 2015) (collecting cases that agree that a court may grant "summary judgment on the availability of a remedy").

Federal courts have limited power to remedy constitutional wrongs committed by States. When remedying such wrongs, federal courts must refrain "from 'rewrit[ing] state law to conform it to constitutional requirements.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). Institutional competence and principles of federalism caution federal courts against using injunctions to force new procedures on states. *See Horne v. Flores*, 557 U.S. 433, 448 (2009); *Ayotte*, 546 U.S. at 329. So although "federal courts can enter positive injunctions that require parties to comply with existing law," "they cannot usurp[ ] a State's legislative authority by re-writing its statutes to create new law." *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) (per curiam) ("*Thompson I*") (cleaned up); *see Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) ("*Thompson II*") ("If we find a state ballot-access requirement unconstitutional, we can enjoin its enforcement," "[b]ut otherwise, 'state and local authorities have primary responsibility for curing constitutional violations'" (quotation omitted)); *cf. Wilson v. NLRB*, 920 F.2d 1282, 1289 (6th Cir. 1990) ("courts cannot . . . redraft statutory language").

Those principles hold true especially in the context of voting-rights disputes. "[T]he federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections." *Thompson I*, 959 F.3d at 812. As such, "federal courts have no authority to dictate to the States precisely how they should conduct their elections." *Esshaki v. Whitmer*, 813 F. App'x 170, 172 (6th Cir. 2020) (order). Injunctions requiring States to implement new procedures to remedy constitutional deficiencies in their electoral framework are thus improper. *See, e.g.*, *Thompson II*, 976 F.3d at 620.

The first injunction sought by Plaintiffs flouts these limitations. Whether and in what circumstances to allow felons re-enfranchisement is a decision committed to Tennessee's discretion as it designs its elections. *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). Although the re-enfranchisement framework is subject to judicial scrutiny, that does not empower the court to rewrite the certificate-of-restoration system if it finds constitutional defects. Yet that is precisely what Plaintiffs ask the court to do here. They seek an injunction requiring Defendants "to implement constitutionally required safeguards to ensure that the COR system" satisfies due process—namely, "a uniform, formal mechanism to request a COR before an impartial decisionmaker," "a requirement to issue formal decisions on COR requests," "a requirement to provide a written statement of reasons for any denials of COR requests," "a requirement that any denials be based upon the statutory criteria for eligibility," "uniform procedures for interpreting the COR requirements," and "a uniform appeals process." (Amended Complaint, R. 102, PageID# 658.) That remedy goes far beyond "enjoin[ing] the enforcement" of an unconstitutional law and "usurp[s]" Tennessee's "primary responsibility" for curing constitutional defects. *Thompson I*, 959 F.3d at 812; *Thompson II*, 976 F.3d at 620

The second injunction that Plaintiffs seek fares little better. To remedy alleged NVRA violations, Plaintiffs ask the court to compel Defendants to rewrite Tennessee's voter registration form and "issu[e] statewide guidance" prohibiting Tennessee from requiring applicants to submit proof of eligibility. R. 102 at 49–50. That amounts to nothing short of an improper request for the court to rewrite Tennessee voter registration procedures wholesale.

But the second requested injunction also suffers from a more fundamental problem. Remedies must be tailored to constitutional violations. Injunctive relief must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518

33

U.S. 343, 357 (1996). To the extent Plaintiffs seek to enjoin Tennessee from enforcing its requirement that applicants using the state voter registration form submit documentary proof, the requested relief exceeds the court's remedial powers because States *may* require applicants to submit proof of eligibility. *See Arizona*, 570 U.S. at 12.

To sum up, the injunctions requested by Plaintiffs are flawed and should not be issued. They would require the court to engage in "quintessentially legislative work" by re-writing Tennessee election law, *Ayotte*, 546 U.S. at 329, and restrict Tennessee from enforcing valid voter registration requirements. Because the remedies sought are impermissible, the court should enter summary judgment for Defendants.

## CONCLUSION

For the reasons stated, summary judgment should be granted in favor of Defendants on all Plaintiffs' claims and their request for relief.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

Sincerely,

/s/ *Zachary L. Barker*
ZACHARY L. BARKER, BPR # 035933
Assistant Attorney General

DAWN JORDAN
Senior Counsel

DAVID RUDOLPH
Senior Assistant Attorney General

Public Interest Division
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
Zachary.Barker@ag.tn.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing document has been forwarded electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties named below. Parties may access this filing through the Court's electronic filing system.

| | |
|---|---|
| Danielle Lang | Charles K. Grant |
| Mark Graber | Denmark J. Grant |
| Aseem Mulji | Baker, Donelson, Bearman |
| Campaign Legal Center | Caldwell & Berkowitz, P.C. |
| 1101 14th Street NW, Suite 400 | 1600 West End Avenue, Suite 2000 |
| Washington, DC 20005 | Nashville, TN 37203 |
| | |
| Phil Telfeyan | Keeda Haynes |
| Natasha Baker | Free Hearts |
| Equal Justice Under Law | 2013 25th Ave. N. |
| 400 7th St. NW, Suite 602 | Nashville, TN 37208 |
| Washington, DC 20004 | |

Date: August 2, 2023

*/s/ Zachary L. Barker*

Assistant Attorney General