# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE CONFERENCE of the NATIONAL ASSOCIATION for the ADVANCEMENT of COLORED PEOPLE, on behalf of itself and its members, and LAMAR PERRY, CURTIS GRAY, Jr, JOHN WEARE, BENJAMIN TOURNIER, LEOLA SCOTT, and REGINALD HENDRIX, for themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM LEE, in his official capacity as Governor of the State of Tennessee, FRANK STRADA, in his official capacity as Commissioner of the Department of Correction of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, and TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee,<br><br>Defendants. | Civil No. 3:20-cv-01039<br><br>JUDGE WILLIAM L. CAMPBELL<br>Magistrate Judge Jeffrey S. Frensley<br><br><br>**CLASS ACTION** |

**EXPERT DECLARATION AND REPORT OF DR. TRACI BURCH**

FEBRUARY 13, 2023

1

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | Introduction | 4 |
| 2 | Qualifications and Background | 5 |
| 3 | Scope of Report | 7 |
| 4 | Summary of Opinions | 7 |
| 5 | Statutory Disenfranchisement and Voting Rights Restoration in Tennessee | 9 |
| 6 | Eligibility Estimates | 10 |
| | 6.1 Individuals Who Have Completed Their Sentence | 10 |
| | 6.2 Excluding Individuals Convicted of Disqualifying Crimes | 11 |
| | 6.3 Estimating the Number of Individuals Who Are Not Deceased | 11 |
| | 6.4 Estimating the Number of Individuals Who Do Not Owe Court Costs or Restitution | 11 |
| | 6.4.1 The Effects of Race and Age on Outstanding Court Costs and Restitution | 13 |
| | 6.4.2 Shelby County Court Costs in Depth | 14 |
| | 6.5 Estimating the Number of Individuals Who Do Not Owe Child Support | 15 |
| | 6.6 Final Estimate of Eligible Population | 15 |
| 7 | Who Gets Their Voting Rights Restored in the COR Process? | 18 |
| | 7.1 Estimating Voting Rights Restorations Through the COR Process | 19 |
| | 7.2 Demographic Breakdown of Voting Rights Restorations | 20 |
| 8 | Description of the Certificate of Restoration Process | 22 |
| | 8.1 Requesting a COR | 23 |
| | 8.2 TDOC | 24 |
| | 8.3 Court Clerks | 25 |
| | 8.4 County Administrators of Elections | 26 |
| | 8.5 Coordinator of Elections | 26 |
| 9 | Problems with the COR Process | 27 |
| | 9.1 Difficulties with Starting the COR Process | 27 |
| | 9.1.1 Finding Someone to Help | 27 |
| | 9.1.2 Barriers Related to Time and Money | 28 |
| | 9.2 Difficulties with Verifying Eligibility | 29 |
| | 9.2.1 Ascertaining Whether a Conviction is a Felony | 29 |
| | 9.2.2 Errors By TDOC Personnel | 32 |

2

    9.2.3    Errors by Clerks ........................................................................ 33

    9.2.4    Erroneous or Missing Records .............................................. 35

10    Who is Denied a COR by the Coordinator of Elections? ......................... 36

  10.1   Estimating the Number of Denials ................................................ 36

  10.2   Data on Denied Restorations........................................................ 37

  10.3   Difficulties with Curing Denials .................................................. 38

Case 3:20-cv-01039    Document 185-6    Filed 10/10/23    Page 4 of 56 PageID #: 3025

# 1  Introduction

The Tennessee Legislature provides a pathway for people with felony convictions to restore their right to vote by obtaining a Certificate of Voting Rights Restoration (COR). However, as I will show in this report, only a small fraction of people who are eligible to obtain a COR have done so. Based on the analysis presented here, I show the ways that the process of rights restoration, as it is currently implemented in Tennessee, makes it difficult for people eligible for a COR to receive one and leads to erroneous denials of CORs to people who meet the eligibility criteria; for some eligible people, restoration may nonetheless prove to be impossible under the current system.

In the following pages, I first calculate the size of the population that is eligible to have their rights restored, paying attention to the ways in which each eligibility criterion affects the size of the eligible population and the ways that these effects vary by race and age. I then estimate the number of people who have had their rights restored. Next, I use public and internal policy documents, training manuals, emails, and websites to outline the process for obtaining a COR in Tennessee. Then, I highlight some of the problems that routinely prevent eligible people from receiving their COR, including those that occur at the final stage of approval or denial by the Coordinator of Elections. Finally, I discuss how the process of rights restoration affects the ability of people who have not been disenfranchised because of felony convictions to register to vote.

Across the various sections in the report, I show how a particular set of factors can impede successful restoration:

- Status confusion: lack of clarity that an individual has committed a felony conviction that requires them to submit documents or request a COR before registering to vote. I show how the established procedures contribute to and fail to adequately address status confusion.
- Documentary disenfranchisement: requiring persons seeking rights restoration to produce extensive documentation of eligibility.[1] I show how the current procedures often require persons seeking rights restoration to hunt for extensive documentation of eligibility, which oftentimes is unavailable to persons seeking rights restoration but within the state's ability to obtain. These verification procedures include difficult-to-obtain signatures from government officials, court records, receipts, or other documents.
- Clerical errors: the failure of administrative officials to complete forms correctly, erroneous entries in databases. I document how such errors require multiple rounds of submissions for rights restoration, and ultimately may lead to the erroneous denial of the restoration of voting rights altogether.
- Lack of instructions: neither the public nor relevant administrators receive adequate information about the rights restoration process. As I show below, the instructions for requesting a COR and completing the COR form are not clear, and many of the alternatives to rights restoration beyond CORs are not outlined publicly.

---

[1] Allen, Jessie. "Documentary disenfranchisement." *Tul. L. Rev.* 86 (2011): 389-463.

- Lack of uniform procedures at the local level: because of a lack of instructions or uniform policies, people may face different barriers to rights restoration depending on their county of conviction or the county where they intend to vote. In particular, I show how court clerk's offices, which have no statutory role in the restoration process, provide different levels of support, complete different aspects of the form, and even calculate court costs and restitution differently across counties.

These barriers operate at all stages of the process, from an individual's decision to seek restoration, to attempting to have a COR form completed by relevant officials, to the submission of a COR form to the Coordinator of Elections, to the restoration outcome. All of these problems are exacerbated by the lack of any requirement that the responsible officials provide applicants with clear determinations of their eligibility and the lack of any appeals process when an applicant believes their COR was improperly denied.

# 2 Qualifications and Background

I am an Associate Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. I received my Ph.D. in Government and Social Policy from Harvard University in 2007.

Over the past 15 years, I have led several large, long-term quantitative and qualitative research projects on political participation in the United States. I have participated in and coauthored several book chapters and articles that examine race, political participation, and inequality, and am widely regarded as an expert on political behavior, barriers to voting, and political participation. My work has been widely cited and replicated and has won several awards. In particular, my dissertation on the effects of felony disenfranchisement on voting in North Carolina, Georgia, and other states, "Punishment and Participation: How Criminal Convictions Threaten American Democracy," won the Robert Noxon Toppan Prize for the Best Dissertation on a Subject of Political Science at Harvard in 2007. I also achieved national recognition for this work; the dissertation was awarded the E.E. Schattschneider Award from the American Political Science Association for the best dissertation in American Government, and the William Anderson Award for the best dissertation in federalism, intergovernmental relations, and state and local politics. Several articles from this dissertation, including work evaluating voting patterns among people with felony convictions in North Carolina, Georgia, Florida, Missouri, and Michigan, have been published in leading peer-reviewed journals.

My articles "Did Disenfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons" and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election," which appeared in the peer-reviewed journals Law and Society Review and Political Behavior, respectively, included my calculations of felony disenfranchisement. My academic book on the community-level effects of criminal convictions on political participation, *Trading Democracy for Justice*, was published by the University of Chicago Press and also won multiple national awards from the American Political Science Association and its sections, including the Ralph J. Bunche Award for the best scholarly

5

work that explores the phenomenon of ethnic and cultural pluralism and best book awards from the law and politics and urban politics sections. *Trading Democracy for Justice*, as well as the articles "The Effects of Imprisonment and Community Supervision on Political Participation," "Did Disenfranchisement Laws Help Elect President Bush?" "Skin Color and the Criminal Justice System," "The Old Jim Crow," and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election," rely on the analysis of large criminal justice and voter registration data files. In addition to my published work, I also have conducted analyses of legal financial obligations and barriers to voting as an expert witness.

I have worked with Professors Kay Schlozman, Sidney Verba, and Henry Brady on book chapters and articles related to the causes and consequences of inequality in political participation. I also collected data on congressional hearings and interest group activities for that book. For my coauthored article with Jennifer Hochschild and our book with Vesla Weaver, I analyzed the legislative history of several racial policies, including the 1965 Hart-Cellar Act. We explore political participation and attitudes in our book as well.

I have testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions with respect to voting and other issues. I have received several grants for my work, including a grant from the Stanford University Center on Poverty and Inequality. I also serve as co-Principal Investigator on a National Science Foundation grant that supports graduate and postdoctoral fellowships at the American Bar Foundation. I have served on Editorial Boards of leading journals including Political Behavior and Law and Social Inquiry. Currently, I am on the Board of Overseers for the General Social Survey, a longstanding national public opinion survey run by the National Opinion Research Center at the University of Chicago. I routinely review the work of my peers for tenure, scholarly journals, university presses, and grants and have served as a reviewer for the American Political Science Review, The American Journal of Political Science, The Journal of Politics, Political Behavior, the National Science Foundation, Cambridge University Press, Princeton University Press, the University of Chicago Press, Oxford University Press, and many other entities. I also am a member of the Executive Council of the Elections, Public Opinion, and Voting Behavior Section of the American Political Science Association.

My curriculum vitae is appended to this declaration as Exhibit A. I am being compensated $350 per hour for work in this case, plus expenses, and my payment is not contingent upon the outcome of this case. This is my eleventh engagement as an expert witness. I previously testified at trial or in a deposition or both in the following matters: *Jones vs. DeSantis*, Consolidated Case No. 4:19-cv-300 (N.D. Fla.); *Community Success Initiative v. Moore*, Case No. 19-cv-15941 (N.C. Super. Ct.); *People First of Alabama v. Merrill*, Case No. 2:20-cv-00619-AKK (N.D. Ala.); *Florida State Conference of the NAACP v. Lee*, Case No. 4:21-cv-00187-MW-MAF (N.D. Fla.). I was also deposed the matters *One Wisconsin Institute Inc. v. Jacobs*, Case No. 15-CV-324-JDP (W.D. Wis.), *Luft v. Evers*, Case No. 20-CV-768-JDP (E.D. Wis.), *Alpha Phi Alpha v. Raffensperger*, Case No. 1:21-cv-05337-SCJ (N.D. Ga.), and testified in a preliminary injunction hearing in *Robinson v. Ardoin*, Case No. 22 CV-00211 (M.D. La.). In all cases where an opinion was issued, the courts accepted and relied on my expert testimony.

6

# 3  Scope of Report

The attorneys for Plaintiffs in this case asked me to: (i) estimate the number of Tennessee residents who have been disenfranchised because of a felony conviction, the number of such people who are entitled to voting rights restoration under Tennessee's COR statutes, and the number of such people who have been granted and denied voting rights restoration; (ii) determine whether there are aspects of the COR process that heighten the risk of erroneous deprivation of voting rights restoration; and (iii) determine whether the COR process treats people unequally. This report builds upon and supplements the analysis in my declaration submitted with Plaintiffs' motion for class certification.

In formulating my opinions, I rely on analysis of the standard sources used by political scientists, including a review of the relevant literature from political science and other disciplines. I also rely on documents and data provided to me by Plaintiffs' counsel, including files produced in discovery by the Tennessee Department of Correction (TDOC), the Tennessee Coordinator of Elections in the Secretary of State's Elections Division, the Tennessee Department of Human Services (DHS), and various county-level election administrators and court clerks. I analyzed publicly available information disseminated by those government entities, including their websites and online court records. I reviewed and rely on deposition testimony of Jessica Lim, former Elections Attorney in the Elections Division, and Juanita Shaw, a supervisor in TDOC's District 40 Probation Office located in Davidson County. Finally, I observed volunteers as they worked with individuals trying to restore their voting rights.

# 4  Summary of Opinions

Based on my analysis, I find evidence that:

- Far fewer people in Tennessee have their voting rights restored than are eligible, even relative to restoration and registration rates in other states.
- I estimate that 184,142 unique individuals with non-disqualifying felony convictions that have completed supervision are still alive today. Of these people, 5,549 (3.0%) have had their right to vote restored since July of 2006, when the COR statute went into effect.
- After accounting for other eligibility criteria such as owing court costs, restitution, or child support debt, I estimate that 61,158 individuals convicted after May 17, 1981 of a non-disqualifying felony conviction in Tennessee state courts are alive and eligible for restoration; 5,549 (9.1%) of this group have had their voting rights restored since 2006.
- The large gap between the number of people who are eligible for rights restoration and those who have had their rights restored is at least in part the result of problems with systemic failures within the rights restoration process.
- Tennessee does not provide adequate instructions to the public about how to request a COR or seek other pathways for voting rights restoration.

- TDOC, the primary public-facing agency with responsibility for issuing CORs, has not implemented adequate training or standard procedures for completing CORs, especially for people who are not eligible for restoration at discharge.
- The current process for requesting a COR often depends on county court clerks or agents in other states, who have no legal responsibility for implementing the COR process. As a result, many of these agencies have no responsibility to participate in the process, and if they do, there are no standardized policies for completing COR forms or providing relevant documents or information.
- Eligibility determinations can be stymied because documents sometimes are unavailable and responsibility for those documents is placed on applicants. In some places, court clerks, TDOC officers, or agencies in other states simply refuse to complete forms. Clerical errors also are common with no uniform way for voters to resolve them.
- Similarly situated people may be denied a COR depending on which county clerk or TDOC official they ask to fill out their COR form(s). Different offices and officials have differing policies and practices regarding which portions of the COR form they are willing to complete and which specific legal financial obligations (LFOs) they treat as court costs and restitution versus other types of LFOs that need not be paid to qualify for a COR, among other differences. As a result, people with the same felony convictions and LFOs could face different outcomes in the COR process depending on where they request to fill out their COR form.
- The lack of certainty—among individuals seeking rights restoration and administrators alike—in making eligibility determinations can effectively deny eligible individuals rights restoration to the extent that officials make mistakes in determining eligibility.
- The decentralization of the process exacerbates these problems by increasing the number of officials a voter must petition for certifications of eligibility, as does the lack of a routine appeals process.
- Even when a person successfully obtains a completed COR form, it may still be denied by the Elections Division because of errors on the form. Over 50% of denials of COR forms are for reasons other than a determination of ineligibility.
- These problems create a significant risk of errors, including erroneous deprivations of voting rights, in Tennessee's COR process.
- The lack of certainty around eligibility determinations and clear instructions about the COR process also lead many people with felony convictions who never lost their voting rights in the first place to engage in a needless rights restoration process.

I reserve the right to amend or supplement my opinions as more information is made available to me.

# 5 Statutory Disenfranchisement and Voting Rights Restoration in Tennessee

The Tennessee Legislature has established a process by which people who lost the right to vote as a result of certain felony convictions may regain those rights. My understanding is that people who were convicted of felonies on or after May 18, 1981 are eligible to have their rights restored if:[2]

1. They are no longer under corrections supervision; that is, they have completed their sentence(s).
2. They were not convicted of any of the following disqualifying crimes:

   After July 1, 1986

   - Voter fraud
   - Treason
   - First-degree murder
   - Aggravated rape

   After July 1, 1996, to June 30, 2006

   - Voter fraud
   - Treason
   - Any degree of murder or rape

   After July 1, 2006

   - Voter fraud
   - Treason
   - Any degree of murder or rape
   - Certain felonies involving bribery, misconduct involving public officials and employees, or interference with government operations.
   - Sexual offenses or violent sexual offenses that are felonies where the victim was a minor.

3. They have paid all restitution associated with their conviction(s).
4. They have paid all court costs ordered at the time of sentencing unless they can obtain a court order declaring that they are indigent.
5. They are current on child support.

People convicted of felony convictions before May 17, 1981 are not subject to this process or criteria. Per the Tennessee Constitution, only individuals convicted of "infamous crimes" and

---

[2] "Restoration of Voting Rights," Tennessee Secretary of State, https://sos.tn.gov/elections/guides/restoration-of-voting-rights (last accessed Feb. 11, 2023).

9

explicitly stripped of the right to vote by legislation lose the right to vote after a felony conviction. The Legislature has twice amended the criteria for loss of the right to vote in the last half century, once in 1972 and once in 1980.

Prior to January 15, 1973, only a certain set of felony convictions were potentially infamous and a person only lost the right to vote upon a conviction of such if the judgement specifically rendered that person infamous. A person not convicted of a felony that is on that list or a person convicted of an enumerated crime whose judgement did not include a statement of infamy never lost the right to vote.

In 1973, the Legislature removed the language stripping individuals of the right to vote. In 1981, the Legislature added language that removed the right to vote for all felony convictions in Tennessee courts. As a result, felony convictions in this "grace period" between January 15, 1973 and May 17, 1981 do not result in loss of the right to vote.

However, individuals convicted of felonies who never legally lost the right to vote continue to face paperwork requirements in order to register.

# 6  Eligibility Estimates

How many people are eligible to have their rights restored by requesting a COR in Tennessee? I analyzed data from several sources to estimate the eligible population. My starting point is a text file produced by TDOC to Plaintiffs' counsel that contains a set of 439,566 case records of state felony convictions in Tennessee.[3] Each case record contains identification numbers, the convicted individual's name, address, birthdate, race, sex, supervision status, case identifiers, offense data (such as severity, counts, and a crime description), and sentence data (such as punishment type, location, start dates, and end dates). I used these records and the additional data described below to estimate how many individuals are eligible for a COR, based on the criteria outlined on Tennessee's COR form and the website of the Tennessee Secretary of State. This estimate, because it relies on a database of people supervised by TDOC, ultimately underestimates the total number of eligible individuals because it does not include eligible people with out-of-state or federal convictions.

## 6.1   Individuals Who Have Completed Their Sentence

First, as noted above, an individual must have completed their sentence to be eligible for a COR. The text file provided by TDOC contains 326,459 unique Offender Identification Numbers, 324,919 of these individuals had felony convictions after May 17, 1981.[4] Of these, 111,590 had at least one case for which the status was listed as something other than inactive (such as "Pending," "Deceased," "Probation," "Parole,", or "Incarcerated"). The remainder, 213,329 individuals, only

---

[3] Produced to Plaintiffs by TDOC on June 16, 2022, as "114 NAACP lawsuit data request_Main.txt."
[4] These figures differ slightly from the estimates I submitted to the Court in October in my declaration related to class certification because here I take the additional step to remove people who do not have felony convictions after May 18, 1981. These individuals are not eligible to request a COR.

had cases listed as "Inactive" by TDOC, indicating that they are no longer under TDOC supervision and meet the first COR criterion.

### 6.2    Excluding Individuals Convicted of Disqualifying Crimes

Second, as described above, certain offenses render people permanently ineligible to vote. The disqualifying crimes vary over time, as described above and depicted in Figure 1 below:



**Persons convicted of any of the following, cannot have his or her voting rights restored:**

- Between July 1, 1986, and June 30, 1996 - first degree murder, aggravated rape, treason, or voter fraud

- Between July 1, 1996, and June 30, 2006 - murder, rape, treason, or voter fraud

- On or after July 1, 2006 – Any of the above, or any degree of murder or rape or any felony offense under TCA Title 39, Chapter 16, parts 1, 4, or 5; or any sexual offense under TCA §40-39-202(20) or any violent sexual offense under TCA § 40-39-202(30) designated as a felony and where the victim of such offense was a minor

*Figure 1: Disqualifying Crimes as Listed on COR Form.* Tennessee Secretary of State, "Certificate of Restoration of Voting Rights,"https://sos-prod.tnsosgovfiles.com/s3fs-public/document/SS-3041.pdf?VersionId=mkmQLLgHaDLdmu8VUXhRhjJAMRaYOkVU, at 2 (last accessed Feb. 11, 2023).

For each relevant time period (as noted on the COR form), I mapped TDOC crime descriptions to the disqualifying crimes listed above. Based on those descriptions, I determined that 7,728[5] individuals had finished serving felony sentences for disqualifying crimes as described above, leaving 205,601 individuals who are no longer being supervised and have only non-disqualifying felony convictions and therefore meet the first two COR criteria.

### 6.3    Estimating the Number of Individuals Who Are Not Deceased

Third, some people in this group may have died since they completed their sentences. In order to account for this possibility, I weighted each person in the sample with the probability they are still alive using the Social Security Actuarial Tables using their age and gender.[6] After accounting for these estimated deaths, 184,142 people have exited TDOC supervision for non-disqualifying crimes and are estimated to still be alive today.

### 6.4    Estimating the Number of Individuals Who Do Not Owe Court Costs or Restitution

Fourth, individuals who owe court costs or restitution are not eligible for CORs, except that court costs are not a barrier to rights restoration if the individual obtains a declaration of indigency from a court.[7] The requirement that people who are no longer under supervision pay

---

[5] This number may seem surprisingly small, but many of the people convicted of these very serious crimes are serving active sentences or died in prison.
[6] Social Security Administration, "Actuarial Life Table 2019," https://www.ssa.gov/oact/STATS/table4c6.html.
[7] For purposes of estimating eligibility, I did not take into consideration whether a person has been declared or could be declared indigent by a court. Thus, my figures underestimate the eligible population.

court costs and restitution is perhaps the most significant factor in rendering people ineligible for rights restoration.

In order to estimate the number of people who owe court costs or restitution, I took a random sample of individuals who were not under active supervision with TDOC and who had not been convicted of disqualifying crimes. With the help of my research assistants, I used county court clerk records to look up the outstanding court costs and restitution for that original sample of 986 people. Data on court costs and restitution were not available for individuals convicted of felony convictions in some counties.[8] The final sample for which outstanding court costs and restitution could be determined was 612 individuals (some individuals had multiple cases).

For the 612 individuals, we recorded the initial amounts assessed for court costs and restitution and the amounts still due, if any. In some counties, such as Davidson, "court costs" and "restitution" were labeled as such in online case records.[9] However, some counties only provide an itemized list of charges with no clear indication as to which of the LFOs are court costs or restitution and which are not.[10] For those counties, I was advised by counsel for the plaintiffs to treat state and county litigation taxes, CIC tax, clerks' fees, and courtroom security fees as court costs or restitution (but not charges related to drug testing, public defenders, probation violations, officer reimbursement, subpoenas, arrest and jail fees, fines, or victim notification fees). For Shelby County, which does not itemize or categorize LFOs, I treated the entire amount due as an individual's outstanding court costs or restitution.[11]

Of the 612 individuals I studied, 65.4% still owed money for court costs and restitution. Using the same random sample, I calculated the percentage of people who owed court costs and restitution for groups based on race, age, and gender as shown in Table 1. I used these values to calculate the weights that I use later to estimate the likelihood that an individual does not owe court costs or restitution. For the youngest category, I merged male and female because of small sample sizes. Moreover, 100% of Latino people in the sample owed court costs and restitution, though the sample was small.

---

[8] The counties in the sample for which we were not able to look up legal financial obligations fully include: Benton, Bradley, Claiborne, Dyer, Gibson, Grainger, Grundy, Hardeman, Hardin, Henderson, Knox, Cannon, Marshall, Maury, Sevier, Stewart, Trousdale, Union, Van Buren, Wayne, White, Stewart, Sequatchie, Scott, Overton, McNairy, McMinn, Lincoln, Houston, Hickman, Hancock, Fentress, Fayette, Warren, Decatur, DeKalb, and Crockett. These counties represent about 22% of the overall Tennessee population.

[9] For some cases, we called court clerks when we could not find data in the online records.

[10] Rutherford, Robertson, Sullivan, Sumner, Tipton, Washington, Weakley, Williamson, Wilson, Obion, Montgomery Jefferson, Dickson, Cheatham, Carter, Carroll, and Bedford.

[11] The evidence indicates that Shelby County counts all money owed to the county when reporting outstanding court costs on CORs. For instance, in the data provided by the Shelby County Criminal Court Clerk to Plaintiffs' counsel (see note 13), their reported amounts for individuals in the sample matched the ones we calculated by including the entire amount due as reported on Shelby County's online database. Comparing our assessment of outstanding court costs using the online database to those provided by Shelby County, we found that 91.5% of our sample convicted in that county still owed money, while Shelby County reported that 100% of the sample still owed money.

*Table 1: Percentage of sample owing court costs and restitution, by race, age, and gender.* Data used for weighting sample of inactive, eligible people with felony convictions.

| | Black Male | Black Female | White Male | White Female |
|---|---|---|---|---|
| Age 18-29 | 90.0% | | 50.0% | |
| Age 30-44 | 88.5% | 80.0% | 69.0% | 44.0% |
| Age 45-64 | 69.9% | 61.5% | 50.8% | 50.0% |
| Age 65 and up | 60.0% | 60.0% | 47.8% | 72.7% |

Applying the above rates to weight the full sample of individuals who have completed their sentence for a non-disqualifying crime, I estimate that 66,412 of those estimated 184,142 individuals do not owe court costs or restitution.

### 6.4.1   *The Effects of Race and Age on Outstanding Court Costs and Restitution*

As Table 1 indicates, the race and age gaps in owing court costs and restitution have important effects on who is eligible to have their rights restored. Overall, 74.8% of Black people in the sample are rendered ineligible because of LFOs, compared with 55.3% of White people. Black people are about 38% of the population that has completed a sentence for a non-disqualifying crime but only 26.7% of the population that has completed a sentence for a non-disqualifying crime *and* has no outstanding court costs and restitution.

Older Tennesseans are less likely to be disqualified due to court costs and restitution. The age gap may be in part because older people tend to be better off and have had more time to pay off their legal debt, but other factors, like the fact that the number of LFOs assessed has grown over time, also may account for the difference.[12] According to my estimates, 42.5% of White people and 40.8% of Black people over age 65 have served their sentence for a non-disqualifying crime and have no outstanding court costs and restitution.

Combining race and age shows that ninety percent of young Black people are ineligible for rights restoration due to court costs and restitution. According to my calculations, only 290 Black people between the ages of 18 and 29 are eligible for rights restoration, a figure that represents 10% of the Black people in that age group who have finished serving sentences for non-disqualifying crimes (N=2904). As shown in Table 1, about half of young White people who have finished serving sentences for non-disqualifying crimes have no remaining costs or restitution to pay.

---

[12] Jennifer Barrie, et al., "Tennessee's Court Fees and Taxes: Funding the Courts Fairly" (Jan. 2017), https://www.tn.gov/content/dam/tn/tacir/documents/2017_CourtFees.pdf.

### 6.4.2    *Shelby County Court Costs in Depth*

Because LFOs pose a significant barrier to eligibility for voting rights restoration, I examine in depth the treatment of LFOs in Shelby County, which accounts for the largest share of convictions in the TDOC file. Shelby County provided Plaintiffs' attorneys with information about court costs owed for part of the sample analyzed above.[13]  We can draw several inferences from these data.

First, comparing my research on these cases with the information provided by the county, it is clear that Shelby County Criminal Court Clerks count *all* LFOs, including fines, when determining whether a person owes LFOs for purposes of voting rights restoration.[14] For this reason, according to the Shelby County clerks that sign off on CORs, the average amount that must be paid in order to restore voting rights for individuals with felony convictions in Shelby County is quite high: $8,630.47. According to the Shelby County Criminal Court Clerk's office, every one of the 95 individuals in the sample that they were able to find in their records still owed money for court costs. In other counties, there were people who had fully paid their obligations. Other counties also count fewer LFO categories as "court costs" when completing the relevant section of the COR form. For instance, Davidson County, which has the second highest number of people with inactive sentences in the TDOC file, now considers only court costs (and not fines or litigation taxes) when completing the COR form. As a result, people convicted in Davidson County will need to pay fewer categories of LFOs and less money overall to have their rights restored than if they had been convicted of the same offense in Shelby County.[15]

As is the case with the larger sample, there are racial differences in the average amount of LFOs owed to Shelby County. Black people owed an average of $8,698.15 to Shelby County while White people owed an average of $7,278.36 to the county. This gap reflects the level of LFOs originally assessed rather than differences in making payments: the average *initial* LFOs for the White people in the Shelby County sample was $7,526.55, far less than the amount still due for Black people in the sample. The initial and total amounts owed for White people in Shelby County are similar because only three of the eleven White people in the sample had paid more than $500 on their debt, and six had not made any payments at all.

There are enough Black people in the sample to make comparisons among age groups. We see a pattern similar to the larger sample: young people are more burdened by court costs and restitution than older people. As shown in Table 2, Black people under age 45 owe more than $12,000 to Shelby County, on average, while Black people over age 45 owe less than $7,000 on average to the county. These gaps partly result from older people having had more time and money

---

[13] I provided Plaintiffs with a list of individuals with convictions in Shelby County and they obtained determinations on court costs from the Shelby County Criminal Clerk. The file that Plaintiffs provided me is labeled "12-2022-GLANE1."

[14] See "RE: Curtis Gray" Email from Cassaundra Horton to Allie Gottlieb, September 21, 2020, in "Gray Cassaundra Email.pdf"; "Gray financials.pdf"; "RE: COR Applicants" Email exchange between Blair Bowie and Cassaundra Horton, August 13, 2020, in "Perry_Horton email.pdf."; "Perry financials.pdf."

[15] See "Davidson County Criminal Court Clerk Letter.pdf," November 15, 2022 Letter to Howard Gentry from Blair Bowie; Email from Cynthia Gross to Blair Bowie and Charles Grant, December 30, 2022, in "Davidson County Criminal Court Clerk email thread."

to pay, but they also reflect the fact that the imposition of LFOs has increased over time, as discussed previously.

*Table 2: Average amount due to Shelby County for court costs for Black people with inactive sentences, by age.* Data Sources: Shelby County Criminal Court Clerk's Office.

| Age | Average Amount Due |
|-----|--------------------|
| Under 30 | $13,714 |
| 30-44 | $12,547 |
| 45-64 | $5,768.63 |
| 65 and Older | $6544.10 |

### 6.5    Estimating the Number of Individuals Who Do Not Owe Child Support

Finally, voting rights cannot be restored to individuals who are not current (i.e., in arrears) on their child support obligations. DHS provided data on child support arrears for a random sample of individuals who have completed state felony sentences. Of these individuals, 10.9% were in arrears on their child support obligations. As Table 3 shows, again, the likelihood of being in arrears varies by age, race, and gender, with younger people, Black people, and men more likely to be behind on payments. Using these data, I was able to calculate weights by race, age and gender for the likelihood that a person who has finished serving a sentence under Tennessee authority is not in arrears on their child support.

*Table 3: Percent in arrears for child support.* DHS provided these data for a sample of people who had finished serving a felony conviction under Tennessee authority.

| | White | | Black | |
|-----|--------|------|--------|------|
| Age | Female | Male | Female | Male |
| Under 30 | 0% | 0% | 0% | 22.2% |
| 30-44 | 4.8% | 16.2% | 0% | 28.6% |
| 45-64 | 2.4% | 5.0% | 0% | 18.8% |
| 65 and Older | 0% | 0% | 0% | 0% |

### 6.6    Final Estimate of Eligible Population

After weighting the sample with a final weight that is the joint probability that a person is still alive, does not owe court costs and restitution, and is not in arrears for child support,[16] **I estimate that 61,158 people meet all five COR eligibility criteria and are eligible to have their voting rights restored.** As noted above, this is an underestimate because it does not account for eligible individuals convicted of out-of-state and federal felonies. Nor does it account for eligible or potentially eligible individuals who owe court costs but have been declared or could be declared indigent by a court.

---

[16] This means, that for each individual, I multiply the weights for still being alive, having no disqualifying LFOs, and having no child support arrears. Each individual is counted in the final estimated total proportionally using this weight. I do not predict the eligibility of particular individuals in the sample.

Table 4 shows the breakdown of the estimated eligible population by race and gender. Figure 2 summarizes the effects of the restoration requirements on the eligible population step-by-step.

*Table 4: Population eligible for rights restoration after Tennessee felony convictions, by race and gender.* The final eligible population takes account of disqualifying felonies, sentence completion, deaths, court costs and restitution, and child support arrears.

| Race | Female | Male | Total |
|------|--------|------|-------|
| Black | 3,538 | 11,753 | 15,291 (25. 0%) |
| White | 13,107 | 32,760 | 45,867 (75.0%) |



*Figure 2: Step-by-step summary of estimating population eligibility for rights restoration.*

# 7 Who Gets Their Voting Rights Restored in the COR Process?

Very few eligible individuals have had their voting rights restored in Tennessee. Based on the analysis described below, I estimate that 5,549 individuals with state felony convictions have had their voting rights restored since the COR process was initiated in July of 2006.[17] This figure represents 3.0% of the 184,142 people who have finished serving sentences for non-disqualifying state convictions after May 17, 1981, which is in line with the 2.5% to 4.9% range reported by Meredith and Morse (2017).[18] Of the estimated 61,158 eligible individuals with non-disqualifying state felony convictions who are likely to have no outstanding court costs, restitution, or child support arrears, approximately 9.1% have had their voting rights restored since 2006.

Tennessee's restoration rate is low relative to the voter registration of people with felony convictions in other states.[19] Among people subject to automatic restoration of rights—meaning no application or additional paperwork is required—voter registration is significantly higher. In Rhode Island, where voting rights are automatically restored upon completion of sentence, it was 43.3%.[20] Tennessee's rate is low even when compared with states that do not have automatic restoration. For example, a 2015 study found that in Iowa, registration among people who had completed felony convictions who were subject to automatic restoration was 26.7%.[21] Reimposing an application process for restoration in 2011 was a barrier to registering to vote, decreasing registration and turnout rates for subsequent releasees in Iowa by ten percentage points.[22] As discussed below (section 9), the low restoration rate in Tennessee as compared to registration rates in these other states results at least in part from features of the process that increase the risk of erroneous deprivation.

---

[12] This number differs from that provided by the Elections Division in public documents. *See, e.g.*, Uggen, Christopher, Ryan Larson, Sarah Shannon, & Arleth Pulido-Nava, "Locked Out 2020: Estimates of People Denied Voting Rights due to a Felony Conviction," (2020) (reporting that the Elections Division stated that 3,415 people had their voting rights restored in Tennessee since 2016). Their number likely includes people who were restored for in-state, out-of-state, and federal convictions, while I discuss primarily felony convictions under Tennessee law in this section. My numbers are higher, however, because I calculate the total number of people convicted of felonies under Tennessee law who have had their rights restored since 2006, rather than just the ones restored since 2016.

[18] Marc Meredith & Michael Morse, "Discretionary Disenfranchisement: The Case of Legal Financial Obligations," at Online Appendix-1 (Aug. 8, 2017), https://www.sas.upenn.edu/~marcmere/workingpapers/DiscretionaryLFOs.pdf (using data from the Election Division's inmate restore file through 2013).

[19] These are appropriate figures to compare because Tennessee residents often submit COR forms to their county election office along with voter registration applications and are generally registered to vote if granted a COR.

[20] Marc Meredith & Michael Morse, "The politics of the restoration of ex-felon voting rights: The case of Iowa," *Quarterly Journal of Political Science* 10 (2015): 41-100.

[21] Meredith & Morse, 2015: 72.

[22] Meredith and Morse, 2015: 69.

## 7.1   Estimating Voting Rights Restorations Through the COR Process

To estimate voting rights restorations in Tennessee through the COR process, I examined the Election Division's "Restoration Database",[23] "Interstate Compact Database,"[24] and "Federal Purge Database,"[25] as well as TDOC's "2022-114 NAACP lawsuit data request_Main.csv."[26]

In the Restoration Database, there are 16,790 non-blank entries with unique last, first, and middle name combinations. However, not all of these entries represent individuals who have had their voting rights restored through the COR process—some appear to have had their rights restored through other means and others appear to have never lost their voting rights in the first place. Of the 16,790 unique entries:

- 5,549 had TOMIS identification numbers that I could use to match to corresponding entries in TDOC's database of individuals with state felony convictions, "2022-114 NAACP lawsuit data request_Main.csv." I matched restorations only to people with felony convictions after May 17, 1981. This is the best available estimate of individuals with state felony convictions after May 17, 1981 who have had their voting rights restored since the inception of the COR system. I also used data from the "Main" TDOC file to determine the race, age, and gender of these individuals, as discussed in the next section.

- 864 entries had TOMIS identification numbers that I was able to match only to people with no state felony convictions after May 17, 1981.

- 1,242 entries matched TOMIS identification numbers of people with felony convictions after May 17, 1981 but were restored before July 1, 2006.

- 3,396 entries were labeled as out-of-state or federal convictions or could be matched to entries in the "Interstate Compact Database" or "Federal Purge Database" files. Of these, 1617 entries were marked as federal or out-of-state in the "TOMISNbr" column of the "Restoration Database" file. The remainder could be matched by last and first name to the "Interstate Compact" or "Federal Purge" files, with subsequent duplicate matches deleted. This is the best available estimate of individuals with out-of-state or federal felony convictions who have had their voting rights restored at any point.[27]

---

[23] Produced to Plaintiffs by the Elections Division and Secretary of State on June 27, 2022, as "Inmate Rest REDACTED.xlsx."

[24] Produced to Plaintiffs by the Elections Division and Secretary of State on June 27, 2022, as "ISC Sentences REDACTED.xlsx."

[25] Produced to Plaintiffs by the Elections Division and Secretary of State on June 27, 2022, as "Inmate Purge.xlsx."

[26] Produced to Plaintiffs by TDOC on June 16, 2022, in response to a request for "documents, including databases, lists, tables, or other records, sufficient to show all individuals who have been supervised by the Tennessee Department of Corrections since May 18, 1981."

[27] I cannot precisely estimate the restoration rate for individuals convicted of out-of-state and federal felonies because I do not have a complete list all people convicted of such felonies who live in Tennessee. However, I can roughly estimate the restoration rate for people in Tennessee convicted of federal felonies. By taking an average of the number of federal criminal cases disposed in Tennessee for certain years and deflating that number by a third to account for recidivism, I estimate that 35,553 people were convicted of felonies in federal court in Tennessee since 1990. *See* United States Courts, "Caseload Statistics and Data Tables," https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables?m%5Bvalue%5D%5Bmonth%5D=&pn=All&t=All&tn=d-3&y%5Bvalue%5D%5Byear%5D=&page=1 (last accessed Dec. 19, 2022). This number may be higher to the extent that people convicted in other jurisdictions might move to Tennessee. In the "Restoration Database" file, 604 people are marked as restored for a

- 1,654 were labeled as having been restored by a means other than a COR or as having no felony conviction (e.g., diversions, dismissals, expungements, misdemeanors, or errors) in the "Charge" or "No Felony" columns of the "Restoration Database" file. These people may have had no felony convictions or were convicted before 1981. Because these individuals were not disqualified from voting or had their rights restored by a means other than a COR, I do not count them as having had their rights restored through the COR process.

- 4,085 entries from the "Restoration Database" could not be matched to any of these felony files, and the notations in the "Restoration Database" file did not provide any information for categorizing them further. These may have been additional out-of-state convictions (especially for people who did not serve their sentences under TDOC authority), federal convictions, or people who were incorrectly flagged by the Elections Division as having been convicted of felonies. I cannot reasonably conclude that these individuals have had their rights restored through the COR process.

7.2    Demographic Breakdown of Voting Rights Restorations

Matching the entries in the "Restoration Database" file with corresponding TDOC records using the TOMIS number as described above allows me to report demographic data on restorations, at least for the people convicted of Tennessee felonies. The following discussion relates only to the 5,549 restorations after July 2006 for Tennessee felonies; people restored for out-of-state or federal convictions may have different demographic characteristics and thus are excluded from the analyses presented below.

Of the larger population of people who have completed supervision for non-disqualifying crimes, 59.2% are White and 38.1% are Black. According to Table 5, I find that Black people are slightly overrepresented in the population of people who have had their voting rights restored after non-disqualifying Tennessee felony convictions since 2006: 41.7% of restored voters are Black, while 57.7% are White. Less than 1% are people of unknown or other races. These figures suggest that Black people attempt rights restoration at higher rates, a conclusion substantiated by Meredith and Morse (2017).[28] Taking the total restorations since 2006 from Table 5 as the numerators by race, and the total who have finished serving sentences for non-disqualifying felonies as the denominator,[29] I calculate that 3.3% of Black people convicted of non-disqualifying state felonies since 1981 were restored since 2006, compared with 2.9% for White people and 0.7% for people of other races.

---

federal felony conviction. I was able to match an additional 563 entries to the "Federal Purge Database" file using last and first name, for a total of 1,167 estimated restorations for federal convictions and a restoration rate among people convicted of federal felonies of 3.3%.

[28] Meredith and Morse, 2017. Online appendix p. 6.

[29] 70,169 Black people; 109,035 White people; and 4,938 people of other races.

*Table 5: Restorations since 2006 for non-disqualifying Tennessee felony convictions, by race and gender (all inactive)*

|  | Female | Male | Total |
|---|---|---|---|
| Black | 642 | 1,670 | 2,312 (41.7%) |
| White | 817 | 2,386 | 3,203 (57.7%) |
| Other | 8 | 26 | 34 (0.5%) |

Turning now to estimates of rights restoration for the eligible population in Table 6, it is important to remember that, as shown in the preceding discussion, eligibility for rights restoration is shaped dramatically by race: Black people are more likely to have court costs and restitution making them ineligible to get their voting rights restored. For instance, I found that only 25.8% of Black people who are no longer under TDOC supervision are estimated to have paid their court costs and restitution, compared with 44.8% of White people. Moreover, child support arrearages reduce these eligible populations even further. With these caveats, however, it is clear that eligible Black Tennesseans have had their rights restored since 2006 at higher rates than eligible White Tennesseans, as shown in Table 6. These figures still fall far below the voter registration rates of people who have finished supervision in other states.

*Table 6: Restorations since 2006 for non-disqualifying Tennessee felony convictions for people without costs, restitution, or child support arrears, by race*

|  | Restored | Completed, no LFOs or Child support | Percent |
|---|---|---|---|
| Black | 2,312 | 15,290 | 15.1% |
| White | 3,203 | 45,868 | 7.0% |

Turning now to the relationship between restorations and age, Table 7 shows that young people are less likely to have their voting rights restored after they leave supervision. Young people with felony convictions remain almost completely disenfranchised in Tennessee. Looking at these disparities by race, only 3 Black people with non-disqualifying Tennessee felony convictions who are currently under the age of 30 have had their voting rights restored, compared with 17 White people.

*Table 7: Rights restoration after completion of non-disqualifying Tennessee felony convictions, by age*

|  | Total Restored | Percent of Completed Sentence, weighted for deaths | Percent of Completed, No LFOs or Child Support |
|---|---|---|---|
| Under 30 | 20 | 0.3% | 1.10% |
| Age 30 to 44 | 967 | 1.5% | 6.5% |
| Age 45-64 | 3,250 | 3.4% | 8.9% |

21

| Age 65 and older | 1,297 | 6.5% | 16.1% |
|---|---|---|---|

In summary, the number of people granted voting rights restoration since 2006 after felony convictions in Tennessee is low relative to other states. Within this overall finding, the percentage of people who have had their rights restored since 2006 after completing a non-disqualifying Tennessee felony sentence varies a small amount by race, but dramatically by age. The effect of costs, restitution, and child support on eligibility also vary by race and age, shaping the pool of restored voters as well.

# 8 Description of the Certificate of Restoration Process

Why is the rate of restoration via COR so low in Tennessee, even when compared to other states that require people with felony convictions to apply to restore their rights? I conclude that Tennessee's low restoration rate is attributable, at least in part, to systemic flaws in its COR process. I describe the COR process in this section and describe the problems with that process in the following section.

Depending on the time period and location of conviction, there are multiple pathways for restoration in Tennessee—e.g., by seeking court orders, submitting judgment documents, or by requesting a COR. The public information available on the Secretary of State's website, however, only discusses one mechanism, the COR, and says that a COR form "must" be completed in order to restore voting rights:

> The restoration of voting rights form may be used to restore an individual's voting rights for a felony conviction on or after May 18, 1981. **Note**: **For each felony conviction on or after May 18, 1981 – whether federal, Tennessee state, or another state – a separate restoration of voting rights form must be completed for each felony conviction with a different docket/case number.**
>
> The form must be completed by an agent, such as a probation/parole officer or criminal court clerk, who has the authority to provide the required information regarding the individual's conviction, final release date and information regarding restitution or court cost. The person convicted of the felony offense may not complete the restoration of voting rights form. Once the form(s) are completed, the form(s) must be submitted to the local county election commission office in the county in which the individual resides.[30]

In the following discussion, I will focus on the process to obtain a COR for people convicted on or after May 18, 1981 and discuss the other pathways for voting rights restoration later in this report.

---

[30] TN Secretary of State, "Restoration of Voting Rights," https://sos.tn.gov/elections/guides/restoration-of-voting-rights (last accessed Feb. 10, 2022) (emphasis added).

8.1  Requesting a COR

There are no clear instructions posted on the Secretary of State's website, the voter registration form, or the COR form describing the process for requesting a COR. A person must obtain a COR form and have it completed by the appropriate state or local officials willing to certify that the person meets each of the eligibility criteria. A blank COR form is attached to this declaration as Exhibit B.

Individuals seeking CORs may initiate the process at several points. They may contact the Administrator of Elections (AOE) in their county of residence, or perhaps the criminal court clerk or probation and parole office in the county or counties of their conviction(s). A few individuals (by my estimate, fewer than 20% of those who exit supervision) are given a partially completed COR form and other paperwork upon discharge from supervision.[31] Some also may receive a blank COR form from the Coordinator of Elections after submitting a voter registration application and checking the box indicating that they have a felony conviction.[32] These individuals are sent a blank COR form with their voter registration rejection packet.

Although the instructions on the COR form and the Secretary of State's website do not state this explicitly, a person convicted of a felony outside of Tennessee may have to contact county clerks and corrections officials in other states to ask them to complete sections of a COR form.[33]

Similarly, although the instructions do not explicitly state it, individuals with federal felony convictions must first submit their COR to federal authorities for completion. Internal documents from the Coordinator of Elections state that the proper authority is an officer from the U.S. Probation or Parole office.[34] These agents are supposed to verify completion of the sentence as well as the payment of costs and restitution.

Completed COR forms must be submitted to the AOE of the county where the person seeking restoration resides and intends to register to vote. Depending on the county, the person seeking to have their rights restored will submit the COR to the AOE, but sometimes government officials will send over the paperwork. The AOE then forwards the COR forms to the Coordinator of Elections. The Coordinator of Elections will then check the submitted COR forms and verify that the person seeking a COR does not have additional convictions and is current on any child support obligations. At this point, approval or denial of the request for rights restoration is communicated to the county AOE.

---

[31] I received a spreadsheet titled "TDOC 000084-2022-114 NAACP lawsuit TEPE Contact Notes Voter Restoration Comments.xlsx," which contains information on individuals discharged from probation. It contains 51,011 entries. After reading notes on discharge for dozens of individuals, I developed a list of commonly used phrases to indicate when people were not given what is typically described in the spreadsheet as "voter registration paperwork," which I assume to mean COR forms: "not eligible," "ineligible," "owes," "balance," "revoked," "form not provided," "not restored," "not mailed" and "fee arrearage." A total of 36,505 of the 51,011 entries (71.6%) contained at least one of these phrases. 84.5% of the entries from the year 2022 contained at least one of these phrases.
[32] 5. Felon Restorations Training (rev.5.2022 JCL) p. 2.
[33] 5. Felon Restorations Training (rev.5.2022 JCL) p. 17.
[34] 5. Felon Restorations Training (rev.5.2022 JCL) pp. 10, 24.

## 8.2    TDOC

TDOC is an important part of the COR process. The stated policy of TDOC, as of October 10, 2019, is to fill out CORs and provide them upon discharge, either in person or by mail.[35] But, in reality, I find that relatively few individuals obtain CORs under this policy.

First, the policy states that CORs should be provided at discharge only to the people who are eligible—that is, they have not been convicted of disqualifying crimes and have paid their court costs and restitution.[36] As the TDOC database shows, very few people discharged from probation and parole supervision meet these criteria immediately because many people still owe court costs or restitution at the time of discharge.[37] Some are ineligible due to disqualifying felonies.[38] Moreover, others are marked as in the TDOC database as "discharged" because they died or their probation was revoked.[39]

Second, the application of the policy to provide completed COR forms at discharge is inconsistent. The case notes indicate that some people in the file were given restoration paperwork even though the notes in the file said that they had a balance due,[40] while others were not given restoration paperwork because of their unpaid costs or restitution.[41] For instance, Juanita Shaw, a TDOC official and Voter Restoration Coordinator for her district, testified that the policy in her office is that everyone gets a COR form at release unless they were convicted of an ineligible crime; however, her office does not complete section 4 (concerning court costs).[42] Similarly, the probation officer for Person A[43] completed a COR form and submitted it for him directly to the Coordinator of Elections and indicated on the form that Person A still owed court costs.[44] I estimate that 71.6% of the people in the discharge database provided to me by Plaintiff's council were not given voter registration paperwork at discharge because they were ineligible.[45]

---

[35] TDOC 000079, "Administrative Policies and Procedures, State of Tennessee Department of Correction, Restoration of Offender Voting Rights." Effective Date October 10, 2019.

[36] TDOC 000080, "Administrative Policies and Procedures, State of Tennessee Department of Correction, Restoration of Offender Voting Rights." Effective Date October 10, 2019.

[37] TDOC 000080, "Administrative Policies and Procedures, State of Tennessee Department of Correction, Restoration of Offender Voting Rights." Effective Date October 10, 2019.

[38] TDOC 000080, "Administrative Policies and Procedures, State of Tennessee Department of Correction, Restoration of Offender Voting Rights." Effective Date October 10, 2019.

[39] Based on my analysis of "TDOC 000084-2022-114 NAACP lawsuit TEPE Contact Notes Voter Restoration Comments.xlsx" described above.

[40] For instance, in "TDOC 000084-2022-114 NAACP lawsuit TEPE Contact Notes Voter Restoration Comments.xlsx," rows 48580, 49244, and 48726 are examples of entries in which outstanding court costs were noted but the person was apparently provided a COR in 2022.

[41] For contrast, see rows 49247 and 49157 in "TDOC 000084-2022-114 NAACP lawsuit TEPE Contact Notes Voter Restoration Comments.xlsx" for examples of cases in which people were not provided CORs due to outstanding court costs in 2022.

[42] Deposition of Juanita Shaw at 26:24-27:3.

[43] I have anonymized the names of specific individuals with felony convictions that I discuss in this report to protect their privacy, except for the names and identities of named Plaintiffs in this case and other individuals whose identities are publicly known.

[44] Email from Jessica Lim to Robertson Commission, April 11, 2022 in "[Person A] Robertson County April 2022.pdf."

[45] See note 32.

24

The small number of people provided CORs at discharge means that the majority of eligible individuals who completed the terms of their sentence for state felonies must initiate contact with TDOC staff (or in some counties, the AOE or clerks' office) to get their CORs completed or updated after they have fulfilled the requirements of eligibility. However, the TDOC policy described above says little about how to field such requests post-discharge. In my review of records from discovery and the TDOC website, I could find no procedures that require officers to complete CORs when requested after a person is discharged from supervision. A TDOC policy dated June 1, 2022 only says that "TDOC staff shall provide assistance to any former TDOC offender who requests it. TDOC shall make appropriate referrals and assist the former offender."[46] CORs or help with voter registration are not mentioned in the "list of services TDOC staff may provide to former offenders."[47] Persons seeking rights restoration must get someone at TDOC to complete their COR form even if they themselves have never been on probation or parole and thus do not have a particular officer as a point of contact.[48]

### 8.3    Court Clerks

While TDOC has primary responsibility for completing CORs, in many cases applicants must also rely on the court clerk's office to complete all or some sections of the COR, particularly the sections related to court costs and restitution. However, as counsel for the Blount County Circuit Court Clerk notes: "The Tennessee laws relative to rights restoration . . . do not place any duties or obligations on the Circuit Court Clerk."[49] Perhaps for this reason, I have not yet seen any written policies of court clerks requiring or guiding the completion of CORs. Clerks in several counties responded to Plaintiffs' subpoenas by stating that they had no such policies.[50]

The evidence suggests that there is no uniform process for completing CORs across clerks' offices. Some clerks complete the entire form, while others only complete section 4. For instance, in Davidson County, the TDOC probation office completes sections 2 and 3 of the COR form (concerning completion of sentence and restitution), but the clerk's office completes only section 4 (concerning court costs).[51] In contrast, in Sullivan and Montgomery counties, the court clerk completes sections 3 and 4 of the COR form on costs and restitution, but leaves TDOC officials to complete section 2, the part about the sentence.[52] Some clerks track requests for help with CORs, while others do not.[53] Still others help persons seeking rights restoration by suggesting that they petition for indigency if they owe costs or provide additional assistance,[54] while others do nothing

---

[46] TDOC 000061. "Administrative Policies and Procedures, State of Tennessee Department of Correction, Reentry Services and Assistance to Inmates and Former Offenders, June 1, 2022."

[47] TDOC 000062. "Administrative Policies and Procedures, State of Tennessee Department of Correction, Reentry Services and Assistance to Inmates and Former Offenders, June 1, 2022."

[48] Email from Jessica Lim to Henry Commission, April 18, 2022 in "[Person D] Henry County April 2022.pdf."

[49] See Letter from Craig L. Garrett to Charles K. Grant July 13, 2022 p. 1 (Blount County).

[50] See Letter from Craig L. Garrett to Charles K. Grant July 13, 2022 p. 1 (Blount County); Letter from W. Timothy Harvey July 26, 2022 p. 1 (Montgomery County), and "Response to 'Documents to be Produced' in 3:20-cv-01039 in p. 10 of "20220725123028938_20220725_13222410756.pdf" for examples.

[51] Deposition of Juanita Shaw at 55:2-10, 64:7-10.

[52] Letter from W. Timothy Marvey to Charles K. Grant, July 26, 2022. P.1. and "Response to 'Documents to be Produced' in 3:20-cv-01039 in p. 10 of "20220725123028938_20220725_13222410756.pdf."

[53] See "All COR Data Carlatina Cedric Aloha.xlsx," and Letter from Craig L. Garrett to Charles K. Grant July 13, 2022 p. 2 for contrasting examples from Davidson and Blount County, respectively.

[54] "All COR Data Carlatina Cedric Aloha.xlsx."

but provide the form and information about amounts due.[55] Some clerks give completed paperwork back to persons seeking rights restoration to submit to their county AOE,[56] while others send the completed COR form to the county AOE directly.[57]

### 8.4    County Administrators of Elections

Completed COR forms must be submitted to the AOE for the county where the person resides and intends to register to vote. The county AOE is supposed to forward the COR form to the Coordinator of Elections for a determination as to whether the person is eligible to register to vote. However, if the COR form is not complete, the county is not supposed to send the COR form to the state for an eligibility determination.[58] The AOE is supposed to return the COR form to the person seeking rights restoration to be completed.[59]

### 8.5    Coordinator of Elections

Once the Coordinator of Elections receives a COR form from either (a) a county Administrator of Elections,[60] (b) a probation officer,[61] or (c) an individual person seeking rights restoration,[62] the Coordinator of Elections begins the process of verifying eligibility. First, they will check the applicant's information through five databases ("TDOC New," "Inmate Purge," "ISC Sentences," "Inmate Rest," "Denial Restore").[63] If the person has an out-of-state conviction, the Coordinator of Elections will check the five databases *plus* Westlaw to check for additional convictions.[64] Next, before 2022, the Coordinator of Elections required documentation that all costs and restitution had been paid,[65] but beginning in May 2022, people are denied for unpaid court costs only if the clerk checks the last box in section 4 of the COR, indicating that court costs are still owed.[66] If all convictions found in the five databases are listed in the COR(s) that were submitted, and no costs or restitution are owed, then the file is sent for Child Support Verification.[67]

If there are problems with the COR form that indicate that an individual is ineligible (e.g. owes court costs or is still under supervision), the restoration is denied. However, people also are denied because of incomplete submissions. For instance, sometimes convictions are missing from the paperwork; this can happen when convictions are from out-of-state or federal courts and the person seeking rights restoration submitted their form to Tennessee authorities. However, some

---

[55] Letter from W. Timothy Marvey to Charles K. Grant, July 26, 2022 p. 1.
[56] "All COR Data Carlatina Cedric Aloha.xlsx"
[57]    See    Response    to    'Documents    to    be    Produced'    in    3:20-cv-01039,    p.    10    of "20220725123028938_20220725_13222410756.pdf."
[58] See DEF000116 at 1.
[59] Id.
[60] 5. Felon Restorations Training (rev.5.2022 JCL) p. 11.
[61] 5. Felon Restorations Training (rev.5.2022 JCL) p. 11.
[62] 5. Felon Restorations Training (rev.5.2022 JCL) p. 11.
[63] 5. Felon Restorations Training (rev.5.2022 JCL) pp. 11-12
[64] 5. Felon Restorations Training (rev.5.2022 JCL) p. 20.
[65] "Felon Restoration Process - Outline.pdf," p. 7.
[66] 5. Felon Restorations Training (rev.5.2022 JCL) p. 11.
[67] 5. Felon Restorations Training (rev.5.2022 JCL) p. 12.

COR forms are missing convictions due to mistakes made by probation and parole officers or court clerks as shown later in this report.[68]

When a COR is rejected, the only recourse appears to be resubmitting new COR forms. For denials because an individual did not submit a separate COR form for each of their felony convictions, the person seeking restoration must submit an additional COR form for each additional felony. For denials due to incomplete paperwork or missing documentation, the person seeking restoration must either submit new COR forms or resubmit the form with missing information corrected or documented. I have seen evidence in the files that the Coordinator of Elections sometimes corresponds with county agencies to get additional information, but I do not see evidence in the files that this effort takes place for every denial or in any systematic way. Upon denial, the person seeking rights restoration must continue the process of seeking out officials to fill out CORs to show they meet the eligibility requirements.

# 9 Problems with the COR Process

As I noted previously, the rate of voting rights restoration in Tennessee lags behind rates in other states. Several problems with the process for obtaining a COR contribute to Tennessee's low restoration rate among eligible individuals. These problems occur throughout the process.

## 9.1   Difficulties with Starting the COR Process

### 9.1.1   *Finding Someone to Help*

As I have described elsewhere in this report, getting one's voting rights restored in Tennessee can require the cooperation of multiple actors across multiple administrative bureaucracies both within and outside of Tennessee. In particular, the experience of persons seeking rights restoration in terms of staff knowledgeability, friendliness, and helpfulness matters a great deal to whether they are able to complete the process. White, Nathan, and Faller (2015) argue that "resource-constrained bureaucrats frequently have discretion over which services are delivered and to whom; discretionary decisions made by local bureaucrats often become *de facto* public policy."[69] Thus, to the extent that completing a COR form depends on the willingness of staff members to help at their discretion, many people may fail to submit COR forms if they cannot find people in the proper agencies who are willing to fill out their portion of the form.

There is evidence that some court clerks and probation officers hesitate or refuse to help with filling out certificates of restoration. For instance, probation officer Juanita Shaw says that she voluntarily took on the role of supervising responses to COR inquiries in her TDOC office because there was no point of contact.[70] As noted above, there are no rules that require a probation or parole officer to fill out a COR aside from the TDOC policies concerning discharge from

---

[68] See Email from Jessica Lim to Scott Commission, March 1, 2022, in denial paperwork for [Person B] in Scott County; Email From Jessica Lim to James Brown, March 4, 2022, in denial paperwork for [Person C] in Monroe County.

[69] White, Ariel, Noah Nathan, and Julie Faller. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *The American Political Science Review* 109.1 (2015): 129-42.

[70] Deposition of Juanita Shaw at 74:6-16.

supervision (when most individuals are not yet eligible).[71] The Coordinator of Elections also notes that probation and parole officers are under no obligation to complete the paperwork: "Note: we do not tell a probation officer if they should sign the form or not, that is not our job. They just need to fill out the form correctly if they can. It is our job to review the paperwork."[72] Internal documents from the Coordinator of Elections also reflect that persons seeking rights restoration report that they have trouble getting the appropriate agents to complete their forms. Indeed, an internal training document acknowledges this problem and advises that individuals unable to find a TDOC staff member to complete the COR form should seek a court order:[73]

> If the applicant insists that the appropriate agents will not complete the COR, the applicant should be advised to seek a court order.
>
> • Situation typically occurs w/ individuals who insist they don't have any court ordered restitution or that they've paid the restitution, but can't get a probation officer or court clerk to sign off on the form. Unfortunately, we cannot waive the requirements.

For instance, Person D's rights were not restored in Henry County because he did not have a parole officer to complete Section 2 and the county's court clerk refused to do so.[74] His restoration was denied even though his submitted paperwork contained the judgment and other court documents for the offense that demonstrated his eligibility.[75] Under the COR process, he has no ability to appeal this denial.

Restorations for out-of-state convictions also are affected by administrators' lack of cooperation. Internal Coordinator of Elections' documents point out that persons seeking rights restoration through external agencies "[s]ometimes can get met with pushback, because again this is a TN form that they have never seen, and it is for laws that they've never heard."[76] Some state agencies may be unwilling to help persons seeking rights restoration, but "[s]ometimes, our office may have to help in getting the information. Generally other states are more willing to give up information if we are requesting the documents."[77] Internal Coordinator of Elections' policies do not require assisting people having difficulties with out of state restorations and prohibit paying money to obtain documents.

### 9.1.2   *Barriers Related to Time and Money*

Aside from the problems that can be observed by looking at paperwork that was eventually submitted to the Coordinator of Elections, erroneous denials often occur at earlier stages even before COR form submissions reach the state. Many people who are interested in rights restoration

---

[71] TDOC 000079 & TDOC 000080, "Administrative Policies and Procedures, State of Tennessee Department of Correction, Restoration of Offender Voting Rights."
[72] Felon Restorations Training (rev.5.2022 JCL) p. 10.
[73] Felon Restorations Training (rev.5.2022 JCL) p. 11.
[74] Email from Henry Commission to Jessica Lim, April 18, 2022, in "[Person D] Henry County April 2022.pdf."
[75] "[Person D] Henry County April 2022.pdf."
[76] Felon Restorations Training (rev.5.2022 JCL) p. 17.
[77] Felon Restorations Training (rev.5.2022 JCL) p. 20.

28

never manage to get the COR form completed by an appropriate official in each county of their felony conviction(s) and submit those forms to their county AOE. For example, in Davidson County, which tracks people who start the process of voting rights restoration, 342 out of 611 cases (56.0%) have no decision from the state or no date that the completed packet was ever sent to the Coordinator of Elections.[78] In other words, fewer than half of the people in Davidson County who started the voting rights restoration process completed it. Some, but not all, of the reasons for not completing the process that are noted in the files are related to eligibility; for instance owing court costs (some less than $100) or waiting to file for expungement or indigency. I was not provided tracking data for other counties; as noted previously in my discussion of county court clerk procedures, some counties do not track requests for help with COR forms.

Submitting a COR form may engender high costs in terms of time and money. Because there is no uniform set of procedures or designated officials required to fill out the CORs, finding someone to help may require repeated phone calls and in-person visits to multiple offices in different areas of the state. For instance, when observing a phone call between a non-profit volunteer and an individual that they were trying to help with the rights restoration process in Shelby County,[79] I heard the person seeking restoration express great frustration because he was unable to complete the COR form during his visit to the county clerk's office because his conviction was more than 30 years old and was archived. He was upset because "he took time off work because he was so excited" but now would need to take another day off to get his form from the clerk and then take the form to the elections commission.[80] Observing another call, my research assistant noted that a woman said she had tried "three or four times" to register to vote, but she is always told the paperwork is wrong.[81] The volunteer assisting the woman hold her she would need to go to each county in person to complete the paperwork.[82] Some county clerks, such as in Montgomery County, require in person visits to access cases from 1999 and earlier.

9.2    Difficulties with Verifying Eligibility

9.2.1    *Ascertaining Whether a Conviction is a Felony*

There is evidence that for some people seeking rights restoration, it is not clear—to them, or to the officials charged with verifying their eligibility— whether they even have a felony conviction. In her deposition, Jessica Lim, former Elections Attorney at the Elections Division said, "lots of people aren't sure if they have felony convictions or not."[83] Other documents from

---

[78] "All COR Data Carlatina Cedric Aloha.xlsx."
[79] My research team and I shadowed five volunteers of Free Hearts, a volunteer organization that assists voters with the rights restoration process in Tennessee, as they attempted to contact people who were interested in having their voting rights restored. We did not participate in the calls, nor did we direct the volunteers to ask particular questions or elicit any information. We were merely passive listeners to the volunteers' normal interactions. For each call, we recorded information such as the date, time, length of the call, and the county of conviction. We also noted the content of the conversation paying particular attention to whether a person said that they had tried to get their rights restored before and any barriers that they faced while doing so. We observed participants at multiple stages of rights restoration. The research assistants were trained to help them record their observations.
[80] Id. (November 3, 2021).
[81] Id. (December 19, 2021).
[82] Id. (December 19, 2021).
[83] Deposition of Jessica Lim at 168:12-13.

the Coordinator of Elections describe a felony conviction search process that is triggered for people who do not know that they have a felony conviction or the details of it, suggesting that this is a common-enough problem to warrant a routinized response.[84]

Reaching out to administrative agencies for help ultimately may not provide certainty as to whether a person is eligible to vote because even state agents may find it difficult to determine with certainty whether a person has a felony conviction. For instance, internal Coordinator of Elections training documents acknowledge that information limitations prevent them from saying with certainty that a person does not have a felony conviction:[85]

> **IMPORTANT NOTE:** Even if you don't find any record of a felony, you are **not** saying the person does *not* have a felony conviction.
>
> • We are ONLY saying we have exhausted our resources and could not find any record of the conviction sufficient to prevent the person from voting
>
> > • Data is never 100%. There are mistakes, there are ones missing, really old convictions aren't in the database, our records of convictions in other states and federal courts are limited to what is shared with us, etc.
>
> • For people in Category 1 above [an individual who reaches out to see whether they have a felony conviction] who are not sure if they have a felony – I say that we looked at all our databases and did not find anything, but I *cannot* tell them what to mark to the felony question under penalty of perjury. That is their truth, and they will have to face consequences if it's not true. (Of course, I highly doubt a DA would prosecute a person who tried to find their conviction through us and didn't find anything.) For people who are still nervous, I tell them they can do a TBI/FBI background check (and refer them to https://www.tn.gov/tbi/divisions/cjis-division/background-checks.html)
>
> • For people in Category 2 above [a person who marked "yes" on the voter registration form] who know they have a felony but need more information about the conviction – I tell them unfortunately we could not give them more information. I explain that they don't necessarily *not* have a felony, but that our data can be missing stuff. They should go look through their old documents, ask friends/family for help, or do a TBI/FBI background check.

---

[84] 5. Felon Restorations Training (rev.5.2022 JCL) p. 4.
[85] 5. Felon Restorations Training (rev.5.2022 JCL) p. 7.

30

In this long passage, the Coordinator of Elections explicitly admits that information costs and the lack of certainty regarding the status of felony convictions may make people nervous about how to answer the felony question on their registration form. This passage also acknowledges the consequences—prosecution—of a lack of information. Such high costs can have a chilling effect on attempting restoration, discouraging some people from starting the process at all.

There are examples in the restoration files of people who were told that they needed to have a COR form completed in order to restore their voting rights, even though they may not have had felony convictions that caused them to lose their voting rights. Person E received a letter that he was being purged from the Rutherford County voter rolls in 2014 for a felony conviction and required to submit a COR form or other paperwork to re-register.[86] After submitting documents from Florida showing his conviction was a judicial diversion, he was allowed to register in September of 2020.[87] Person F was denied rights restoration in Rutherford County because of unpaid court costs after submitting a COR form in 2020. The form was signed by the clerk's office. However, Jessica Lim of the Elections Division, when denying his eligibility, noted that his conviction was usually a misdemeanor and that the Coordinator of Elections did not have a record of a felony conviction for him.[88] In 2022, a clerk in Carter County completed a COR form for Person G, even though he had no felony convictions.[89]

Administrators especially have difficulty discerning felonies from misdemeanors in cases outside of Tennessee, where convictions may show up without clear labels. The Coordinator of Elections search for felony convictions in Westlaw and other databases may uncover convictions from Tennessee or other jurisdictions. Person H's restoration submission was denied initially for additional convictions not listed on the COR form on very little evidence that this additional conviction was a felony; the Coordinator of Elections found an additional conviction in which the "probation period was for 3 years (usually anything over 1 year is a felony)."[90] Person H was denied even though the Coordinator of Elections' office "couldn't find any additional documentation on it because the criminal court portal was down today."[91] Person H was restored, but only after submitting additional paperwork confirming that his California conviction was a misdemeanor.[92] Person I's restoration in Davidson County was denied in August of 2020 because she has a TOMIS Identification number and it is "not sure that she does not have a felony conviction out of Tennessee."[93] As shown in internal Coordinator of Elections documents and my analysis here, it is not uncommon for people to have TOMIS numbers even if they do not have felonies (i.e. because of errors, expungements, or misdemeanors).

[86] "[Person E] Rutherford September 2020.pdf."
[87] "[Person E] Rutherford September 2020.pdf."
[88] Email from Jessica Lim to Rhonda McFerrin, October 12, 2021, in "[Person F] Rutherford County October 2020.pdf."
[89] "[Person G] Carter March 2022.pdf."
[90] Email from Jessica Lim to Tabitha Oody, March 1, 2022, in "[Person H] Loudoun March 2022.pdf."
[91] Email from Jessica Lim to Tabitha Oody, March 1, 2022, in "[Person H] Loudoun March 2022.pdf."
[92] "[Person H] Loudoun March 2022.pdf."
[93] Email from Jessica Lim to Carlatina Hampton, August 8, 2020, in "[Person I] Davidson August 2020.pdf."

There is a lot of evidence that many people are unsure whether they can ever vote after a conviction.[94] My analysis of the "Inmate Rest REDACTED" file shows that that substantial numbers of people are confused about their eligibility and their need to have their rights restored before they can vote. It is clear from my analysis that hundreds of people go through some verification process even though they never lost the right to vote: more than 1,000 people in the restored file were labeled as having no felony convictions, and some unmatched persons seeking rights restoration may not have had felony convictions as well. Some people, like John Woodard of Wilson County, submit a COR to establish that they have a judicial diversion.[95]

### 9.2.2  *Errors By TDOC Personnel*

A person seeking to restore their voting rights must reach out to administrators such as probation officers or county clerks for help in clarifying the status of their felony sentences. Those TDOC agents, county clerks, federal agents, or officers of courts in other states should certify if a person is no longer under supervision for a felony conviction in section 2 of the COR form. However, clerks or probation officers may provide erroneous or incomplete information verbally or on the COR form itself. For instance, Pamela Moses was prosecuted for registering to vote after a Tennessee probation officer signed off on her COR form erroneously.[96] That officer "failed to adequately investigate the status of this case. He failed to review all of the official documents available through the Shelby County justice portal and negligently relied on a contact note from a court specialist in 2016."[97]

There are several instances of persons seeking CORs being denied for mistakes made by probation officers, who sometimes complete forms incorrectly or omit convictions. For example, Person J submitted a COR in order to register to vote in Obion County; it was denied because the probation officer failed to list his conviction for robbery.[98] Person K was denied restoration because she submitted a COR form in which the probation officer failed to write that she was convicted of vandalism at the same time as her burglary conviction.[99] Person L was denied restoration initially because the TDOC officer who competed her COR form failed to list all of her convictions; notably, an email from the Coordinator of Elections blamed Person L for the officer's mistake, writing:

> I'm not sure why the probation/parole officer who completed the COR for her theft conviction (which was on February 14, 2014) didn't also complete it for her forgery conviction. Sometimes when I see this happen, it's because the individual might have still owed restitution or court costs on the other conviction but turn in the COR anyways in

---

[94] Meredith, Marc, and Michael Morse. "The politics of the restoration of ex-felon voting rights: The case of Iowa." *Quarterly Journal of Political Science* 10 (2015): 41-100.
[95] "Woodard Wilson September 2020.pdf."
[96] Sam Levine, "New evidence undermines case against Black US woman jailed for voting error," The Guardian (2022), https://www.theguardian.com/us-news/2022/feb/24/fight-to-vote-newsletter-Black-woman-jailed-voting-error-evidence.
[97] Id.
[98] "[Person J] Obion October 2016.pdf"
[99] "[Person K] Hamilton October 2016.pdf"

hopes that we'll accept it. Either way, Person L must have a COR completed for the other conviction to get her voting rights restored.[100]

Person M was denied restoration because his probation officer filled out his COR form without including his birth date or social security number.[101] Person N's probation officer put the wrong first name on his COR.[102] Davidson County submitted a COR for Person O in which the probation officer failed to check any box in Section 3 of the form (despite the fact that Ford had been declared indigent).[103] These examples provide an illustrative, but not exhaustive list of mistakes by probation and parole officers that led to restoration denials. Errors like these are consequential to the extent that such mistakes prevent people who otherwise could be eligible from registering to vote.

### 9.2.3 *Errors by Clerks*

As noted above, depending on the county, either TDOC agents or county court clerks may play a role in determining whether a person has completed their sentences and paid all their court costs and restitution. However, examining the records shows that it is not clear that clerks, or officers in agencies outside of Tennessee are making those determinations correctly or even in a uniform manner.

First, with respect to ascertaining whether a person owes court costs and restitution, there is no uniform policy to guide TDOC agents or clerks' offices with respect to which debts should be considered court costs or restitution when completing a COR form. Internal documents from the Coordinator of Elections list the following guidelines, but it is not clear that this policy has been communicated to clerks and TDOC staff:[104]

- **Must have eligible box checked in Section 4 re court costs paid**

  - All are eligible EXCEPT "Court costs ordered by the court is owed"

  - Court Costs vs. Fines

    - Court costs are paid directly to the court.
    - Court fines are paid to an outside organization (such as the brain trauma fund)
    - If someone calls to ask, we only care about court costs in our statute.

---

[100] Email from Jessica Lim to Moe Click, May 9, 2022 in "[Person L] Blount May 2022.pdf."
[101] "[Person M] Williamson August 2020.pdf."
[102] "[Person N] Sumner County October 2020.pdf."
[103] "[Person O] Davidson County October 2020(2).pdf."
[104] 5. Felon Restorations Training (rev.5.2022 JCL) p. 11.

33

- Remember, this only applies to felony convictions. If they owe money for misdemeanors, you clear them if they don't owe any for felonies.

Clerks' offices are not using these criteria uniformly to complete the court costs section of the COR form, which in practice means that some people will have to pay money in order to have their rights restored depending on where they were convicted. For instance, Shelby County and Rutherford County consider *all* money owed to the county when completing the COR form, including fines.[105] They do not seem to distinguish costs paid directly to the court from fines paid to an outside organization as the Coordinator of Elections describes. Davidson County used to include all monies owed as well but have committed to no longer considering fines or debts other than court costs when completing Section 4 (concerning costs) of the COR form.[106] Similarly, prior to this year, Davidson County court clerks would not check box 3 in Section 4 of the COR form when a person owed money even if they had been declared indigent.[107] This lack of uniformity and authoritative guidance lead applicants for CORs being held to different eligibility standards depending on where they live.

Second, mistakes by county clerks in filling out CORs or ascertaining whether a person has completed their sentence or paid their court costs and restitution has led to the denial of several restorations. For example, in Knox County, the clerk did not include the date of sentence completion in Box 2 Person P's COR, so his restoration was denied.[108] In 2020, attempts to have their rights restored in Shelby County were denied for both Person Q and Person R; in both cases, the submissions were denied because the same clerk listed the same start and end dates for the supervisions and the Coordinator of Elections could not verify the information in her database.[109] Person S's restoration was denied because the clerk did not check any box in section 4 of his COR.[110] The clerk submitted the COR for Person T, which is not the correct paperwork for restoring rights for convictions before January 15, 1973.[111] Person U submitted his CORs several times, in one case, the clerk failed to mark him as indigent in section 4, even though the clerk submitted the court order (he ultimately was denied a final time for unpaid child support).[112] Person V was denied restoration multiple times because the court clerk did not check that he had been found indigent in Section 4; even though the order of indigency was included in the paperwork,

[105] See "RE: Curtis Gray" Email from Cassaundra Horton to Allie Gottlieb, September 21, 2020, in "Gray Cassaundra Email.pdf"; "Gray financials.pdf"; "RE: COR Applicants" Email exchange between Blair Bowie and Cassaundra Horton, August 13, 2020, in "Perry_Horton email.pdf."; "Perry financials.pdf"; "Rutherford LFOs Examples.pdf."
[106] See Letter to Howard Gentry from Blair Bowie, November 15 2022 and "Meeting follow up" Email from Cynthia Gross to Blair Bowie and C. Grant, December 30, 2022.
[107] See Letter to Howard Gentry from Blair Bowie, November 15 2022 and "Meeting follow up" Email from Cynthia Gross to Blair Bowie and C. Grant, December 30, 2022.
[108] "[Person P] Knox August 2020.pdf."
[109] Email from Cara Harr to Vicki Collins, September 29, 2020, in "[Person Q] Shelby County September 2020.pdf." Email from Cara Harr to Vicki Collins, September 27, 2020, in "[Person R] Shelby County September 2020.pdf."
[110] Email from Jessica Lim to Kim Witherspoon, September 14, 2020, in "[Person S] Sullivan September 2020.pdf."
[111] Email from Jessica Lim to Joshua Tapp, September 23, 2020, in "[Person T] Fayette County September 2020.pdf."
[112] Email from Jessica Lim to Carlatina Hampton, September 29, 2020, in "[Person U] Davidson County October 2020.pdf."

the Coordinator of Elections refused to restore his rights because of the clerk's mistake.[113] For example, Person W's restoration was denied in 2020 due to unpaid restitution even though none of the court documents included in the file showed that Person W owed restitution; court costs were marked as unpaid as well.[114] A second set of COR forms was submitted for those same crimes in April of 2022, showing that Person W had been declared indigent by a court in 2017; the clerk marked the boxes correctly in the new forms and Person W was restored to vote in Cocke County.[115] Again, these denials are meant to be illustrative, but not exhaustive, examples of the ways in which mistakes by clerks kept people from having their voting rights restored.

### 9.2.4    *Erroneous or Missing Records*

Some restorations are denied because no one can find satisfactory documentation of the applicant's eligibility. Sometimes court records no longer exist,[116] counties archive or destroy old records, or there may be errors in databases. To the extent that these documents or other evidence are difficult to access because of cost or the passage of time, they may lead to "documentary disenfranchisement," as described by Allen:

> Election boards return registration forms sent in by individuals who are eligible to reregister and demand that prospective voters with felony convictions produce documents to prove their eligibility, documents that are always burdensome to obtain, and that, in many cases, are entirely fictional, unavailable by law, or available only as a matter of pure official discretion.[117]

Coordinator of Elections internal documents acknowledge that documentary evidence of convictions, pardons, and payments are difficult to obtain. For instance, the training manual says: "Data is never 100%. There are mistakes, there are ones missing, really old convictions aren't in the database, our records of convictions in other states and federal courts are limited to what is shared with us, etc."[118] Even in newer cases, documentary evidence that is necessary to confirm the completion of the sentence or payment of costs can be "tedious to find."[119] When my team and I attempted to research the court costs and restitution owed by people who had completed sentences in Tennessee, we also found that clerks in several counties told us that cases were "too old" to find the costs when we reached out to them via phone (for instance, in Williamson and Lauderdale Counties).[120] Likewise, Jessica Lim also noted that she had worked with a person for a month who

---

[113] "[Person V] Houston County September 2020.pdf."

[114] "[Person W] Cocke April 2022.pdf."

[115] "[Person W] Cocke April 2022.pdf."

[116] Deposition of Jessica Lim at 156:6-11.

[117] Allen, Jessie. "Documentary disenfranchisement." *Tul. L. Rev.* 86 (2011): 389-463; 394.

[118] Felon Restorations Training (rev.5.2022 JCL) p. 7.

[119] Sam Levine, "New evidence undermines case against Black US woman jailed for voting error." *The Guardian* (Feb. 24 2022), https://www.theguardian.com/us-news/2022/feb/24/fight-to-vote-newsletter-Black-woman-jailed-voting-error-evidence. Links to email available at: https://www.documentcloud.org/documents/21272992-pamela-moses-email-redacted.

[120] We were able to find most of our information on the sample for which we collected data on legal financial obligations using online sources; however, for a few older cases, we reached out to court clerks via phone to request information. These calls took place in late September 2022.

had difficulty getting court documents from Williamson and Davidson Counties to certify that their convictions occurred during the grace period.[121]

There are several examples of denials because of missing documentation or data errors. For instance, in 2016, Person Y was denied restoration in Madison County for a 1992 Missouri felony conviction because of "Incomplete/Insufficient Document(s)."[122] The clerk in Missouri was "unable to answer the questions regarding court costs and restitution due to this case being so old."[123] Person AA was denied for lack of evidence that his restitution had been paid.[124] It appears that Person BB was denied restoration because Wisconsin was unable to provide information from its records about court costs on one of his convictions.[125] The Coordinator of Elections issued a denial for Person CC after failing to find any information about her Virginia felony convictions.[126] Issues with child support verification also can lead to denials: Person DD was denied restoration in Anderson County because of an ongoing dispute with uncredited child support, a dispute that even the administrator thought should not hold up the restoration.[127]

# 10 Who is Denied a COR by the Coordinator of Elections?

For reasons described above, sometimes people are unable to obtain completed COR forms to submit to the Coordinator of Elections for final approval. Because of a near total lack of record keeping, it is impossible to know how many people attempt to have CORs filled out by the designated officers or why those CORs are effectively, even if not formally, denied. However, records do exist for people who are able to submit a COR form to the Coordinator of Elections. In this section, I analyze who is denied at this stage in the process and why.

## 10.1  Estimating the Number of Denials

To calculate the number of denials, I analyzed the Election Division's "Denial Database" spreadsheet that was provided to me by the attorneys for the Plaintiffs.[128] This spreadsheet contained 2,966 rows with an identifier, last, first and middle name, date of decision letter, reason for denial, and a comments field. The "Denial Database" sheet contains 1,774 entries with unique last, first, middle name combinations that do not have corresponding entries in the restored file.

---

[121] Email from Jessica Lim to Marti Davis, April 19, 2022. In "[Person X] Hickman April 2022.pdf."

[122] "[Person Y], [Person Z] Madison October 2016.pdf."

[123] Email from William Sifford to Jeffrey Neely, September 26, 2016, in "[Person Y], [Person Z] Madison October 2016.pdf."

[124] "[Person AA], Blount, March 4 2016.pdf."

[125] "[Person BB] Shelby August 28, 2020.pdf."

[126] "[Person CC] Greene August 2020.pdf."

[127] Email from John M. Jarrett to Jessica Lim, March 17, 2021, in "[Person DD] Anderson County February 2021.pdf." Child support administrator Melissa Miles is quoted as saying, "If getting his voter registration reinstated is the only thing in question what is needed to release it? Just an ok from us? If so I think it should be released."

[128] Produced to Plaintiffs by the Coordinator of Elections and Secretary of State on June 27, 2022, as "Denial Restore REDACTED.xlsx".

Because the "Denial Database" sheet that I received did not contain TOMIS numbers or other identifiers, in order to obtain demographic information about denials I matched a sample of people who were denied for incomplete applications and unpaid costs and restitution to the full file of TDOC data (the "main" file) using date of birth, which I obtained from CORs found in a "Denials" folder produced by the Elections Division. I matched 249 of 471 records for which I had COR paperwork to "2022-114 NAACP lawsuit data request_Main.csv" using Last Name, First Name, and Birthdate.

10.2 <u>Data on Denied Restorations</u>

As noted previously, there are 16,790 unique people in the Restoration Database file and 1,774 unique people in the denials file that have not been restored. Thus, the overall denial rate for people who submit completed COR forms to the Coordinator of Elections is 9.5%, a figure that is close to that estimated by Meredith and Morse using data through 2013.[129] There are 974 entries that are in both the denial and restored files; if we expand denials to include these initial outcomes the denial rate is 14.8%.

Examining the smaller sample data that could be matched to an entry in the TDOC file, 42.8% of the denied submissions come from Black people, while 55.4% come from White people. Denied submissions also tend to come from older adults: 16.1% of denials were issued to people currently over age 65, 60.1% to people between ages 45 and 64, 22.5% to people between ages 30 and 44, and only 0.8% were issued to people currently under age 30. These proportions mostly reflect differences in who submits COR forms to the Coordinator of Elections.

Turning to the universe of entries in the "Denial Database" file, 2,961 entries had a reason for the denial. Table 8 shows the reasons for denial. Child support was the most common reason. However, a majority of the files are denied not because of eligibility, but because the paperwork is incomplete (27.1%) or missing convictions (26.3%), both of which can happen because of errors by probation officer officers or clerks. Aside from child support, other categories of ineligibility, such as having a conviction for murder or owing court costs, constitute a smaller proportion of denials.

*Table 8: Reasons for Restoration Denial*

| Reason for Denial | Percent of Total |
|---|---|
| Additional Conviction Not on COR | 26.3 |
| Incomplete | 27.1 |
| Ineligible Conviction | 5.0 |
| Currently Under Supervision | .8 |
| Unpaid Child Support | 29.6 |
| Unpaid Costs or restitution | 9.7 |
| Other | 1.4 |

---

[129] Meredith and Morse, 2015.

### 10.3  Difficulties with Curing Denials

Overall, Meredith and Morse (2017) estimate based on 2013 data that the denial rate for restorations is about 9%. Earlier, I calculate that about 9.5% of people who applied for rights restoration are rejected. However, that overall denial rate obfuscates the fact that many of the people who ultimately had their rights restored did not succeed on their first try and needed several attempts to get their rights restored. The initial denial rate may be more than three times as high as the final denial rate. For example, for 2022, I was provided with 306 restoration letters as of July 22nd of that year among the documents produced to Plaintiffs' by the Elections Division. Of those files, 22 of the successful restorations were rejected at least once, a rate of 7.2%. Only one of those 22 individuals was restored after paying child support or otherwise indicating his eligibility; the other 21 were restored after correcting errors by court clerks or TDOC agents, rectifying databases, or getting additional paperwork.[130] If one also considers the 131 submissions through July 22nd in the denials folder in addition to these 22 cured denials, the initial denial rate increases to 35.0%.[131]

These data suggest that curing denials is important. However, if there are problems with the COR form and a restoration is denied, currently the situation can only be addressed by starting the process over and resubmitting forms repeatedly. The examples that I provide in this report are just a few instances of the ways that clerical errors, missing documents, data errors, and other factors can lead to the denial of restoration. As described in the previous paragraph, 21 of the 22 individuals whose restoration was denied initially in 2022 were eligible for restoration at the time of their denial, but their rights were not restored at first because they needed to resubmit their COR forms after getting additional paperwork or corrected records, some of which did not exist. Some people do successfully make it through the rights restoration process, but only after several tries. For instance, Person EE, after having her restoration denied, wrote:

> At this point I have no idea of what to do. I have given you what the clerk gave me and informed Ms. Cinda [Tillman, of the Lauderdale County Election Commission] that the clerk stated that they do not even know who or where they would even send those forms because they never had to do it previously. I cannot keep running back and forth to Illinois to request completion of a form that the courts will not even accept. I guess the best thing to do is to seek legal assistance to pursue.[132]

Similarly, Jessica Lim said of Person DD:

> [Person DD] called me today, and he is adamant that he does not have any arrears. I didn't quite understand everything he was saying, but he said his child support payments ended in 2019. He had some arrears, but Virginia was collecting them through taxes and finally sent him a letter saying he didn't owe anything. He said he has been to the Montgomery

---

[130] Specifically, 8 were denied initially because TDOC missed a Tennessee conviction, 2 were denied initially because of a Coordinator of Elections error, 5 were denied initially because of problems with out-of-state or federal convictions, 4 were denied because of data errors (with child support or felony records), 1 was denied because of a clerk error, and 1 for an AOE error.

[131] Meredith and Morse, 2017. Online appendix p. 5.

[132] Email from [Person EE] to Lauderdale Commission, March 30, 2022, in "[Person EE] Lauderdale County March 2022.pdf."

County Child Support office (where he lives), but that they were giving him the runaround too. He said he can't figure out how to resolve this.[133]

Eventually, through persistence, Person EE found a public information officer in Cook County to complete her COR, and her right to vote was restored in May of 2022.[134] Person DD also managed to sort out his issues with the Child Support Office. However, other people may be unable find a county court clerk or other agent willing to help them find the documents or correct the databases that they need to verify their eligibility: as I calculated, 9.5% of people were denied voting rights restoration.

There is no clear policy for what happens when there is a problem with a submission. The Coordinator of Elections sends a denial letter to the county election administrator, but I can find no further documentation about whether and how that information is communicated to the person seeking rights restoration in a way that is uniform across counties. Jessica Lim, in her deposition, said that county administrators usually reached out to the person seeking rights restoration, typically via phone, to follow up.[135]

<u>Summary</u>

As I have shown through the preceding discussion, relatively few of the people who are eligible to have their rights restored after a Tennessee felony conviction have done so. I analyzed data, memos, documents, emails, training manuals, web sites, restoration submissions, and other records to provide concrete evidence of the ways that the restoration process, as implemented, can reduce the number of eligible people who are successful in having their rights restored.

- Status confusion: the inability to determine whether people have been convicted of a felony that would cause them to lose their voting rights. Persons seeking rights restoration may be confused about their status, but sometimes clerks and other administrators cannot ascertain a person's felony definitively either. As I have shown, status confusion can lead to a denial of restoration, or to the failure to seek restoration altogether because of fear.
- Documentary disenfranchisement: both internal documents at the Coordinator of Elections, as well as individual case records, show that fulfilling the demands of the restoration process can be difficult and onerous. In particular, the current procedures require the cooperation of court clerks, federal, and out-of-state agencies who have no statutory obligation to participate in Tennessee's process of restoring voting rights. Additionally, I have provided several cases in which documents were unavailable or did not exist, making it impossible for a person to prove their eligibility.
- Clerical errors: mistakes by clerks or probation officers within and outside of Tennessee, coupled with errors in databases and other records, can lead to the denial of restorations. These errors may take a lot of time and effort to correct, if they can be corrected, and may require a person seeking rights restoration to undertake several rounds of submissions in order to succeed.
- Lack of information about the process: The lack of guidance for the public and for individual agencies creates difficulties for people seeking to restore their voting rights. As

---

[133] Email from Jessica Lim to Lauren Awad, March 16, 2021, in "[Person DD] Anderson County February 2021.pdf."
[134] "[Person EE] Lauderdale April 2022.pdf."
[135] Deposition of Jessica Lim at 183:23-24, 184:1-2.

I have shown, instructions for alternatives to completing the COR are not made widely known, and I could find only limited guidance about what probation officers or clerks should consider as court costs, or how to help persons seeking rights restoration when their restorations were denied.

- Lack of uniform procedures at the county level: The lack of information and concrete policies, in an environment where a process delegates responsibility to hundreds of county-level agencies within and outside of Tennessee, leads to variation in implementation. For instance, counties differ in terms of whether probation and parole officers will provide CORs at discharge (even when a person has outstanding court costs or restitution), how to calculate the amount due on court costs, and even the role of the court clerks and probation officers in terms of which sections of the COR each will complete. As a result, people living in some counties will face higher barriers to successful restoration, including higher court costs or more time to complete paperwork.

Each of these factors creates risk that an eligible person seeking rights restoration will be denied the restoration of their voting rights, or deterred from attempting rights restoration in the first place.

The Plaintiffs propose additional procedures, such as (1) establishing a centralized, state-run process for rights restoration that includes (2) written notification of outcomes and their rationales and (3) an appeals process for denials. The establishment of a centralized, state-run process would help with problems sch as the lack of uniform procedures and lack of information about the process, especially if clear instructions for rights restoration and all of its alternative processes, were made public. A centralized process also might lessen the impact of clerical errors, as the job of ascertaining eligibility would be left to a smaller number of people who are trained by the state rather than to untrained clerks, probation officers, and agents throughout Tennessee and other states. Policies that set out to help establish eligibility when documentary evidence is not available might also help. Right now, errors are corrected on an ad-hoc basis, with the Coordinator of Elections sometimes working with county administrators and the persons seeking rights restoration to find documents or resubmit new CORs.

Alerting persons seeking rights restoration to problems with their files and making appeals more routine is particularly important given the current process of curing denials. I found that in the first half of 2022 (the only part of the year for which I have data), 21 restorations were denied initially not because of ineligibility, but because of clerical and data errors, missing paperwork, or other problems. I expect that more denied restorations from that year suffer from those problems but may never be cured because there is no uniform process for alerting people to problems with their COR form and resolving them, especially when court or clerk documents cannot be found.

*     *     *     *     *

I reserve the right to continue to supplement this report upon receiving additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.


Dated: February 13, 2023


Traci Burch

# EXHIBIT A

**Traci Burch**

## Employment

- Associate Professor, Northwestern University Department of Political Science (2014-Present)

- Research Professor, American Bar Foundation (2007- Present)

- Assistant Professor, Northwestern University Department of Political Science (2007-2014)

## Education

- *Harvard University*

Ph.D. in Government and Social Policy

> Dissertation: *Punishment and Participation: How Criminal Convictions Threaten American Democracy*

Committee: Jennifer Hochschild (Chair), Sidney Verba, and Gary King

- *Princeton University*

A.B. in Politics, *magna cum laude*

## Publications

- Burch, Traci. 2022. "Adding Insult to Injury: the Justification Frame in Official Narratives of Officer-Involved Killings." *Journal of Race, Ethnicity, and Politics.*

- Burch, Traci. 2022. "Officer-Involved Killings and the Repression of Protest." *Urban Affairs Review.*

- Burch, Traci. 2021. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." *Perspectives on Politics.*

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2018. "Organizations and the Democratic Representation of Interests: What Happens When Those Organizations Have No Members?" *Perspectives on Politics.*

- Burch, Traci. 2016. "Political Equality and the Criminal Justice System." In <u>Resources, Engagement, and Recruitment</u>. Casey Klofstad, ed. Philadelphia: Temple University Press.

- Burch, Traci. 2016. "Review of <u>The First Civil Right</u> by Naomi Murakawa." *The Forum.*

1

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady. 2015. "Louder Chorus – Same Accent: The Representation of Interests in Pressure Politics, 1981-2011." In Darren Halpin, David Lowery, Virginia Gray, eds. The Organization Ecology of Interest Communities. New York: Palgrave Macmillan.

- Burch, Traci. 2015. "Skin Color and the Criminal Justice System: Beyond Black-White Disparities in Criminal Sentencing." *Journal of Empirical Legal Studies* 12(3): 395-420.

- Burch, Traci. 2014. "The Old Jim Crow: Racial Residential Segregation and Neighborhood Imprisonment." *Law & Policy* 36(3) 223-255.

- Burch, Traci. 2014. "The Effects of Imprisonment and Community Supervision on Political Participation." Detaining Democracy Special Issue. *The Annals of the American Academy of Political and Social Science* 651 (1) 184-201.

- Burch, Traci. 2013. Trading Democracy for Justice: Criminal Convictions and the Decline of Neighborhood Political Participation. Chicago: University of Chicago Press.

- Hochschild, Jennifer, Vesla Weaver, and Traci Burch. 2012. Transforming the American Racial Order. Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Traci Burch, and Phillip Jones. 2012. "Who Sings in the Heavenly Chorus? The Shape of the Organized Interest System." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Phillip Jones, and Traci Burch. 2012. "Political Voice through Organized Interest Activity." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Burch, Traci. 2012. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons." *Political Behavior* 34 (1); 1-26.

- Burch, Traci. 2011. "Turnout and Party Registration among Criminal Offenders in the 2008 General Election." *Law and Society Review* 45(3): 699-730.

- Burch, Traci. 2011. "Fixing the Broken System of Financial Sanctions." *Criminology and Public Policy* 10(3).

- Hochschild, Jennifer; Vesla Weaver, and Traci Burch. 2011. "Destabilizing the American Racial Order." *Daedalus* 140; 151-165.

2

- Burch, Traci. 2009. "Can the New Commander-In-Chief Sustain His All Volunteer Standing Army?" *The Dubois Review on Race* 6(1).

- Burch, Traci. 2009. "Review of *Imprisoning Communities,* by Todd Clear." *Law and Society Review* 43(3) 716-18.

- Burch, Traci. 2009. "American Politics and the Not-So-Benign Neglect of Criminal Justice," in <u>The Future of American Politics</u>, ed. Gary King, Kay Schlozman, and Norman Nie. (New York: Routledge).

- Schlozman, Kay Lehman and Traci Burch. 2009. "Political Voice in an Age of Inequality," in <u>America at Risk: Threats to Liberal Self-Government in an Age of Uncertainty</u>, ed. Robert Faulkner and Susan Shell (Ann Arbor: University of Michigan Press).

- Hochschild, Jennifer and Traci Burch. 2007. "Contingent Public Policies and the Stability of Racial Hierarchy: Lessons from Immigration and Census Policy," in <u>Political Contingency: Studying the Unexpected, the Accidental, and the Unforseen</u>, ed. Ian Shapiro and Sonu Bedi (New York: NYU Press).

**Grants**

- Co-Principal Investigator. "Fellowship and Mentoring Program on Law and Inequality." September 1, 2020 to August 31, 2023. $349, 313. National Science Foundation.

**Honors and Fellowships**

- American Political Science Association 2014 Ralph J. Bunche Award (for <u>Trading Democracy for Justice</u>).

- American Political Science Association Urban Section 2014 Best Book Award (for <u>Trading Democracy for Justice</u>).

- American Political Science Association Law and Courts Section 2014 C. Herman Pritchett Award (for <u>Trading Democracy for Justice</u>).

- Research grant, Stanford University Center for Poverty and Inequality (2012).

- American Political Science Association E. E. Schattschneider Award for the best doctoral dissertation in the field of American Government (2009)

- American Political Science Association William Anderson Award for the best doctoral dissertation in the field of state and local politics, federalism, or intergovernmental relations (2008)

3

- American Political Science Association Urban Section Best Dissertation in Urban Politics Award (2008)

- Harvard University Robert Noxon Toppan Prize for the best dissertation in political science (2007)

- Institute for Quantitative Social Sciences Research Fellowship (2006-07)

- *European Network on Inequality* Fellowship (2005)

- Research Fellowship, The Sentencing Project (2005)

- Doctoral Fellow, Malcolm Weiner Center for Inequality and Social Policy (2004-07)

**Professional Service**
- APSA Law and Courts Section Best Paper Award Committee (2020-2021)

- APSA Elections, Public Opinion, and Voting Behavior Executive Committee (2020-2023)

- General Social Survey Board of Overseers (2020-2025)

- APSA Kammerer Prize Committee (2017)

- Associate Editor, *Political Behavior* (2015-2019)

- APSA Law and Courts Section, Lifetime Achievement Award Prize Committee (2014-2015)

- Law and Society Association, Kalven Prize Committee (2013-2014)

- American Political Science Association, Urban Politics Section Dissertation Prize Committee (2012-13)

- American Political Science Association, Urban Politics Section Executive Committee (2012-13)

- Law and Society Association Diversity Committee, (2012-2013)

- American Political Science Association, Urban Politics Section Program Co-Chair (2011)

- Associate Editor, *Law and Social Inquiry*

- American Political Science Association, Urban Politics Section Book Prize Committee (2009)

4

- Reviewer for *The American Political Science Review, Public Opinion Quarterly, American Politics Research, and Time-Sharing Experiments in the Social Sciences.*

## Presentations and Invited Talks

- American Political Science Association Annual Conference, Montreal, Canada. "Not All Black Lives Matter: Officer-Involved Deaths and the Role of Victim Characteristics in Shaping Political Interest and Voter Turnout." September 2022.

- University of Pennsylvania. Virtual. "Voice and Representation in American Politics." April 2021.

- University of Michigan. Virtual. "Which Lives Matter? Factors Affecting Mobilization in Response to Officer-Involved Killings." February 2021.

- University of Pittsburgh. Virtual. "Policing and Participation." November 2020.

- Hamilton College Constitution Day Seminar. Virtual. "Racial Protests and the Constitution." September 2020.

- New York Fellows of the American Bar Foundation. New York, NY. "Police Shootings and Political Participation." March 2020.

- Pennsylvania State University, State College, PA. "Effect of Officer Involved Killings on Protest. November 2019.

- Princeton University. Princeton NJ. "Effects of Police Shootings on Protest among Young Blacks." November 2019.

- Missouri Fellows of the American Bar Foundation. Branson, MO. Police Shootings and Political Participation in Chicago. September 2019.

- Northwestern University. "Police Shootings and Political Participation." November, 2018.

- Princeton University. Princeton, NJ. "Police Shootings and Political Participation." September, 2018.

- University of California at Los Angeles. Los Angeles, CA. "Police Shootings and Political Participation." August, 2018.

- American Bar Association Annual Meeting. Chicago, IL. "Police Shootings and Political Participation." August 2018.

- American Bar Endowment Annual Meeting. Lexington, KY. "Effects of Police Shooting

5

in Chicago on Political Participation." June 2018.

- Vanderbilt University. "Effects of Police Shootings in Chicago on Political Participation." April 2018.

- Washington University in St. Louis. "Effects of Pedestrian and Auto Stops on Voter Turnout in St. Louis." February 2018.

- Fellows of the American Bar Foundation, Los Angeles. "Assaulting Democracy." January 2018.

- Northwestern University Reviving American Democracy Conference. Panel presentation. "Barriers to Voting." January 2018.

- University of Illinois at Chicago. "Effects of Police Shootings in Chicago on Political Participation." October, 2017.

- Chico State University. "Constitution Day Address: Policing and Political Participation." September, 2017.

- Fellows of the American Bar Foundation, Atlanta, Georgia. "Policing in Georgia." May 2017.

- United States Commission on Civil Rights. Testimony. "Collateral Consequences of Mass Incarceration." May 2017.

- Northwestern University Pritzker School of Law. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." April 2017.

- University of California at Los Angeles. Race and Ethnic Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." March 2017.

- University of North Carolina at Chapel Hill. American Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." February 2017.

- National Bar Association, St. Louis MO. "Political Effects of Mass Incarceration." July 2016.

- Harvard University, Edmond J. Safra Center for Ethics. Inequalities/Equalities in Cities Workshop. April 2016.

- American Political Science Association Annual Meeting. September 2015. "Responsibility for Racial Justice." Discussant.

6

- St. Olaf College. April 2015. "The Collateral Consequences of Mass Incarceration."

- Northwestern University. Institute for Policy Research. February 2015. "The Civic ~~Culture~~ Structure."

- Texas A&M University. Race, Ethnicity, and Politics Workshop. September 2014. "Trading Democracy for Justice."

- Columbia University Teachers College. The Suburban Promise of Brown Conference. May 2014. "Can We All Get Along, Revisited: Racial Attitudes, the Tolerance for Diversity, and the Prospects for Integration in the 21st Century."

- University of Kentucky. Reversing Trajectories: Incarceration, Violence, and Political Consequences Conference. April 2014. "Trading Democracy for Justice."

- University of Chicago. American Politics Workshop. March 2014. "How Geographic Differences in Neighborhood Civic Capacity Affect Voter Turnout."

- Kennedy School of Government, Harvard University. February 2014. "Trading Democracy for Justice.

- University of Michigan. American Politics Workshop. December 2013. "Trading Democracy for Justice."

- Yale University. American Politics and Public Policy Workshop. September 2013. "Trading Democracy for Justice."

- American Political Science Association Annual Meeting. August 2013. "The Heavenly Chorus Is Even Louder: The Growth and Changing Composition of the Washington Pressure System." With Kay Lehman Schlozman, Sidney Verba, Henry Brady, and Phillip Jones.

- National Bar Association, Miami Florida, July 2013. "The Collateral Consequences of Mass Imprisonment."

- Loyola University. American Politics Workshop. December 2012. "Mass Imprisonment and Neighborhood Voter Turnout."

- Marquette University School of Law. November 2012. "The Collateral Consequences of Mass Imprisonment."

- Yale University. Detaining Democracy Conference. November 2012. "The Effects of Imprisonment and Community Supervision on Political Participation."

7

- Brown University. American Politics Workshop. October 2012. "Mass Imprisonment and Neighborhood Voter Turnout."

- American Bar Association National Meeting, August 2012. "Mass Imprisonment: Consequences for Society and Politics."

- University of Madison-Wisconsin. American Politics Workshop. March 2012. "The Spatial Concentration of Imprisonment and Racial Political Inequality."

- American Political Science Association Annual Meeting. 2011. "Theme Panel: How Can Political Science Help Us Understand the Politics of Decarceration?"

- University of Pennsylvania. Democracy, Citizenship, and Constitutionalism Conference. April, 2011. "Vicarious Imprisonment and Neighborhood Political Inequality."

- University of Chicago School of Law. Public Laws Colloquium. Chicago, IL. November, 2010. ""The Effects of Neighborhood Incarceration Rates on Individual Political Efficacy and Perceptions of Discrimination."

- Pomona College. November, 2010. "Incarceration Nation."

- University of Washington. Surveying Social Marginality Workshop. October 2010. "Using Government Data to Study Current and Former Felons."

- American Bar Foundation, Chicago, IL, September 2010. "The Effects of Neighborhood Incarceration Rates on Individual Political Attitudes."

- Northwestern University. Chicago Area Behavior Conference. May 2010. "Trading Democracy for Justice: The Spillover Effects of Incarceration on Voter Turnout in Charlotte and Atlanta."

- Annual Meeting of the Law and Society Association, Chicago, IL, May 2010. "Neighborhood Criminal Justice Involvement and Voter Turnout in the 2008 General Election."

- Annual Meeting of the Southern Political Science Association, Atlanta, GA, January 2010. "The Art and Science of Voter Mobilization: Grassroots Perspectives on Registration and GOTV from Charlotte, Atlanta, and Chicago."

- University of Illinois at Chicago. Institute for Government and Public Affairs. November 2009. "Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

8

- Annual Meeting of the American Political Science Association, Toronto, Ontario, Canada, September 2009. "'I Wanted to Vote for History:' Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Harris School of Public Policy, University of Chicago. American Politics Workshop. December 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Northwestern University School of Law. Law and Political Economy Colloquium. November 2008. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- University of California, Berkeley. Center for the Study of Law and Society. October 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Midwest Political Science Association Conference, Chicago, IL, April 2007. Paper: "Concentrated Incarceration: How Neighborhood Incarceration Decreases Voter Registration."

**Working Papers Under Review**

- Which Lives Matter? Factors Shaping Public Attention to and Protest of Officer-Involved Killings

**Additional Activities**

- Expert witness in *Kelvin Jones vs. Ron DeSantis, etc. et al.* (U.S. District Court for the Northern District of Florida Consolidated Case No. 4:19-cv-00).

- Expert witness in *Community Success Initiative, et al., Plaintiffs v. Timothy K. Moore* (Superior Court, Wake County, NC Case No. 19-cv-15941).

- Expert witness in *People First of Alabama v. Merrill* (U.S. District Court in Birmingham, Alabama, Case No. 2: 20-cv-00619-AKK)

- Expert witness in *Florida State Conference of the NAACP v. Lee* (U.S. District Court in the Northern District of Florida, Case No. 4:21-cv-00187-MW-MAF)

- Expert witness in *One Wisconsin Institute Inc. v. Jacobs* (U.S. District Court in the Western District of Wisconsin, Case No. 15-CV-324-JDP).

- Expert witness in *Alpha Phi Alpha Fraternity Inc., et al. v. Raffensperger* (U.S. District Court for the Northern District of Georgia, Case No. 1:21-cv-05337-SCJ)

- Expert witness in *Robinson, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 22-cv-00211).

- Expert witness in *Nairne, et al. v. Ardoin* (U.S. District Court for the Middle District of Louisiana, Civil Action No. 3:22-cv-00178 SDD-SDJ).

- Expert witness in *White, et al. v. State Board of Election Commissioners, et al.* (U. S. District Court for the Northern District of Mississippi, Civil Action No. 4:22-cv-00062-SA-JMV).

# EXHIBIT B



**Division of Elections**
Secretary of State Tre Hargett

# CERTIFICATE OF RESTORATION OF VOTING RIGHTS
**for Persons Convicted of a Felony on or after May 18, 1981**

This includes any federal or state felony conviction both
within Tennessee or from another state.

**State of Tennessee**
312 Rosa L. Parks Avenue, 7th Floor
Nashville, Tennessee 37243
615-741-7956

*TO BE COMPLETED BY AN AGENT OF THE PARDONING AUTHORITY, AN AGENT OR OFFICER OF THE INCARCERATING AUTHORITY, OR A PROBATION/PAROLE OFFICER OR AGENT OF THE SUPERVISING AUTHORITY. A SEPARATE FORM MUST BE COMPLETED FOR EACH FELONY CONVICTION WITH A DIFFERENT DOCKET/CASE NUMBER. THE PERSON CONVICTED OF THE FELONY OFFENSE MAY NOT COMPLETE THIS FORM.*

1. I hereby certify that the following information is true and correct:
   a. Applicant's Name: _____  _____  _____
                                  (First)            (Middle)             (Last)
   b. Applicant's County of Residence: _____   c. Applicant's Phone Number: _____
   d. Felony Conviction: _____
   e. Month/Day/Year of Conviction: _____   f. TOMIS ID: (if applicable) _____
   g. Date of Birth: _____   h. Soc. Sec. No.: _____

2. On the _____ day of _____ , _____   ***(check one)***
   ☐ The above individual received a pardon which contained no special conditions pertaining to the right of suffrage. A copy of said pardon is attached hereto; *or*
   ☐ The maximum sentence imposed for such infamous crime has been served by the above individual; *or*
   ☐ The maximum sentence imposed for such infamous crime has expired; *or*
   ☐ The above individual has been granted final release from incarceration or supervision from either the United States Probation/Parole, a state Board of Probation/Parole, the Department of Correction, or county correction authorities.

   Signature: _____    Date: _____
   Printed Name: _____    Title: _____
   Address: _____    Phone Number: _____

3. I hereby certify that the following is true and correct:    ***(check one)***
   ☐ The court did not order the above individual to pay any restitution as part of his or her sentence; *or*
   ☐ All of the restitution ordered by the court as a part of the sentence for the above individual has been paid; *or*
   ☐ For Federal Convictions Only, 18 U.S.C. § 3613(b) applies in this case and therefore the liability to pay has expired; *or*
   ☐ Restitution ordered by the court is owed.

   Signature: _____    Date: _____
   Printed Name: _____    Title: _____
   Address: _____    Phone Number: _____

4. I hereby certify that the following is true and correct:    ***(check one)***
   ☐ The court did not order the above individual to pay any court cost as part of his or her sentence; *or*
   ☐ All court cost assessed against the above individual has been paid; *or*
   ☐ The court has made a finding at an evidentiary hearing that the above individual is indigent at the time of application; *or*
   ☐ Court costs ordered by the court are owed.

   Signature: _____    Date: _____
   Printed Name: _____    Title: _____
   Address: _____    Phone Number: _____

SS-3041 (Rev. 3/20)     SEE REVERSE FOR INSTRUCTIONS     RDA S836-1

# INSTRUCTIONS

Instructions to the Agent Completing the Certificate of Restoration:

> *In order to complete any section of this form, the agent must have access to the information being attested to on this form.*

1. In **BOX #1**, the proper authority/agent must provide the requested applicant information.

   NOTE: For 1d, list the crime(s) for which the person was convicted.
   For 1e, list the date the person was convicted for the crime listed in 1d.

2. In **BOX #2**, the proper authority/agent must provide the following information:

   a) Provide the date that corresponds to the box that is checked
   b) Check the appropriate box indicating how the applicant completed their sentence
   c) Provide your signature (print name below signature) and contact information

3. In **BOX #3**, the proper authority/agent must provide the following information:

   a) Check the appropriate box as it relates to any restitution that was or was not assessed to the applicant.
   b) Provide your signature (print name below signature) and contact information.

4. In **BOX #4**, the proper authority/agent must provide the following information:

   a) Check the appropriate box as it relates to any court fines that were assessed to the applicant.
   b) Provide your signature (print name below signature) and contact information.

## Persons convicted of any of the following, cannot have his or her voting rights restored:

- Between July 1, 1986, and June 30, 1996 - first degree murder, aggravated rape, treason, or voter fraud

- Between July 1, 1996, and June 30, 2006 - murder, rape, treason, or voter fraud

- On or after July 1, 2006 – Any of the above, or any degree of murder or rape or any felony offense under TCA Title 39, Chapter 16, parts 1, 4, or 5; or any sexual offense under TCA §40-39-202(20) or any violent sexual offense under TCA § 40-39-202(30) designated as a felony and where the victim of such offense was a minor

## Instructions to the Applicant Seeking to have His or Her Voting Rights Restored:

- After completion, the original form must be filed with the local county election commission office in the county the applicant desires to register to vote.

---

NOTICE
A person is not eligible to apply for a voter registration card and have their voting rights restored unless the person is current in all child support obligations. Before restoring the voting rights of an applicant, the Coordinator of Elections will verify with the Department of Human Services that the applicant does not have any outstanding child support payments or arrearages.

---

SS-3041 **Certificate of Restoration of Voting Rights**