# EXCERPT OF DEPOSITION OF BETH HENRY ROBERTSON, DAY 1 TRANSCRIPT

**In the Matter of:**

NAACP, et al.

vs

LEE, et al.

ELIZABETH HENRY-ROBERTSON

*December 05, 2023*



www.beresandassociates.com

615.742.2550 | info@beresandassociates.com

1  A.      No.

2  Q.      Okay.  Can you describe what your role

3  entails?

4  A.      Well, as it says, assistant to the

5  coordinator.  So assisting the coordinator in

6  whatever capacity he needs.  Drafting memos,

7  training, drafting letters, and give legal advice

8  for each of those things.  I've assisted with

9  legislation when needed.

10  Q.      Do you assist in the development of policies?

11  A.      I give legal advice.  I don't consider myself

12  a policy -- I don't believe I give -- I help with

13  policy.  But to the extent that I give legal advice,

14  the impact a certain policy may have on the statutes

15  or the case law, I do do that.

16  Q.      Have you ever drafted a policy?

17  A.      Yes.

18  Q.      Okay.  Have you ever drafted a procedure?

19  A.      Yes.

20  Q.      Do you review the implementation of policies?

21  A.      When you say "review," you'll have to

22  clarify.

23  Q.      So in this case, I'm referring to the

24  applications of policies or procedures to particular

25  instances.  So --

1  contact the probation and parole to figure that

2  out, or you have to contact the court to figure

3  that out.  Then you have to look at the elements of

4  that to see if it's a disqualifying felony.

5         So those questions, I think, have gotten

6  eliminated because in that regard we improved the

7  form.  So we do have less questions in that sense.

8  Q.     So you added a step, but there are fewer

9  questions?

10 A.     Well, the court -- I mean, the statute -- how

11 you interpret that, we added a step.  We followed

12 the court ruling and the statute.

13 Q.     There's now an additional step, but you get

14 fewer questions?

15 A.     So far.

16 Q.     Is that because there are fewer applications?

17 A.     Now that I don't know.  I haven't done any

18 comparison.

19 Q.     Okay.  Staying sort of with your role

20 broadly, you used to get questions about

21 certificates of restoration before July 21st you

22 said?

23 A.     Yeah, periodically.  Again, not on a regular

24 basis.  It would just be if there was an issue.

25 Q.     About how often do you think that would come

1  up?

2  A.     It's hard to quantify.  If an off-year, not

3  much.  In a presidential year, probably at least

4  every other week or so, at least.  In a

5  gubernatorial year, not as often as presidential,

6  but still more than an off-year.  When I say

7  off-year, odd numbered year.

8  Q.     Yeah.  Got it.

9         How often are you drafting memos as part of

10 your job?

11 A.     Regularly.

12 Q.     Okay.  Did you draft these memos?

13 A.     I participated in drafting, yes.

14 Q.     How often do you draft trainings?

15 A.     So at least once a year because we have

16 annual training, statewide training.  And often

17 twice a year because we have regional meetings.  We

18 haven't had as many regional meetings in the past as

19 we have.  We are kind of starting back meeting

20 together.

21        But for the regional meetings, meaning east,

22 middle, and west divisions of Tennessee, we may do

23 different training material from what we did in the

24 annual training.

25 Q.     Would it be the same training for each of the

1  grand divisions or a different training for each

2  grand --

3  A.    It -- it would be the same training for each

4  of the grand divisions, but it may be a different

5  topic from what we handled -- from what we covered

6  during the annual trainings.

7  Q.    Got it.  What's the purpose of having

8  regional meetings versus a statewide meeting?

9  A.    Our counties like the -- it's not intimacy,

10  but the smaller groups.  They like having meetings

11  with a smaller group than statewide, which involves

12  over 300 people.

13  Q.    Got it.  So they have more opportunities

14  to --

15  A.    For questions, uh-huh (affirmative), yeah.

16  Q.    Okay.  So do you conduct those trainings?

17  A.    I participate in conducting meetings.  Other

18  people do as well.

19  Q.    You help draft the trainings?

20  A.    Yes.

21  Q.    And you may run part of them?

22  A.    Yes.

23  Q.    Are those usually PowerPoints?

24  A.    I usually do PowerPoints.

25  Q.    Yeah.

1  A.      Not everyone does.

2  Q.      Okay.  And how often are you drafting

3  letters?

4  A.      Regularly.  I mean, as needed.

5  Q.      Okay.  And when you say that you are drafting

6  letters, what kinds of letters are we talking about?

7  A.      Well, I mean, one recent letter was approving

8  a polling location change, where a county is not

9  able -- is -- they just found out that they won't be

10  able to use a polling place that they have

11  traditionally used, and the election commission had

12  to find another polling place for this upcoming

13  March election.  And the only polling place that

14  they could find is outside of a half mile from the

15  precinct line.  So in order for them to use that

16  polling place, they have to get the coordinator's

17  approval.  And that's one of the recent letters I

18  drafted, was for him to approve that.

19  Q.      Okay.  So you draft letters on behalf of

20  Mark?

21  A.      Correct.

22  Q.      Okay.  How often do you draft policy?

23  A.      When you say "policy," I -- my mind really

24  kind of goes to law --

25  Q.      Okay.

1 A.       -- the legal.

2        And the memos involve some policy -- I mean,

3 the applicant.  But in terms of legislation, we

4 draft legislation yearly as needed.

5 Q.    Okay.  What's your role in drafting

6 legislation?

7 A.       I'll draft the language.

8 Q.    Okay.  How often -- so you do that yearly in

9 advance of the legislative session, I assume?

10 A.       It will depend.  There may be legislation

11 that needs to be amended that's already been

12 proposed, that's already been drafted, and Mark has

13 decided he wants to make changes to it.  Sometimes

14 it's legislation that we introduce.

15 Q.    Okay.  How much of your job is that?

16 A.       Well, during legislative session, it will

17 depend upon how much legislation has to be reviewed

18 and has to be -- I can't quantify it -- quantify it.

19 I mean, it's -- during legislative session, it's a

20 -- it's a routine duty.

21 Q.    Okay.  Routine duty.

22 A.       Uh-huh (affirmative).

23 Q.    Understood.

24        Okay.  And how often are you drafting

25 procedures for the elections division?

1  A.      It's almost as-needed.  I'm trying to think

2  of -- I mean, this is a procedure we've recently

3  worked on.  I'm trying to think of another procedure

4  that we've recently worked on.

5       List maintenance is a procedure I've

6  recently worked on.  When you say -- again, when

7  legislation changes, procedures have to be

8  modified.  So, regularly.

9  Q.      Okay.  So a lot of different components

10 happening in your job at any given moment?

11 A.      Yes.

12 Q.      Okay.  Would you say that you as the

13 assistant coordinator do a little bit of everything

14 that the coordinator does?

15 A.      Not to the extent.

16 Q.      Okay.  How does his role differ?

17 A.      Well, for example, during legislative

18 session, he's pretty much over at the general

19 assembly each day testifying, talking to general

20 assembly members, answering/asking questions.  I

21 don't serve in that capacity.

22      I may -- I may testify on his behalf if he's

23 not -- if he can't.

24      He deals with the media far more than I do.

25 He gets far more calls than I do on his -- after

1  hours and weekends.  So, you know, I can't say that

2  our roles are the same.

3  Q.    Okay.  Got it.  So he's a little bit more

4  external-facing, it sounds like?

5  A.    He's the -- yeah, the division -- he's the

6  coordinator.

7  Q.    Yeah.  What other -- and now I'm going to ask

8  about some of the roles of other folks at the

9  elections division.  What are the coordinator's

10  roles?

11  A.    I'm sorry, not understanding.

12  Q.    What the roles of the coordinator at the

13  elections division?

14  A.    Oh, under the statute, he has to -- he

15  interprets the election laws, and he is charged with

16  ensuring that they are applied uniformly throughout

17  95 states -- I'm sorry, 95 counties.

18        So he -- that's why we use memos in

19  training, to make sure that all 95 counties

20  understand his interpretation of how we implement

21  statutes.

22  Q.    Okay.  So he's the chief election official?

23  A.    He is.

24  Q.    So is he in charge of ensuring that the

25  elections -- that elections in Tennessee conform

1  A.      Oh, gosh, I would have to count.  We have

2  about ten.  Ten to 11.  Ten.  I would have to count

3  if you want me to.

4  Q.      That's okay.  The ballpark is fine.

5          And do you assist with management as well?

6  A.      Not as much.  To some degree, but not as

7  much.

8  Q.      So you have some management responsibilities?

9  A.      Only in the context of -- well, only in the

10  context of procedure.  But in terms of, you know,

11  when you talk about managing people's time and when

12  you're off, when you take -- you know, reporting, I

13  do not.

14  Q.      Okay.  Does the coordinator do that kind of

15  management?

16  A.      Yes.

17  Q.      Okay.  And when you say that you have some

18  management responsibilities in the sense of

19  procedures, what do you mean by that?

20  A.      What we talked about earlier.  But if the

21  elections attorney has a question about how do we do

22  this, you know, I may go over that with them.  And,

23  ultimately, Mark has to decide, but I may go over it

24  with them.

25  Q.      Okay.  But beyond that, the coordinator does

1      And then Andrew Dodd, you said he's also an

2  assistant coordinator?

3  A.     Yes.

4  Q.     Does his job look like yours?

5  A.     Very similar in the sense that we both give

6  legal advice to Mark.  We both evaluate.  We both

7  draft memos.  We both draft training.  We both do --

8  do all of those things.  He also, though, has

9  another component that I do not, which is

10 administering federal grant moneys for purchasing

11 voting systems and moneys that are used for security

12 in our counties.

13 Q.     Under the Help America Vote Act?

14 A.     Correct, uh-huh (affirmative).

15 Q.     Okay.  So he's the statutory designee for

16 that act?

17 A.     I don't know about statutory.

18 Q.     The Help America Vote --

19 A.     I think Mark is the -- I don't know if he's

20 associated with it.

21 Q.     Does he have another role -- or another title

22 that's related to that responsibility?

23 A.     He used to be the HAVA attorney.

24 Q.     Okay.  Got it.

25 A.     But -- yeah.

1  Q.     When did he become the assistant

2  coordinator -- or an assistant coordinator?

3  A.     He got promoted, I think, sometime in

4  October.  Late September or October.

5  Q.     And then Bob Brown, the auditor --

6  A.     Yes.

7  Q.     -- new role, is he new?

8  A.     Yes.

9  Q.     Okay.

10  A.     And it's a new position.

11  Q.     And what does that position do?

12  A.     So under legislation they drafted last year,

13  our counties will have to do an audit after each

14  August and November election.  And Bob Brown, who is

15  an auditor, and he is also a former election

16  commissioner in Williamson County, is assisting in

17  what that will look like, what will the audit

18  process look like.

19  Q.     Okay.  Is that -- you said it's required by a

20  new law?

21  A.     Correct.

22  Q.     State law?

23  A.     State law.

24  Q.     So will that audit cover issues related to

25  people who have previous felony convictions?

1  Q.     So what is this?

2  A.     So this is Eligibility to Vote after a Felony

3  Conviction, and this is the outline we have on our

4  website.

5  Q.     Okay.  So that's what you are referring to

6  when you say the website may have changed?

7  A.     Right.

8  Q.     Is this document used for other purposes?

9  A.     Yes.  Counties use it.  We use it to send to

10 individuals who are asking about the process.

11 Q.     Okay.  So it's a public education document?

12 A.     Public information, yes.

13 Q.     Okay.  All right.  So now that we've got a

14 good stack of paper to work with --

15 A.     Uh-huh (affirmative).

16 Q.     -- and I've got a pile of paperclips, I want

17 to talk in more detail about these memoranda and

18 documents.

19        So earlier you said you helped draft these

20 documents --

21 A.     Yes.

22 Q.     -- is that right?

23 A.     Yes.

24 Q.     What level of involvement did you have with

25 the drafting?

1  A.     So for the memos that went to Governor's

2  office, Department of Corrections, board of parole,

3  the clerks, criminal court, to the US probation --

4  US probation and parole, I did the initial drafting

5  of the -- of that memo.

6         Also, the memo -- one of the memos to the

7  county election commissions, I did the original

8  drafting.  And that was the one, again, that

9  focused on the Falls v. Goins.

10        The memo regarding the -- what we referred

11  to as the older felons --

12  Q.     Uh-huh (affirmative).

13  A.     -- and the procedure that changed in

14  processing those, I drafted much of it, but also got

15  a lot of the details from someone else in the

16  office, too, so...

17  Q.     Who did you get them from?

18  A.     DJ.

19  Q.     Okay.  Who else worked on drafting these

20  memos?

21  A.     In terms of reviewing and -- I mean, we had

22  counsel.  Andrew was one.  Secretary --

23  Secretary Hargett's counsel.  I believe counsel with

24  the AG's office, you know, reviewed it.

25  Q.     Do you recall in what order you drafted these

1  Q    (BY MS. BOWIE)  Have you seen this document

2  before?

3  A.     Yes.

4  Q.     Okay.  What is this?

5  A.     This is a Supplemental Declaration by the

6  Coordinator of Elections, Mark Goins.

7  Q.     Okay.  Can you go to the third page, please,

8  and, please, read No. 10?

9  A.     "However, while our discussions with the CLC

10  may have ceased, internal discussions with Secretary

11  Hargett, staff and legal counsel continued and as

12  noted above, these discussions in conjunction with

13  the Tennessee Supreme Court's decision in Falls

14  ultimately resulted in the new policies and

15  procedures that were formalized in my July 21, 2023,

16  memoranda.  Furthermore, absent a change in the

17  applicable law or a court order, I have no intention

18  of changing course."

19  Q.     Okay.  So this says that discussions with

20  CLC, internal discussions in conjunction with the

21  Falls decision, ultimately resulted in the new

22  policies and procedures, correct?

23  A.     Yes, that's what it says.

24  Q.     This is a declaration signed by Mr. Goins?

25  A.     Yes.