# Exhibit A

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 28, 2024

Mr. Zachary Lewis Barker
Mr. Philip W Hammersley
Ms. Dawn M. Jordan
Mr. James Matthew Rice
Office of the Attorney General of Tennessee
Nashville, TN 37202

Ms. Ellen Boettcher
Ms. Blair S. Bowie
Ms. Kathryn Lynn Huddleston
Ms. Alice Clare Campbell Huling
Ms. Danielle Marie Lang
Ms. Valencia Richardson
Ms. Kate Uyeda
Campaign Legal Center
1101 14th Street, N.W.
Washington, DC 20005

Mr. Charles Kevin Grant
Mr. Denmark Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz
1600 West End Avenue, Suite 2000
Nashville, TN 37203

Re:  Case No. 24-5546, *TN Conference of the NAACP, et al v. William Lee, et al*
Originating Case No. : 3:20-cv-01039

Dear Counsel,

The attached order designated for full-text publication was filed today in this case.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely, Opinions Deputy

cc:  Ms. Lynda M. Hill

Enclosure

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0140p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, on behalf of itself and its members,

*Plaintiffs-Appellees*,

    *v.*

WILLIAM BYRON LEE, et al.,

*Defendants*,

MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; TRE HARGETT, in his official capacity as Secretary of the State of Tennessee,

*Defendants-Appellants*.

> No. 24-5546

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-01039—William Lynn Campbell, Jr., District Judge.

Decided and Filed:  June 28, 2024

Before:  BUSH, LARSEN, and MURPHY, Circuit Judges.

───────────────

### COUNSEL

**ON MOTION:** J. Matthew Rice, Philip Hammersley, Zachary Barker, Dawn Jordan, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  **ON RESPONSE:**  Charles K. Grant, Denmark J. Grant, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Nashville, Tennessee, Blair S. Bowie, Alice C.C. Huling, Valencia Richardson, Ellen M. Boettcher, Kate Uyeda, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellees.

————————————

## OPINION

————————————

PER CURIAM.  Tennessee law permits many convicted felons to vote, but it prohibits many others from exercising the franchise.  When processing registration forms submitted by felons, then, state election officials must distinguish applicants who are eligible from those who are not.  To facilitate this review, these officials require some felon applicants to submit records with their registration forms to confirm their eligibility.  In this suit, the Tennessee Conference of the NAACP alleged that this so-called "Documentation Policy" for felon applicants violated the National Voter Registration Act (NVRA).  A district court recently agreed and permanently enjoined the policy in the middle of the 2024 election cycle.  Tennessee's Secretary of State and Coordinator of Elections seek a stay of this injunction pending appeal.

We grant the stay for two reasons.  First, the injunction triggers the Supreme Court's "*Purcell* principle," which instructs federal courts not to disrupt state election rules close to an election.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).  And here, the district court issued its injunction less than a month before the looming July 2 registration deadline for an August election.  Second, the NAACP likely did not present enough evidence to prove its standing to challenge the Documentation Policy.  The NAACP claimed that the policy forced it to divert its resources to help those convicted of felonies track down the records that they need to register.  But the conclusory declaration that the NAACP used to support this theory appears to lack the "specific facts" that the NAACP needed to show its entitlement to summary judgment on this standing question.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).

I

A

The Tennessee Constitution provides that the "right to suffrage" can be "denied" to a person "upon conviction by a jury of some infamous crime, *previously ascertained and declared by law*, and judgment thereon by court of competent jurisdiction."  Tenn. Const. art. I, § 5 (emphasis added).  The highlighted text requires the Tennessee General Assembly to identify the

"infamous" crimes that will result in the loss of voting rights before the State may disenfranchise any person convicted of a crime. *See Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983).

The General Assembly has taken a winding path to classifying the crimes that qualify as "infamous." Its evolving views can be divided into three periods. Before January 15, 1973, the General Assembly identified 21 specific crimes that would result in the loss of voting rights if a criminal judgment noted that the offense qualified as "infamous." *See Crutchfield v. Collins*, 607 S.W.2d 478, 480–82 (Tenn. Ct. App. 1980). Then, between January 15, 1973, and May 17, 1981, the General Assembly treated *no* felonies as "infamous." Yet this "grace" period did not last long. Since May 18, 1981, the General Assembly has reversed course by treating *all* felonies committed within the State as infamous. *Falls v. Goins*, 673 S.W.3d 173, 176 n.1, 179 (Tenn. 2023); Tenn. Code Ann. § 40-20-112. It has also started to treat federal and out-of-state felonies as disenfranchising if they would qualify as felonies under Tennessee law. *See* Tenn. Code Ann. § 2-19-143(2)–(3); *Falls*, 673 S.W.3d at 179.

At the same time, some convicted felons may seek to restore their voting rights. This restoration process has similarly evolved over time. From 1981 until 2006, most disqualified felons had to obtain a court order after completing their sentence or receiving a pardon. *See* Tenn. Code Ann. §§ 40-29-101, 2-19-143. Since 2006, most disenfranchised felons who were convicted after May 18, 1981 can restore their voting rights by obtaining a Certificate of Voting Rights Restoration. *See* Tenn. Code Ann. §§ 40-29-201 to 40-29-205; *Falls*, 673 S.W.3d at 179 & n.6. Before they may do so, though, the governor must have "pardoned" them or their "full rights of citizenship" must "have otherwise been restored as prescribed by law." Tenn. Code Ann. § 2-19-143(1); *see also id.* § 2-19-143(2)–(3). They also must have paid all required "restitution" to their victims and all required court costs. *Id.* § 40-29-202(b)(1)–(2). And they must be "current in all child support obligations." *Id.* § 40-29-202(c); *see Falls*, 673 S.W.3d at 183–84. If convicted felons meet these requirements, they can apply for a "voter registration card" using a "certificate of voting rights restoration form" that Tennessee's Coordinator of Elections prepares. Tenn. Code Ann. § 40-29-205; *see* Goins Decl., R.151-1, PageID 1092; Form, R.157-2, PageID 2719–20.

No. 24-5546          *Tenn. Conference of the NAACP, et al. v. Lee, et al.*                Page 4

As a result of Tennessee's changing law, many individuals who have committed felonies may vote in the State. The district court identified five groups of eligible felons. *See Tenn. Conf. of NAACP v. Lee*, __ F. Supp. 3d __, 2024 WL 1685554, at *18 (M.D. Tenn. Apr. 18, 2024). *First*, individuals remain eligible to vote if they were convicted of a felony before January 15, 1973, and the judgment does not identify their offense as one of the 21 infamous crimes at that time. Resp., R.181, PageID 2895. *Second*, individuals remain eligible to vote if they were convicted of their felony during the grace period between January 15, 1973 and May 17, 1981. *Id. Third*, individuals remain eligible to vote if a court has expunged their felony. *Id.*, PageID 2917. *Fourth*, individuals remain eligible to vote if a court has placed them on judicial diversion in lieu of a criminal conviction. *Id.* And *fifth*, individuals convicted after May 1981 regain their eligibility to vote if the government has restored their voting rights. *Id.*, PageID 2896.

B

The NVRA applies to Tennessee's processes for registering eligible felons to vote. Congress passed this statute under its power to regulate the "Times, Places, and Manner" of holding federal elections. U.S. Const. art. I, § 4, cl. 1; *id.* amend. XVII. Congress sought to streamline registration while ensuring that only eligible voters could vote. 52 U.S.C. § 20501(b). To make registering easier, it required States to allow voters to register in any of three ways: when applying for a driver's license, through the mail, or in person. *See id.* § 20503(a)(1)–(3); *Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 5 (2013). This appeal concerns the forms that Tennessee uses for mail registration and the way that it processes those forms.

*Registration Forms*. The NVRA's mail-registration program identified two registration forms. 52 U.S.C. § 20505(a)(1)–(2). We will call the first of these forms the "Federal Form." The NVRA *requires* Tennessee to "accept and use" this form: "Each State shall accept and use the mail voter registration application form prescribed by" what is now the Election Assistance Commission (or EAC) "for the registration of voters in elections for Federal office." *Id.* § 20505(a)(1); *see ITCA*, 570 U.S. at 5 n.1. This "standard" form looks the same for all States and lacks any space for applicants to identify prior felonies. *ITCA*, 570 U.S. at 5; Fed. Form, R.156-11, PageID 2508–09. So an election official will not know if the applicant has prior

Case: 24-5546   Document: 27-2   Filed: 06/28/2024   Page: 5     (7 of 28)

No. 24-5546        *Tenn. Conference of the NAACP, et al. v. Lee, et al.*        Page 5

convictions (or the dates or types of convictions) "from the face of the form itself."  Resp., R.181, PageID 2909.  That said, the Federal Form does have state-specific instructions that the EAC adopts with input from each State.  *See ITCA*, 570 U.S. at 5–6.  These instructions alert applicants to the State's eligibility requirements and to whether they must submit other information.  *Id.*  As relevant here, the EAC's felony-related instructions for Tennessee provide:

> To register in Tennessee you must: . . . not have been convicted of a felony, but if convicted, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction.  For more information about this process, call 877-850-4959 or visit https://sos.tn.gov/restoration.

Fed. Form, R.156-11, PageID 2509.  Applicants must swear or affirm that they meet their State's "eligibility requirements" under penalty of perjury.  *Id.*, PageID 2508.

We will call the second NVRA-contemplated registration form the "State Form."  The NVRA provides that, "[i]n addition to accepting and using the" Federal Form, "a State may develop and use a mail voter registration form that meets" certain identified requirements "for the registration of voters in elections for Federal office."  52 U.S.C. § 20505(a)(2); *see id.* § 20508(b).  Tennessee's State Form has changed over time.  Resp., R.181, PageID 2901.  Through the November 2020 election, the State Form included the following statement concerning felony convictions: "To register to vote: . . . you must not have been convicted of a felony, or if you have, your voting rights must have been restored."  Previous State Form, R.156-12, PageID 2510.  It also included the following "yes" or "no" question for applicants to complete: "Have you ever been convicted of a crime which is a felony in this state, by a court in this state, a court in another state, or a federal court?"  *Id.*; *see* Resp., R.181, PageID 2906–07.

But Tennessee changed the State Form shortly after that election.  Resp., R.181, PageID 2905.  It now includes the following statement about felony convictions:

> To register to vote: . . . If you have had a felony conviction, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction.  To assist in processing your application, provide the required information in box 4 and any responsive documents you have.  For more information about this process, call 1-877-850-4959 or visit sos.tn.gov/restoration.

Current State Form, R.156-10, PageID 2503.  Box 4, in turn, includes questions for applicants to answer.  It first asks a "yes" or "no" question: "Have you ever been convicted of a felony? (If expunged, answer 'no')[.]"  *Id.*  If applicants answer "yes" to this question, this box includes spaces for them to identify the crime, the date of the conviction, and the place of the conviction. *Id.*  The box then asks a second "yes" or "no" question: "Have you received a pardon or had your voting rights restored?"  *Id.*  If applicants answer "yes," the box lastly instructs them to "provide copy of document."  *Id.*

*Processing the Forms*.  Tennessee law permits the Coordinator of Elections to adopt a "uniform procedure" to verify the eligibility of individuals convicted of crimes.  *See* Tenn. Code Ann. § 2-2-139(c).  Over time, the Coordinator of Elections has changed the procedure for processing the registration forms of those who mark that they have been convicted of felonies. Beginning at least in 2014, Tennessee had a broad "Documentation Policy."  Under this policy, election officials would reject the State Forms of *all* applicants who indicated that they had been convicted of a felony if these applicants did not provide "other documentation" proving their eligibility.  Lim Dep., R.156-4, PageID 2404; *see* Resp., R.181, PageID 2909–11.  Election officials would likewise reject the Federal Forms of applicants if the officials learned through other means that the applicants had been convicted of a felony.  Resp., R.181, PageID 2911–12. Although the Federal Form does not include this information, officials might learn of it by speaking with the applicant or checking the "felon files" that they maintain using data from such sources as the State's department of corrections or county clerks of court.  *Id.*, PageID 2911–12, 2918–19.

In July 2023, however, the Coordinator of Elections narrowed the Documentation Policy to "avoid the unnecessary rejection" of felon applicants.  Goins Decl., R.151-1, PageID 1093. Two groups benefitted from this change.  The change first affected individuals convicted of felonies before January 15, 1973.  Mem., R.151-2, PageID 1095–96.  The Coordinator of Elections instructed election officials to approve the applications of all felons in this group who indicated that they were not convicted of one of the 21 infamous crimes that existed at that time. *Id.*  The change next affected individuals convicted of felonies during the grace period between

January 1973 and May 1981. *Id.* The Coordinator of Elections again instructed election officials to approve the applications of these felons since they remained eligible. *Id.*, PageID 1096.

County election officials must follow a certain process when they reject applications because the applicants have been convicted of a felony but have not provided the required documentation confirming their eligibility. The officials must tell the applicants the "reason" for the rejection. Tenn. Code Ann. § 2-2-125(a). They must also alert them of a right to appeal to the county election commission and give them the "appeal form" for doing so. *Id.* § 2-2-125(b).

C

In December 2020, the Tennessee Conference of the NAACP and several individuals filed this suit under the NVRA and 42 U.S.C. § 1983 against, among others, Tennessee's Coordinator of Elections and Secretary of State (collectively, "Tennessee"). Compl., R.1, PageID 1. In their first three counts, the NAACP and individual plaintiffs challenged Tennessee's administration of the law allowing felons to seek certificates of restoration. Am. Compl., R.102, PageID 648–54. This appeal does not involve these counts.

The appeal instead implicates Counts 4 through 6. In those counts, the NAACP alone (not the individual plaintiffs) challenged the way that Tennessee processed the registration forms for felons. In Count 4, the NAACP alleged that the State Form violated the NVRA because it did not adequately inform felons of the eligibility requirements. *Id.*, PageID 654–55. In Count 5, the NAACP alleged that Tennessee's broad Documentation Policy violated the First and Fourteenth Amendments. *Id.*, PageID 655–56. In Count 6, the NAACP alternatively alleged that this broad Documentation Policy violated the NVRA. *Id.*, PageID 656–57.

In August 2023, the NAACP and Tennessee both moved for summary judgment on Counts 4 and 6. On April 18, 2024, the district court granted summary judgment to the NAACP. *See NAACP*, 2024 WL 1685554, at *1. It first held that the NAACP had standing to challenge the State Form and Documentation Policy. *Id.* at *14–15. The court reasoned that the State Form's lack of clarity and the Documentation Policy's requirement for additional records had made it more "costly" for the NAACP to help felons register and thus had "diverted" the organization's time and money away from other activities. *Id.* at *14. On the merits, the court

held that the State Form violated the NVRA because it did not inform all individuals with felony convictions of the "voter eligibility requirements" relevant to them. *Id.* at *22 (quoting 52 U.S.C. § 20507(a)(5)(A)). The court lastly held that the Documentation Policy violated the NVRA. *Id.* at *22–25. The NVRA allowed the State Form to require only that "information" that was "necessary to enable" election officials to determine an applicant's eligibility. 52 U.S.C. § 20508(b)(1); *see id.* § 20505(a)(2). And the district court held that Tennessee did not need its Documentation Policy to determine the eligibility of those with felony convictions because it had other information at its disposal to make that decision. *NAACP*, 2024 WL 1685554, at *24–25.

Although the court granted summary judgment to the NAACP, it did not award any relief in April 2024. It instead ordered the parties to negotiate the terms of an injunction "as to Count Six" (regarding the Documentation Policy) over the next several weeks. Order, R.222, PageID 3692. The parties could not agree to an injunction, so the court directed each side to identify its preferred injunction. Because the proposed injunctions had "little-to-no common ground," the court next ordered the parties to file objections to the other side's preferred approach by May 17, 2024. Order, R.229, PageID 3722.

On June 5, the court entered its permanent injunction against the Documentation Policy. The court declared that the policy "of rejecting valid, timely submitted mail in voter registration forms . . . based solely on an indication that the applicant has a past felony conviction and requiring the applicant to provide additional documentary proof of eligibility before being placed on the voter rolls" violated the NVRA. Inj., R.237, PageID 3825. The court then permanently enjoined all election officials "from enforcing, applying, or implementing" this policy against all applicants. *Id.* The injunction instructed election officials that they "[s]hall process valid, timely mail in voter registration forms . . . submitted by individuals with prior felony convictions who are otherwise eligible to vote[.]" *Id.*, PageID 3826. It added that these officials "[s]hall register individuals with prior felony convictions who submit valid, timely mail in voter registration forms . . . absent credible information establishing that they are ineligible to vote." *Id.* It also ordered Tennessee's Secretary of State and Coordinator of Elections to issue "written guidance to all state election staff and county administrators of election" that explained two things:

(1) how they should "process" registration forms consistent with the court's summary-judgment opinion and (2) how they should "establish that an individual with prior felony convictions is ineligible to vote" consistent with that opinion. *Id.* The injunction lastly ordered these officials to hold "at least one live training" for election officials on these topics and to make that training available on their website. *Id.*

Two days later, Tennessee filed a notice of appeal and an emergency motion to stay the injunction pending appeal. The State informed the district court that it also planned to seek a stay from our court on June 12 and asked the court to resolve its pending stay motion "quickly" without waiting for a response from the NAACP because of the urgency of implementing the required changes in the "middle of the 2024 election cycle." Mot., R.243, PageID 3868. The court instead ordered the NAACP to respond by June 17. It has yet to rule on the stay request.

In the meantime, Tennessee filed its emergency stay motion in our court on June 12. We granted an administrative stay on June 14 to give us time to consider the emergency motion.

II

A

Appellate courts have traditionally asked four questions when deciding whether to stay an injunction during the enjoined party's appeal of that injunction. *See Kentucky v. Biden*, 23 F.4th 585, 593 (6th Cir. 2022); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009). First: What is the "likelihood" that the party seeking the stay will win on the merits at the end of the appeal? *Griepentrog*, 945 F.2d at 153. Second: Will the injunction likely cause the party seeking the stay an irreparable injury? *Id.* Third: Would the stay harm other parties? *Id.* And fourth: Does the public interest favor the stay? *Id.* We must balance these four factors. *Id.* So if stay applicants establish that an injunction will cause a severe irreparable injury, they might obtain a stay with a lesser showing of their likelihood of success. *See id.* at 153–54. Under this traditional approach, though, applicants always have to establish more than a mere "possibility" of success on the merits or irreparable injury. *Id.* at 153 (citation omitted); *see Nken*, 556 U.S. at 434–35.

But this case concerns a challenge to a State's election procedures. In that setting, the Supreme Court has adopted a unique injunction principle: the so-called "*Purcell* principle" named after *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). *Purcell* involved an Arizona law that required voters to provide proper identification at the polls. *Id.* at 2. A circuit court had issued an injunction against this law a month before the 2006 election. *Id.* at 3. The Supreme Court reversed without stating any "opinion" about the likelihood of success. *Id.* at 5. Seemingly relying on the other stay factors, the Court dissolved the injunction because of the need for "clear guidance" to election officials and the risk of "voter confusion" from the judiciary's last-minute election changes. *Id.* at 4–5. Since *Purcell*, the Court regularly cites the opinion for the proposition "that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam); *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (citing cases).

An ongoing debate exists over how this *Purcell* principle affects the traditional four-part test for a stay in the election context. Some decisions might suggest that appellate courts should grant stays of untimely injunctions based on *Purcell* alone. *See Petteway v. Galveston County*, 87 F.4th 721, 723 (5th Cir. 2023) (en banc) (per curiam) (Oldham, J., concurring); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641–42 (7th Cir. 2020) (per curiam). Others seem to treat *Purcell* as one data point *within* the usual four-part test. *See Kim v. Hanlon*, 99 F.4th 140, 160–61 (3d Cir. 2024); *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225–29 (4th Cir. 2024). And still others suggest that *Purcell* establishes a preelection *presumption* against an injunction (and in favor of a stay) unless the party seeking the injunction can satisfy a more demanding test. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370–72 (11th Cir. 2022) (per curiam) (citing *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)).

For our part, we have continued to recite our usual four-part test for a stay in the election context. *See, e.g.*, *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020); *A. Philip Randolph Inst. of Ohio v. LaRose*, 831 F. App'x 188, 190–91 (6th Cir. 2020); *Thompson v. DeWine*, 959 F.3d 804, 807 (6th Cir. 2020) (per curiam); *Serv. Emps. Int'l Union Local 1 v.*

*Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (per curiam); *Ne. Ohio Coal. for the Homeless v. Blackwell* (*NEOCH I*), 467 F.3d 999, 1009 (6th Cir. 2006).  And we have placed the *Purcell* principle within "the balance of [the] equities" addressing the non-merits factors governing a stay.  *Kishore v. Whitmer*, 972 F.3d 745, 751 (6th Cir. 2020); *see Thompson*, 959 F.3d at 813.  In some cases, we have noted that the "public interest" supported a stay because a district court's injunction threatened to cause "voter confusion" or create "disorder in [the] electoral process[.]" *A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 192; *NEOCH I*, 467 F.3d at 1012; *see Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam).  In others, we have reasoned that a belated request for an injunction undercut the plaintiffs' claim of irreparable injury.  *See Serv. Emps. Int'l Union*, 698 F.3d at 345–46.

At the same time, we have also held that the equities underlying *Purcell* can justify a stay *by themselves*.  *See Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016).  In *Crookston*, a voter challenged a Michigan law that protected the secrecy of the ballot by barring voters from exposing their ballot to others (including by way of "ballot selfies").  *Id.* at 397.  Challenging this law ahead of the November 2016 election, a voter sued on September 9 and requested a preliminary injunction on September 26.  *Id.* at 398–99.  When a district court granted the injunction on October 24, we issued a quick stay.  *Id.* at 397, 399.  We held that the voter had waited too long to challenge this decades-old law before the 2016 election.  *Id.* at 399, 401. Among other reasons, we highlighted the difficulty that Michigan would face in training election officials on any departure from the ban in a short time.  *Id.* at 399.  Although we went on to express skepticism with the merits of the plaintiff's claim, we held that the equities "alone" justified a stay regardless of Michigan's likelihood of success on the merits.  *Id.* at 399–400. This reasoning—consistent with *Purcell* itself, *see* 549 U.S. at 5—departs from the usual need for a stay applicant to show more than a mere "possibility" of success.  *Griepentrog*, 945 F.2d at 153 (citation omitted).

B

How should these principles apply here?  Like *Crookston*, we may well have granted a stay based on the *Purcell* principle alone.  In the end, though, Tennessee's likelihood of success also supports a stay.  We will discuss both in turn.

### 1. The Equitable *Purcell* Factors

The Supreme Court has instructed federal courts that they should not disrupt State "election rules" if the change occurs "on the eve of an election." *Republican Nat'l Comm.*, 589 U.S. at 424. To decide whether this legal principle applies here, we must ask two questions.

Question One: Did the district court's injunction change an "election rule[]" within the meaning of *Purcell*? *Id.* Courts have characterized many election-related provisions as "election rules" subject to *Purcell*. *Id.* The principle has, for example, covered injunctions imposing new congressional maps. *See Robinson v. Callais*, 144 S. Ct. 1171, 1171 (2024) (mem.). It has covered injunctions changing the rules for initiatives or candidates to get on the ballot. *See Kishore*, 972 F.3d at 751; *Thompson*, 959 F.3d at 813. It has covered injunctions compelling curbside voting. *See Merrill v. People First of Ala.*, 141 S. Ct. 25, 25 (2020) (mem.). And it has covered injunctions changing the rules for submitting absentee ballots. *See Republican Nat'l Comm.*, 589 U.S. at 424; *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 30–31 (2020) (mem.) (Kavanaugh, J., concurring); *Andino v. Middleton*, 141 S. Ct. 9, 9–10 (2020) (mem.).

Tennessee's Documentation Policy likewise fits comfortably within the phrase "election rule." Admittedly, the policy governs the processing of *registration* forms, not *ballots*. But we fail to see why that difference should matter. The concerns that underlie *Purcell*—the risk of voter confusion and the unfairness of unexpected administrative burdens—can apply just as much to last-minute registration changes as to other types of belated voting changes. *See A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 192; *Crookston*, 841 F.3d at 398–99. Unsurprisingly, then, other circuit courts have already extended *Purcell* to registration-changing injunctions. *See League of Women Voters of Fla.*, 32 F.4th at 1369–72; *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 953 (9th Cir. 2020); *Democratic Nat'l Comm.*, 977 F.3d at 641–42; *see also North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (mem.). We do the same here.

Question Two: Did the district court issue its registration-changing injunction "on the eve of an election"? *Republican Nat'l Comm.*, 589 U.S. at 424. As others have recognized, the

Supreme Court has not adopted any categorical answer to the question of "how close is too close?" *See League of Women Voters of Fla.*, 32 F.4th at 1371. The answer might depend on injunction-specific factors about the nature of the required changes and the burdens they will impose. *See Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring). That said, the Court's cases do provide some data points. *Purcell*, for example, overturned an injunction issued about a month before an election. 549 U.S. at 3. And the Court's other cases have stayed injunctions issued many months before. *See Petteway*, 87 F.4th at 723 (Oldham, J., concurring) (listing examples).

Under these standards, the injunction here likewise falls within *Purcell*. The next Tennessee election—a primary election for federal and state legislators and a general election for judicial and local candidates—will occur on August 1. *See* Tenn. Sec'y of State, Key Dates for the 2024 Election Cycle ("Key Dates") (last visited June 28, 2024), https://bit.ly/45dJNO2. But given that the injunction changes registration rules, the registration deadline provides the more accurate date to evaluate the injunction's timeliness. *See Mi Familia Vota*, 977 F.3d at 953. And Tennessee requires citizens to register 30 days before elections. *See* Tenn. Code Ann. § 2-2-109(a). Voters thus must register for the upcoming election by July 2—only days from now. *See* Goins Decl., R.243-1, PageID 3878. So the district court's June 5 injunction gave Tennessee less than a month to implement a statewide change concerning how election officials should process the registration forms of individuals with felony convictions. That timeline was too short. *See Purcell*, 549 U.S. at 3–5.

Given that the injunction triggers the *Purcell* principle, we must next ask whether that principle "alone" warrants a stay. *See Crookston*, 841 F.3d at 399. We see three reasons to believe it should: the timing of the injunction, the confusion that it risks, and the burdens it imposes.

*Timing*. The NAACP has provided us with "no reasonable explanation" why it did not seek expedited relief against the Documentation Policy. *Id.* at 398. This policy dates at least to 2014—perhaps earlier. The NAACP sued over the policy in December 2020. Since then, though, it appears to have treated this case like any other suit. As the litigation progressed, the 2022 primary and general elections came and went. In August 2023, the NAACP moved for

summary judgment on a seemingly ordinary track. We see no indication that it sought an expedited ruling. So this year's presidential primary likewise occurred with that motion pending. The district court did not grant summary judgment to the NAACP until April 2024. Yet the NAACP's motion had requested only "such permanent relief" as the court found "just and proper." Mem., R.154, PageID 2312. The court thus spent several more weeks figuring out the proper injunction. Again, the NAACP did not seek to expedite this review. In short, even if the NAACP was not "sluggish" in *filing* this suit, this history suggests it was "sluggish" in *litigating* it. *Crookston*, 841 F.3d at 399.

The NAACP's choice not to seek preliminary relief from the Documentation Policy sooner undercuts any claimed "irreparable harm in the absence of the injunction." *Serv. Emps. Int'l Union*, 698 F.3d at 346. Indeed, the NAACP's response does not even attempt to treat its alleged injuries (the extra time and money incurred as a result of the Documentation Policy) as irreparable. *Cf. Sampson v. Murray*, 415 U.S. 61, 90 (1974). It instead invokes alleged harms that the Documentation Policy causes others, correctly noting that voters would suffer irreparable injuries if a State denied them their right to vote. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020). But the NAACP has not sued in any representational capacity. And while we give "careful consideration" to concerns that a state regulation will violate the fundamental right to vote, *Purcell*, 549 U.S. at 4, the NAACP's response did not identify a single specific example of any eligible individual who has been hindered by the longstanding Documentation Policy, *see Memphis A. Philip Randolph Inst.*, 978 F.3d at 391.

In response, the NAACP raises timing concerns of its own. It simultaneously faults Tennessee for waiting too long and moving too fast in its challenge to the injunction. These arguments are both mistaken. Start with whether the State waited too long. The NAACP points out that the district court issued its summary-judgment decision in April, and Tennessee did not appeal until June. But the State could not appeal that nonfinal summary-judgment decision. It had to wait until the court entered an injunction. *See* 28 U.S.C. § 1292(a)(1). From that point, Tennessee did not dally. It appealed and sought a stay within two days. This conduct in no way resembles the actions of the Tennessee officials in *Memphis A. Philip Randolph Institute v. Hargett*, 977 F.3d 566 (6th Cir. 2020). There, a district court issued an injunction on September

9, 2020, but the officials waited until October 9—over a month later—to seek relief from the injunction.  *See id.* at 567–68.  We denied a stay because of the Tennessee officials' "own" conduct.  *Id.* at 568.  Early voting had started during their unexplained delay, and the plaintiffs had informed many voters about the injunction.  *See id.*  No similar unexplained delay occurred here.

Indeed, the NAACP alternatively says that Tennessee acted too quickly.  It suggests that the State filed a motion to stay in our court prematurely because the district court had yet to rule on a similar request in that court.  *See* Fed. R. App. P. 8(a)(1).  Yet Federal Rule of Appellate Procedure 8 allows a movant to seek a stay in our court if the district court has "denied" a similar stay motion "*or failed to afford the relief requested*[.]"  Fed. R. App. P. 8(a)(2)(A)(ii) (emphasis added).  Here, Tennessee filed a stay motion in the district court on June 7 and asked for a decision by June 12.  But the court ordered the NAACP to respond by June 17 and still has not ruled on the motion.  Given the need for immediate action in light of the pending registration deadline, we view the court's failure to issue a timely decision as a failure to afford Tennessee's "requested relief."  *Tiger Lily, LLC v. HUD*, 992 F.3d 518, 521 n.2 (6th Cir. 2021); *see Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 n.5 (9th Cir. 2020) (order).

*Confusion*.  The district court's injunction has already caused confusion and could threaten more.  Despite the need for "clear guidance" to election administrators, Tennessee's obligations have been unclear.  *Purcell*, 549 U.S. at 5.  To begin with, Tennessee's State Form currently refers to the Documentation Policy by, among other things, asking felon applicants to provide a "copy" of the document restoring their voting rights.  Current State Form, R.156-10, PageID 2503.  But the injunction seemingly bars Tennessee from requiring registration applicants "to provide additional documentary proof of eligibility before" placing them on the voter rolls.  Inj., R.237, PageID 3825.  So Tennessee concluded that it must scramble to rewrite this now-inaccurate State Form.  Goins Decl., R.243-1, PageID 3877.  And, according to evidence that the NAACP filed in our court with its response, the State apparently changed this form on its website before taking the revised form down when we granted an administrative stay.  Response Br. 7.  But the district court has since signaled its view that the injunction does not

require Tennessee to change the State Form (and the NAACP agrees).  Order, R.245, PageID 3884; Response Br. 6.

Yet this clarification merely creates another risk of confusion—this time, "voter confusion."  *A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 192.  The State Form will tell felon applicants who have had their voting rights restored that they need to do one thing (provide documentation).  But the injunction, when publicized, will tell them that they need to do another (fill out the form).  Should a voter trust the language on the form?  Or what somebody else might tell them about an injunction?  The uncertainty that could result from this conflicting guidance could create an "incentive" for voters to "remain away from the polls."  *Purcell*, 549 U.S. at 5.  This "general concern" shows why administrators should plan and implement significant changes to registration processes well ahead of an election—not just before a deadline.  *Lichtenstein v. Hargett*, 83 F.4th 575, 600 (6th Cir. 2023).

In response, the NAACP claims that confusion concerns cut *against* a stay.  It points out that "conflicting" judicial "orders" changing election rules back and forth can themselves exacerbate voter confusion.  *Purcell*, 549 U.S. at 4–5.  The NAACP adds that voters have known of the district court's "legal change" since its summary-judgment ruling in April and that Tennessee posted an updated voter-registration form on its website for a few days.  Response Br. 20–21.  As Justice Kavanaugh has explained, however, this argument would "turn *Purcell* on its head."  *Democratic Nat'l Comm.*, 141 S. Ct. at 31–32 (Kavanaugh, J., concurring).  If appellate courts could not stay a belated injunction because the stay itself qualified as a prohibited "conflicting order," *Purcell*, 549 U.S. at 4, those courts would lack the power to enforce the *Purcell* principle and it would become merely advisory.  But the many stay orders that the Supreme Court and our court have issued—which conflicted with the underlying injunctions that they stayed—show that the NAACP misreads the law.  *See, e.g.*, *Republican Nat'l Comm.*, 589 U.S. at 424; *A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 192.

*Burdens*.    When discussing Tennessee's injury from this injunction, the parties vigorously debate the size of the administrative burdens that the injunction would impose.  According to the NAACP, election officials *already* research the eligibility of applicants who have noted that they have committed felonies.  Response Br. 7–8.  According to Tennessee,

election officials will have to spend significantly *more* time conducting searches of felony and restoration databases without the accompanying records.  Reply Br. 6–7.  Yet it is not clear that the State needed to show much in the way of burdens.  After all, our cases teach that a State suffers a form of irreparable injury whenever a court enjoins one of its election laws.  *See Priorities USA v. Nessel*, 860 F. App'x 419, 422 (6th Cir. 2021); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (per curiam); *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 344 (6th Cir. 2018).  And while the district court here enjoined an administrative policy rather a law, we have suggested the same principle in that context.  *See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (order); *cf. Arizona v. Biden*, 31 F.4th 469, 482 (6th Cir. 2022).

Regardless, common sense suggests that the injunction would impose at least *some* new burdens on election officials in the weeks before the registration deadline.  The Documentation Policy *partially outsourced* to registration applicants the duty to confirm their eligibility to vote by presenting the documents that prove this eligibility (primarily certificates of voting-rights restoration).  This requirement facilitated the administrative review of whether the applicants were qualified to vote.  The injunction, by contrast, *fully internalizes* this task by requiring election officials to independently research the eligibility of applicants.  *See* Goins Decl., R.243-1, PageID 3879.  But the State has "finite and rivalrous" resources to prepare for and run an election.  *A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 192.  By imposing new and unplanned obligations, the injunction takes some election administrators away from other tasks.  *Id.*

Tennessee also has "a compelling interest in preserving the integrity of its election process."  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021) (quoting *Purcell*, 549 U.S. at 4).  Yet the Coordinator of Elections has opined that the State will likely lack the ability to verify the eligibility of all applicants before early voting starts for the August election.  *See* Goins Decl., R.243-1, PageID 3879.  Despite the injunction, moreover, even the NAACP recognizes that the State should be able to require *some* applicants to produce their restoration documents with their registration forms.  It suggests that the State may require these documents from those who are "restoring their voting rights for the first time after their most recent felony

conviction" and lack "a current restoration letter on file with" Tennessee.  Sur-Reply, R.256-1, PageID 4440–41.

The NAACP responds that the burdens cannot be great because the Coordinator of Elections already *narrowed* the Documentation Policy in July 2023 while this litigation progressed.  As noted, election officials no longer require documentation from those who indicate on registration forms that they were convicted of a non-infamous crime before 1973 or that they were convicted of a felony during the "grace" period until 1981.  But this fact is double-edged.  Yes, it shows that Tennessee has the capacity to fully internalize this eligibility research—at least when it properly plans for the task.  But it also shows that a stay will have less of an impact on registration applicants.  Tennessee has represented that it will adhere to its narrower policy during this appeal, and we expect it to abide by its representations.  *See* Mot. for a Stay at 6–7.

In sum, "[a]bsent the best of reasons," election officials should not have to change a decade-old policy weeks before voter registration ends.  *Crookston*, 841 F.3d at 399.  The NAACP has not offered a good enough reason here.  A stay thus may well be justified under *Purcell* alone.

## 2. Likelihood of Success

In all events, we would have reached the same result even if we added Tennessee's likelihood of success to the mix.  Setting aside the NVRA-related questions that this suit raises, Tennessee has shown that it will likely "prevail on the merits" in this appeal.  *Thompson*, 959 F.3d at 811.  Why?  Because the "merits" in this likelihood-of-success context include what otherwise seems like a non-merits question: Does the plaintiff have standing to raise the claims on which it won an injunction?  *Waskul v. Washentaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018); *see Memphis A. Philip Randolph Inst.*, 978 F.3d at 385–86; *see also Murthy v. Missouri*, __ S. Ct. __, 2024 WL 3165801, at *7–8 (June 26, 2024).  And the district court here likely erred when it granted summary judgment to the NAACP on this standing question.

To explain this conclusion, we start with the standing basics. A party may not invoke the federal judiciary's coercive powers against an adversary unless their dispute has taken the shape of the "Cases" or "Controversies" that fall within Article III's text. U.S. Const. art. III, § 2. This Article III limit on the judicial power represents a critical part of our Constitution's separation-of-powers framework designed to protect the political branches from the "advisory" supervision of unelected federal judges. *See FDA v. Alliance for Hippocratic Med.*, __ S. Ct. __, 2024 WL 2964140, at *5–6 (June 13, 2024); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536–37 (6th Cir. 2021). And a "Case" or "Controversy" does not exist under Article III unless the plaintiff has standing to sue. *See Lujan*, 504 U.S. at 560.

To establish its standing (and the court's jurisdiction), a plaintiff must satisfy three oft-repeated elements: that it has suffered (or will suffer) a "concrete and particularized" injury; that a "causal connection" exists between the injury and the defendant's conduct; and that the requested remedy will redress the injury. *Id.* at 560–61; *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022). One aspect of this standing test warrants special attention. A plaintiff typically faces little difficulty satisfying standing's three elements when the plaintiff is "the object of the government action" challenged in the suit. *Lujan*, 504 U.S. at 562. So, for example, a party may sue over a ban on the party's speech as long as a credible threat exists that the government will enforce that ban. *See Fischer v. Thomas*, 52 F.4th 303, 307–09 (6th Cir. 2022) (per curiam). When, by contrast, a plaintiff challenges a government regulation "of *someone else*," the plaintiff will have a "substantially more difficult" time establishing standing. *Lujan*, 504 U.S. at 562 (citation omitted). In that scenario, it is often "speculative" whether the unregulated plaintiff's asserted injury flows out of the government's regulation of the third party—rather than from some other factor. *All. for Hippocratic Med.*, 2024 WL 2964140, at *7.

The NAACP faces this difficulty here. The Documentation Policy "neither require[s] nor forbid[s] any action" on its part. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Rather, the policy regulates other parties (certain registration applicants with felony convictions) by requiring them to submit paperwork (such as restoration-of-rights documents) that confirms their eligibility to vote. And the NAACP cannot establish its standing merely through its "legal, moral, ideological, or policy" disagreement with this state requirement. *All. for Hippocratic*

*Med.*, 2024 WL 2964140, at *6.  The NAACP must instead show that the Documentation Policy causes it to suffer a concrete injury that its requested remedy would redress.  *See id.*

To satisfy these elements, the NAACP invokes a "diversion-of-resources" theory of standing.  This theory originates with *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982).  There, three individuals and a nonprofit named Housing Opportunities Made Equal (HOME) sued Havens Realty under the Fair Housing Act, alleging that it had engaged in "racial steering" by turning away racial minorities from its apartment complexes.  *Id.* at 366–67 & n.1.  Havens told two of the individuals (both of whom were African American and one of whom was a "tester" for HOME) that it had no vacancies.  *Id.* at 368.  But it told the third individual (a white "tester" for HOME) that it had plenty of apartments.  *Id.*  While allowing an individual plaintiff to proceed with the case, the district court dismissed HOME for lack of standing.  *Id.* at 369.  On appeal, the Supreme Court addressed HOME's claim that its complaint adequately pleaded its standing to seek damages from Havens.  *Id.* at 371, 378.  The complaint alleged that HOME had spent "significant resources" (its employees' time) to eliminate Havens's unlawful steering.  *Id.* at 379 (citation omitted).  And the complaint alleged that Havens's false statements to one of HOME's employees had directly harmed HOME's business of placing clients in housing through "counseling and other referral services."  *Id.* (citation omitted).  The Court held that these allegations sufficiently asserted an Article III injury at the pleading stage.  *Id.*

After *Havens*, therefore, our cases have recognized that an organization can sometimes establish its standing if the organization shows both that the defendant's challenged conduct has caused "a drain" on its "resources" and that the organization would have used those resources in another way.  *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013); *see, e.g.*, *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547–49 (6th Cir. 2021); *Ne. Ohio Coal. for the Homeless v. Husted* (*NEOCH II*), 837 F.3d 612, 623–24 (6th Cir. 2016); *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991).

Yet two legal developments since *Havens* have clarified its narrow domain.  Development One: Just weeks ago, the Supreme Court clarified that *Havens*'s "unusual" facts did not support a categorical rule allowing standing whenever "an organization diverts its

resources in response to a defendant's actions." *All. for Hippocratic Med.*, 2024 WL 2964140, at *13–14. In *Alliance for Hippocratic Medicine*, medical associations with moral objections to abortion sued the FDA over regulations broadly allowing an abortion drug on the market. *Id.* at *3–4. These associations argued that the regulations forced them to spend time and money on studies showing the drug's safety risks and "public education" informing patients about those risks. *Id.* at *13. The Court held that this purported diversion of resources did not establish the associations' standing. *Id.* at *13–14. It distinguished *Havens* on the ground that HOME had "operated a housing counseling service" and that Havens Realty had "directly" harmed HOME's business by giving its employees false information about apartment complexes. *Id.* at *13. So the Court compared HOME to a "retailer who sues a manufacturer" (Havens) "for selling defective goods to the retailer." *Id.* The medical associations, by contrast, did not allege that the FDA had caused them a similarly direct informational injury; rather, they alleged only that they had made the decision to spend money to minimize the alleged harms from the FDA's regulations. *Id.* at *14.

Development Two: Even before *Alliance for Hippocratic Medicine*, we had recognized other limits on *Havens*. For one thing, the Supreme Court decided *Havens* at a time when a complaint's "general allegations" sufficed to state a claim. *Lujan*, 504 U.S. at 561 (citation omitted). Even at the pleading stage, the Court has now jettisoned this test. *See Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44. Besides, a plaintiff's burden increases as the suit moves past the pleadings. *See Lujan*, 504 U.S. at 561. On summary judgment, the plaintiff must produce evidence showing the "specific facts" that support its standing. *Id.* (citation omitted); *see Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted). We thus have granted summary judgment against similar nonprofit entities that failed to back up their diversion-of-resources allegations with adequate proof. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014); *cf. Tenn. Republican Party v. SEC*, 863 F.3d 507, 519–20 (6th Cir. 2017).

For another thing, *Havens* addressed HOME's standing to seek *damages*—not its standing to seek an *injunction*. *See* 455 U.S. at 378. That difference matters because plaintiffs "cannot establish standing 'in gross.'" *Davis*, 51 F.4th at 171 (quoting *DaimlerChrysler Corp. v.*

*Cuno*, 547 U.S. 332, 353 (2006)).  They must prove their standing on a remedy-by-remedy basis.  *Id.*  For example, a past injury might support a request for damages—the "traditional backward-looking remedy" for harms that have already occurred.  *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983)).  But this injury cannot support a request for an injunction.  *Id.*  To obtain that forward-looking relief, the plaintiff must instead show that the same kind of injury is "*certainly* impending" in the future.  *Id.* at 172 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see Murthy*, 2024 WL 3165801, at *8.  *Havens* thus said nothing about the types of *future* injuries that plaintiffs must allege when they pursue diversion-of-resources theories.  *See Fair Elections*, 770 F.3d at 460 n.1; *see also Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (per curiam).  And we have held that organizations cannot establish their standing by diverting resources to eliminate a risk of harm to third parties that is not imminent.  *See Memphis A. Philip Randolph Inst.*, 978 F.3d at 386–89; *Shelby Advocs.*, 947 F.3d at 982.

The NAACP's diversion-of-resources theory likely falls short under this law.  The NAACP sought to satisfy its burden to produce "specific facts" at this summary-judgment stage primarily with a declaration from its president.  *Viet*, 951 F.3d at 823 (citation omitted); *see* Sweet-Love Decl., R.156-2, PageID 2355–58.  The NAACP's president asserts that it "expends significant resources helping individuals, including those with past felony convictions, register to vote."  Sweet-Love Decl., R.156-2, PageID 2356.  She then asserts that when an NAACP-assisted voter "is incorrectly denied the ability to register" or "required to present additional paperwork" to show the voter's eligibility, the NAACP "must divert significant resources" to fix the problem.  *Id.*  NAACP volunteers have "taxied" unidentified voters to "governmental offices" to help them register.  *Id.*, PageID 2357.  These volunteers have also traveled with unidentified voters to get "old court records that are not easily accessible" or helped them print the records from online sources.  *Id.*, PageID 2357–58.  If court employees charge for the paper records, the volunteers also "will occasionally help pay for" them.  *Id.*, PageID 2358.  The NAACP president concludes that the NAACP would like to redirect these "resources to its voter turnout activities[.]"  *Id.*

At least at this stay stage, we see one *potential* problem and another *likely* problem with the NAACP's standing theory. *First*, Tennessee has identified "serious questions" about how the Supreme Court's decision in *Alliance for Hippocratic Medicine* affects the NAACP's standing. *Griepentrog*, 945 F.2d at 153 (citation omitted).

On the one hand, the NAACP may no longer be able to rely on *Havens* to support its standing given that case's "unusual" facts. *All. for Hippocratic Med.*, 2024 WL 2964140, at *14. Havens had directly harmed HOME because it had given one of HOME's own employees "false information" and so had violated HOME's right to truthful information under the Fair Housing Act. *Id.* at *13–14; *Fair Elections*, 770 F.3d at 460 n.1. Unlike HOME, the NAACP points to no evidence showing that the Documentation Policy "directly" injured it. *All. For Hippocratic Med.*, 2024 WL 2964140, at *13. As noted, the policy did not apply to the NAACP at all. To be sure, the NAACP alleged an indirect "pocketbook" harm from the policy. *California v. Texas*, 593 U.S. 659, 669 (2021). The policy has made the nonprofit's voter-registration efforts *more costly* by requiring it to spend "extra time and money" on those efforts. Sweet-Love Decl., R.156-2, PageID 2358. But the medical associations in *Alliance for Hippocratic Medicine* identified a "pocketbook" harm too. *California*, 593 U.S. at 669. They alleged that the FDA regulations had rendered their public-education efforts more costly by forcing them to devote extra time and expense to informing the public about the risks of the abortion drug. *See All. for Hippocratic Med.*, 2024 WL 2964140, at *13. Yet the Supreme Court held that these pocketbook injuries did not establish their standing to sue the FDA. *Id.* If the associations' expenditures did not suffice in that case, why should the NAACP's expenditures suffice in this one?

On the other hand, perhaps the NAACP can rely on a *Havens*-like standing theory. *Alliance for Hippocratic Medicine* said that the medical associations did not have standing because a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* Yet HOME did more than engage in issue advocacy. It "also operated a housing counseling service." *Id.* And Havens's actions "interfered with HOME's core business activities." *Id.* In this case, too, the NAACP arguably alleges that it is in the business of registering voters—not merely gathering information and

advocating against the law.  As for the directness of the harm, *Alliance for Hippocratic Medicine* did not question—and, indeed, approvingly cited—many other cases in which the Court has allowed "unregulated" parties to sue a defendant even though the defendant's conduct harmed those parties indirectly.  *Id.* at *8 (citing cases).  A State's tax on a manufacturer, for example, might give the manufacturer's *customers* standing by raising their prices for some commodity. *Cf. Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286–87 (1997).  If a customer's expenditure for the commodity sufficed to give it standing, why shouldn't the NAACP's expenditure for its voter-registration efforts?

In short, *Alliance for Hippocratic Medicine* creates uncertainty over when a plaintiff's own choice to spend money can give it standing to challenge a government action that allegedly caused the expenditure.

*Second*, whether or not the NAACP's standing theory remains tenable, its president's declaration likely fails to "identify 'specific facts, as opposed to general allegations,'" to prove the theory.  *Viet*, 951 F.3d at 823 (citation omitted); *see Fair Elections*, 770 F.3d at 460.  The declaration generically discusses what the NAACP has done when election officials have rejected the registration forms of voters that the NAACP has assisted.  Sweet-Love Decl., R.156-2, PageID 2357–58.  But it does not expressly identify a single voter that the Documentation Policy has ever affected.  At most, it says that the NAACP "is aware" of individuals with felony convictions who could not register using the State Form alone even though they remained eligible to vote because they were convicted during the "grace" period.  *Id.*, PageID 2357.  Yet the Documentation Policy no longer applies to those voters.  And the declaration does not identify the reasons why election officials have rejected the registration forms of other unidentified voters that the NAACP has assisted.  So we have no idea whether the Documentation Policy (or some other issue) affected these unidentified voters.  *Cf. Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710,717 (6th Cir. 1995).  We also have no idea when the NAACP provided this assistance.  And we have no idea how often these issues have arisen for the organization.

This generic declaration likely would not suffice to allow the NAACP to seek *damages* for past harms—the only remedy that the Supreme Court permitted in *Havens*.  *See* 455 U.S. at

378. In that case, HOME identified a *specific* example of harm. Havens had given false information to one of HOME's two employees on specific dates. *See id.* at 368. Similarly, in some of our other diversion-of-resources cases, entities have identified their precise harms from the defendant's conduct down to the penny. *See Miami Valley Fair Hous. Ctr.*, 725 F.3d at 576. The NAACP has introduced no similarly specific evidence of a "concrete" injury. *Lujan*, 504 U.S. at 560.

To make matters worse, the NAACP sought an *injunction* that bars Tennessee from enforcing its Documentation Policy. Even if the declaration had identified examples with enough detail to show a past injury, that evidence would still not suffice for this requested relief. *See Davis*, 51 F.4th at 171–72; *see Murthy*, 2024 WL 3165801, at *8. Rather, the NAACP had to offer evidence proving that it would likely "again experience" a diversion of resources from the Documentation Policy. *Lyons*, 461 U.S. at 109. But since we have no idea how often that policy has affected the NAACP in the past, how could we decide whether such a future injury was "*certainly* impending"? *Clapper*, 568 U.S. at 409 (citation omitted); *see Memphis A. Philip Randolph Inst.*, 978 F.3d at 388–89. And since the NAACP did not identify any specific applicants that it planned to assist in the future, the district court could not grant a *tailored* injunction tied to these applicants. Rather, the court granted a *universal* injunction that bars enforcement of the Documentation Policy against everyone—including applicants that the NAACP has no plans to assist. Yet the Supreme Court has noted that courts should limit their remedy "to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 2024 WL 3089532 (U.S. June 24, 2024); *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

We do not find the NAACP's counterarguments convincing at this stage. It primarily relies on our decision in *Online Merchants*. There, the Online Merchants Guild sued the Kentucky Attorney General to challenge his enforcement of Kentucky's price-gouging laws against Guild members who sold their products on Amazon. *See* 995 F.3d at 544. The Attorney General had issued subpoenas and civil investigative demands to Kentucky members of the

Guild.  *See id.* at 545–46.  The Guild had standing because it spent resources to help these merchants respond to this investigation and would continue to do so because of the investigation's ongoing nature.  *See id.* at 548.  This reasoning may (or may not) survive *Alliance for Hippocratic Medicine*.  But we need not resolve that issue now because *Online Merchants* does not help the NAACP in any event.  For starters, the case arose in a different procedural posture.  To obtain a preliminary injunction, the Guild had to prove that it *likely* had standing. *See id.* at 546.  Here, by contrast, the NAACP obtained a permanent injunction after the district court awarded it summary judgment.  So the NAACP had to prove that it *actually* had standing. *See* Fed. R. Civ. P. 56(a).  In addition, the Guild identified "specific facts" to establish its standing.  *Viet*, 951 F.3d at 823 (citation omitted).  It had diverted resources to help the *specific* members who had received subpoenas or civil investigative demands.  *Online Merchs.*, 995 F.3d at 548.  Here, by contrast, the NAACP did not identify any specific voters, or even the number of voters, that it had helped in the past.  Nor did it provide any similar detail about its plans to help voters register in the future.

All told, the declaration's "conclusory allegations" may well not suffice to withstand summary judgment.  *Viet*, 951 F.3d at 824.  So the district court likely erred when it found them sufficient to conclude "as a matter of law" that the NAACP had standing.  Fed. R. Civ. P. 56(a).

\* \* \*

We grant a stay of the district court's injunction pending this appeal.  We further deny the NAACP's motion to strike as moot.

The parties are directed to file a notice with the court as soon as possible but **no later than Wednesday, July 3, 2024, at 12:00 p.m. (Eastern)** addressing the following: (1) a proposed schedule for the submission of briefs; and (2) whether oral argument is desired, and, if so, a proposed schedule and format for oral argument.  The parties should confer on their proposals for briefing and argument.  If the parties reach consensus, they should file a joint notice.  If the parties do not reach a consensus, each party should file a separate notice.  The Court will issue a scheduling order after consideration of the parties' position(s).