# EXHIBIT 41

**In the Matter of:**

NAACP, et al.

vs

LEE, et al.

DONALD HALL

*December 13, 2023*



www.beresandassociates.com
615.742.2550 | info@beresandassociates.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

TENNESSEE CONFERENCE of the NATIONAL
ASSOCIATION for the ADVANCEMENT of
COLORED PEOPLE, on behalf of itself
and its members, et al.,

        Plaintiffs,

vs.                    Case No. 3:20-CV-01039

WILLIAM LEE, in his official capacity
as Governor of the State of Tennessee,
et al.,

        Defendants.

---

Deposition of:

DONALD J. HALL

Taken on behalf of the Plaintiffs
December 13, 2023
Commencing at 2:30 p.m.

---

Reported by:  Georgette K. Arena, RPR, LCR
BERES & ASSOCIATES
Licensed Stenographic Court Reporters
Post Office Box 190461
Nashville, Tennessee 37219-0461
(615)742-2550

```
 1

 2                    A P P E A R A N C E S

 3

 4    For the Plaintiffs:

 5              MS. BLAIR BOWIE
                MS. ALICE HULING
 6              Attorneys at Law
                Campaign Legal Center
 7              1101 14th St. NW
                Suite 400
 8              Washington, DC 20005
                (202)736-2200
 9              BBowie@campaignlegal.org
                Ahuling@campaignlegal.org
10    and

11              MR. CHARLES K. GRANT
12              Attorney at Law
                Baker, Donelson, Bearman,
13               Caldwell & Berkowitz, P.C.
                1600 West End Avenue
14              Suite 2000
                Nashville, TN 37203
15              (615)726-5767
                CGrant@bakerdonelson.com
16

17
      For the Defendants:
18
                MR. ZACHARY L. BARKER
19              MR. JEREMY PARHAM
                Assistant Attorneys General
20              Office of the Tennessee Attorney General
                P.O. Box 20207
21              Nashville, TN 37202-0207
                (615)741-3491
22              Zachary.Barker@ag.tn.gov
                Jeremy.Parham@ag.tn.gov
23

24    Also Present:

25              MS. GICOLA LANE
```

BREES & ASSOCIATES COURT REPORTERS

1
2                S T I P U L A T I O N S
3
4
5              The deposition of DONALD J. HALL was
6  taken by counsel for the Plaintiffs, by Notice, at
7  the offices of Baker, Donelson, Bearman, Caldwell &
8  Berkowitz, PC, 1600 West End Avenue, Nashville,
9  Tennessee, on December 13, 2023, for all purposes
10  under the Federal Rules of Civil Procedure.
11              The formalities as to notice, caption,
12  certificate, transmission, et cetera, are expressly
13  waived.
14              It is agreed that GEORGETTE K. ARENA,
15  RPR, Notary Public and Licensed Court Reporter for
16  the State of Tennessee, may swear the witness.
17
18              *  *  *     *  *  *      *  *  *
19
20
21
22
23
24
25

```
 1                    *    *    *
 2                 DONALD J. HALL,
 3   was called as a witness, and after having been duly
 4   sworn, testified as follows:
 5
 6                    EXAMINATION
 7   QUESTIONS BY MS. HULING:
 8   Q.     Good afternoon, Mr. Hall.  My name is Alice
 9   Huling, and I represent plaintiffs in Tennessee
10   NAACP versus Lee.  And I'm joined today by my
11   colleagues Blair Bowie and Gicola.
12          I know you previously sat for a deposition
13   in this case; is that correct?
14   A.     Yes.
15   Q.     Was that in March of this year?
16   A.     Yes.
17   Q.     So since you are a seasoned deponent, I'm not
18   going to go through all of the rigmarole of getting
19   started.  But I'll go over a few basic preliminaries
20   to make to sure we're on the same page.
21          Firstly, because we have our court reporter
22   here, it's important for us to each wait until the
23   other is finished speaking before we give an answer
24   and ask our next question.  I will try to do my
25   best with that, and I ask you do, too.
```

1        If I'm ever asking a question you don't

2   understand, please just ask me to clarify.  Happy

3   to.

4        If you need to go on break at any time,

5   please just let me know.  I will try to accommodate

6   that as best I can.  The only exception being if I

7   have asked a question, I just ask that you answer

8   it before we take a break.

9        And, finally, your counsel may make some

10  objections throughout.  For the most part you are

11  going to go ahead and answer unless they

12  specifically tell you not to answer.  Does that

13  make sense?

14  A.      Yes.

15  Q.      Okay.  Do you understand you have been sworn

16  to tell the truth while you're here today?

17  A.      Yes, I do.

18  Q.      Great.  Is there any reason you can't tell

19  the truth today?

20  A.      No.

21  Q.      Okay.  What did you do to prepare for today's

22  deposition?

23  A.      I met with counsel from the attorney

24  general's office.

25  Q.      Is that counsel who's here today?

```
1   A.      Yes.

2   Q.      Anyone else?

3   A.      No.

4   Q.      Was there anyone else at the elections

5   division that you spoke with?

6   A.      No.

7   Q.      Anyone else from any other county elections

8   office that you spoke with?

9   A.      No.

10  Q.      How about at any other government office?

11  A.      No.

12  Q.      So other than the counsel who is here today,

13  you didn't speak with anyone else in preparation for

14  your deposition?

15  A.      Correct.

16  Q.      Did you take any notes while you were

17  preparing?

18  A.      No.

19  Q.      And about how long in total did you spend

20  preparing?

21  A.      I believe about two hours.

22  Q.      Since your deposition in March, have you sat

23  for any other depositions?

24  A.      No.

25  Q.      And I think know the answer to this, but do
```

BRBES & ASSOCIATES COURT REPORTERS

1   understand what I mean when I say restoration of

2   voting rights?

3   A.      Yes.

4   Q.      Or rights restoration?

5   A.      Yes.

6   Q.      We can use those relatively interchangeably?

7   A.      Yes.

8   Q.      And if I say C-O-R or COR, do you understand

9   what I'm referring to?

10  A.      Yes.

11  Q.      And what's your understanding?

12  A.      My understanding that it's the Certificate of

13  Restoration of Voting Rights.

14  Q.      That form that's filled out?

15  A.      Correct.

16  Q.      Okay.  I believe in your last deposition you

17  largely went through your role and responsibilities

18  at that time.  But I'm curious to know how at all

19  your role and responsibilities have changed in the

20  pending nine months since then.  So can you describe

21  your current role?

22  A.      My current role is still as an elections

23  assistant with the division of elections and the

24  Tennessee Secretary of State's office.

25  Q.      Okay.  What are you doing in your current

1  role?

2  A.     I am currently still assisting with the

3  felony voting rights restoration process in addition

4  to other office duties.

5  Q.     And what are those other office duties?

6  A.     Generally helping with different

7  election-related things that are coming up, you

8  know, as we are moving into the kind of 2024

9  election season, we have been issuing a lot of

10 delegate petitions for individuals that are going to

11 be delegates for presidential preference primary

12 candidates.  So that's been something I've been

13 helping with, in addition to serving as the chairman

14 of the Tennessee Highway Officials Certification

15 Board, in doing different duties associated with

16 that as well.

17 Q.     In your current capacity in your role, how

18 much of your time is being spent on rights

19 restoration?

20 A.     I'm not quite sure that I have, like, a way

21 to quantify that.

22 Q.     Is it the bulk of what you're doing

23 day-to-day, or is it sort of equally split between

24 that and some of the other responsibilities you've

25 just identified?

BRBES & ASSOCIATES COURT REPORTERS

1  A.      There's times where I think it may be roughly

2  equally split.

3  Q.      And times it's less than half?

4  A.      Sometimes it would be less than half, and

5  sometimes I think it would be more than half as

6  well.

7  Q.      Depends on the day?

8  A.      Yeah.

9  Q.      Fair enough.

10         Has that sort of distribution of work

11 between rights restoration work and other parts of

12 your role changed at all since you were deposed in

13 March?

14 A.      Yes.

15 Q.      How so?

16 A.      I think there's been a little bit less time,

17 at least more recently, that I've been spending on

18 the rights restoration process, as there was a new

19 attorney hired for our office as well.

20 Q.      And is that Lou Alsobrooks?

21 A.      Yes.

22 Q.      When was he hired?

23 A.      I believe it was the beginning of September.

24 Q.      And you work with him?

25 A.      Correct.

1  Q.      And is Lou also working on rights

2  restoration?

3  A.      Yes.

4  Q.      Is that his primary responsibility?

5  A.      I know that it's one of his responsibilities.

6  I'm not quite as familiar with -- with the other

7  things that he's tasked with.

8  Q.      Prior to Lou joining, were you the one in the

9  office who was primarily handling rights restoration

10  work?

11  A.      Yes.

12  Q.      And now that's split between the two of you?

13  A.      Correct.

14  Q.      Is there anyone else in the office who is

15  helping with work at this point?

16  A.      Not initially.

17  Q.      Not in the sort of day-to-day processing when

18  things come in?

19  A.      Correct.

20  Q.      But they might -- others might be involved at

21  other points?

22  A.      Correct.

23  Q.      How so?

24  A.      When needing guidance on interpreting

25  different -- different things and how to -- how to

BRHS 275 ASSOCIATES COURT REPORTERS

1  handle different situations.

2  Q.    And who -- who might -- who would be those

3  folks who would be involved in that way?

4  A.    Generally, it would be Beth Henry-Robertson

5  and Mark Goins.

6  Q.    So if you or Lou required guidance, you would

7  go to either of the -- either Mr. Goins or Beth

8  Henry-Robertson?

9  A.    Yes.

10  Q.    When Lou started, did he receive training?

11  A.    Yes.

12  Q.    From whom?

13  A.    Regarding the -- the felony restoration

14  process?

15  Q.    Specifically, yeah.  Uh-huh (affirmative).

16  A.    He received training from me, as well as

17  reviewing different -- different documents and

18  materials.

19  Q.    Were you primarily tasked with training him

20  and getting him up to speed on the rights

21  restoration work?

22  A.    For -- for a good bit, yes.

23  Q.    What does that mean "for a good bit"?

24  A.    There was -- there was a good bit that I

25  believe he also picked up by reviewing the documents

BREES & ASSOCIATES COURT REPORTERS

1 and things. It was a sort of interesting situation.

2 He was starting -- he started on a Friday before I

3 went on a week-long vacation. So he -- he, I

4 believe, probably discussed things and did research

5 while I was gone at that point as well.

6 Q.     Do you know that week while you were on

7 vacation if he was assigned to a primary point of

8 contact for guidance on what he was doing with

9 respect to rights restoration?

10 A.     I believe that my instruction was probably --

11 sort of direction, would have been that if he -- if

12 he had questions in the interim while he was doing

13 his research and various things, that he should

14 reach out to -- to Beth or Mark.

15 Q.     Some amount of your work on rights

16 restoration is in -- is corresponding and

17 communicating with county elections officials; is

18 that fair to say?

19 A.     Yes.

20 Q.     Is that true for Lou as well?

21 A.     Yes.

22 Q.     When did he start sort of picking up that

23 part of -- of the rights restoration work and

24 communicating with counties?

25 A.     At some point after probably two or three

1  weeks.  I'm not particularly sure.

2  Q.     Are you both primary contacts for county

3  election officials at this point, or is one of you

4  more so than the primary contact for folks?

5  A.     We are both primary contacts.

6  Q.     Is the plan to keep it that you both were

7  stay that as primary contacts?

8  A.     I don't believe so.

9  Q.     What's the plan going forward?

10  A.     My understanding of the plan going forward

11  would be that he would end up taking over the felon

12  restoration process for our office.

13  Q.     So you will transition off it, and he will be

14  transitioning to wholly sort of being the point

15  person on rights restoration work in your office?

16  A.     At some point I believe so because my plan is

17  to be leaving for law school in the -- in the not

18  too distant future.

19  Q.     Congratulations.

20  A.     Thank you.

21  Q.     I suppose.

22          MR. PARHAM:  More condolences.

23          MS. HULING:  Yeah.

24  Q   (BY MS. HULING)  Okay.  During the summer you

25  were the primary point person handling

```
1   communications coming in and any sort of rights
2   restoration work that was going on?
3   A.      Yes.
4   Q.      And I'm just -- sorry to reconfirm.  Lou, you
5   said, started in September?
6   A.      Yes, I believe it was.
7   Q.      So sometime thereafter he started picking up
8   more and more of that responsibility?
9   A.      Correct.  Sort of incrementally.
10  Q.      When you were generally doing rights
11  restoration work, you said you are sort of -- will
12  do the initial kind of work when it comes in, and
13  you'll seek guidance sort of as necessary.  Is there
14  any sort of -- is that for you to sort of trigger or
15  ask for guidance on something, or is there some sort
16  of supervision that happens on a regular basis of
17  your work on the rights restoration-related things?
18  A.      I would say most of the time that it would be
19  something that I would initiate.
20  Q.      And when Lou started or -- yeah, when Lou
21  started, is that true for him as well?
22  A.      I believe so.
23  Q.      So there wasn't sort of a period when he
24  started that he would take a first crack at
25  something and then you would put eyes on it before
```

1  it went out the door or something of that sort?

2  A.      Again, not that I remember.

3  Q.      Okay.  Are you familiar with the July 21st

4  memoranda regarding rights restoration and voter

5  registration changes?

6  A.      Yes.

7  Q.      Can you describe your familiarity with those

8  memoranda?

9  A.      I've read over them and looked at them

10 several times.

11 Q.      And is that for both the memos relating to

12 changes to the Certificate of Restoration or the

13 rights restoration process and to the memo

14 specifically to voter registration policies for

15 older felony convictions?

16 A.      Yes, that would be true for sort of both of

17 those camps.

18 Q.      So you -- and you said you've read over them.

19 Were you involved in their creation?

20 A.      I was -- yes, I have read over them.  And I

21 was involved in sort of proofreading things of those

22 different -- those different documents.  And I was

23 -- I was also involved in the drafting, initially,

24 of the -- of the processing older -- older voter

25 registrations for individuals who had old felony

1  convictions.

2  Q.     Okay.  Focusing on that memo, so the one

3  regarding processing older felony convictions, were

4  you the initial drafter of that memo?

5  A.     I -- I drafted, after having been given

6  direction from the coordinator of elections.

7  Q.     And sort of what -- can you walk me through

8  that process of you getting the directions and doing

9  that initial drafting?

10 A.     It was -- it was largely just an explanation

11 of what Mark wanted it to say, and then putting that

12 into more extended written format.

13 Q.     And when did you do that initial drafting?

14 A.     I don't remember the specific date, but it

15 would have been prior to -- to July, what, 21st of

16 2023.

17 Q.     Do you have a sort of ballpark of how long

18 that sort of initial drafting to July 21st took?

19 A.     Maybe -- I don't specifically remember, but I

20 would think probably a few weeks.

21 Q.     A few weeks.  So possibly from sometime in

22 June would have been when you first spoke to Mark

23 about drafting that; does that seem right?

24 A.     Maybe sooner than that.  But, again, I don't

25 -- I don't remember.

1  Q.     Okay.  So possibly before that, possibly in

2  June?

3  A.     Yeah.

4  Q.     So it sounds like it wasn't a process that

5  would have been longer than a couple of months, but

6  it might have been shorter than that?

7  A.     The process of?

8  Q.     From your initial discussions with Mark to

9  having the product go out on the 21st of July?

10  A.     No.  It wouldn't have been longer than a

11  month.

12  Q.     Okay.  When you did your initial draft, what

13  happened then?

14  A.     I sent it to Mark.

15  Q.     Were there follow-up drafts that you were

16  involved with?

17  A.     I don't believe so.

18  Q.     Were you involved in proofreading for that

19  one?

20  A.     I may have been, but I don't remember.

21  Q.     Do you recall in the creation of the

22  memorandum, specifically the one on registration for

23  folks with older felony convictions, if you had any

24  other involvement in that creation or drafting

25  process other than what you've already gone through?

```
 1   A.      I don't remember any additional involvement.

 2   Q.      And then with regard to the memorandum on

 3   changes to the rights restoration policy, I

 4   understood you to say you were not the initial

 5   drafter on that; is that accurate?

 6   A.      Yes.

 7   Q.      Do you know who was?

 8   A.      No.

 9   Q.      Do you know when that was initially drafted?

10   A.      No.

11   Q.      What was your involvement, if any, with the

12   drafting of that memorandum, or creation, I guess?

13   A.      Of which -- which specific memorandum?

14   Q.      Actually, let's back up.  The memorandum with

15   respect to the changes to the rights restoration

16   process, were there multiple versions -- multiple

17   memoranda touching on changes to the rights

18   restoration process?

19   A.      I believe so.

20   Q.      To different agencies and officials who are

21   involved in that process?

22   A.      Yes.

23   Q.      Did you have any involvement with the

24   drafting or creation of any of those memoranda?

25   A.      Again, as far -- as far as I remember, aside
```

1 from about basic proof reading organizational stuff,

2 no.

3 Q.      Were there any discussions with you as the

4 person who was primarily handle rights restoration

5 work about feasibility of the new procedures that

6 were included in those memoranda?

7 A.      I don't believe so.

8 Q.      I would just like to discuss a little bit

9 about the process that's laid out specifically in

10 the changes to the rights restoration process.  Can

11 you give me your sort of basic understanding of how

12 the new process operates?

13 A.      The new process since July --

14 Q.      Yes, uh-huh (affirmative).

15 A.      -- 22st, 2023?

16 Q.      Uh-huh (affirmative).

17 A.      My understanding is that it is a two-step

18 process for somebody to get their voting rights

19 restored in the State of Tennessee.  The sort of

20 first step being that an individual has to have

21 either received a pardon or have had their full

22 rights of citizenship restored.  The second is

23 showing the criteria related to their conviction,

24 the date, it would have been restitution

25 requirements and court costs requirements as well.

1  Q.      And this is a departure from the way rights

2  restoration worked prior to the guidance going --

3  that guidance going out on the 21st of July?

4  A.      Yes.

5  Q.      How so?

6  A.      At least for individuals in the State of

7  Tennessee, they would not have -- under the previous

8  operation, would not have needed to show their full

9  rights of citizenship or a pardon having -- or full

10 rights of citizenship having been restored or having

11 received a pardon.

12 Q.      And now you mentioned it as a two-step

13 process.  Does one step have to come first?

14 A.      I don't believe so.

15 Q.      So an individual could either have a

16 Certificate of Restoration completed and then get

17 either a court order of citizenship rights restored

18 -- restoration or a pardon or vice versa?

19 A.      I think so.  We would just need to receive

20 both of them.

21 Q.      Under the process, the first step, I think

22 that you talked through, was requiring either proof

23 of a pardon or full citizenship rights restoration.

24 Can you explain a little bit more what both of those

25 entail?

```
 1   A.      The -- the pardon and the full restoration?

 2   Q.      We can start with the pardon.  What would be

 3   required to sort of satisfy that first step with

 4   regard to a pardon?

 5   A.      I believe a copy of the pardon.

 6   Q.      And just any copy of the pardon?

 7   A.      I believe so.

 8   Q.      And for the proof of -- or for satisfying a

 9   full rights -- full citizenship rights restoration,

10   what's required for that?

11   A.      If it comes from a court in Tennessee, if

12   it's a court order from a Tennessee court, it would

13   need to be a certified copy, I believe.

14   Q.      And who else could it come from if it's not

15   coming from a Tennessee court?

16   A.      If there would be somebody that had their

17   citizenship rights restored in another state.

18   Q.      Would that have to be a certified copy?

19   A.      If it did not come from a court, my

20   understanding is no.

21   Q.      And what constitutes full citizenship rights

22   restoration?

23   A.      That's sort of determination for the -- for

24   the coordinator of elections.

25   Q.      So is the coordinator of elections the one
```

BRIPS & ASSOCIATES, COURT REPORTERS

1  looking at all rights restoration documentation

2  that's coming in and deciding whether or not the

3  full rights of citizenship have been met --

4  citizenship restoration have been met?

5  A.      No.

6  Q.      Who is doing that?

7  A.      Who is looking at all the documents?

8  Q.      Yeah.

9  A.      Myself and Lou Alsobrooks.

10 Q.      Okay.  So when you're looking at

11 documentation that you receive, and specifically you

12 are looking at documentation pertaining to full

13 citizenship rights restoration, what are you looking

14 for to know if that's been satisfied or not?  Like

15 what constitutes that?  Because I thought you just

16 said Mark would be making that determination?

17 A.      He would be.  But you kind of said all -- all

18 the restoration documentation that we receive, so he

19 -- he would be reviewing if we had gotten to the

20 point where things had looked -- looked good for

21 that -- that person, up to the point of needing to

22 know if they had had their full citizenship rights

23 restored.

24 Q.      Let me make sure I am understanding this

25 right.  If you are receiving -- if your office is

1  receiving documentation for rights restoration, you

2  and Lou would look at all of it.  And if it all

3  looks good to you, then you would pass it along to

4  Mark for him to make a determination as to whether

5  the full rights of citizenship restoration have been

6  satisfied?

7  A.      Yes.

8  Q.      Okay.  So there's like a two-step review

9  process before something can get approved?

10  A.      In a way.

11  Q.      Okay.  And what if you make a determination

12  that something -- that something doesn't look right,

13  what happens then?  You wouldn't send it to Mark for

14  his opinion?

15  A.      Largely if the individual -- especially if

16  they do not submit documentation of having their

17  full citizenship rights restored or a pardon or

18  anything, they would be denied for not having

19  provided that information.

20  Q.      Okay.  So when you're doing that initial look

21  at documents, you are sort of looking to see if each

22  of the pieces looks to be there, and then passing it

23  along to Mark to make sure that each of the piece --

24  or specifically the full rights restoration piece is

25  satisfied?

```
 1  A.     Yeah, we look to -- we look to see and make
 2  sure that all the other pieces regarding
 3  restitution, court costs, the conviction and its
 4  date and everything are in line.  And that if it
 5  sort of gets to the point of where we would believe
 6  the person to possibly be eligible, if they had had
 7  their full rights of citizenship restored, that
 8  would be point it would be elevated to Mark.
 9  Q.     Could there be a time when you would receive
10  documentation and it looked like all the pieces that
11  needed to be there were there, but you or Lou would
12  determine that the -- the sort of piece to satisfy
13  Step 1, the documentation regarding full rights of
14  citizenship restoration, is like incomplete or
15  insufficient and you would issue a denial before
16  sending it to Mark to make that determination?
17  A.     I'm not sure if that's occurred so far.
18  Q.     Can you think of an instance when you
19  would -- like, are you empowered to make that
20  decision, I guess?  Or are you -- let me see if I
21  can rephrase this.
22         Are you ever looking at the documentation
23  pertaining to full rights of citizenship
24  restoration and making a determination of whether
25  or not it satisfies the requirement?
```

1  A.      Like the document itself that we received,

2  whether or not it meets those qualifications?

3  Q.      Right.

4  A.      I don't -- I don't particularly know.  I

5  don't know that -- again, I'm not sure that we've

6  come across that so far.

7  Q.      Is there an internal policy or guidance that

8  you've received from Mark as to whether or not you

9  could make that sort of determination, or whether he

10  is solely to make those sorts of determinations?

11  A.      I don't believe that we've received official

12  direction or anything of that sort.  But, generally,

13  my -- my own policy has been that if it's -- if I

14  have any sort of questions, that -- and the actual

15  policy is that it's ultimately Mark's -- Mark's

16  decision.

17  Q.      So if I'm understanding this correctly, are

18  you saying that any rights restoration that is

19  approved under the new policy, Mark will review

20  before it's approved?

21  A.      He has reviewed all of the restorations that

22  have occurred since July 21st, 2023.

23  Q.      Has he reviewed all of them or specifically

24  all before they are approved, or are there some that

25  are denied without his review?

```
 1   A.      There are some that are denied without his
 2   review.
 3   Q.      Okay.  Is his reviewing them a change from --
 4   reviewing all approvals before they go out, a change
 5   from the process that was in place before July 21st?
 6   A.      Yes.
 7   Q.      Was that -- strike that.
 8           Do you know how many rights restorations
 9   have been approved since the July 21st change?
10   A.      Yes.
11   Q.      How many?
12   A.      One.
13   Q.      But have there been other rights restoration
14   applications that have come in since July 21st that
15   have been denied?
16   A.      Yes.
17   Q.      And just to make sure, Mark has not reviewed
18   all of those denials?
19   A.      Correct.
20   Q.      Has he reviewed any of those denials?
21   A.      I believe he probably has.
22   Q.      Is that a sort of case-by-case basis, whether
23   he's reviewing them or not?
24   A.      Yes.
25   Q.      So what would trigger his review of a denial?
```

1  A.     Again, it would be on a case-by-case basis,

2  if either Lou or I had a question regarding whether

3  or not the person would be -- would be eligible to

4  have their voting rights restored.

5  Q.     Okay.  We have been talking about the sort of

6  change in process here as July 21st.  Is that when

7  the new procedure became effective?

8  A.     Effective in?

9  Q.     When it went into effect, when the new

10 procedures went into effect.

11 A.     So that's -- that's when the new procedures

12 were distributed and the memos were distributed to

13 the counties and the different authorities that they

14 were given out to.

15 Q.     When did the new procedures go into effect?

16 A.     I believe it would have been on -- on that

17 date.

18 Q.     When the notice was distributed to the

19 authorities at the county court clerks office and

20 that sort of thing?

21 A.     Yes.

22 Q.     Who generally is -- so am I correct in

23 understanding that along with new procedures, a new

24 Certificate of Restoration form was issued?

25 A.     Yes.

1  Q.      Who fills out this new form?

2  A.      Both the applicant and the requisite

3  authorities that are described on the form.

4  Q.      And who are the requisite authorities

5  described on the form?

6  A.      The specific -- the form has the specific

7  language on it.  But generally it's going to be

8  probation and parole officers or individuals

9  associated with the department of correction, or

10 it's going to be court clerks in the court where

11 an individual had their conviction at.

12 Q.      Is that a change from who was previously

13 filling out Certificate of Restoration forms?

14 A.      Overall in the sense that, yes, that the

15 applicant now has the ability to fill out -- or is

16 directed to fill out the first portion.

17 Q.      Do you know why the applicant is now the one

18 filling out part of the form?

19 A.      My understanding is sort of ease of -- ease

20 of use in being able to fill it out and convenience.

21 Q.      Ease for the applicant?  When you say "ease,"

22 I guess whose ease are you referencing?

23 A.      Sort of everybody's, both the applicant

24 and -- and us for processing.

25 Q.      Who specifically is filling out -- on the

1  form it asks about court costs, restitution, and the

2  conviction information.  Is it generally one person

3  filling out all of those pieces, or who's filling

4  out each of those pieces?

5  A.      It would be either the -- like I said, kind

6  of generally the probation and parole officer or the

7  court clerk -- or somebody with the court clerk's

8  office where the conviction was at.

9  Q.      Is it sometimes that, like, different

10 officials would fill out different parts of the same

11 COR form?

12 A.      It -- it would be possible I believe for them

13 to, but I'm not sure if we've seen that.

14 Q.      How when these new policies -- when these new

15 policy memoranda were issued on July 21st, do you

16 know how they were distributed to the intended

17 recipients?

18 A.      My understanding is that they were

19 distributed by email.

20 Q.      And was there any training that went along

21 with that?

22 A.      Outside of the memoranda themselves?

23 Q.      Yeah.

24 A.      Yes.

25 Q.      What was that training?

1  A.      There was a training called with the -- all

2  the counties -- counties' election commissions were

3  invited to -- regarding that, those memoranda.

4  Q.      Was there a training call for any of the

5  department of correction personnel who were

6  receiving the memoranda?

7  A.      Not that I'm aware of.

8  Q.      Was there any sort of training call when -- I

9  believe a memo was also issued to court clerk

10  officials; is that right?

11  A.      I believe so, yes.

12  Q.      Do you know if there was a training call that

13  went along with the issuance of that memoranda?

14  A.      Not that I'm aware of.

15  Q.      Were you involved with any of the -- with the

16  training call that happened for the election

17  commissions officials?

18  A.      I listened to it.

19  Q.      Was it a phone call or a -- or what form was

20  the training in?

21  A.      If I'm remembering correctly, I believe it

22  was WebEx, but it also had a phone call feature that

23  you could call in to a line and listen to it.

24  Q.      Were there visuals that went along with it?

25  A.      I'm not sure if there was.  I didn't

1  participate by -- by computer.

2  Q.     Got it.

3         When the new guidance was issued and if

4  election commissions had questions about the new

5  guidance, were you their primary point of contact

6  to follow up with those questions?

7  A.     Not the day of.  I was actually on vacation

8  at the time, hence me listening in on the phone that

9  day.

10  Q.     That's not such a vacation.

11         Who would have been the primary point of

12  contact the day of --

13  A.     The --

14  Q.     -- the questions folks had?

15  A.     Sure.  The day of, I believe it would have

16  been either Beth, Mark, or, possibly, Andrew in our

17  office.

18  Q.     When you got back from vacation, would it

19  have been assumed that you would have been the

20  primary point of contact for fielding questions

21  about the new guidance?

22  A.     I believe so.  But there were still questions

23  that went to Beth as well.

24  Q.     Was it conveyed to elections commissions that

25  if they had questions the day of or immediately

1  thereafter while you were out, that they should

2  direct their questions to someone else in the

3  elections division?

4  A.      I don't remember.

5  Q.      Did you receive questions related to the new

6  guidance?

7  A.      Yes.

8  Q.      What kinds?

9  A.      I received several different questions on --

10  on different topics.

11  Q.      What type topics were those?

12  A.      There was several, and I don't particularly

13  remember individual instances.

14  Q.      Were there certain particular topics or -- or

15  concerns that you remember getting a lot of

16  questions about, or the majority of questions about?

17  A.      I don't -- I don't believe so.  I don't

18  remember any specific ones.

19  Q.      So it was sort of varied across the board

20  from different folks?

21  A.      I would say so.

22  Q.      Outside of questions, was there any other

23  sort of general feedback that you received about the

24  new guidance?

25  A.      There may have been individual comments along

1  with -- along with the questions, but I don't

2  remember specifics.

3  Q.      Do you have any general memory of any of the

4  content of any of those comments?

5  A.      No.

6  Q.      After the guidance was issued, did you see

7  sort of any types or particular types of mistakes

8  that were being made in implementing the new

9  guidance?

10 A.      In implementing the new guidance?

11 Q.      The new process.

12 A.      Who -- who implementing it?

13 Q.      I guess we could start with the folks in the

14 elections commissions.  Were the AOEs in

15 implementing the new guidance?

16 A.      Not -- not that I remember, specifically

17 recall.

18 Q.      Do you remember seeing, in particular, any

19 types of mistakes from anyone else implementing the

20 guidance, perhaps, the folks in the department of

21 correction who were filling out the certificates?

22 A.      Aside from possibly receiving old forms on

23 occasion, no.

24 Q.      Were you aware of having seen any particular

25 types of mistakes coming out of court clerks filling

1  out any of the forms or processing?

2  A.     Not that I remember.

3  Q.     Okay.  All right.  I apologize up front.  I'm

4  going to start showing you a lot of documents.

5          MR. BARKER:  Before we begin that, can

6  take a real short break for me to run to the

7  restroom?

8          MS. HULING:  Sure.

9          (Short break.)

10  Q   (BY MS. HULING)  Circling back to the

11  conversation we were having before we jumped into

12  documents, we were talking about when you -- when

13  it -- your office receives a rights restoration

14  application and you reviewed -- and then sometimes

15  you would raise to Mark for review as well.  Were

16  there ever any applications that came in that

17  either you or Lou thought was a close call or you

18  thought might have been an application that could

19  be approved or should be approved and raised to

20  Mark and he said, no, it needed to be an

21  application that was denied?

22  A.     No, not that I recall.

23  Q.     All right.

24          (WHEREUPON, the above-mentioned

25  document was marked as Exhibit Number 1.)

```
 1  Q     (BY MS. HULING)  One more follow-up question.
 2  So one -- the only -- the only one that was
 3  elevated that -- the only application that was
 4  elevated that you thought should be approved was
 5  the one that was ultimately approved by Mark --
 6  A.     That was --
 7  Q.     -- since July 21st?
 8  A.     That's been the only one that was elevated to
 9  him that where the individual, he determined, had
10  received their full rights of citizenship having
11  been restored.
12  Q.     I guess I thought you had mentioned there
13  might have been some others that -- maybe "elevated"
14  isn't right word, but that you brought to Mark's
15  attention because you had questions about or Lou had
16  questions that were ultimately denied; is that true?
17  A.     I think there -- there may have been, but
18  that was ones that I don't remember.
19  Q.     Okay.  Thank you.  All right.  Do you
20  recognize this email document in front you?  It
21  looks like it was sent by you Susie Davenport.  The
22  top email in the thread here is from July 27th?
23  A.     Did you ask if I recognized it?
24  Q.     Is it --
25  A.     Yes.
```

1  Q.    -- an email exchange that you were on?

2  A.    Yes, I do recognize it.

3  Q.    Okay.  Looking about sort of halfway down the

4  first page it says -- it is addressed to Andrew.

5  And it looks like Ms. Davenport is clarifying her

6  understanding with respect to older convictions and

7  the new process under the new guidance; is that a

8  fair encapsulation?

9  A.    I believe so.

10  Q.    Okay.  And she says, Do I understand

11  correctly that I can process this registration from

12  the summer of '69, one, without having to have

13  anything else, and without sending it to you?  Do

14  you see that?

15  A.    Yes, I do.

16  Q.    Is that a correct understanding -- is she

17  correctly sort of stating the process under the new

18  guidance?

19  A.    Without seeing the individual's voter

20  registration form -- I believe it was from

21  Ms. Grubbs -- I wouldn't be able to say.

22  Q.    Assuming everything on the registration form

23  was accurate and it indicated that there was a

24  felony from the summer of 1969, is her understanding

25  of the process that she could process it without

1  sending it to you correct?

2  A.    If it -- if it was also indicated on that

3  voter registration form that the individual's

4  conviction was not one of the specific infamous

5  crimes that are listed out in the statute -- I don't

6  unfortunately have all of them memorized -- but I

7  believe that, yes, that would be accurate that she

8  would be able to process that registration.

9  Q.    Does she make any mention about it needing to

10  be one of -- needing to check as to whether it's one

11  of those crimes that's infamous or not?

12  A.    I believe she sort of does.

13  Q.    How so?

14  A.    In the second -- sort of second paragraph

15  under where it's addressed to Andrew, she says,

16  Depending on what and when, if it falls in the list

17  of what is permitted and what was current at the

18  time to not lose their right to vote by -- that part

19  that's in parenthesis there.

20  Q.    Okay.  And then up at the top it looks like

21  she forwards this to you on July 27th, almost a week

22  later, when she hadn't gotten a response.  Do you

23  remember receiving that?

24  A.    I remember having seen this email before.

25  Q.    Do you know if you got back to her?

```
 1  A.      I believe so.
 2  Q.      And do you remember what your response back
 3  to her was?
 4  A.      No, not specifically.
 5  Q.      Looking at it now for this first sort of one
 6  that we were just talking about, would you have --
 7  what would have been your response about whether she
 8  was understanding of the policy, whether she was
 9  understanding the policy correctly or not?
10  A.      I believe with my understanding of everything
11  today, I -- I would have said that -- that, again,
12  if that person had not been convicted of one of
13  those specifically infamous crimes that were laid
14  out in the statute and that she had provided all the
15  necessary information on her voter registration
16  application, that she would be -- would be able to
17  process that.
18  Q.      Is that different than the process for these
19  -- for those -- is that a change from the way the
20  process was prior to the July 21st guidance change?
21  A.      Yes.
22  Q.      How so?
23  A.      In the prior to the July 21st, 2023, changes,
24  we would have needed to see evidence of the person's
25  conviction.
```

BRRES ASSOCIATES COURT REPORTERS

1  Q.     Okay.  And then in the -- at the bottom of

2  the page here she follows -- there's a -- not

3  follows up.  I think there was a separate thread

4  with a few more questions.  And specifically she --

5  there's a sort of No. 2.  And she mentions receiving

6  court orders restoring rights of citizenship that

7  would restore them -- previously having received

8  court orders restoring rights of citizenship that

9  would restore them with the exception of owning

10 firearms or running for public office, but sometimes

11 stating specifically that the right of suffrage was

12 restored.  And she says those would count, wouldn't

13 they or not?  Do you remember responding to her

14 about that question?

15 A.     I don't specifically remember responding to

16 her on that question.

17 Q.     If you were responding to that question now,

18 what would be your response?

19 A.     I believe that my response to No. 1 would be

20 that individuals can have their rights of

21 citizenship restored if they have a conviction in

22 another state and they've been restored there.

23        To No. 2, that would be -- that would be a

24 question that I would elevate either to -- either

25 to Beth or to Mark.

1   Q.     Are you aware of having come across instances

2 of that question since the guidance has changed?

3   A.     Instances of the -- either the exception of

4 specific rights?

5   Q.     Right.

6   A.     And in restoration of citizenship rights,

7 yes.

8   Q.     And what have you been told in those

9 instances when that's come up?

10   A.     When that's come up, I've elevated those to

11 -- to -- to Mark.

12   Q.     And is there a general guidance now that

13 you've elevated those to Mark as to how to handle

14 those types of cases if you get more of them?

15   A.     No.

16   Q.     Was there any discussion of what to do in

17 those cases when the guidance was first issued and

18 when Ms. Davenport posed this question in late July?

19   A.     Not that I remember.

20   Q.     Do you have any specific memory of what's

21 happened in, like, those instances that you've

22 elevated to Mark?

23   A.     I remember some of them.

24   Q.     What happened in those instances when this

25 sort of issue has come up and you've elevated them

1  to Mark?

2  A.      They've been awaiting his approval or

3  decision.

4  Q.      And so are they still awaiting his approval

5  or decision?

6  A.      Yes.

7  Q.      So is there like a sort of pending status

8  that these types of questions are in at this point?

9  A.      Yes.

10  Q.      Do you know how long those questions have

11  been pending?

12  A.      No, not specifically.

13  Q.      Do you have any guidance to give back to

14  folks about when to expect a determination on these

15  types of questions?

16  A.      No.

17  Q.      So if I'm understanding correctly when that's

18  come up and you moved that over to Mark, to your

19  knowledge there's been no follow-up or response on

20  those?

21  A.      No follow-up in the sense of an approval or

22  denial?

23  Q.      Right.  Right.

24  A.      No.

25  Q.      And what about sort of a general response

BREES & ASSOCIATES COURT REPORTERS

1  back to whatever county sent them in?

2  A.    There have been counties that have contacted

3  us.

4  Q.    Specifically about these sorts of issues?

5  A.    Yes.

6  Q.    And what do you tell them when they contact

7  you?

8  A.    That they are on the coordinator's desk for

9  review.

10 Q.    And so, basically, the counties -- the

11 counties and the applicants should hold tight while

12 the coordinator is reviewing them?

13 A.    Our direction has been that it's been

14 under -- under review for the coordinator.  It's

15 been on his desk.

16 Q.    Has that been true since the guidance has

17 been issued on July 21st?

18 A.    When -- when these instances have come up,

19 yes.

20 Q.    Do you have any idea of how many instances of

21 that this type have come up?

22 A.    I don't know the specific number.

23 Q.    Ballpark?

24 A.    Somewhere between nine and 12.

25 Q.    And do you have a feel, like, for when

1  they've been received?

2  A.      Again, not specifically.

3  Q.      Could be any time between -- since the

4  guidance has been issued or does it -- do you have a

5  sense of them having been more recent or more in the

6  summer right when the guidance changed, anything of

7  that sort?

8  A.      No.

9          MS. HULING:  I'm going to introduce

10  another document.

11          (WHEREUPON, the above-mentioned

12  document was marked as Exhibit Number 2.)

13  Q    (BY MS. HULING)  I am going to introduce as

14  Exhibit 2, this communication between, it looks

15  like, yourself and Ms. Staggs.  Do you know who

16  Barbara Staggs is?

17  A.      Yes.

18  Q.      Who is she?

19  A.      She is the individual at the Sumner County

20  Election Commission Office that has largely been my

21  contact for the voting rights restoration process

22  there.

23  Q.      And take a minute to look at this if need be.

24  But could you just in your own words give a

25  summation what she's sending here?

1  there had been multiple reasons for denial, that

2  would be listed on the form as well, wouldn't it?

3  A.    I believe the previous format for the denial

4  letters only allowed one reason for denial to be

5  listed on here.

6  Q.    Okay.  That's all with that.  Thank you.

7         (WHEREUPON, the above-mentioned

8  document was marked as Exhibit Number 8.)

9  Q    (BY MS. HULING)  Sorry.  This is another

10  multi-pager.  Okay.  So this would be Exhibit 8.

11       This is correspondence between yourself

12  and -- it might change, but it starts out in the

13  prior emails, it says, with Jerry Bierbrodt and

14  ultimately is between yourself and Clifford Caver;

15  is that right?

16  A.    Yes, that seems to be accurate.

17  Q.    Probably really butchering some names there,

18  unfortunately.

19       So if we turn to the initial email on the

20  last couple of pages, do you remember this

21  correspondence?

22  A.    Yes.

23  Q.    On this August 9th email, who is this sender,

24  Jerry?

25  A.    So I believe he is -- sort of the states in

1   his email signature on the very last page, but he

2   was a U.S. probation services assistant.  I knew he

3   worked for the U.S. Probation and Parole Office.

4   Q.      So would this be somebody who would be

5   involved with rights restoration with regard to

6   federal convictions, federal felony convictions?

7   A.      Yes.

8   Q.      And he asks if you could tell him what was

9   meant to have full rights of citizenship restored

10  and how one would go about having their rights

11  restored.  Do you see that?

12  A.      Yes.

13  Q.      Had there been a memoranda -- July 21

14  memoranda sent to federal officials handling rights

15  restoration in Tennessee?

16  A.      Yes, I believe so.

17  Q.      And that was similar to the other memoranda

18  that were sent out on July 21st?

19  A.      They had similar content, yes.

20  Q.      Do you know if there was any other guidance

21  or training provided for federal officials?

22  A.      Not that I'm aware of.

23  Q.      Okay.  It looks like he's asking for -- when

24  he says what is meant by having full rights of

25  citizenship restored.  In your response you say that

```
1   it could be either a pardon or seeking a court order
2   restoring full citizenship rights.  And you go on to
3   provide him a list of what might be included in
4   citizenship rights, like holding public office,
5   sitting on a jury, the right to vote, but you note
6   that that's not an exhaustive list.  Do you see
7   that?
8   A.      Yes.
9   Q.      What is an exhaustive list?
10  A.      I -- I don't know.
11  Q.      Was an exhaustive list or a definition of
12  what full rights of citizenship restoration entailed
13  provided to federal officials handling rights
14  restoration?
15  A.      Not to my knowledge.
16  Q.      It looks like then in the -- on Page 5777 you
17  get a response back to -- to your email from
18  Clifford that asks that -- it looks like he had
19  passed along from their investigative assistant what
20  you had sent, and asks for individuals convicted in
21  federal court, whether they should be directed to
22  their court of clerk's office.  Do you see that?
23  A.      I do.
24  Q.      Do you remember receiving that question?
25  A.      Yes.
```

1    Q.      And it looks like your answer goes back --

2    you responded back on August 23rd.  So -- I don't

3    know, what is that -- seven or eight days later?

4    Was that something that -- was that something you

5    had an answer to right away, or was that something

6    you needed to figure out before answering him?

7    A.      The question that he had about them being

8    directed to the federal clerk of the court's office?

9    Q.      Yeah.

10   A.      No.  That was not an answer that I had right

11   away.

12   Q.      Okay.  So where an individual with a federal

13   felony conviction should go to get their full rights

14   of citizenship restored on that conviction was not

15   something you had an answer to when he asked that in

16   mid August?

17   A.      No.  Our office -- at least me, specifically,

18   I was -- I was relatively sure that there was no

19   mechanism for a federal court to restore someone's

20   full citizenship rights.  But before responding, we

21   want to be, to ensure that there is -- there was

22   nothing that we could find.  At least I believe that

23   was that response.  I know that was a part of this

24   sort of back-and-forth that we had.

25   Q.      And at this point in time you were the

1 primary point of contact for rights restoration type

2 of questions in your office; is that fair to say?

3 A.    Yes.  I believe it would have been in August.

4 So, yes.

5 Q.    So once you got an answer, what was

6 ultimately your answer back about where someone with

7 a federal felony conviction -- what steps they would

8 need to do to get full rights of citizenship

9 restored?

10 A.    So it -- I believe that the direction was

11 that -- and this is kind of reflected in the email

12 as well, but if an individual had a felony

13 conviction in a U.S. district court in Tennessee,

14 that they would need to petition either the county

15 circuit court in the county where they lived or the

16 county where they were convicted in Tennessee for

17 restoration of citizenship rights.

18 Q.    It looks like then on the follow-up emails

19 here that you sort of had a meeting of the minds

20 agreement with Clifford that that was right, that's

21 what needed to happen for someone with a federal

22 felony conviction; is that fair to say?

23 A.    Yes, I believe that's fair to say.

24 Q.    Is that still the guidance, or has that

25 changed at all since then?

```
 1   A.      As far as I'm aware of, that's still the
 2   guidance.
 3   Q.      Done with that document.  Thank you.
 4              (WHEREUPON, the above-mentioned
 5   document was marked as Exhibit Number 9.)
 6   Q    (BY MS. HULING)   Then this will be Exhibit 9.
 7   At the bottom of this email thread is some of the
 8   same email thread we were just discussing, correct?
 9   But the top email is, it looks like, maybe a draft
10   response that you spent -- that you sent to Mark
11   before sending your response back about what needs
12   to happen for a federal felony conviction to get
13   full citizenship rights restored?
14   A.      Yes, that seems correct.
15   Q.      Okay.  It looks like this was sent on
16   August 17th.  And I think looking back you
17   ultimately responded on August 23rd.  Do you
18   remember -- do you remember any discussions that
19   took place in that time, or why the delay?
20   A.      No.  No, I don't remember.
21   Q.      Do you remember if you got a response back
22   from Mark?
23   A.      I got some sort of approval before sending
24   the -- that email to the -- Mr. Caver, Carver --
25   yeah, Caver.
```

BREES & ASSOCIATES COURT REPORTERS

1  Q.      The email you ended up sending back to

2  Mr. Caver is a bit different than the draft email

3  you have sent here -- that you have drafted here.

4  Do you remember if there was back-and-forth between

5  you and Mark to change any of that?

6  A.      I -- I remember there being at least a

7  discussion and then a review of the draft and us

8  going over it.  I don't remember specifics about the

9  conversation, no.

10  Q.      One thing that you have in your draft from

11  August 17th here on Exhibit 9 is for individuals

12  with federal felony convictions, as well as previous

13  circuit court felony convictions in multiple

14  different Tennessee counties, it may be useful for

15  them to reach out to an attorney, legal clinic, or

16  the county circuit court where they currently live

17  in Tennessee, under wanting register to vote.  Do

18  you see that?

19  A.      Yes.

20  Q.      So I have a couple questions.  What led you

21  to include that in your initial draft?

22  A.      I don't remember the particulars, but

23  generally just giving the ability for them to have

24  some more direction to where to send these people.

25  Q.      Was that guidance given to anyone else in

```
 1   another context?

 2   A.      Definitely reaching out to the county circuit

 3   court has been...

 4   Q.      Do you have any recollection of why that

 5   didn't ultimately get included in the response you

 6   sent back?

 7   A.      No, I don't.

 8   Q.      Do you think, generally speaking, that that

 9   is like still helpful guidance?

10           MR. BARKER:  Objection to form.

11           You can answer.

12           THE WITNESS:  I'm not sure if it would

13   be or not.

14           MS. HULING:  Great.  Okay.

15           I'm switching gears a little bit.  I was

16   going to -- would folks like a break?

17           THE COURT REPORTER:  Yes.

18           MS. HULING:  Let's take it then.

19           (Short break.)

20           (WHEREUPON, the above-mentioned

21   document was marked as Exhibit Number 10.)

22   Q    (BY MS. HULING)  All right.  So I believe you

23   said a little bit ago that there has been one

24   rights restoration approved since the guidance --

25   the new guidance was issued on July 21st; is that
```

1  right?

2  A.      Yes.

3  Q.      Is this Exhibit 10 that restoration?

4  A.      Yes.

5  Q.      And this is the only approval of rights

6  restoration under the new procedures?

7  A.      Yes.  This is the only person we've issued a

8  restoration of voting rights for.

9  Q.      On Page 7975, the sort of third page here.

10 Yep, the order restoring citizenship.  On the order

11 it says that the petitioner is eligible to have his

12 citizenship and his right to posses a firearm

13 restored.  Do you see that?

14 A.      Yes.

15 Q.      Do you read that to understand that his

16 citizenship and his right to possess a firearm are

17 two distinct things?

18 A.      I don't particularly know.

19 Q.      Are firearm rights contained within

20 citizenship rights?

21 A.      I -- I don't know.

22 Q.      Is this something that is -- is this

23 something that is -- is this part of what some of

24 the questions that you were saying are with Mark --

25 that are sort of pending with Mark about whether or

1    not or -- or what is constituted within full

2    citizenship right restoration?  That was a bad

3    question.  I can rephrase that.  It is getting late.

4         Earlier you said that there were some amount

5    of rights restoration applications that are with

6    Mark pending a sort of determination on how full

7    rights of citizenship restoration is defined.  Is

8    that accurate?

9    A.    Yes.

10   Q.    Is part of that question whether or not the

11   right to possess a firearm is a part of full

12   citizenship rights restoration?

13   A.    From my understanding, that's a part of it.

14   Q.    But this application was approved.  Is that

15   because it separately lists out the rights -- the

16   right to possess a firearm?

17   A.    I know that it was determined by Mark that

18   this met the criteria for somebody of having their

19   full citizenship rights restored.

20   Q.    So would this have been an application that

21   either you or Lou looked at, it seemed to meet all

22   of the obligations under the new procedures, and so

23   you sent it to Mark for his final approval?

24   A.    Yes.

25   Q.    And he, on this one, issued approval, and so

1 me say, pending the evaluation of the effects of

2 Falls v. Goins.

3 Q.   Do you remember when you were told that?

4 A.   No, I don't.

5 Q.   So the new guidance may not have gone into

6 effect until July 21st, but some time before that

7 you were told to basically sit on any restoration

8 applications you got until that guidance was issued?

9 A.   To pause until we knew what the effects of

10 Falls v. Goins were going to be.

11 Q.   So some amount of restorations that were

12 submitted prior to the new guidance being issued

13 were paused and ultimately had applied the new

14 procedures even though they had been received before

15 the effective date of the new procedures?

16 A.   The effective date language is sort of

17 unclear to me, I guess, a bit.  As the issuance of

18 Falls v. Goins for, like, my non-lawyer-yet

19 understanding, is that was giving a new definition,

20 or direction, for the process, interpreting the law

21 and saying how it was supposed to be implemented.

22 Q.   So as a general timeframe, there were the old

23 processes that were in place and that you would

24 generally process as applications came in under the

25 old procedures.

```
 1          The Falls decision came out.  You continued
 2   to process applications as they came in under the
 3   old procedures.  At some date, maybe in early July,
 4   you were told to stop processing things under the
 5   old procedures.  On July 21st new guidance was
 6   issued, and then the kind of pile that had
 7   accumulated in the interim was processed under the
 8   new procedures; is that accurate?
 9   A.      I believe that that would be accurate, yes.
10   Q.      And we don't know when that date that you
11   were told to pause was?
12   A.      Not the specific date, no.
13   Q.      4th of July is right around there.  Sometimes
14   there's a holiday.  Any feel for whether it was
15   before or after that?
16   A.      It probably would have been around that time.
17   But, again, I don't -- I don't know.
18   Q.      If this had been processed -- if this
19   application had been processed under the old
20   procedures, would this have resulted in his voting
21   rights restored?
22   A.      Assuming that he did not have any convictions
23   after the date of this restoration of citizenship
24   rights that would have not been covered by the order
25   and after confirmation that child support
```

1  obligations were up-to-date if there were any, yes,

2  pre -- pre-Falls v. Goins he would have been

3  restored.

4  Q.    And if he had received from -- if service had

5  been tendered at some point in the month between

6  when the order was issued and when it was tendered

7  and Mr. Murphy had similarly gotten his voter

8  registration completed within a few days of

9  receiving that order such that it would have been

10  received by your office earlier and processed

11  earlier, is it likely that his rights would have

12  been restored?

13  A.    Earlier on -- on what date, I guess?

14  Q.    So the order is issued on June 5th.  A copy

15  was not served until July 10th.  If it had been --

16  if that order would be served on June 6, let's say,

17  the next day, and he had gone in three days later --

18  so on June 10th, let's say -- and filled out his

19  voting rights restoration -- or his voter

20  registration information and provided the court

21  order and that had been sent off to your office and

22  processed, it would have been processed under the

23  old guidance?

24  A.    If we had received it, you know, within few

25  days of -- of its issuance, the decision of

1  Falls v. Goins wouldn't have come out yet.  So, yes.

2  Q.     And even if it was in late June but before

3  you decided -- before the decision was made to pause

4  on processing, but after the Falls v. Goins

5  decision, it still would have processed under the

6  old guidance?

7  A.     Until I would have received some direction,

8  you know, the pause direction that I did receive, I

9  would have continued operating under -- under the

10 previous procedures.

11 Q.     Thank you.  Okay.  Done with that document.

12 Thank you.

13             (WHEREUPON, the above-mentioned

14 document was marked as Exhibit Number 14.)

15 Q    (BY MS. HULING)  Okay.  So this is Exhibit 14,

16 and it appears to be email communications from the

17 Greene County Elections Commission -- Election

18 Commission attaching some restoration documentation

19 for Mr. Wright; is that accurate?

20 A.     Yes, that seems to be accurate.

21 Q.     Okay.  I'm looking at the initial email sent

22 on Monday, July 3rd.  It indicates that there is a

23 Certificate of Restoration attached and that -- then

24 the individual also returned with a citizenship

25 restoration form.  Do you see that?

1  A.      Yes.

2  Q.      Okay.  And it looks like -- that was sent on

3  July 3rd.  It looks like the attachments include the

4  Certificate of Restoration.  I'll note that it's the

5  old form, correct?

6  A.      Yes.

7  Q.      And it was signed on June 29th -- I suppose

8  June 22nd, on June 29th, depending on who was

9  filling out different parts.  Is that right?

10  A.      Oh, yes, sorry.  Yes, that does seem to be

11  correct.  And this does seem to be actually an even

12  older version of the form that was updated in 2011.

13  Q.      Okay.  And the order that was also included,

14  the citizenship restoration order, is dated

15  June 23rd; is that correct?

16  A.      Yes.

17  Q.      And that predates the Falls decision; is that

18  correct?

19  A.      Yes.

20  Q.      And both of these predate the issuance --

21  sorry.

22  A.      Yeah.  I was trying to remember the date of

23  the Falls decision.  I believe it was June 29th.

24  Q.      Or June 28th.

25  A.      28th, something --

```
 1   Q.      Yeah.
 2   A.      -- in that range, yes.
 3   Q.      And they both predate the July 21st issuance
 4   of the new guidance?
 5   A.      Yes.
 6   Q.      And they were sent to your office on
 7   July 3rd?
 8   A.      Yes.
 9   Q.      So would that have come in right around the
10   time that you were directed to pause on processing?
11   A.      It -- it may have.
12   Q.      Even though this seems to have both an order
13   restoring citizenship rights and a Certificate of
14   Restoration, so it sort of has both pieces, which
15   under the old guidance, it wouldn't have needed to;
16   is that correct?
17   A.      Correct.
18   Q.      It looks like on the version of the
19   communication, we have that then on July 26th.
20   There's a follow-up email saying I wanted to
21   follow-up on the attached, noting that they received
22   this prior to the change in registration process,
23   and asking if they meet the requirements even under
24   the new process.  Do you see that?
25   A.      Yes.
```

1 Q.     I guess do you have any recollection of

2 receiving this and why it wasn't processed when it

3 was received under the old guidance?

4 A.     No, I don't particularly remember.

5 Q.     Do you have any recollection of responding to

6 the follow-up questions that are raised in the

7 July 26th email?

8 A.     If I remember correctly, yes.

9 Q.     What do you remember responding?

10 A.    I just remember responding.  I believe it was

11 by phone call.

12 Q.    And what was the content of the response?

13 A.    I -- I don't remember specifically what the

14 response was.

15 Q.    As of July 26th were you issuing -- or were

16 you processing -- like understanding at some point,

17 maybe in early July, you had been told to pause on

18 processing applications.  Had you started processing

19 them again by July 26th?

20 A.    As the new guidance had -- or updated

21 guidance had been issued, we would have started

22 processing them.  Again -- again, denial letters

23 didn't go out for a little while due to the need to

24 update those as well.  But we would have been, you

25 know, going through them and looking at them again

1  to see if they met the requirements for restoration.

2  Q.     So from understanding correctly from some

3  period in early July until July 21st when you

4  received restoration applications, they are

5  basically put in a file and waited on until that new

6  guidance was issued?

7  A.     If I remember what I -- what I was doing at

8  the time, if that was correct, it was sort of going

9  through and making sure that what I understood the

10  requirements to be at the time, obviously waiting on

11  the -- on the issuance of -- or the issuance of

12  those -- those updated procedures.  Still would have

13  been making sure that court costs and restoration

14  were paid.  But, again, I don't believe we were

15  issuing any denials in that time period either.  So

16  still going through and making sure that facially

17  from my understanding from at the time that things

18  were -- were in line so that when those updated

19  procedures were issued, then they would be sort of

20  ready to go in whatever direction they needed to go

21  in.

22  Q.     So when was the new guidance -- when the new

23  guidance was issued, you could maybe take a next

24  step in processing, of sorting them, but you still

25  weren't sending out anything -- or at least not any

1   denials until mid August?

2   A.      Yeah, I believe that was correct.

3   Q.      Okay.  So it sounds like no denials were

4   going out from about early July to mid August; is

5   that accurate?

6   A.      I believe that that would be accurate.

7   Q.      And I can't remember the exact date from the

8   one approval.  November 1, looking back at

9   Exhibit 10.

10          So in addition to no denials going out from

11  early July to mid August, no approvals were going

12  out in that time roughly --

13  A.      Correct.

14  Q.      -- as well?

15  A.      Correct.

16  Q.      So, more or less, no restoration applications

17  were being fully processed during that time?

18  A.      There were no sort of decisions being issued,

19  correct.

20  Q.      Following up on this one -- or continuing

21  with questions on this one, the question is raised

22  from the county as to whether the attachments would

23  meet the new requirements even under the new

24  process.  And notes that they think that the

25  restoration of citizenship is sufficient but aren't

1  sure because of -- about this Certificate of

2  Restoration because it's on an old form.  Do you see

3  those questions?

4  A.     Yes.

5  Q.     Let's take that one at a time.  Because would

6  -- even though it is -- the Certificate of

7  Restoration is on the old form, would that be

8  acceptable or would somebody have to submit --

9  resubmit with the new Certificate of Restoration

10  after the guidance was issued?

11  A.     My understanding is that the old -- they

12  would need to reissue a new Certificate of

13  Restoration if they had turned in an old -- an old

14  version of the form.

15  Q.     Okay.  Is that still true?

16  A.     From my understanding, yes.

17  Q.     And then with regard to the order, I'll note

18  that this says that the petitioner -- let's see.

19  Petitioner will still be prohibited from possessing

20  any firearm or ammunition under provisions of Title

21  18, USC Section 922(g).  And as the Supreme Court

22  held in Beecham v. U.S. and the citation, a state's

23  restoration of a convicted felon's civil rights does

24  not remove the disability as to firearm's possession

25  and imposed by federal law.  But, otherwise, the

1  rights restoration are granted, as it says above

2  that there has not been any objection filed.  Am I

3  reading that correctly?

4  A.      Correctly in what way?  As like that's what

5  it says --

6  Q.      Is that reading?

7  A.      -- that's what it said in the order.

8          I mean, that -- that -- that's the language

9  that it says in the order, I believe.

10 Q.      And at the bottom it says, It is therefore

11 ordered that the petitioner's citizenship is

12 restored.  Does this, under your understanding,

13 suffice for Step 1 under the new process as a

14 demonstration of full restoration of citizenship

15 rights?

16 A.      I'm not sure.

17 Q.      Do you know whether or not this individual's

18 application has been processed yet?

19 A.      My understanding is that there's not been a

20 decision issued on his application.

21 Q.      So this individual who got -- received this

22 order on June 23rd and received a Certificate of

23 Restoration on June 29th and had them submitted on

24 July 3rd, all of which happened before the change in

25 guidance, is still in pending status awaiting

1  determination from Mark as to what constitutes full

2  citizenship restoration?

3  A.      I believe so.

4  Q.      All done with that document.  Thank you.

5          Okay.  You will be surprised to know we have

6  another document.

7               (WHEREUPON, the above-mentioned

8  document was marked as Exhibit Number 15.)

9  Q   (BY MS. HULING)  Okay.  So this is Exhibit 15,

10 the top document is a voting rights restoration

11 denial letter from July 3rd with corresponding

12 documents from the file; is that accurate?

13 A.      Yes, that seems to be accurate.

14 Q.      Okay.  And flipping to the Certificates of

15 Restoration forms here, it appears that they were

16 received by HCEC which I believe stands for Houston

17 County Elections Commission on June 15th.  Do you

18 see that stamp up in the right-hand corner on those?

19 A.      Yes, I do.

20 Q.      And that would have predated both the Falls

21 decision and the new guidance; is that correct?

22 A.      Yes.

23 Q.      And it looks like they were also submitted

24 with the voter registration application which was

25 also received on June 15th, along with this

1  Certificates of Restoration -- or the same date at

2  least; is that right?

3  A.      That seems to be correct from the stamp on

4  there.

5  Q.      And I don't think I've actually seen the

6  transmission to your office of these forms.  But at

7  any rate, they were transmitted to your office some

8  time before July 3rd because that's when the denial

9  letter was issued; is that accurate?

10 A.      Yes.  That would be correct.

11 Q.      Okay.  And it looks like that they are denied

12 for the reason of additional convictions not listed

13 on the Certificate of Restoration.  And then I think

14 the last page of this document is your email

15 submitting the denial letter back to the county

16 commission indicating that you have a record of a

17 conviction in Davidson County for Case No. IF7502 on

18 June 8th, 1995, correct?

19 A.      Yes.

20 Q.      And so am I understanding correctly that the

21 denial was because there was a third COR that your

22 office should have received or felt that it should

23 have received in order for this application to be

24 approved?

25 A.      Yes.

1   Q.     Okay.  It doesn't actually say -- it just

2   says, Additional convictions not listed on the

3   Certificate of Restoration.  But that's additional

4   felony convictions, correct?

5   A.     Yes, that is -- that's what that reason for

6   denial means.

7   Q.     Okay.  Okay.  Thank you.  Done with that

8   document.

9              (WHEREUPON, the above-mentioned

10  document was marked as Exhibit Number 16.)

11  Q    (BY MS. HULING)  Okay.  So Exhibit 16 appears

12  to be judgments indicating the additional

13  convictions that you list for the -- what you've

14  listed in your email, IF7502; is that correct,

15  looking at the case number up in the upper

16  left-hand corner?

17  A.     Yes, in the email in the previous document.

18  Q.     Email in the previous document --

19  A.     Yes.

20  Q.     -- yes.

21         Okay.  Thank you.  And it appears from these

22  judgments the sort of top right box that both of

23  them are checked off as misdemeanors.  Do you see

24  that?

25  A.     Yes.

1  Q.     Okay.  And if this instance -- this -- these

2  additional convictions were for misdemeanors, they

3  do not require a Certificate of Restoration form; is

4  that correct?

5  A.     That is correct.

6  Q.     Do you have any recollection of this

7  particular instance -- or this particular case?

8  A.     Yes.

9  Q.     Okay.  Do you remember how you received these

10 copies of the judgments here?

11 A.     If I'm remembering correctly, I believe they

12 were forwarded to me by a sort of third-party

13 volunteer that had contacted me previously about

14 assisting individuals with restoration of voting

15 rights.

16 Q.     So the sort of chain of events here would

17 have been that the CORs for the felony convictions

18 were submitted.  There was denial because your

19 records indicated that there was an additional

20 conviction that was lacking a COR.  You sent that

21 back to the elections commission who would have

22 passed along the denial information to the

23 individual.  The individual through a representative

24 obtained copies of the judgments indicating that

25 they're misdemeanors, and that got shared back with

1  your office.  Is that accurate?

2  A.      Yes, that's seems to be accurate.

3  Q.      Thank you.  That's all with this document.

4              (WHEREUPON, the above-mentioned

5  document was marked as Exhibit Number 17.)

6  Q    (BY MS. HULING)  Exhibit 17 appears to be

7  email correspondence related to Donald Hall which I

8  should have specified, but is the same individual

9  who is the subject -- maybe that's not true.  Oh,

10  I'm sorry.  That's not right.  I'm sorry.

11          It seems to be concerning two individuals,

12  but specifically seems to be concerning

13  Mr. Whitson, who is the subject of the prior two

14  documents that we were looking at?

15  A.      Yes, that's seems like it.

16  Q.      Very well.  Sorry.  Okay.  Not about you.

17          It looks like turning to the initial email

18  in this communication thread on third page, that

19  with respect to Mr. Whitson, you sent an email to

20  Aloha Morgan in -- the court clerk, and say that

21  your records from TDOC show that Mr. Whitson was

22  convicted in this case.  And then you'd received

23  copies of the judgments indicating that they were

24  both misdemeanors.  Is it fair to say that the

25  records that you had from TDOC seemed -- indicated

1   that they were felony convictions as opposed to

2   misdemeanors?

3   A.      Yes.

4   Q.      Okay.  And so you were asking the court clerk

5   to confirm that the judgment -- that what you were

6   seeing on the judgment documents, that these were,

7   in fact, misdemeanors as opposed to felonies?

8   A.      Yes.

9   Q.      Okay.  As a side question, wouldn't the

10  judgment be what would indicate whether it was a

11  misdemeanor or a felony?  I guess why would you need

12  further confirmation?

13  A.      If I'm remembering the situation and

14  circumstances right, due to receiving this judgment

15  not from a county election commission, or from a

16  court themselves, or even the individual turning it

17  in to the county election commission, I -- I wanted

18  to ensure its validity.

19  Q.      Just doing your due diligence?

20  A.      Correct.

21  Q.      And then on July 28th you hear back the case

22  is, indeed, a misdemeanor conviction; is that

23  correct?

24  A.      Yes.

25  Q.      And, again, the misdemeanors don't require a

1  COR to be submitted for them?

2  A.     Correct.

3  Q.     So, ultimately, the denial for additional

4  felony convictions lacking a COR was made in error

5  based on erroneous information from TDOC?

6  A.     Yes.  Under the previous procedures.

7  Q.     Then I think the following emails are just

8  reconfirming that the date is the same and just

9  further due diligence on that front; is that fair?

10  A.     Yes, I believe so.

11  Q.     Okay.

12              (WHEREUPON, the above-mentioned

13  document was marked as Exhibit Number 18.)

14  Q    (BY MS. HULING)  Document 18 appears to be --

15  or Exhibit 18, I'm sorry, appears to be an email

16  that you received from a woman named Amy Kurland.

17  Is that the individual who supplied the judgment --

18  the copies of the judgment to you; do you remember?

19  A.     If -- if I'm remembering correctly, yes, I

20  think it was her.

21  Q.     She sent this email on September 11th, it

22  looks like, correct?

23  A.     Yes.

24  Q.     It looks like, according to her email, she

25  sent you the information showing that the additional

```
1  convictions were misdemeanors on July 17th.  Is that
2  what she says?
3  A.     I think --
4  Q.     Does that sound about right to?
5  A.     Yeah, I wouldn't challenge it.
6  Q.     And that you confirmed receipt of that and
7  sent a July 18th email -- or a July 28th email
8  saying that you were looking into the issue.
9          And then it looks like around that same
10 July 28th time, you received the confirmation from
11 Davidson County that they were, in fact,
12 misdemeanors, and I think that is what we were just
13 looking -- the exhibit you were just looking at?
14 A.     (Witness nodding head affirmatively).
15 Q.     Do you remember if you said you were looking
16 into it before or after you received that
17 confirmation from Davidson County?
18 A.     I don't remember.
19 Q.     And then this email is from September 11th.
20 Do you remember what happened regarding
21 Mr. Whitson's restoration between confirmation that
22 he had already submitted the required certificates
23 and receiving this email from Amy?
24 A.     What happened in the interim?
25 Q.     So once you've confirmed that they were, in
```

1   fact, misdemeanors that he hadn't needed to submit

2   CORs for and so that his initial denial was

3   erroneous, do you remember what happened in the

4   interim, like after that?

5   A.      I believe that there were discussions

6   regarding the matter with, if I remember correctly,

7   both Beth and Mark.

8   Q.      Do you remember the content of those

9   discussions?

10          MR. BARKER:  Objection.  Attorney-client

11  privilege, as Beth is an attorney that provides

12  legal advice to the division of elections.

13          I would instruct the witness not to

14  answer.

15  Q   (BY MS. HULING)  Do you know if you ever

16  replied to this email from Amy?

17  A.      I don't -- I don't remember.

18  Q.      Would you -- like do you usually --

19          Is it a part of your general

20  responsibilities for rights restoration work to

21  correspond with third-party agents who might be

22  helping individuals with the rights restoration

23  process?

24  A.      I have in the past.

25  Q.      I'm done with that exhibit.  Thank you.

```
 1              (WHEREUPON, the above-mentioned
 2   document was marked as Exhibit Number 19.)
 3   Q    (BY MS. HULING)  Exhibit 19 appears to be the
 4   email transmitting an additional denial dated
 5   August 15th of Mr. Whitson's rights restoration
 6   application.  And it looks like this time the
 7   reason for the denial is that his application was
 8   not provided with evidence of pardon or restoration
 9   of full citizenship in addition to the Certificates
10   of Restoration; is that accurate?
11   A.    Yes, that seems to be accurate.
12   Q.    Okay.  So without getting into the privileged
13   conversations -- any privileged conversations you
14   may have had with your attorney, the outcome of
15   those conversations, ultimately with respect to
16   Mr. Whitson, is that he was denied because he had
17   not submitted -- he was denied under the new
18   guidance for not complying with the two-step process
19   laid out on the July 21st guidance; is that
20   accurate?
21   A.    Yes, that would be accurate.
22   Q.    Okay.  I guess I'm a little confused by that
23   because he had submitted -- if we look back at the
24   initial document with respect to Mr. Whitson, which
25   is Exhibit 15 -- sometime prior to July 3rd, he had
```

1 submitted all of the required documentation under

2 the old guidance which was still in effect at that

3 point and was wrongly denied under the old guidance

4 that was in effect at that point based on erroneous

5 information from the TDOC file; is that accurate?

6 A.     I believe that would be accurate, yes.

7 Q.     And, nevertheless, though, that was wholly

8 outside of his control.  He was then -- had -- he

9 was then further denied for not complying with a

10 process that was not yet in place when he had

11 submitted his initial application?

12 A.     I believe that he was denied because he did

13 not meet the requirements for -- he had not been

14 restored prior to the issuance of the new

15 procedures.

16 Q.     But when he had submitted his application,

17 those had not been -- that had not been the policy

18 that was in place; is that accurate?

19 A.     That's correct.

20 Q.     And he was, nevertheless, denied under

21 procedures that went into effect several weeks after

22 he submitted his application?

23 A.     Correct.

24 Q.     Was that done in error?

25 A.     What --

```
 1              MR. BARKER:  Objection to form.
 2              You may answer.
 3   Q    (BY MS. HULING)  The first denial was done in
 4   error, correct?
 5   A.     That is correct because it was based off of
 6   incorrect information.
 7   Q.     Was the second denial done in error?
 8              MR. BARKER:  Objection to form.
 9              You can answer.
10              THE WITNESS:  From my understanding, no.
11   Q    (BY MS. HULING)  Was it the general practice
12   of the department to deny individuals under
13   guidance that was issued after they submitted their
14   applications?
15   A.     I don't know the other instances that would
16   be like that.
17   Q.     When he originally applied, he was eligible
18   to have his voting rights restored?
19   A.     Hindsight being 20/20, with the information
20   received after the issuance of Falls v. Goins, the
21   -- the judgments in the cases that were ultimately
22   misdemeanors, if that information had been
23   hypothetically received at the same time, then -- if
24   he had not been -- if he had not had child support
25   obligations -- I'm not sure that those were
```

1   checked -- he, I believe, would have been restored.

2   Q.      And did I hear you say that to your

3   understanding he is -- this is a unique case, this

4   wasn't part of a general process or policy that

5   folks in his situation -- let me strike that.

6           Do you know of other individuals that fall

7   into a similar boat, where they were eligible under

8   the old process when they applied for their rights

9   restoration but were nevertheless denied under the

10  new policy?

11  A.      Not -- not that I can recall.

12  Q.      Does this seem like an instance that should

13  be revisited if this is a unique issue where the

14  individual applied and was eligible when he applied

15  and was wrongly denied?

16  A.      I don't believe that would be my decision.

17  Q.      Is there any process within the department

18  for -- or within your office for revisiting those

19  sorts of decisions?

20  A.      Not that I'm aware of.

21  Q.      Is that an appealable decision?

22  A.      If an individual turns in -- I don't know.

23  Q.      Do you know if the department -- or your

24  office has considered whether an individual who

25  applied under the -- and was eligible under -- when

1  they applied under the old guidance but was denied

2  under the new guidance, whether that's an appealable

3  denial?

4  A.      I don't know if those conversations have

5  occurred.

6  Q.      But you have not been a part of them if they

7  have?

8  A.      Not -- not that I recall.

9  Q.      Okay.  Done with that document.

10              (WHEREUPON, the above-mentioned

11  document was marked as Exhibit Number 20.)

12  Q   (BY MS. HULING)  Okay.  Exhibit 20, the cover

13  page here appears to be a voter restoration denial

14  letter from May 5 for incomplete or insufficient

15  documents; is that correct?

16  A.      Yes, that seems to be correct.

17  Q.      Okay.  If we flip to Pages 1966 and 1964, I

18  believe -- or through 4, it looks like Grainger

19  County.  Am I saying that correctly?

20  A.      I believe so, yeah.

21  Q.      It looks like Grainger County received a

22  Certificate of Restoration for a conviction with the

23  date of July 8th, 1989, on April 27th, along with a

24  voter registration application on April 27; is that

25  correct?

1  A.      That seems to be correct.

2  Q.      Okay.  And it looks like on the last page

3  here those were submitted to you on April 28th,

4  correct?

5  A.      Yes.

6  Q.      And that is before the Falls decision and

7  before the new guidance was issued, correct?

8  A.      Yes, that's correct.

9  Q.      If we look at Pages 1970 to 71, so the

10 first -- front and back of the first page, it looks

11 like this application was denied for lack -- or for

12 -- the offense date, that July 8th, '99 date was

13 inaccurate -- '89 date was inaccurate; is that

14 correct?

15 A.      That does seem correct, though I would note

16 that the front page is 1970 and the back page is

17 1969.  So the front page being a denial letter from

18 May 5th, and then the back -- first page that I have

19 is an email dated May 5th.

20 Q.      Does that look like the email conveying the

21 denial letter?

22 A.      Yes, it does.

23 Q.      And in the email you add a little bit of

24 extra explanation beyond what's in the denial letter

25 specifying that the TDOC database shows the

BRRES & ASSOCIATES COURT REPORTERS