**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE CONFERENCE of the NATIONAL ASSOCIATION for the ADVANCEMENT of COLORED PEOPLE, on behalf of itself and its members, et al.,<br><br>        Plaintiffs,<br><br> v.<br><br>WILLIAM LEE, in his official capacity as Governor of the State of Tennessee, et al.,<br><br>        Defendants. | Civil No. 3:20-cv-01039<br><br>JUDGE CAMPBELL<br>MAGISTRATE JUDGE FRENSLEY |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO COUNTS ONE, TWO, AND THREE**

In support of their response to Defendants' Motion for Summary Judgment on Claims 1-3, and pursuant to Local Rule 56.1(b), Plaintiffs submit this statement of the undisputed, material facts:

**I. Parties**

 **A. Individual Plaintiffs**

1. **Plaintiff Lamar Perry** is a resident of Shelby County, Tennessee. Ex. 1 (Perry 1st ROG Resp.) at 9. In 2006, he was convicted of three counts of felony forgery of $1,000 or less. *Id.* He completed his sentence, including probation. *Id.* None of his convictions are for permanently disqualifying crimes. *See* T.C.A. § 40-29-204.

 **Response:**

1

2.     In 2013, Mr. Perry went through a second-chance program where he learned about the availability of a Certificate of Restoration of Voting Rights (COR) to restore his voting rights. Ex. 1 (Perry 1st ROG Resp.) at 9. Eager to do so, he sought a COR but was told that he did not qualify because he had been assessed $3,288.10 in legal financial obligations (LFOs) for his convictions. *Id.* He was surprised to learn that he owed these LFOs, as he had already paid his restitution in full and believed that to be his only debt. Still, he worked to pay down this debt. *Id.*

**Response:**


3.     In 2020, Mr. Perry again sought a COR. *Id.* Because probation officers in Shelby County routinely refuse to fill out CORs, Mr. Perry sought certification of his COR from the Shelby County Criminal Court Clerk, which sometimes completes CORs on request. *Id.* The Clerk's office refused to fill out his COR citing outstanding court costs. *Id.* However, his only outstanding LFO on his convictions was and remains a $952.10 fine. *Id.*; Ex. 2 (Perry Case Summ.) at PL000077. Under Tennessee law, fines are not required to be paid to qualify for a COR, only court costs and restitution. T.C.A. § 40-29-202(b). Under Defendants' rights restoration procedures, Mr. Perry had no way to appeal this refusal.

**Response:**


4.     During Defendants' deposition of Mr. Perry on May 13, 2023, Defendants' counsel suggested that denial of Mr. Perry's voting rights was proper because he ostensibly owed child support. *See* Ex. 3 (Perry Dep.) at 43:20-25, 45:25-46:9. Mr. Perry has never received a denial of his voting rights on that basis because he was effectively denied a COR before Defendants conducted any assessment of his child support obligations. *See id.* at 43:20-25 ("Q. And we've

talked about this previously, but just so we are clear, in order to get your rights restored, one of the things that you have to do is to be current on your child support obligations; do you understand that? A. I do now. I didn't know it had anything to do with it until you just spoke it earlier."). Had he been denied on the basis of outstanding child support obligations, he would have appealed the determination because he believed he was accruing outstanding child support in error. *See id*. at 45:25-46:9. In fact, as of August 1, 2023, his child support obligations were terminated, and his arrears were set at $0, as ordered by Juvenile Court Magistrate Debra M. Sanders on September 20, 2023. *See* Ex. 4 (Magistrate Findings and Recs). Mr. Perry is eligible to restore his voting rights in Tennessee but is at a standstill because Defendants' COR procedures afford him no means to appeal the Shelby County Clerk's erroneous accounting of a fine as a court cost.

**Response:**


5.      **Plaintiff Reginald Hendrix** is a resident of Davidson County, Tennessee. Ex. 5 (Hendrix Dep.) at 11:13-15. He was convicted of a series of drug and theft crimes in Williamson and Davidson Counties over a roughly fifteen-year period, most recently in 2012. Ex. 6 (Hendrix 1st ROG Resp.) at 9. He was released from supervision in 2012. *Id.* None of his convictions are for permanently disqualifying crimes. *See id.*; T.C.A. § 40-29-204.

**Response:**


6.      Mr. Hendrix requested a COR from the Tennessee Department of Correction (TDOC) office in Williamson County. Though TDOC officers are under a statutory obligation to issue a COR sufficient to restore voting rights to eligible requestors, T.C.A. § 40-29-203(c), Mr. Hendrix's COR was ultimately denied by the Election Division in May 2022 because "additional

3

convictions [were] not listed," a reason immaterial to his eligibility. Ex. 6 (Hendrix 1st ROG Resp.) at 9-10. He received no determination of his eligibility and had no means to appeal, so he was forced to try requesting a COR again, which he did in a different county. *Id.* at 10. His COR was approved and his voting rights were restored 11 days after he filed the First Amended Complaint in this case. *Id.*

**Response:**


7.      **Plaintiff Curtis Gray, Jr.** is a resident of Shelby County, Tennessee. Ex. 7 (Gray Dep.) at 10:19-20. In 1988, he was convicted of one count of drug possession in Shelby County. Ex. 8 (Gray 1st ROG Resp.) at 9. He has completed his sentence, including probation. Ex. 7 (Gray Dep.) at 18:3-7. His conviction is not permanently disqualifying. *See* T.C.A. § 40-29-204.

**Response:**


8.      Mr. Gray's court records show that he owes $279.00 in court costs, no restitution, and a $500 fine. Ex. 9 (Gray Cost Bill, Ex. 2 to Gray Dep.) In 2020, Mr. Gray attempted to restore his voting rights by having his representatives ask the Shelby County Criminal Court Clerk fill out a COR form, according to the instructions on Defendants' COR form. *See* Ex. 7 (Gray Dep.) at 29:19-31:5. The Clerk's office would not fill out his COR until he paid off the full balance of his LFOs, including the $500 fine. Ex. 10 (Shelby County Email) at PL000070. Defendants' procedures afforded him no statement of reasons explaining why he was ineligible and no means for him to appeal the Shelby County Clerk's assessment of what he must pay to receive his COR. Ex. 8 (Gray 1st ROG Resp.) at 9.

**Response:**

4

9. Mr. Gray does not owe any child support. Ex. 7 (Gray Dep.) at 11:23-25.

**Response:**


10. **Plaintiff Leola Scott** is a resident of Dyer County, Tennessee. She is a member of the and the Civic Engagement Chair for the Dyersburg Chapter of the Tennessee NAACP. Ex. 11 (Scott Decl.) ¶ 3.

      **Response:**


11. Ms. Scott has three felony convictions from 1991, 1992, and one from 2004. Ex. 12 (Scott 1st ROG Resp.) at 9. She has since served her entire sentence, including supervision imposed on those convictions. *Id.* None of her convictions are for permanently disqualifying crimes. *See id.*; T.C.A. § 40-29-204.

      **Response:**


12. In 2022, Ms. Scott attempted to restore her voting rights by asking a probation officer in Dyer County for a COR. Ex. 12 (Scott 1st ROG Resp.) at 9. The officer filled out the top half of the three CORs, one for each conviction. *Id.* The officer would not complete the bottom half of the forms, so she took them to the Dyer County Clerk of Court. *Id.* The Dyer County Clerk of Court informed Ms. Scott that she had outstanding LFOs on two of the felony cases. *Id.* One case had an outstanding balance of $93 and the other case had an outstanding balance of $2,297, of which $2,000 was labeled a "fine." *Id.* at 10. Of the $390 that was not labeled a fine, the Clerk did not provide Ms. Scott with an explanation of which of the obligations are considered "court

5

costs." *Id.* Further, Ms. Scott believes that the summation of LFOs is in error and that payments she made to her community supervision officer were not properly accounted for. *Id.* If there were an appeal process, Ms. Scott would have appealed. *Id.* Absent that, she was unable to get CORs or written statements of denial related to these convictions, preventing restoration of her voting rights. *Id.*

**Response:**

13.     Since then, Ms. Scott has paid off all $390 that may or may not have been considered "court costs." Ex. 11 (Scott Decl.) ¶ 8; Ex. 13 (Scott LFOs). She also filed a court petition for full citizenship rights restoration and received such restoration to the "fullest extent provided by law" on July 16, 2024. Ex. 11 (Scott Decl.) ¶ 9; Ex. 14 (Scott Citizenship Order).

**Response:**

14.     Ms. Scott then sought to get new COR forms filled out for the two cases on which she had made payments in 2024. Ex. 11 (Scott Decl.) ¶ 10. She had to go to both the Community Supervision Office (TDOC) and the Dyer County Clerk of Court to get all parts of the new forms filled out. *Id.* On one of the forms, the Dyer County Deputy Clerk of Court erroneously marked that "court costs ordered by the court are owed" on her one felony case with the outstanding $2,000 "fine." *Id.* She did not attempt to get a new COR form filled out for the third conviction because she had already obtained a valid COR for that conviction in 2022. However, she did return to the Clerk's office a second time to obtain a certified copy of the order restoring her full rights of citizenship because that is what Defendants' new procedures require. *Id.* ¶ 11.

**Response:**

6

15.     When Ms. Scott went to the Dyer County Administrator of Elections (AOE) to submit the two updated COR forms certifying no outstanding court costs, the 2022 COR form, and the certified court order, the AOE's office once again denied her voting rights restoration. *Id.* ¶ 12. She was informed that her documentation would not be accepted unless she submitted the new COR form, created in July 2023, for her third conviction, even though nothing had changed since 2022 as to her eligibility for that conviction. *Id.* She had to go *back* to Community Supervision and Clerk's office to get a COR form filled out for the third felony conviction. *Id.* ¶ 13. She finally submitted all the documentation to the Dyer County AOE on July 22, 2024. *Id.* ¶ 14.

**Response:**


16.     Ms. Scott has no child support obligations. Ex. 15 (Scott Dep.) at 12:16-19.

**Response:**


17.     **Plaintiff Benjamin Tournier** is a resident of Jackson, Madison County, Tennessee. Ex. 16 (Tournier 1st ROG Resp.) at 9; Ex. 17 (Tournier Judgment Docs). He was convicted of a felony in Yavapai County, Arizona in 1997 and three in Maricopa County, Arizona in 1993, 2000, and 2001.[1] Mr. Tournier moved to Tennessee through an interstate compact to be with his mother and completed parole in Tennessee in 2003 under TDOC authority. *Id.* He has completed his sentence on his convictions. Ex. 18 (Tournier Discharge Docs). None of his convictions are for permanently disqualifying crimes. *See* T.C.A. § 40-29-204.

**Response:**

---

[1] While at the time of filing, Mr. Tournier originally only recalled having been convicted of two felonies, he discovered over the course of this case that he had two additional felony convictions in Maricopa County.

18.      In 2020, Mr. Tournier learned that he might be eligible for rights restoration and began to try to get CORs completed for his convictions. Ex. 16 (Tournier 1st ROG Resp.) at 9. He first attempted to find officials in Arizona to fill out his COR; however, such requests to date have gone unanswered, refused, or redirected to Arizona's rights restoration system. *Id.* at 9-10. He then tried to request a COR from a Tennessee probation officer in Madison County. *Id.* at 11. Upon going in person to request a COR, he was erroneously told to fill out the top portion of the COR form himself (which at the time Defendants prohibited) and to leave it there to be filled out by an officer. *Id.* He was told the officer would only fill out half of the form and a court clerk would need to fill out the rest. *Id.* The officers said they would call once the form was complete, but no officer contacted him. *Id.* The Madison County Probation Office did not say he was ineligible, issue a formal denial, or give him a statement of reasons for not completing the entire form or returning it to him. *Id.*

     **Response:**


19.      Additionally, Mr. Tournier's attempts to find an official willing to complete a COR in Yavapai County led to the discovery that he has outstanding LFOs in that county. Ex. 19 (Tournier 2d ROG Resp.) at 10. The Yavapai County Clerk has reported that Plaintiff Tournier still owes $1,855 in "probation fees and attorneys' fees." Ex. 20 (Tournier Yavapai Financial Balance). Since filing this case, Plaintiff Tournier has also discovered that he owes LFOs on his 1993 and 2000 Maricopa County felony convictions. Ex. 21 (Tournier CRO) (showing "fees" and a "fine" still owed on the 2000 conviction); Ex. 17 (Tournier Judgment Docs) at PL000387 (showing a $112 court "assessment" was ordered for his 1993 case).  It seems clear that these debts

are not restitution, but he has received no authoritative determination on whether they would be considered "court costs" under T.C.A. § 40-29-202.

**Response:**


20.     Mr. Tournier does not have any child support obligations. Ex. 16 (Tournier 1st ROG Resp.) at 11.

**Response:**


21.     **Plaintiff John Weare** is a resident of Lewis County, Tennessee. Ex. 22 (Weare 2nd ROG Resp.) at 8. He was convicted of a felony in Maricopa County, Arizona in 1997. He was also convicted of a felony in Yuma County, Arizona in 2003 but his judgment of guilt was set aside and the indictment was dismissed. Ex. 23 (Weare 2003 CRO). He was also convicted of a felony in Maricopa County, Arizona in 1983 but that judgment was vacated and the charges were dismissed. Ex. 24 (Weare 1983 CRO). He has completed his sentence on his convictions. Ex. 25 (Weare Discharge Docs). None of his convictions are for permanently disqualifying crimes. *See id.*; T.C.A. § 40-29-204.

**Response:**


22.     Mr. Weare spent countless time asking officials in Arizona for assistance to complete his CORs, but his efforts have all gone unanswered, refused, or redirected to Arizona's rights restoration system. Ex. 22 (Weare 2d ROG Resp.) at 8-9. He also inquired with his County Election Commission about how to get his voting rights restored but received no relevant

information. Ex. 26 (Weare Dep.) at 53:9-21. He has therefore been unable to submit a completed COR to TDOC. *Id.* at 53:22-54:1.

**Response:**


23.  Mr. Weare does not owe court costs or victim restitution on any of his felony convictions. *See* Ex. 27 (Weare LFO docs). His Yuma County case may have a balance for probation fees, which are not court costs, and at any rate, that conviction was set aside. *Id.* at PL000414. During the course of this case, Mr. Weare was informed that there was an outstanding balance for victim restitution on his 1983 case, despite his belief that it had been paid. This has no impact on his right to vote given that the conviction was vacated and all charges dismissed; nonetheless, that balance has now been paid. *Id.* at PL000379.

**Response:**


24.  Mr. Weare does not have child support obligations. Ex. 26 (Weare Dep.) at 13:6-8.

**Response:**


**B. TN NAACP**

25.  Plaintiff the Tennessee State Conference of the National Association for the Advancement of Colored People ("TN NAACP") is a nonpartisan, multi-racial, non-profit membership organization headquartered in Jackson, Tennessee. ECF 156-2 ¶ 3.

**Response:**

26.     TN NAACP was founded in 1946 to serve as the Tennessee arm of the NAACP. Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons. *Id.* ¶¶ 3, 6.

**Response:**


27.     TN NAACP has three regional divisions—Eastern, Middle, and Western Tennessee—as well as the 33 local branch units and 22 college chapters and youth councils. TN NAACP and most of its local branch units are primarily volunteer-run, and all officers are volunteers. ECF 156-2 ¶¶ 4, 5.

**Response:**


28.     Promoting voter registration and turnout are the core activities through which the TN NAACP furthers its mission. *Id.* ¶ 8; Ex. 28 (3d Sweet-Love Decl.) ¶ 4.

**Response:**


29.     TN NAACP constantly works to help and encourage community members to register to vote, through events, voter registration drives, door-to-door canvassing, tabling, texting, and word-of-mouth outreach, with the goal of registering and turning out as many people as possible to the polls. Ex. 28 (3d Sweet-Love Decl.) ¶ 6; Ex. 29 (Randolph Decl.) ¶¶ 7-11; Ex. 30 (Tipton-Boyd Decl.) ¶ 7; Ex. 31 (Carter Decl.) ¶¶ 7-10.

**Response:**

11

30. TN NAACP has plans to continue providing voter registration assistance and mobilization services to its community in the future, with a focus on engaging Black and brown communities. Ex. 28 (3d Sweet-Love Decl.) ¶ 6; Ex. 29 (Randolph Decl.) ¶ 8; Ex. 30 (Tipton-Boyd Decl.) ¶ 8; Ex. 31 (Carter Decl.) ¶ 7.

**Response:**

31. Because the communities TN NAACP serves are disproportionately disenfranchised, the organization frequently encounters individuals who have lost the right to vote or are uncertain whether they have the right to vote during its voter registration and mobilization efforts. TN NAACP also receives regular requests for assistance from individuals seeking to regain their right to vote. Ex. 28 (3d Sweet-Love Decl.) ¶ 7; Ex. 29 (Randolph Decl.) ¶ 12; Ex. 30 (Tipton-Boyd Decl.) ¶ 9; Ex. 31 (Carter Decl.) ¶ 11.

**Response:**

32. TN NAACP is impeded in its effort to register and mobilize individuals in its communities to vote due to difficulties in assisting community members with the voting rights restoration process because the State administers the process without due process protections and uniform standards. TN NAACP must also divert significant resources—both in volunteer time and in monetary resources—within its voter registration and mobilization efforts specifically to assisting community members with the voting rights restoration process because the State administers the rights restoration process without due process protections and uniform standards. Ex. 28 (3d Sweet-Love Decl.) at ¶ 6; Ex. 29 (Randolph Decl.) ¶¶ 13-20; Ex. 30 (Tipton-Boyd Decl.) ¶¶ 11-24; Ex. 31 (Carter Decl.) ¶¶ 11-17.

12

**Response:**

33.    For example, because the State does not provide a uniform statewide application to request a COR, TN NAACP volunteers spend significant time helping individuals hunt down officials willing to fill out a COR form and submitting it to the local election office. This process can take many hours spread across many weeks or months. It can require making phone calls, connecting with legal counsel, and driving from government office to office to office, without any guarantee that the investment of time will result in the person regaining their right to vote. This is time volunteers could spend on other voter registration and mobilization efforts, and efforts to assist individuals in this way are a significant drain on the organization's overall time and resources. Ex. 28 (3d Sweet-Love Decl.) ¶ 9; Ex. 29 (Randolph Decl.) ¶ 17; Ex. 30 (Tipton-Boyd Decl.) ¶¶ 11-24; Ex. 32 (Lumpkin Decl.) ¶¶ 8-19.

**Response:**

34.    This lack of uniform procedures for COR requests and lack of uniform guidance on assessment of COR eligibility make it impossible for the TN NAACP to develop uniform guidance for its volunteers across the state, so that its volunteers can uniformly assist individuals seeking voting rights restoration. Instead, when TN NAACP volunteers work with community organizations to hold public education events to explain the COR process, they must tailor these events to what they understand the process to be in each county. The variation in the procedures for requesting rights restoration and assessment of COR eligibility across counties, and the uncertainty regarding procedures and assessment of COR eligibility, makes it hard for the TN NAACP to successfully train and inform its volunteers. Ex. 28 (3d Sweet-Love Decl.) ¶¶ 10-11.

13

**Response:**

35.     The State's recent changes to the voting rights restoration process in July 2023 and thereafter have further impeded TN NAACP's ability help community members who have lost the right to vote. The requirement to secure a pardon or court order restoring full citizenship rights requires the organization to find legal service partners who are able and willing to assist the community members TN NAACP serves, convince individuals volunteers meet in the field to work with legal service providers to undergo the burdensome process, and serve as a liaison between the community member and legal service providers to ensure their assistance is moving along. Ex. 28 (3d Sweet-Love Decl.) ¶¶ 12; Ex. 29 (Randolph Decl.) ¶¶ 18-19; Ex. 30 (Tipton-Boyd Decl.) ¶¶ 22-23; Ex. 31 (Carter Decl.) ¶ 11.

**Response:**

36.     Tennessee's complex, standardless process for voting rights restoration increases the cost of TN NAACP's assistance to and engagement with the communities we seek to register and mobilize to participate in the political process, making it harder for us to achieve our mission. It also forces us to divert significant time and volunteer resources from our voter registration and mobilization work to, specifically, assisting our community members with at least one disqualifying felony conviction with voting rights restoration. Ex. 28 (3d Sweet-Love Decl.) ¶ 13; Ex. 29 (Randolph Decl.) ¶¶ 20-21; Ex. 30 (Tipton-Boyd Decl.) ¶ 24; Ex. 32 (Lumpkin Decl.) ¶ 22; Ex. 31 (Carter Decl.) ¶ 17.

**Response:**

37.     Tennessee's rights restoration process also directly harms its members who have lost the right to vote due to a felony conviction and are denied rights restoration without due process and uniform treatment. Plaintiff Leola Scott is one such member.  Ex. 28 (3d Sweet-Love Decl.) at ¶¶ 13-16; Ex. 30 (Tipton-Boyd Decl.) ¶¶ 14; Ex. 11 (Scott Decl.) ¶ 3.

**Response:**


## C. Defendants

38.     Defendant Mark Goins, under the supervision of Defendant Hargett, is the Coordinator of Elections for Tennessee. Mr. Goins is the head of the Tennessee Secretary of State's Election Division ("Election Division"), the "chief election officer of the state," and is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of the election code." T.C.A. § 2-11-201(b).

**Response:**


39.     Defendant Goins is also responsible "prepar[ing] a certificate of voting rights restoration form and the written statement explaining the form and the procedure by which a person can . . . become eligible to vote." *Id.* § 40-29-205.

**Response:**


40.     Upon receipt of a COR from an Administrator of Elections (AOE), Defendant Goins, "shall verify that the certificate was issued in compliance with this section. Upon determining that the certificate complies with this section, the coordinator shall notify the appropriate administrator of elections and, after determining that the person is qualified to vote in

that county by using the same verification procedure used for any applicant, the administrator shall grant the application for a voter registration card." T.C.A. § 40-29-203(d).

**Response:**

41.     Upon receiving a court order restoring citizenship rights, Defendant Goins shall, along with the AOE, "verify... that the order was issued and, upon receiving the verification, [the AOE], shall issue the person a voter registration card entitling the person to vote." T.C.A. § 40-29-105(c)(7).

**Response:**

42.     Defendant Tony Parker is the Commissioner of the Department of Correction ("the Commissioner") and is sued in his official capacity. The Commissioner is the executive officer of TDOC and is charged with the department's general management. *Id.* §§ 4-3-111, 4-3-603. As Commissioner, Parker supervises the wardens, parole officers, agents, and other officers who are responsible for issuing CORs to eligible persons. *Id.* §§ 40-29-203(a), 4-6-107, 4-3-602.

**Response:**

43.     The Governor is Tennessee's chief executive, must "take care that the laws be faithfully executed," and has the "power to grant . . . pardons" to any individual convicted of a crime. Tenn. Const. art. III, §§ 1, 6, 10. The Governor also appoints the Commissioner of the Department of Correction who holds the office at his pleasure. T.C.A. § 4-3-112.

**Response:**

## II. Felony Disenfranchisement & Voting Rights Restoration in Tennessee

44. Tennessee's felony disenfranchisement and voting rights restoration process is more complex and extensive than any other state. Ex. 33 (Selin Rep.) at 5.

**Response:**


45. Over the past half century, the Tennessee Legislature has changed the definition of infamous crimes, resulting in a complex disenfranchisement regime in which the effect of a felony conviction varies depending on the date of the conviction, and not all felony convictions result in the loss of the right to vote. *See Crutchfield v. Collins*, 607 S.W.2d 478, 482 (Tenn. Ct. App. 1980); Restoration of Voting Rights, Tenn. Sec'y of State, https://perma.cc/N2T7-YFRJ.

**Response:**


46. Before January 15, 1973, the Legislature defined a specific class of infamous crimes that resulted in disenfranchisement. A conviction before January 15, 1973 only disqualifies a person from voting if the conviction is for one of approximately twenty specific felonies listed in state law at the time *and* the judgment of conviction included a statement rendering the crime "infamous." *Id.*

**Response:**


47. Between January 15, 1973 and May 17, 1981, Tennessee had no law on the books stating that convictions for infamous crimes result in disenfranchisement. *See Crutchfield*, 607 S.W.2d at 482. Thus, felony convictions during this "grace period" never disqualify a Tennessean from voting.

**Response:**

17

48.     In 1981, the Legislature reinstated felony disenfranchisement by defining "infamous crimes" to mean all felonies. T.C.A. § 40-20-112. Thus, all felony convictions from May 17, 1981 on—whether by a Tennessee court, a court in another state, or a federal court—result in loss of the right to vote, until that right has been restored. *See* T.C.A. § 2-19-143.

**Response:**


### A. Before 2006, Tennessee Offered a Pathway to Restoration of Citizenship Rights by Court Petition.

49.     From 1981 to 2006, for most disqualifying convictions, the available avenue to restore voting rights was to for restoration of citizenship rights, generally by petitioning a court, upon completion of the maximum sentence, or upon receiving a pardon that did not already restore the right to vote, or, in the case of out-of-state convictions, upon civil rights restoration under the laws of the state of conviction. *See* T.C.A. §§ 40-29-101, *et seq.* (criminal procedure code); 2-19-143 (election code); *see also* 1981 Tenn. Pub. Act 345, § 7.

**Response:**


50.     The specifics of how to restore citizenship rights have been changed by the Legislature twice since 1981, so the process varies depending on the year of conviction. *See* T.C.A. § 40-29-105.

**Response:**


51.     For those with convictions before July 2, 1986, the circuit court must sustain the petition for restoration of citizenship rights upon "satisfactory proof that ever since the judgment

18

of disqualification, the petitioner has sustained the character of a person of honesty, respectability, and veracity, and is generally esteemed as such by the petitioner's neighbors." T.C.A. § 40-29-102; *see also* T.C.A. § 40-29-105(a).

**Response:**

52.     For those with convictions between July 1, 1986 and July 1, 1996, restoration of citizenship rights is non-discretionary and shall be granted by the pardoning, supervising, or incarcerating authority upon request upon satisfying requirements resembling the COR criteria under T.C.A. § 40-29-202. *See* T.C.A. § 40-29-105(b). Defendant Goins must prescribe a COR form to effectuate this procedure, *id.* at (b)(3), but the Elections Division says no form currently exists. Ex. 34 (12/05/23 Henry-Robertson Dep.) at 160:04-12.

**Response:**

53.     For those with convictions on or after July 1, 1996, a person may file a petition for restoration of full rights of citizenship in the circuit court of the county where they reside or where the conviction occurred. T.C.A. § 40-29-105(c)(1). The petition must set forth the basis for the petitioner's eligibility and state the reasons the petitioner believes full citizenship rights should be restored. *Id.* at (c)(3). "There is a presumption that a petition . . . shall be granted and that full rights of citizenship shall be restored[,]" which can only be overcome by "proof by a preponderance of the evidence that either the petitioner is not eligible for restoration or there is otherwise good cause to deny the petition." *Id.*

**Response:**

19

54.     In 1983, the Legislature also amended both the elections code and criminal procedure code, which previously was available only to individuals with Tennessee convictions, to allow people with out-of-state convictions to use the court petition process to restore civil rights. *See* 1983 Tenn. Pub. Act 207, § 2 (amending T.C.A. § 2-19-143(3) to permit people with out-of-state convictions to restore civil rights "under the law of this state"); *id*. at § 3 (amending T.C.A. § 40-29-101 to permit petitions from those "deprived of the rights of citizenship by the judgment of any state").

        **Response:**


### B. In 2006, the Tennessee Legislature created an independent administrative pathway to restore the right to vote alone by seeking a COR.

55.     In 2006, the Legislature amended the code of criminal procedure to add a new, easier, administrative process for voting rights restoration under Tennessee law separate and apart from petitioning a court for citizenship rights restoration. 2006 Tenn. Pub. Act 860, § 1 (codified as amended at T.C.A. § 40-29-201 *et seq.*). This alternative procedure enabled citizens who satisfy certain criteria to restore their voting rights by requesting a COR. *Id.*

        **Response:**


56.     In enacting the COR process, the Legislature recognized that the existing patchwork procedures to restore citizenship rights under T.C.A. § 40-29-101 *et seq*., including the court petition process, created a burdensome, "disparate, unequal system that[ was] hard to understand" and that the COR process would provide "a uniform system" to restore voting rights that "would make it to where you wouldn't have to go do court, hire a lawyer, and pay court fees, which is just a vestige of the old pol[l] tax." Ex. 35 (Committee Meeting, House Judiciary

20

Committee Meeting, May 3, 2005), at 74 (statements of sponsor Sen. Cohen); *see also id.* at 98 (statements of sponsor Rep. Turner) ("It's confusing…we're trying to standardize the procedure"); *see also id.* at 43-44 (testimony of impacted voter) ("Can you imagine someone coming out of prison and going through probation, trying to find an attorney that, number one, even understands these laws and then trying to come up with the money to petition the Court? Either they can't navigate the system or, frankly, most can't afford it.").

     **Response:**

57.    Rather than replace or amend the existing procedures for restoration of citizenship rights under T.C.A. § 40-29-101 *et seq*., including the court petition process, the Legislature instead added the COR procedure as a streamlined, easier alternative just for restoring the right to vote. *See id.*; Ex. 36 (Committee Meeting Part 2) at 150 ("REP. L. TURNER: It does not deal with anything except getting your voting rights back by making it easier … REP. COCHRAN: Is the process still in place then where you petition the Court to get your right to own a gun or right to hold office or right to sit on a jury? Is that process still in place with this -- ...REP. L. TURNER: Yes. We don't deal with that. Yes, it's still in place.").

     **Response:**

    **C.**  **Tennesseans eligible for a COR have a statutory right to restore their right to vote upon request.**

58.    A person who meets certain eligibility requirements for a COR has a right to "request, and then *shall* be issued," a COR. T.C.A. § 40-29-203(a) (emphasis added).

     **Response:**

21

59.     Under T.C.A. § 40-29-202, a person disenfranchised due to a felony conviction after May 18, 1981, must satisfy three requirements to be eligible for a COR. First, the person must have completed their sentence, including prison, probation, parole, or other community supervision, or received a pardon. T.C.A. § 40-29-202(a).

**Response:**


60.     Second, the person must have "paid all restitution . . . ordered by the court as part of the sentence" and "all court costs assessed against the person at the conclusion of the person's trial, except where the court has made a finding at an evidentiary hearing that the applicant is indigent at the time of application." T.C.A. § 40-29-202(b). While the statute requires payment of restitution and court costs related to felony convictions (absent a declaration of indigency), it does not require payment of any criminal fines. Nor does it require payment of any legal financial obligations ("LFOs") related to misdemeanor convictions, civil violations, or fees associated with supervision. *Id.*

**Response:**


61.     Third, the person must be "current in all child support obligations." T.C.A. § 40-29-202(c).

**Response:**


62.     Under T.C.A. § 40-29-204, persons convicted of certain enumerated crimes, which vary based on the date of the conviction, "shall never be eligible to register and vote" in Tennessee.

**Response:**

63.     Once issued, a COR serves as "sufficient proof that the person . . . is no longer disqualified from voting by reason of having been convicted of an infamous crime." T.C.A. § 40-29-203(c). A validly issued COR indicates that a person has regained their right to vote. *Id.*

**Response:**

### D. Tennessee law requires Defendants Lee and Helton to issue CORs upon request and Defendants Goins and Hargett to administer the COR process.

64.     T.C.A. § 40-29-203(a) names the categories of officials who must issue CORs upon request by eligible persons: "(1) [t]he pardoning authority; (2) [t]he warden or an agent or officer of the incarcerating authority; or (3) [a] parole officer or another agent or officer of the supervising authority." This list encompasses the Governor (the pardoning authority) and officials within TDOC (the incarcerated and supervising authority).

**Response:**

65.     The Coordinator of Elections is required to create the COR form along with a statement adequately explaining the form and procedure for voting rights restoration. T.C.A. § 40-29-205. The Coordinator of Elections is also responsible for printing and distributing the form to TDOC and the other supervising and pardoning authorities. *Id.*

**Response:**

66.     After requesting and being issued a completed COR, a person seeking to exercise their right to vote must submit the COR to the election administrator in the county where the person intends to register to vote. T.C.A. § 40-29-203(d).

**Response:**

67.     The county election administrator must send the COR to the state Coordinator of Elections, who must determine whether the COR was issued by an issuing authority pursuant to T.C.A. § 40-29-203 and must notify the county election administrator of that decision. *Id*. If the COR is approved, the county election administrator may grant the person's voter registration application, and the person may once registered exercise their right to vote. *Id.*

**Response:**

### III.  Defendants' Recent Changes to COR Procedures.

68.     On July 21, 2023, less than two weeks before the summary judgment deadline in this case, Defendant Goins released a memorandum to county election officials and various state and local officials announcing significant changes to the procedures for requesting and issuing CORs. ECF 151-5 (July 2023 COR Memo).

**Response:**

69.     Under the new procedures, Defendants refuse to issue CORs to otherwise eligible applicants unless they "[h]ave been pardoned by a Governor, U.S. President, or other appropriate authority of a state or have had their full rights of citizenship restored as prescribed by law." *See id.* at 1; *see also* Ex. 37 (06/18/24 Henry-Robertson Dep.) at 113:1-11 (describing "pardon or court order restoring full citizenship rights" requirement as a COR eligibility criterion).

**Response:**

24

70. COR requestors must now submit with their COR form "evidence of either a Pardon by the appropriate authority, or evidence of the person's full rights of citizenship having been restored, such as by a court," including if applicable a "certified copy of the court order." ECF 151-5 (July 2023 COR Memo) at 2.

**Response:**


71. Defendant Goins also released a new COR form that includes a section requiring the requestor to attest either that they "have been pardoned by a Governor, U.S. President, or other appropriate authority of a state" or that their "full rights of citizenship have been restored as required by law." ECF 151-7 (New COR Form).

**Response:**


72. Defendant Goins did not follow typical procedures in developing and issuing these administrative changes. Defendants rushed to develop the new guidance, drafting it in only a matter of days. *See* Ex. 34 (12/05/23 Henry-Robertson Dep.) at 101:01-101:25; *see also id.* at 102:08-102:09 ("We wanted to get [the new procedure for restoration of voting rights restoration] done as soon as we could."). Defendants did not seek an attorney general's opinion. *See* Ex. 38 (6/18/24 Goins Dep.) at 73:1-7. Nor did Defendants seek consultation from other relevant agencies. *See* Ex. 39 (12/14/23 Goins Dep. vol. II) at 257:09-11 (testifying that Elections Division did not seek the Governor's input on July 2023 changes); *id.* at 253:20-254:01 (testifying that Elections Division did not seek TDOC's input on July 2023 changes).

**Response:**

73.     In December 2023, the Election Division indicated during depositions that it was internally considering whether their new procedure requiring that COR seekers obtain either a pardon or court-ordered full restoration of civil rights meant that they had to get their gun rights restored (as part the full restoration of civil rights) before they would be issued CORs. *See* Ex. 40 (12/14/23 Goins Dep. vol. I) at 112:3-7; Ex. 24 (12/05/23 Henry-Robertson Dep.) at 23:6-10.

**Response:**


74.     The Election Division also indicated that it was not acting on certain COR requests pending this decision. See Ex. 41 (12/13/23 Hall Dep.) at 109:21-110:03, 84:04-84:85:08.

**Response:**


75.     On January 23, 2024, public reporting confirmed that the Election Division had come to a decision to require restoration of gun rights before any eligible Tennessean would be issued a COR. See Jonathan Mattise, *Felons must get gun rights back if they want voting rights restored, Tennessee officials say*, AP News (Jan. 23, 2024), available at https://perma.cc/VKT3-23KB.

**Response:**


### IV.  Defendants' COR procedures create a high risk of erroneous deprivation, and their new procedures only heighten the risk.

76.     Fewer people in Tennessee have their voting rights restored than are eligible, even relative to restoration and registration rates in other states. ECF 185-6 (Burch Rep.) at 7. Based on a systematic quantitative analysis of felony conviction databases produced by TDOC, restoration databases produced by the Elections Division, samples of legal financial obligation data obtained

26

via subpoena from county clerks, and other public data sources, Dr. Burch estimated rates of re-enfranchisement for Tennesseans with felony convictions, finding that of the 184,142 living Tennessee residents with non-permanently disqualifying felony convictions who have completed supervision (but who may still owe disqualifying LFOs), a mere 3% (5,549) have had their right to vote restored since July 2006, when the COR statute went into effect. *Id.*

**Response:**

77.     Dr. Burch estimates that 61,158 people likely satisfy the LFO requirements as well and are eligible for a COR (i.e., have no outstanding court costs, restitution, or child support arrears), of whom only 9.1% have had their voting rights restored since 2006. *Id.* These numbers are low relative to voter registration rates of people with felony convictions in other states, including those states that also do not provide automatic restoration of voting rights. *Id.* at 17-18. They are also overestimates because they do not capture the universe of COR seekers who attempt to request a COR from a relevant official but are turned away or effectively denied without a formal recorded determination.

**Response:**

78.     Tennessee's low restoration rate is attributable, at least in part, to "systemic failures within the rights restoration process." *Id.* at 22.

**Response:**

### A.  Problems Initiating a COR Request

79.     Under Tennessee law, a Tennessee resident who believes they may be eligible for a COR "may request" one from TDOC or the Governor (who together comprise the state's

"pardoning," "incarcerating," and "supervising" authorities) and "shall be issued" one if they are deemed eligible under the law, and that COR will serve as "sufficient proof" they are eligible to vote. T.C.A. § 40-29-203.

**Response:**


80.     But there is no application or other formal mechanism to request COR from the issuing authority. *See* Ex. 42 (03/24/23 Hall Dep.) at 133:09-134:07 (testifying that there is no application to request a certificate of restoration).

**Response:**


81.     Instead, the Election Division posts a blank COR form on the Secretary of State's website, and applicants are required to hunt down the appropriate officials and hope that they agree to complete the form. *See* Restoration of Voting Rights, Tenn. Sec'y of State, https://perma.cc/N2T7-YFRJ; Ex. 42 (03/24/23 Hall Dep.) at 127:13-132:05 ("Q: . . .So a person who wishes to restore their voting rights . . . It is the responsibility of the person seeking rights restoration to seek out the appropriate authorities to fill out this form; is that correct? A: Yes.").

**Response:**


82.     Neither the Secretary of State's website nor the voter registration form clearly describes the process for requesting a COR. ECF 185-6 (Burch Rep.) at 23.

**Response:**


28

83.     The current version of the COR form, revised in July 2023, requires the applicant to provide various demographic information and attest that they have received a pardon or had their full rights of citizenship restored. ECF 151-7. It states that the remaining parts of the form regarding the individual's conviction, release date, court costs, and restitution must "be completed by an agent of the pardoning authority, an agent or officer of the incarcerating authority, or a probation/parole officer or agent of the supervising authority"—but offers no further explanation of where and how to find an appropriate agent. *Id.*

**Response:**


84.     The form also states that "[i]n order to complete any section of this form, the agent must have access to the information being attested to on the form," but does not say what a COR seeker is to do if the agent to whom they are directing the request *lacks* this information. *Id.* TDOC probation and parole officers (PPOs) often lack information about restitution and court costs and leave the applicant to seek completion of the form elsewhere, such as a court clerk's office. *See* Ex. 43 (Harvey Dep.) at 48:2-17, 66:5-14; 67:21- 68:13; Ex. 44 (Mathes Dep.) at 70:23-71:17; Ex. 45 (Phillips Dep.) at 31:04-09, 41:05-08.

**Response:**


85.     Court clerks are not one of the statutorily enumerated authorities that may complete a COR. *See id.*; ECF 151-7; *see also* ECF 185-6 (Burch Rep.) at 25. However, in many cases, applicants must also rely on court clerk offices to complete all or some sections of the COR, particularly the sections related to court costs and restitution. *Id.* at 25.

**Response:**

29

86.     Tennesseans with out-of-state felony convictions have a uniquely challenging time finding and convincing out-of-state authorities to complete and sign CORs—which are foreign to them. Out-of-state offices often refuse to do so even when the requestor clearly meets the eligibility criteria for rights restoration. *See, e.g.*, Ex. 26 (Weare Dep.) at 31:09-22 ("I called the Clerk of Superior Court [in Maricopa County, Arizona ] . . . the person I got ahold of said, no, we're not going to fill out these forms"); Ex. 45 (Phillips Dep.) 36:25-37:04 ("I once spent an hour and a half on the phone trying to find the right person in New York City. I do not believe that I ever found the right person to help that particular person."); 37:05-07 ("It's difficult to explain to other states who don't have this process what it is that we need.").

**Response:**


87.     Neither the COR form nor the Secretary of State's website mention that individuals with federal or out-of-state convictions may have to contact officials from the state or court of conviction to get a COR completed. *See* ECF 151-7 (COR Form); Restoration of Voting Rights, Tenn. Sec'y of State, https://perma.cc/N2T7-YFRJ; *see also* Ex. 46 (Sivley Dep.) at 74:11-75:10, 57:25-59:22 ("So when it is an out-of-state felony conviction and you'[re] giving someone a blank COR to be filled out, is it your general guidance that they reach out to the court clerk in the county in the state of their conviction?... I usually direct them to contact the court clerk in the county of conviction assuming that there's a possibility the court clerk may fill out the form in its entirety.").

**Response:**

30

88.     Some individuals may be given blank or partially completed CORs when they are discharged from supervision. *See* ECF 185-6 (Burch Rep.) at 23. However, a partially completed COR does not restore the right to vote and only about 20% of people leaving supervision meet the supervision, court cost, and restitution COR criteria. *See id.* at 23.

**Response:**


89.     Securing a filled-out COR form can "engender high costs in terms of time and money" requiring "repeated phone calls and in-person visits to multiple offices in different areas of the state." ECF 185-6 (Burch Rep.) at 29.

**Response:**


90.     Some counties, such as Montgomery, require applicants to visit in-person to access cases from 1999 and earlier. *Id.* As a result, individuals who live outside the county of conviction must take the time, money, and resources to travel throughout the state trying to get a COR completed. *See, e.g.*, Ex. 47 (Samantha Max NPR Article).

**Response:**


91.     According to Plaintiffs' expert Dr. Selin, the highly decentralized nature of the COR process, requiring individuals to interact with several agencies in administration of the same policy "can reduce chances of successful implementation of the law and may affect a citizen's ability to access an impartial decision-maker." Ex. 33 (Selin Rep.) at 42. She notes that four states have circumvented this problem by having citizens fill out applications to initiate the eligibility verification and/or right restoration process, easing the administrative burden placed on citizens to

31

initiate the process and lowering the burden on the state by reducing the number of administrators involved. *Id.* at 43.

**Response:**


92.     By forcing COR seekers to expend significant time and money to contact and visit various offices during business hours, sometimes multiple times (rather than submit a uniform application), Defendants make the voting rights restoration process needlessly and uniquely difficult for justice-involved voters, who often lack the financial means to take off work for such trips and often distrust and fear visiting probation offices and courts. Ex. 32 (Lumpkin Decl.); ECF 185-6 (Burch Rep.) at 29 ("the [applicant] express[ed] great frustration because he was unable to complete the COR form during his visit to the county clerk's office because his conviction was more than 30 years old and was archived. He was upset because 'he took time off work because he was so excited' but now would need to take another day off to get his form from the clerk and then take the form to the elections commission.").

**Response:**


**B. Refusals to Issue CORs or Provide Eligibility Determination**

93.     Even if a Tennessean is able to find the appropriate office or agent that accepts COR requests, officials may simply decline to issue a COR, or fill out necessary portions of a COR form, without a formal denial. Despite their statutory obligation to issue CORs upon request, TDOC PPOs can and do refuse to issue CORs or complete the form without assessing an applicant's eligibility. *See* ECF 185-6 (Burch Rep.) at 27-28; Ex. 43 (Harvey Dep.) at 107:21-108:04 (discussing practice of refusing to fill out CORs for federal convictions, even if that conviction is related to a case that they are supervising the applicant under); Ex. 44 (Mathes Dep.)

at 38:10-18 (stating practice of refusing to fill out CORs for those whom a conviction "does not include supervision"); Ex. 48 (Felon Restorations Training) at 368 (Elections Division Training Document advising election officials that "[i]f the applicant insists that the appropriate agents will not complete the COR, the applicant should be advised to seek a court order" and that this "[s]ituation typically occurs w/ individuals who insist they don't have any court ordered restitution or that they've paid the restitution, but can't get a probation officer or court clerk to sign off on the form.").

     **Response:**

94.     Refusals to complete CORs by PPOs are sanctioned by official TDOC policy, namely Policy 705.06, which covers PPOs' obligations under the voting rights restoration process. A prior version of this policy, which expired on October 10, 2022, primarily concerned obligations of a PPO upon a person's discharge from supervision (when most individuals are not yet eligible) and did not require PPOs to fill out CORs or determine eligibility upon request. *See* ECF 185-18 (Prior Policy 705.06); ECF 185-6 (Burch Rep.) at 27-28; Ex. 49 (Hill Dep.) at 51:07-51:24 (confirming this policy expired in 2022).

     **Response:**

95.     Policy 705.06 was not renewed again until very recently on April 24, 2024. Ex. 50 (New Policy 705.06). This new version of 705.06 states that it is a TDOC staff responsibility to "to complete Section 2 of the [COR] form when requested by the offender," which requires the authority to confirm whether court costs and restitution are owed or not owed. *Id.* at DEF017410. However, the policy then directly contradicts itself by stating that "[s]taff are not responsible for

33

deciding whether an offender is qualified/disqualified" and are "not responsible for determining whether the offender has paid restitution and court cost obligations." *Id.* at DEF017411. Under this TDOC policy, a TDOC official may refuse to determine whether court costs or restitution are still owed, effectively deny an applicant their COR in doing so. *See id.* (instructing staff to "leave the section(s) blank" if they cannot access the information on the form).

**Response:**


96. Training materials of the Election Division also specify that PPOs are under no obligation to complete CORs: "Note: we do not tell a probation officer if they should sign the form or not, that is not our job. They just need to fill out the form correctly if they can. It is our job to review the paperwork." ECF 185-6 (Burch Rep.) at 28.

**Response:**


97. Applicants may submit a blank COR to be completed by a TDOC agent, only to receive no response or further communication. *See* Ex. 51 (Tournier Dep.) at 18:19-25 ("The lady at the [local parole and probation office] would not set me up with somebody to fill it out. She just handed me a form and told me to fill out the top portion, which I did, even though it said at the top not to fill it out myself, and then that they'd contact me. And I never heard a word back.").

**Response:**


98. Refusals to complete CORs are especially likely for out-of-state or federal convictions, as officers in other states refuse to complete a "TN form that they have never seen, and it is for laws that they've never heard of." *See* Ex. 48 (Felon Training 2022) at 17.

34

**Response:**


99.     Although statutorily obligated and authorized to issue CORs to eligible individuals, the Tennessee Governor has completely abdicated any responsibility to do so. *See* Ex. 52 (Merrick Dep.) at. 89:12 - 92:02 ("Q: And who do you understand to be the pardoning authority under this statute? . . . A: The governor . . . Q: So would you agree that the statute is saying that if someone came to the governor's office with a certificate of voting rights restoration form, and if they were eligible to apply for it, the pardoning authority must issue one? . . . A: No . . . the certificate must be issued by any one of those three, but that no one of them alone bears the full obligation or even the obligation entirely to do it.").

**Response:**


100.    If an individual requests a completed COR and the authority refuses to complete it, either fully or in part, no record is created of that interaction. *See, e.g.*, Ex. 53 (Maxey Dep.) at 78:02-79:19, 81:07-82:10 ("A: Now, we may not be able to make that determination the day the offender is in the office. It may take us a few days to get that information, but we will follow up on that . . . Q: In that case is there a policy or standard practice in the office for tracking those kind of still-open cases? A: There's no set tracking mechanism, no."); *see also* Ex. 54 (Sullivan Cty. Clerk Prod.) at 10 ("There are no records kept of the number of individuals that request the forms or assistance . . . There are no records kept of an individual requesting assistance."); ECF 185-6 (Burch Rep.) at 25.

**Response:**


35

101.    When an individual is not yet eligible for rights restoration, there is considerable variation across county TDOC offices as whether an agent will complete the COR form (noting ineligibility) or refuse to do so. *Compare* Ex. 61 (Shaw Dep.) at 28:25-29:20 (stating that officers would still complete a COR even if the officer knew the individual to be ineligible due to criteria like restitution owed by marking the form as such) *with* Ex. 44 (Mathes Dep.) at 70:9-11 (stating that officers will not provide a COR if the applicant is not yet eligible). There is also likely variation among individual TDOC officers. *See* ECF 185-6 (Burch Rep.) at 24 ("The [TDOC] case notes indicate that some people in the file were given restoration paperwork even though the notes in the file said that they had a balance due, while others were not given restoration paperwork because of their unpaid costs or restitution.").

        **Response:**


102.    When a statutory authority refuses to fill out a COR, this is an effective denial of the individual's opportunity to restore their right to vote. *See* Ex. 42 (03/24/23 Hall Dep.) at 155:25-157:13 ("Q: And have you encountered circumstances where the applicant explains that the appropriate agencies are refusing to complete their form? A: Yes. I've had instances where they've either been unable to locate somebody willing to complete the form or ran into issues with the individual that they had contacted, but was unsure about completing the form . . . Q: And what was the final outcome for that individual? A: There was not a definitive outcome, from my recollection. Q: To your knowledge, that person has not been able to obtain the necessary documentation to register to vote? A: No . . .").

        **Response:**


36

### C. No Written Decisions or Statement of Reasons for Denial

103.    If an agent does not issue or fill out some portion of a COR because they have determined the requestor to be ineligible, Defendants have no requirement that the agent explain in writing how they came to that conclusion, depriving the requestor information critical to determine how to become eligible for voting rights restoration. *See* Ex. 50 (New Policy 705.06); Ex. 55 (05/18/23 Ricci Dep.) at 76:12-77:15. ("Q: [I]f [the PPOs] determine they are not eligible, does your memo direct them to do anything? A: This memo does not cover if they are ineligible. Q: Okay. So if they are ineligible, they won't necessarily be told that? A: I can't say on a firsthand, like what each specialist tells the inmates. So I'm not positive. Q: But pursuant to your memo – A: Pursuant to my memo, it doesn't state that they would tell them. Q: And it wouldn't require them to say in writing, You're not eligible, and here's why? A: There is not anything."); Ex. 43 (Harvey Dep.) at 68:14 (discussing that nothing is provided in writing to individuals who are denied a COR because the PPO cannot find the restitution or court cost information).

    **Response:**


104.    Without a written statement of reasons for denial of a COR, the requestor cannot assess whether the determination of eligibility was based on an error or mistake, which are not uncommon in Tennessee's rights restoration process. *See* ECF 185-6 (Burch Rep.) at 32-36 (describing errors by TDOC personnel in filling out COR forms, errors by clerks in ascertaining outstanding court costs or restitution, and denials arising solely from missing documentation or data errors).

    **Response:**

105.    The risk of error in determining an individual's outstanding restitution and court costs for purposes of determining COR eligibility is especially high because there is no statewide criminal record database that tracks LFO obligations. *See* Ex. 33 (Selin Rep.) at 30. The only publicly available databases are managed by county-level court clerk offices, and counties do not use consistent systems for tracking and categorizing LFOs assessed for criminal convictions. *Id.*

**Response:**

106.    An individual who has been convicted of a crime in Tennessee can be assigned several different kinds of LFOs by the court clerk—like restitution, fines, court costs, litigation taxes, and expenses related to supervision and rehabilitation—all of which are authorized by and/or separately defined in the Tennessee criminal code. *See, e.g.*, T.C.A. § 40-24-105; *see also City of Chattanooga v. Davis*, 54 S.W.3d 248, 270 n.23 (Tenn. 2001). However, the only criminal LFOs that a person needs to pay to become eligible for a COR are "restitution" and "all court costs assessed against a person at the conclusion of the person's trial" for a felony offense. T.C.A. § 40-29-202.

**Response:**

107.    County officials who have fielded requests to fill out the LFO portions of the COR have erroneously deemed COR requestors ineligible based on nonpayment of debts that do not implicate COR eligibility under Tennessee, including Plaintiffs Perry and Gray. *See* ECF 185-6 (Burch Rep.) at 34; Ex. 56 (Horton Dep.) at 164:1-4, 164:11-18, 174:22-175:6, 180:14-19.

**Response:**

38

108.    CORs have also been denied because the issuing agent mistakenly overlooked that a requestor had been declared indigent by a court despite having documentation available. *See* ECF 185-6 (Burch Rep.) at 34.

**Response:**

109.    The risk of mistake is also high because LFO and criminal conviction records are highly decentralized and may be sloppy, incomplete, or inaccessible through no fault of the requestor. *See* ECF 185-6 (Burch Rep.) at 36; Ex. 33 (Selin Rep.) at 31.

**Response:**

### D.  No Uniform Rules for Decision-making

110.    Defendants have not provided any meaningful statewide guidance to ensure uniform interpretation and application of the COR eligibility criteria, which heightens the risk of erroneous and arbitrary outcomes that depend solely on where the requestor lives or made their request. *See* Ex. 42 (03/24/23 Hall Dep.) at 178:8-180:1 ("Outside of perhaps the letter that we're about to discuss, are you aware of any guidance provided by the Secretary of State to county clerks about the certificate of restoration process? Not that I'm aware of.").

**Response:**

111.    There are no uniform rules or training for officials who issue or fill out CORs as to what constitutes a "court cost" for the purposes of voting rights restoration. *See* Ex. 42 (03/24/23 Hall Dep.) at 240:1-240:25 (when presented with a list of legal financial obligations an individual could be assessed, deponent could not determine which ones would be considered court costs and

39

did not think that "any of [the provided] training documents would help [him] ascertain which of these are disqualifying or have to be paid in order to be eligible for a COR . . .").

**Response:**


112.    The Secretary of State's website and the COR form offer no guidance delineating LFOs that need and need not be paid. *See Restoration of Voting Rights*, Tenn. Sec'y of State, https://sos.tn.gov/elections/guides/restoration-of-voting-rights (last accessed July 30, 2024); ECF 151-7 (New COR Form).

**Response:**


113.    This has led to significant variation in how court clerks who fill out CORs in different counties assess court costs and restitution. ECF 185-6 (Burch Rep.) at 34. There are major discrepancies between the state's two largest counties. In Shelby County, the court clerk counts *all* LFOs, including fines, when determining whether a person owes LFOs for the purposes of voting rights restoration. *Id.* at 14. But other counties, like Davidson, only consider specific LFOs to be "court costs" and do not consider items such as fines or litigation taxes when completing a COR form. *Id.* As such, "people convicted in Davidson County will need to pay fewer categories of LFOs and less money overall to have their rights restored than if they had been convicted of the same offense in Shelby County." *Id.*

**Response:**


114.    TDOC offices across the state are similarly confused on what constitutes a court cost. *Compare* Ex. 43 (Harvey Dep.) at 57:20-58:12 (testifying that only restitution and court

costs are needed for restoration for TDOC District 30) *with* Ex. 44 (Mathes Dep.) at 120:12-120:23 (testifying that all financial obligations are considered including "fines" for TDOC District 60). *See also* Ex. 57 (Killinger Dep.) at 184:23-185:06, 129:25-130:09, 178:10-178:25, 199:18-204:05 (testifying for TDOC Districts 70 and 71 that he was unsure if court fines, litigation fees, or incarceration fees were considered, and stating that he did not believe supervision fees were considered even though records indicate that CORs were refused by officers in those district on that basis).

    **Response:**

115.    TDOC Policy 705.06 fails to explain that LFOs other than restitution and court costs imposed at time of trial need not be paid before a COR is issued. Ex. 50 (New Policy 705.06).

    **Response:**

116.    There are no uniform rules as to when a determination of "indigency" excuses an individual from having to pay court costs for the purposes of voting rights restoration. Individuals tasked with completing CORs are not provided guidance on this, and whether an individual who has been determined to be indigent receives a COR may depend on what county they happen to seek a COR from. *See* Ex. 50 (New Policy 705.06); Ex. 39 (12/14/23 Goins Dep. vol. II) at 303:20-303:22 (testifying that the Elections Division has no written policy on how to evaluate CORs where the applicant has been found to be indigent); Ex. 43 (Harvey Dep.) at 135:25-136:20 (testifying that the TDOC District 30 does not have an understanding as to how indigency waivers work with regard to COR forms).

    **Response:**

41

117.     Some officials assisting individuals with CORs inform them that they can file for indigency, but others do not. *See* ECF 185-6 (Burch Rep.) at 25-26.

**Response:**


118.     There are no uniform rules as to what types of child support debts are disqualifying for the purposes of voting rights restoration. Individuals tasked with completing CORs are not provided guidance on this, and whether an individual is even told that child support is required for rights restoration may depend on what county they happen to seek a COR from, as many officials were not aware of this requirement. *See, e.g.*, Ex. 43 (Harvey Dep.) at 219:16-220:07; Ex. 46 (Sivley Dep.) at 112:15-113:15 (testifying that there's no direction regarding how to interpret child support obligations when completing COR forms).

**Response:**


### E.  Denials for Immaterial Reasons

119.     Defendants only formally approve or deny a COR once a person has obtained a completed COR from the appropriate agent(s) and submitted it to their county administrator of elections (AOE), who forwards the application to the Election Division for review. *See* T.C.A. § 40-29-203. At this point in the process, the Election Division—rather than the statutorily designated issuing authority—also verifies that the requestor is current in child support obligations before approving a submitted COR form. ECF 151-7 at 2.

**Response:**

42

120.    Even when Tennesseans manage to secure a fully completed COR, the Elections Division frequently rejects them for reasons immaterial to the individual's eligibility. *See* ECF 185-6 (Burch Rep.) at 37.

**Response:**


121.    A TDOC officer may neglect to include a COR form for additional convictions a person might have, leading to a denial for a reason unrelated to the applicant's eligibility. *See id.* at 32-33 ("I'm not sure why the probation/parole officer who completed the COR for her theft conviction . . . didn't also complete it for her forgery conviction.").

**Response:**


122.    The official may neglect to include additional convictions within the same case on the COR form, leading to a denial for a reason unrelated to the applicant's eligibility. *See id.* at 32.

**Response:**


123.    The official may neglect to complete part of the form, leading to a denial for a reason unrelated to the applicant's eligibility. *See id.* at 33 (discussing denial because TDOC officer neglected to check any box for Section 3 of the COR form, even when the applicant "had been declared indigent."); *id.* at 34 (discussing how Knox County clerk neglected to include the date of sentence completion on an individual's COR, leading to denial, and a denial because the clerk did not check any box in one of the COR sections).

**Response:**

43

124.    The official may misrepresent the conviction information on the form, leading to a denial for a reason unrelated to the applicant's eligibility. *See id.* at 34 (discussing denial after Shelby County Clerk listed incorrect dates of supervision and the Elections Division could not verify the correct dates, applicants were instructed to resubmit corrected CORs); *id.* (discussing denial when court clerk neglected to check the box indicating they had been found to be indigent even when applicant submitted documentation showing court finding of indigency).

**Response:**


125.    During discovery, the Elections Division produced records of approval and denial letters for CORs that it reviews that it maintains in its file storage systems. Dr. Burch analyzed each of the records in this "Restoration Database" which included 16,790 unique individuals. *Id.* at 37.

**Response:**


126.    The overall denial rate for people who submitted COR forms to the Election Division is 9.5%. *Id.*

**Response:**


127.    However, the "initial" denial rate "may be more than three times as high" as the overall denial rate, possibly as high as 35.0%, because "many of the people who ultimately had their rights restored did not succeed on their first try and needed several attempts to get their rights restored." *Id.* at 38. These findings indicate that "curing denials is important," but if a COR form

or restoration is denied because of a curable deficiency, "the situation can only be addressed by starting the process over and resubmitting forms repeatedly" as there is no appeals process. *See id.*

**Response:**

128.    Of the entries in the "Denial Database," 2,961 entries listed a reason for denial. *Id.* at 37. The most common reason (29.6%) was unpaid child support, but a majority of the denials were for reasons immaterial to a person's eligibility. *Id.* 27.1% of rejections were for incompleteness and 26.3% were for "additional convictions not listed on COR"—both of which are errors of the TDOC or other official who was required to fill out the form, not the requestor. *Id.*

**Response:**

### F.  No Opportunity to Appeal

129.    Despite the complexity of Tennessee's disenfranchisement and rights restoration laws and the heightened risk of error in assessing an individual's eligibility for a COR, there is no means for a COR requestor to appeal decisions of officials resulting in denial or non-issuance of a COR. *See* Ex. 42 (03/24/23 Hall Dep.) at 166:14-25 (confirming no awareness of any process for appeal); *see also* Ex. 49 (Hill Dep.) at 171:15-18 (confirming there is no policy at TDOC that includes a process for appealing a determination of eligibility); Ex. 33 (Selin Rep.) at 46.

**Response:**

130.    Rather, the individual must re-start the entire COR process, rolling the proverbial rights restoration rock up the hill, and requiring additional time and money to seek out new CORs.

45

*See* ECF 185-6 (Burch Rep.) at 27 ("When a COR is rejected, the only recourse appears to be resubmitting new COR forms.").

**Response:**


131.    Pressing for a second opinion or review, without a formal mechanism to do so, can put COR seekers at risk of criminal prosecution. Indeed, a Memphis resident was charged with and convicted of a felony for submitting false election documents because she availed herself of these options. Initially she was told by a court clerk that she was ineligible, but believing that to be an error, she asked a TDOC officer to look at her file again. After an hour or reviewing her records, the officer completed her COR. At trial, her self-advocacy was characterized as "trick[ing] the probation officer." *See* Sam Levine, *New evidence undermines case against Black US woman jailed for voting error*, The Guardian (Feb. 24, 2022), https://www.theguardian.com/us-news/2022/feb/24/fight-to-vote-newsletter-black-woman-jailed-voting-error-evidence.

**Response:**


132.    When the consequences of engaging in the State's current restoration process could involve prosecution, this "can have a chilling effect on attempting restoration, discouraging some people from starting the process at all." ECF 185-6 (Burch Rep.) at 31.

**Response:**


46

**V. Defendants' Changes to the COR Procedure Have Further Heightened the Risk of Erroneous Deprivation and Resulted in Arbitrary Treatment.**

133.    Defendants' new requirement of a pardon or restoration of full rights of citizenship by court petition is not among the statutory prerequisites to receiving a COR sufficient to restore voting rights under Tennessee law; it is instead an administrative requirement without basis in state law. *See* T.C.A. § 40-29-204.

**Response:**


134.    In a training memo for restoring voting rights from May 2022, restoring citizenship rights by court petition was treated as an inferior *alternative* to submitting a COR, rather than a necessary precursory to it. *See* Ex. 58 (Suppl. Burch Rep.) at 1; Ex. 48 (Felon Restorations Training Memo) at 17. The memo notes that an order restoring citizenship takes longer and usually requires an attorney. *Id.*

**Response:**


135.    Adding the step of obtaining a pardon or court order increases the burden on people who want to restore their voting rights and the likelihood of a wrongful denial. Ex. 58 (Suppl. Burch Rep.) at 2.

**Response:**


136.    Applying for a pardon in Tennessee is an onerous process. The individual seeking a pardon from the Governor must submit a 6-page application to the Board of Parole and provide a variety of additional application materials, including support letters and copies of various official documents. To be eligible, a person must have "demonstrated exemplary citizenship . . .

47

which shall mean both specific achievements and incident-free behavior that indicates an extraordinary transformation following the conviction(s) at issue." This can require substantial socioeconomic resources and is not a realistic pathway to fulfilling the new requirement for most of the thousands of individuals who are otherwise eligible for a COR. *Id.* at 3-5.

**Response:**


137.    The likelihood of obtaining a pardon in Tennessee is very small. *Id.* at 5. In FY21-22, the Board of Parole received 110 applications for pardons, exonerations, or clemency. Only 13 pardons were granted. In 2022, the governor granted 13 pardons. At the end of 2023, the governor granted 22 pardons. *Id.* at 5.

**Response:**


138.    Restoring full citizenship rights by court petition is similarly onerous and also unlikely. The petitioner must give notice to the district attorney or U.S. attorney who may object, pay all costs associated with the petition process, and provide various certified records with the petition. *Id.*

**Response:**


139.    Filing a petition can be costly because it generally requires hiring a lawyer and petitioners must pay a filing fee ranging from $100-300. *Id.* at 6-7.

**Response:**

140.    The time required to complete the petition process is also substantial. In Davidson County, the majority of petitions filed between 2013 and 2023 took longer than two months to yield a decision: 44% were decided after 60-99 days, while 29% took more than 100 days to complete. Of the petitions Dr. Burch analyzed in Shelby County, a majority also took more than two months to yield a decision. *Id.* at 7.

**Response:**


141.    Relatively few people have petitioned successfully to have their full rights of citizenship restored. Only 34 petitions were filed in Davidson County in the last 10 years, while 83 have been filed in Shelby County since 2013. In Davidson County, 28 of the 34 filed petitions were granted at least in part. Among these, only 15 of the 28 orders granting restoration did not hold back the right to own a firearm during the ten-year period, meaning that almost half of people (13 of 28) who had their rights restored by the courts since 2013 still would not be able to vote under the new policy because their gun rights were not restored. In Shelby County, based on online search records, 61 of 83 filed petitions were granted in part, while 13 are still open. *Id.* at 7-8.

**Response:**


142.    Defendants' new changes have dramatically reduced the number of people whose rights are restored. Dr. Burch found that since the change was implemented, voting rights were restored to only nine people who lost the right to vote, between August 2023 and February 2024. At least two of these people had to submit their applications multiple times in order to obtain their

voting rights. Ninety-three restorations (91%) were denied between August 2023 and February 2024. *Id.* at 8-10.

**Response:**


143.    According to Defendants, before the change, 203 of people had their rights restored from January 1, 2023 to July 20, 2023. Between July 21, 2023 and November 1, 2023, only one individual had their voting rights restored under the new process. *See* Ex. 41 (12/13/23 Hall Dep.) at 29:08-12; Ex. 59 (email to AP reporter confirming restoration rates). Between January 2024 and June 18, 2024, there were only 28 total restorations. *See* Ex. 37 (6/18/24 Henry-Robertson Dep.) at 10:04-10.

**Response:**


144.    Defendants at times describe the July 2023 changes to the rights restoration system as establishing a "two-step process," which adds full citizenship restoration requirement, either through a court petition or a pardon, to the existing COR process. *See* ECF 157-3 at 1 (memorandum to County Election Commissions announcing changes to the rights restoration process).

**Response:**


145.    However, the Elections Division later testified that there is "no particular order" in which the steps must be completed. Ex. 34 (12/05/23 Henry-Robertson Dep.) at 120:13-121:09 *see also* Ex. 41 (12/13/23 Hall Dep.) at 12:15-20.

**Response:**

146.    TDOC's Policy 705.06, which was issued in April 2024 states that the section on affirming the applicant had had their citizenship rights restored is "not required to be completed by the offender before requesting staff to complete" the COR. *See* Ex. 50 at DEF017411.

**Response:**


147.    During the several months before issuance of the new Policy 705.06, however, there was confusion within TDOC regarding whether there is a particular order for these steps. *See* Ex. 60 (12/04/23 Ricci Dep.) at 152:10-153:03 (testifying that she is "unsure" as to whether citizenship rights restoration must happen first and that TDOC's policy on rights restoration was "under review" because of the changes, and as such, there is "nothing in the policy" as of December 4, 2023, the ate of the deposition); Ex. 61 (Shaw Dep.) at 104:04-10 (testifying that "before the officers can complete . . . the COR, the offender will have to have their citizenship rights restored, or a pardon").

**Response:**


148.    There was also confusion as to what constitutes "proof" required to show citizenship restoration if the individual requests a COR after having gotten their citizenship rights restored. TDOC testified it was unsure of what such proof would look like and insisted that they do not verify it. *See* Ex. 60 (12/04/23 Ricci Dep.) at 181:02-19 (testifying that there is no formal training on what an "instrument restoring the full rights of citizenship," as stated on the COR form, would look like, no training for district directors on this definition, and no examples provided to officers); *see also id.* at 183:21-184:01 (testifying that TDOC does not train officers

51

on how to interpret a pardon document and that the Elections Division does not provide assistance with training officers on this); *see also id.* at 184:02-19 (testifying that there is no training regarding what a "certified" document, as used on the revised COR form, would mean).

**Response:**


149.    At the local level, TDOC officials are also confused about what is sufficient proof that someone has had their citizenship rights restored such that they could complete a COR for the applicant. For example, TDOC District 40 testified that the office would need to verify proof before they could complete a COR but had not been provided instructions as to how to do so. *See* Ex. 61 (Shaw Dep.) at 97:19-100:24, 104:24-105:01 (testifying that for TDOC District 40 that she had not received instructions as to as to what citizenship rights entails no as to how to tell "whether a [pardon] documentation is genuine").

**Response:**


150.    Nearly six months after announcing that voting rights restoration applicants must also restore "full citizenship rights," Defendants still did not have a clear definition of what "full citizenship rights" includes. Ex. 34 (12/05/23 Henry-Robertson Dep.) at 21:17-22:09 ("Q: "[A]re those five rights what you would consider full citizenship rights? A: That's still in discussion. Q: . . . Can you explain more? A: Not without violating attorney-client privilege. Q: Why is that? A: Because that's in consultation with the other attorneys. Q: Which attorneys? A: Counsel for the Secretary of State, Attorney General's office. Q: And that's to determine what the elections division's position will be about what full rights of citizenship means? A: Correct."); *see also* Ex.

52

41 (12/13/23 Hall Dep.) at 77:09-10 ("Q: What is an exhaustive list [of citizenship rights]? A: I – I don't know.").

**Response:**

151.     Even as of June 18, 2024, nearly one year after the change to require full rights of citizenship be restored for voting rights restoration, there "no written material, no guidance, or anything to let [individuals] know that this is what [the Elections Division] says full rights of citizenship is." *See* Ex. 38 (06/18/24 Goins Dep.) at 29:23-30:08.

**Response:**

152.     Defendants also did not create a uniform policy for when the new procedures would go into effect, and largely ceased processing any CORs received in early July to mid-August. Ex. 41 (12/13/23 Hall Dep.) at 107:03-06.

**Response:**

153.     Key materials for administration of the new process were not completed until weeks or months after it was announced. For example, Defendants did not promulgate a revised voter registration rejection letter until late August, and instructed counties to hold pending applications which would be rejected under the new process until the revised rejection notice had been finalized. *See* Ex. 41 (12/13/23 Hall Dep.) at 61:25-62:25.

**Response:**

154.     Similarly, Defendants did not finalize a revised rights restoration denial letter for COR applicants until mid to late August, and held any pending COR applications that would be denied until the letter was finalized, even if those completed CORs had been received prior to the July 2023 change. Ex. 41 (12/13/23 Hall Dep.) at 70:12-74:04 ("Q: So the pause [in issuing denial letters for COR applicants after the July 2023 changes] was specifically to get the language for the denial letters finalized? A: Yes. . .").

     **Response:**


155.     The Elections Division applied the new "first step" requirement to some, but not all people who submitted documents sufficient to restore their right to vote under the previous procedures prior to the issuance of the memos. *See* Ex. 41 (12/13/23 Hall Dep.) at 100:1-17. For example, one person who had an order from a Tennessee court restoring his citizenship rights, including the right to vote, prior to the Falls decision and who submitted his documentation prior to the issuance of the memo, was ultimately denied restoration on the basis of the new procedures. *Id.* at 95:24-99:10.

     **Response:**


156.     Another person who submitted an application nearly two months before the change was denied because Election Division staff wrongly deemed the person's misdemeanor conviction to be an additional felony not listed on the COR. Ex. 41 (12/13/23 Hall Dep.) at 114:13-123:9. Though a person helping the applicant obtained court records showing the Election Division's determination was erroneous and submitted them before the July 2023 memoranda and new procedures were made public, the Elections Division held the application and eventually

54

denied it for not complying with the new requirements that did not exist at the time all of the documents were properly submitted. *Id.*; Ex. 62 (Whitson File).

**Response:**


157.     Another person received a court order restoring his citizenship, including voting rights on June 23, 2023, and a completed COR on June 29, 2023, submitted those documents to his county administrator of elections and all were transmitted to the Elections Division on July 3, 2023, well prior to the issuance of the memoranda. Ex. 41 (12/13/23 Hall Dep.) at 102:15-110:3; Ex. 63 (Wright File). However, his voting rights restoration was held over until after the procedure changes and was judged under the new rules. *Id.* Despite having submitted a court order restoring his citizenship, his restoration was still pending without a response on December 23, 2023 because the Elections Division had not yet decided whether he needed to satisfy a new requirement that they were contemplating creating: restoration of gun rights. *Id.*; Ex. 41 (12/13/23 Hall Dep.) at 102:25-110:3. His voting rights restoration was denied on February 9, 2024 for "incomplete/insufficient documents," and ultimately, on February 22, 2024 a correction letter was issued stating that the reason for denial was actually that his right to possess a firearm had apparently not been restored. *Id.*

**Response:**


158.     Defendants created disparate treatment among pre-change applications, based solely on the county the applicant happened to live in. If an applicant who submitted a valid COR before the July 2023 changes happened to live in a county with an upcoming election, their COR was processed under the old procedures and they had their rights restored. Ex. 39 (12/14/23 Goins

55

Dep. vol. II) at 291:13-18; Ex. 73 (12/14/23 Hall Dep.) at 144:23-145:02 ("Q: So applicants from certain counties who had an upcoming election and a corresponding registration deadline in advance of that election, you were prioritizing for focusing on [processing under the old COR system]? A: Correct."). However, other applicants who also submitted a valid COR before the July 2023 changes had their application held and rejected under the new procedure, simply because their county of residence did not have an upcoming election or an election as immediate as another applicant. *Id.* at 145:03-145:08 ("Q: And applicants from counties that did not have an upcoming election and corresponding registration deadline were paused and then ultimately processed under the guidance that was put in place sometime later? A: That may be accurate.").

**Response:**


159.    This resulted in unequal and arbitrary application of the new policy – some individuals were processed and approved for rights restoration while others had their applications held and denied under the new procedure, despite the fact that they all submitted sufficient paperwork for restoration before July 21, 2023. *See id.*

**Response:**


160.    For years, Defendants considered restored of the right to vote, the right to run for office, and the right to serve on a jury adequate to meet restoration of "full rights of citizenship" in Tenn. Code § 2-19-143. Ex. 64 (12/13/23 Henry-Robertson Dep.) 284:20-291:13; Ex. 65 (Lim memo on out-of-state convictions) (stating expressly that it does not matter if gun rights are restored as long as the other three core rights are restored); Ex. 66 (Lim training docs) at 17. The Elections Division registered people to vote based on that definition. Ex. 64 (12/13/23 Henry-

56

Robertson Dep.) at 291:13-295:8; Ex. 67 (Goins Letter on Out-of-State Convictions). However, sometime after deciding that all Tennesseans would now be required to restore their full rights of citizenship to restore their right to vote, the Elections Division began to rethink their interpretation of what that means. Ex. 64 (12/13/23 Henry-Robertson Dep.) at 290:21-292:18.

**Response:**


161.    Because Defendants were mulling redefining "full rights of citizenship" at the time of publishing the July 2023 memoranda, they also could not instruct other officials in the COR process regarding what constituted "full rights of citizenship." *See* Ex. 41 (12/13/23 Hall Dep.) at 77:11-15 ("Q: Was an exhaustive list or a definition of what full rights of citizenship restoration entailed provided to federal officials handling restoration? A: Not to my knowledge.").

**Response:**


162.    Defendants held in limbo applicants who had a restoration of citizenship rights that excluded gun rights for this entire period, because they had not determined whether firearm rights restoration was a right needed to be restored under the new procedure at the time they announced the July 2023 changes. Ex. 34 (12/05/23 Henry-Robertson) at 21:24-23:10 ("Q: So an exclusion for the right to own a gun would mean that the full citizenship rights have not been restored? A: That's what's still being determined. Q: But there's no current position? A: It's being discussed, looking at the legal aspects of that. Q: Okay. But you're saying that as of right now, there is no determinative position that the elections division holds on that question? A: If gun rights have been excluded or another right has been excluded, no, not as of yet."); *see also* Ex. 41 (12/13/23 Hall Dep.) at 44:04-46:08 (discussing how such applications have been "on the [coordinator's]

57

desk" for review and that there have been "somewhere between nine and 12" instances of this occurring).

**Response:**


163.     Defendant Goins was unaware that there are federal laws that permanently deny restoration of gun rights to individuals with specific convictions. Ex. 40 (12/14/23 Goins Dep. vol. I) at 108:22-109:05. Defendant Goins, at the date of the 36(d) deposition on December 14, 2023, had not researched whether this was the case. *Id.* at 115:23-116:03.

**Response:**


164.     As such, at the time of July 2023 changes and up to the December 14, 2023 deposition Defendant Goins did not realize that requiring restoration of firearm rights for restoration of voting rights would effectively "expand" the list of permanently disqualifying offenses. *See id.* at 112:16-113:19 ("So [the list of permanently disqualifying offenses] would expand. I just don't know how much it would expand . . . I think you're educating me some, which is fine.").

**Response:**


165.     Even individuals who submitted a court order restoring their rights of citizenship *before the change requiring citizenship rights restoration was announced* had their applications held for months if the court order excluded firearm rights restoration. *See* Ex. 41 (12/13/23 Hall Dep.) at 109:21-110:03 (describing that, as of the date of the deposition on December 13, 2023, "this individual who got – received this order on June 23rd and received a Certificate of

58

Restoration on June 29th and had them submitted on July 3rd, all of which happened before the change in guidance, is still in pending status awaiting determination from [Defendant Goins] as to what constitutes full citizenship restoration? A: I believe so.").

**Response:**


166.     Defendants did not seek an attorney general opinion as to whether firearm rights restoration was required under the new procedure. *See* Ex. 38 (06/18/24 Goins Dep.) at 72:21-24 ("Based on discussions with counsel, no formal request was made.").

**Response:**


167.     Defendants did not come to a conclusion on whether gun rights would need to be restored as part of the July 2023 changes until January 2024, six months after the new guidance was announced. *See* Ex. 41 (12/13/23 Hall Dep.) at 83:19-21 ("Q: Are firearm rights contained within citizenship rights? A: I -- I don't know.").

**Response:**


168.     As of June 18, 2024, Defendant Goins did not know whether the Secretary of State's website had been updated to "reflect what full rights of citizenship is." *See* Ex. 38 (06/18/24 Goins Dep.) at 39:25-40:02.

**Response:**


169.     As of June 18, 2024, the Elections Division had not released guidance as to what constituted "full rights of citizenship." *Id.* at 43:14-19.

**Response:**


170.    In fact, Defendant Goins testified that the "best guidance" is the public reporting that broke the news that gun rights restoration would be required as part of citizenship restoration, although Defendant did not know whether the article listed all the rights which his office considers to be part of the rights of citizenship. *Id.* at 43:01-13.

**Response:**


171.    When reviewing a restoration of citizenship rights order, Defendants do not consider the underlying law of whether an individual is eligible for firearm rights restoration. *See* Ex. 38 (06/18/24 Goins Dep.) at 64:16 (testifying that they look to the court order not whether the crime of conviction is one that permanently disqualifies the applicant from restoring gun rights). Defendants merely use the language of the order, looking only for whether any citizenship rights were excluded, whether or not the underlying felony conviction is one which is eligible for firearm rights restoration. *Id.* at 65:21-25 ("Q: . . . [I]f the order says 'full rights of citizenship restored,' then your office will register the person to vote? A: That's right.").

**Response:**


172.    Defendants have cited the language of T.C.A. § 2-19-143 and the Tennessee Supreme Court's decision in *Falls v. Goins* as justification for requiring restoration of "full" rights of citizenship, including gun rights. *See* Ex. 37 (6/18/24 Henry-Robertson Dep.) at 17:13-20.

**Response:**

173.     However, T.C.A. § 2-19-143 does not use the phrase "full restoration of citizenship" in every circumstance; the statute permits individuals convicted of out-of-state felonies to vote if they have been pardoned or restored to the "rights of citizenship" by an out-of-state authority. *See* T.C.A. § 2-19-143(3).

**Response:**

174.     Yet Coordinator insists that individuals with out-of-state convictions who have been restored to the "rights of citizenship" must still restore their gun rights and has denied voting rights restoration on that basis. For example, Robert Jeffrey Young is a resident of Meigs County and had been registered to vote in Tennessee since June 2008. Ex. 38 (06/18/24 Goins Dep.) 104:1-108:12; *see* Ex. 68 (Young files). When Mr. Young registered to vote in 2008, he disclosed that he had previously been convicted of a felony in Georgia. *See* Ex. 68. He also disclosed that he had received a pardon in Georgia. *Id.* In August 2023, Mr. Young was purged from the Meigs County voter rolls because the AOE allegedly received notice that he had been convicted of felony, *Id.*, even though they had been on notice since 2008 that Mr. Young had a felony conviction and that he had his voting rights restored because he disclosed that information on his voter registration form. *Id.* After being wrongly removed, Mr. Young was informed that he needed to comply with Defendant Goins' new "two-step process," *id.*, despite the Defendant Goins' written statement that this new rule would not be applied to people who had already had their rights restored. *Felon Restoration FAQs*, Tenn. Div. of Elections, https://www.documentcloud.org/documents/23884689-tennessee-division-of-elections-faq ("All voters who have had their rights restored remain eligible to vote"). Mr. Young worked diligently to get a COR form filled out by Georgia officials, *id.*, a process which took months. But even

61

after submitting the completed COR form and Georgia pardon (again), presumably fulfilling the "two-step process," he was denied because he had not had his gun rights restored. *Id*. at 3-4. The denial based on gun rights was at odds with Defendant Goins' guidance that individuals could "have been pardoned by a Governor, U.S. President, or other appropriate authority of a state *or* have had full rights of citizenship restored as prescribed by law, . . . ", *see, e.g.*, Ex. 75 (July 2023 Memo to County Election Commissions) (emphasis in original). Additionally, the denial ignored the plain language of T.C.A. § 2-19-143(3), requiring Tennesseans with out-of-state convictions to restore only their "rights of citizenship" not their "full rights of citizenship." Finally, in June 2024, Defendant Goins stated that Mr. Young had restored his voting rights, refusing to address the inconsistencies in Mr. Young's treatment under the new COR procedures, instead relying on the fact that Mr. Young should not have been purged from the voter rolls in the first place. *See* Ex. 38 (6/18/24 Goins Dep.) at 90:10-91:8.

  **Response:**


175.     Kathleen Baker is a resident of Marshall County and has been trying unsuccessfully to restore her voting rights in Tennessee since May 2023. Ms. Baker meets the currently outlined new eligibility criteria for voting rights restoration in Tennessee because she has complied with T.C.A. § 2-19-143(3) (restoring the requisite "rights of citizenship" through Florida clemency) and § 40-29-202 (requiring completion of sentence, including supervision, payment of restitution and court costs, and currency on child support). *See* Ex. 69 (Baker File). She submitted all requisite documentation evincing her eligibility to the Marshall County Administrator of Elections' Office and to the Tennessee Elections Division by July 7, 2023, *id.*, prior to the July 21, 2023 procedure change. Ex. 37 (06/18/24 Henry-Robertson Dep.) at 95:25-106:3, 108:3-12.

Nonetheless, the Elections Division failed to issue a decision on Ms. Baker's voting rights restoration eligibility for seven months, at which point Defendant Goins issued a denial letter. *See* Ex. 69 (Baker File). Worse, Ms. Baker did not receive a copy of this denial letter for two additional months. *Id.* And while this denial letter cited the reason for denial as "Evidence of Pardon/Restoration of Full Citizenship Rights Not Received," *id.*, the statute governing Ms. Baker's situation only requires restoration of "rights of citizenship" not "full rights of citizenship." T.C.A. § 2-19-143(3). Ms. Baker has already restored those requisite rights of citizenship because she received executive clemency from the State of Florida. *Id.*

**Response:**


176.    Defendants' recent shifting sands approach to voting rights restoration procedures is not new. In 2019, Defendant Goins he wrote a letter stating that a person with an out-of-state felony conviction had the right to vote in Tennessee if their citizenship rights – specifically the rights to run for office, vote, and serve on a jury – had been restored. Ex. 67 (Goins letter on out-of-state convictions). He registered multiple people on the basis of that decision. *Id.*; *see also* Ex. 34 (12/05/23 Henry-Robertson Dep.) at 186:15-194:14. Then, apparently because of internal disagreement in the Elections Division, Secretary of State's office, or Attorney General's office, he sought an attorney general opinion to reverse his earlier position and require all Tennesseans with felony convictions, regardless of the jurisdiction, to meet the criteria for Certificates of Restoration. *Id.* at 199:15-207:10. The reversal and subsequent denial of Grainger County resident Ernest Falls on its basis led to the case in the *Falls v. Goins*.

**Response:**


63

177.    Though Mr. Falls continues to try to comply with Defendant Goins changing standards, he continues to be denied restoration of his voting rights. After the Tennessee Supreme Court held that Mr. Falls still needed to show that he did not owe court costs or was indigent, Mr. Falls filed in Grainger County court for an order declaring that he was indigent. Ex. 70 (Falls Indigency Order). That petition was granted and on March 5, 2024, Mr. Falls submitted the order of indigency to the Grainger County Elections Commission, along with a letter from his attorney explaining why this should be sufficient to restore his voting rights, who forwarded it to the Elections Division. Ex. 71 (Falls letter). Mr. Falls and his counsel never received a denial, approval, or other response. However, Defendant Goins stated in a deposition that Mr. Falls would be denied because the grant of clemency he received from the governor of Virginia did not restore his gun rights. Ex. 38 (06/18/24 Goins Dep.) at 104:1-108:12. This is despite the Tennessee Supreme Court's specific finding that the grant of clemency restored Mr. Falls citizenship rights and its statement that this was all that is necessary to "meet the first exception" for a person in Mr. Falls' shoes. *Falls v. Goins*, 673 S.W.3d 173, 175 (Tenn. 2023); *see also id.* at 178 (referring to Mr. Falls having his citizenship rights restored after moving to Tennessee); *id.* at 183 ("[t]o comply with the first exception set forth in section 2-19-143(3), a person must be 'pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state.'") More than five years after submitting a registration form that complied with Election Division's stated policy on out-of-state convictions, Mr. Falls has missed two federal elections, and is poised to miss another because Defendant Goins continues to move the goal posts.

**Response:**

64

## VI. Defendants' Decentralized Administration of the Rights Restoration Lacks Uniformity.

178.    Tennessee's rights restoration process requires applicants to navigate a decentralized network of actors across multiple administrative bureaucracies both within and outside of Tennessee. *See* ECF 185-6 (Burch Rep.) at 27.

**Response:**


179.    Plaintiff's expert Dr. Selin estimates that "every COR form requires the coordination of a minimum of three administrative units across state and local governments," and out-of-state convictions require additional actors. *See* Ex. 72 (Selin Dep.) at 98:10-15. Within these administrative units, "there are over 150 sub-units that are involved in the implementation of the restoration of rights in Tennessee." *Id.* at 98:17-20. With so many actors involved in the rights restoration process, "the likelihood of human error just increases with the number of people involved." *Id.* at 100:05-08.

**Response:**


180.    TDOC regional managers, who oversee the implementation of the COR process at their office, do not receive any training specific to supervision of the COR process. See Ex. 55 (05/18/23 Ricci Dep.) at 77:17-78:23; *see also* Ex. 57 (Killinger Dep.) at 261:03-261:07; Ex. 43 (Harvey Dep.) at 174:21-175:12; Ex. 44 (Mathes Dep.) at 154:9-10; Ex. 61(Shaw Dep.) at 22:20-23:11 (noting they received no training on CORs or rights restoration as part of their roles as Director or rights restoration lead).

**Response:**

181. There is little oversight or quality control for completed CORs by TDOC. In fact, many TDOC regional managers do not even review CORs completed by their officers unless the officer has a specific question. *See* Ex. 57 (Killinger Dep.) at 71:20-72:22 (" . . . I don't review the forms in general, unless there's something that's specific that needs to be looked at, like the note was not right, and we need to verify that the form was done correctly . . .").

**Response:**


182. There is no feedback mechanism to communicate errors in completing CORs to the officials who complete CORs incorrectly, nor is there a process that such officers will be trained so as not to make that error again. *See* Ex. 74 (Holt Dep.) at 128:03-131:06 (testifying to the mistake their office made in not mailing a voter a certificate of restoration; also testifying to the lack of written guidance on how to complete CORs correctly and the lack of training on that). In fact, many TDOC regional managers testified that they receive no communication regarding the outcome of a COR they complete. *See, e.g.*, *id.*; Ex. 44 (Mathes Dep.) at 137:02-138:08, 212:24-212:17 ("Q: Okay. Are you ever notified by the state if a COR is improperly issued? . . . A: No . . . Q: Would it be helpful to be notified if your office improperly issued a COR? . . . A: Yes . . . To, one, make sure if it was done incorrectly, for training purposes.").

**Response:**


183. This lack of standardized practice leaves administrators to act with wide discretion and results in inconsistencies and errors, particularly with respect to determinations of outstanding court costs and restitution. *See* Ex. 33 (Selin Rep.) at 22; Ex. 72 (Selin Dep.) at 100:24-101:06.

**Response:**

184.    Which officials complete which part of the COR form also varies widely and randomly by county. Prior to the July 2023 change, TDOC District 40 would "always" leave the section on court costs blank and direct the applicant to the clerk's office. *See* Ex. 61 (Shaw Dep.) at 124:11-12, 125:1-8; ECF 185-6 (Burch Rep.) at 24. Yet probation officers from next-door county Robertson have done so. *See* ECF 185-6 (Burch Rep.) at 24; *see also* Ex. 43 (Harvey Dep.) at 48:2-17 (discussing how officers "fill out as much of the form as [they] can," including court costs or restitution, and "give a partially or fully completed COR when possible to the individual.").

**Response:**


185.    TDOC officers are not trained to review an applicant's file for convictions beyond the one they may be under supervision for, leading to omissions in restoration paperwork that result in denial, leading to a patchwork of inconsistent practices across the state in which some offices review for additional convictions and some do not. *Compare* Ex. 47 (Killinger Dep.) at 69:01-69:07 (confirming that staff would try to assist individuals who were not under TDOC supervision) *with* Ex. 43 (Harvey Dep.) at 46:01-46:24, 51:14-52:12, 203:09-21 (confirming staff are "not in the habit of looking up prior convictions," would only fill out forms for additional convictions if the applicant affirmatively told the officer about the convictions, and even if the officer saw there were other convictions listed, they would "not notify the individual that there might be other convictions they need a COR for").

**Response:**

67

**VII.** **The Cost to the Government to Implement Constitutionally Adequate Process is Minimal.**

186.     Other states with felony disenfranchisement regimes offer a uniform application for people to make requests without having to hunt for officials to certify a COR form, which lowers the cost to the state by reducing the number of administrators involved. Ex. 33 (Selin Rep.) at 43-44.

**Response:**


187.     Alabama, Kentucky, Virginia, and Wyoming circumvent the inefficiencies of decentralized procedures at the outset by having citizens fill out and submit applications to begin the eligibility verification and/or rights restoration process. *Id.* at 43.

**Response:**


188.     Research examining election administration across the country also shows that in addition to decreasing the number of organizational layers involved in implementation, more streamlined procedures significantly improve administrative performance. *Id.* at 44.

**Response:**

68

Dated:  August 1, 2024

Keeda Haynes, BPR No. 031518
Free Hearts
2013 25th Ave. N,
Nashville, TN 37208
(615) 479-5530
keeda@freeheartsorg.com

Phil Telfeyan
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org


* Admitted pro hac vice

Respectfully submitted,

/s/ *Blair Bowie*
Blair Bowie*
Danielle Lang*
Alice Huling*
Valencia Richardson*
Aseem Mulji*
Ellen Boettcher*
Kate Uyeda, BPR No. 040531
Kathryn Huddleston*
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
Bbowie@campaignlegal.org
Dlang@campaignlegal.org
Ahuling@campaignlegal.org
VRichardson@campaignlegal.org
Amulji@campaignlegal.org
EBoettcher@campaignlegal.org
KUyeda@campaignlegal.org
KHuddleston@campaignlegal.org

Charles K. Grant, BPR No. 017081
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
211 Commerce Street, Suite 800
Nashville, TN 37201
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
cgrant@bakerdonelson.com
dgrant@bakerdonelson.com


*Counsel for the Plaintiffs*

69

**CERTIFICATE OF SERVICE**

  I hereby certify that on August 1, 2024, a copy of the foregoing document was filed electronically. Notice of this filing will be served by operation of the Court's electronic filing system to counsel for parties below. Counsel for the parties may access these filings through the Court's electronic filing system:

  DAWN JORDAN (BPR #020383)
  Special Counsel
  dawn.jordan@ag.tn.gov

  ANDREW C. COULAM (BPR #030731)
  Deputy Attorney General
  Andrew.Coulam@ag.tn.gov

  DAVID M. RUDOLPH (BPR #13402)
  Senior Assistant Attorney General
  david.rudolph@ag.tn.gov

  ZACHARY BARKER (BPR #035933)
  Assistant Attorney General
  Zachary.barker@ag.tn.gov

  ROBERT W. WILSON (BPR # 034492)
  Assistant Attorney General
  Robert.Wilson@ag.tn.gov

  Office of the Tennessee Attorney General
  Public Interest Division
  P.O. Box 20207
  Nashville, TN 37202

  *Attorneys for State Defendants*

        /s/ *Blair Bowie*
        Blair Bowie

70