**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

TENNESSEE CONFERENCE of the
NATIONAL ASSOCIATION for the
ADVANCEMENT of COLORED PEOPLE, on
behalf of itself and its members, et al.,

         Plaintiffs,

  v.

WILLIAM LEE, in his official capacity as
Governor of the State of Tennessee, et al.,

         Defendants.

**Civil No. 3:20-cv-01039**

**JUDGE CAMPBELL
MAGISTRATE JUDGE FRENSLEY**

[Class Action]

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO COUNTS ONE, TWO, AND THREE**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STANDARD OF REVIEW ....................................................................................................2

ARGUMENT...........................................................................................................................2

  I.  Plaintiffs Have Standing ..............................................................................................2

      A. Individual Plaintiffs Have Standing to Challenge Tennessee's Voting Rights Restoration Process. ..............................................................................2

      B. TN NAACP Has Standing to Challenge Tennessee's Voting Rights Restoration Process ...............................................................................................7

          1.  TN NAACP has representational standing .............................................7

          2.  TN NAACP has direct organizational standing....................................8

  II.  Defendants Are Not Entitled to Summary Judgment as to Plaintiffs' Procedural Due Process Claims (Counts 1 & 2)......................................................................................11

      A. Plaintiffs Have Protected Liberty Interests at Stake. ......................................12

          1.  Plaintiffs have a state-created liberty interest in seeking a COR.........12

              a.  Plaintiffs have a liberty interest as applicants for a COR ........13

              b.  Defendants' new requirements do not negate Plaintiffs' liberty interest in seeking a COR .......................................................16

          2.  Plaintiffs have a constitutional liberty interest in restoration of voting rights ....................................................................................................19

      B. The Due Process Clause Requires Defendants to Provide Additional Procedural Safeguards in Administering CORs.............................................20

          1.  The question of what process is due is a fact-intensive, context-dependent inquiry, and there are genuine disputes of material fact.....21

          2.  Defendants' COR procedures create a serious risk of erroneous deprivation, and their new requirements only heighten this risk.........22

          3.  The cost to Defendants of providing additional process is low and far outweighed by the significance of Plaintiffs' interests at stake ...........24

          4.  Plaintiffs do not challenge Tennessee's rights restoration laws, but rather Defendants' procedurally deficient administration...................26

  III.  Defendants Are Not Entitled to Summary Judgment as to Plaintiffs' *Bush v. Gore* Claim (Count 3). ......................................................................................................29

      A. Plaintiffs' Equal Protection Claim is Subject to Heightened Scrutiny Under *Bush v. Gore* ...............................................................................................29

      B. Defendants' Application of the COR Process Fails Any Level of Scrutiny......32

  IV.  Plaintiffs' Requested Relief is Proper ........................................................................34

CONCLUSION......................................................................................................................35

# INTRODUCTION

Tens of thousands of Tennesseans who are disenfranchised due to a felony conviction have the right under Tennessee law to request and, if eligible, be issued a Certificate of Restoration of Voting Rights (COR). State law places the duty to administer requests and issue CORs squarely on Defendants. But Defendants' procedures for doing so are wholly deficient, leaving potentially eligible citizens left to navigate a process that lacks the minimum safeguards of due process and equal protection. In July 2023, Defendants announced changes to the COR process that have degraded an already dysfunctional process, including a new rule requiring COR seekers to obtain a pardon or a court order restoring full citizenship rights before Defendants will issue a COR sufficient to restore voting rights. This "requirement" has no basis in state law, departs from decades of practice, and has only intensified the already substantial risk of erroneous deprivation in the process for requesting and issuing CORs.

Based on these new changes, Defendants move for summary judgment on Plaintiffs' due process and equal protection claims. Their motion fails. The new procedures have no bearing on the standing of Individual Plaintiffs or the Tennessee Conference of the NAACP ("TN NAACP") to remedy procedural and organizational injuries. And on the merits, the record shows that Defendants' COR process creates a serious risk of erroneous deprivation of a protected liberty interest in the right to a COR and the constitutional right to vote, which could be mitigated by additional procedures at little cost to the state. Defendants offer no evidence to the contrary, and there are genuine disputes of material fact as to what procedures are due under the highly context-dependent *Mathews v. Eldredge* inquiry, precluding summary judgment. The evidence also shows that the COR process results in differential treatment of similarly situated Tennesseans based only on the county where the request is directed, violating the right to uniform treatment under *Bush v. Gore*. Defendants offer no evidence to justify this state of affairs under any level of scrutiny, and

1

there are disputes of material fact as to the validity of their asserted interests in maintaining such an arbitrary, dysfunctional rights restoration process.

For these reasons explained more fully below, Defendants' motion for summary judgment should be denied.

## STANDARD OF REVIEW

Summary judgment is appropriate only when, drawing the inferences from the evidence most favorably to the non-movant, the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## ARGUMENT

## I.   Plaintiffs Have Standing.

Though the presence of one party with standing is enough, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006), here Individual Plaintiffs and the TN NAACP have all suffered redressable injuries caused by Defendants' conduct that are sufficient to pursue their claims under Article III.

### A.   Individual Plaintiffs Have Standing to Challenge Tennessee's Voting Rights Restoration Process.

Plaintiffs have Article III standing when they suffer an injury in fact that is traceable to the defendants' conduct and likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). Where, as here, plaintiffs allege violations of their procedural rights, such claims "are treated uniquely under the standing inquiry." *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 712 (6th Cir. 2015). "[T]he causation and redressability requirements are relaxed" and satisfied so long as the procedural protection plaintiffs seek are those that Defendants failed, but could be ordered, to provide. *Klein v. U.S. Dep't of Energy*, 753

2

F.3d 576, 579 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interest can assert that right without meeting all the normal standards for redressability and immediacy.")). The Sixth Circuit has therefore held that procedural-rights claims are justiciable so long as the plaintiffs will, if successful, obtain relief from the defendants in the form of procedure, and "the procedures sought would lead to a concrete, particularized, and actual benefit." *Wright v. O'Day*, 706 F.3d 769, 771 (6th Cir. 2013). Individual Plaintiffs satisfy "both steps of this procedural-standing analysis." *Id.*; *see also Amiri v. Sec'y, Dep't of Homeland Sec.*, 818 F. App'x 523, 526 n.4 (6th Cir. 2020) (procedural due process claims met Article III standing requirements under the unique procedural-standing analysis).

Individual Plaintiffs are disenfranchised Tennesseans with prior felony convictions who requested or attempted to request a COR pursuant to Defendants' current procedures but were denied one sufficient to restore their voting rights, or information necessary to obtain one. None are permanently disqualified from voting. *See* ECF 276, Pls. Stmt. of Undisputed Material Facts ("SOF") ¶¶ 1, 5, 7, 11, 17, 21. All have served their full sentence, including supervision. *Id.* And all have faced significant procedural roadblocks in requesting a COR. Mr. Perry, Mr. Gray, and Ms. Scott were all refused CORs due to legal financial obligations (LFOs) that are actually non-disqualifying or were erroneously assessed, but they received neither a written explanation for the refusals nor an opportunity to appeal. *Id.* ¶¶ 3, 8, 12. Mr. Tournier, upon completing supervision in Tennessee for his Arizona convictions, first attempted to get his COR forms certified by Arizona court clerks, who refused. *Id.* ¶ 18. He then requested a COR in person at his local TDOC office under which he served probation, but it ultimately ignored the request and has not issued a COR or an appealable denial with explanation. *Id.* Mr. Weare, another Tennessean with Arizona convictions, also got the runaround owing to the lack of any uniform way to request a COR from

3

Tennessee's issuing authorities. *Id.* ¶ 22. Despite spending countless hours seeking out officials willing to fill out his COR forms (per Defendants' instruction), his requests have been refused or unanswered and he has no means to appeal these non-decisions. *Id.* Finally, unlike the others, Mr. Hendrix was lucky to obtain a fully certified COR from the Williamson County TDOC office, but his COR was rejected by the Election Division because the TDOC officer who completed his form failed to list all of his felony convictions, a reason unrelated to his eligibility. *Id.* ¶ 6. He had no means to appeal the denial and was forced to make another request to a different county TDOC office. *Id.* ¶ 6.[1] Thousands of similarly situated Tennesseans must navigate this same arbitrary, process-free system. *Id.* ¶¶ 76-77.

To remedy these deficiencies, Individual Plaintiffs seek uniform rules and procedures that would enable them, and those similarly situated, to request and be issued a COR and, if ultimately deemed ineligible, be provided a statement of reasons explaining what they must do (or pay) to become eligible. ECF 102 at 49 (listing procedures due). If Individual Plaintiffs win, Defendants will have to implement these procedures. "This is enough for Article III standing" because the procedures would facilitate Individual Plaintiffs' regained access to the franchise—an interest that is plainly "concrete, particularized, and actual." *Wright*, 706 F.3d at 771; *see Gill v. Whitford*, 585 U.S. 48, 65 (2018) ("We have long recognized that a person's right to vote is 'individual and personal in nature.'") (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

---

[1] The Election Division finally approved Mr. Hendrix's COR 11 days after he filed this claim. *Id.* As a class representative, Mr. Hendrix's claims are not moot because his class certification motion is still pending on remand. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction."). His claims remain live also because they are "inherently transitory"— *i.e.*, it is certain "other class members would suffer the same [procedural] injur[ies]" but it is uncertain how long any given class member's claim will remain live. *Wilson v. Gordon*, 822 F.3d 934, 945-46 (6th Cir. 2016).

4

Defendants wrongly claim that Individual Plaintiffs lack standing because they have not satisfied the eligibility criteria, including Defendants' new "first step" requirement to obtain a pardon or restoration of full citizenship rights before a COR will be issued. Mem. in Supp. of Defs. Mot. Summ. J. ("Br.") at 8.[2] As an initial matter, this "first step"—which did not exist until Defendants created it in July 2023 after the close of discovery and years after Plaintiffs filed suit— is not a valid requirement under Tennessee law, and Individual Plaintiffs need not satisfy it to become eligible for a COR. *See infra* Part II.A.1.b. And, insofar as Defendants disagree, that is a dispute going to the merits and irrelevant to the standing inquiry because standing is assessed based on Plaintiffs' view of the law. *See* ECF 83 at 6 (citing *Gerber v. Herskovitz*, 14 F.4th 500, 507 (6th Cir. 2021)).

More fundamentally, Defendants misunderstand that Individual Plaintiffs' due process and equal protection claims are for "violations of *procedural* rights." *Parsons*, 801 F.3d at 712 (emphasis added). In such cases, "a litigant can suffer an injury-in-fact from the denial of procedural protections even if, when applied, the procedures might not result in relief." *Wright*, 706 F.3d at 771-72 (citing *Goldberg v. Kelly*, 397 U.S. 254, 256 n.2 (1970)); *see also Lujan*, 504 U.S. at 572 n.7. While this suit has now prompted Defendants to do a deep dive into Individual Plaintiffs' eligibility, Defendants' rights restoration process itself could not provide them an authoritative eligibility determination—this, in itself, is a cognizable procedural injury.

In any event, Plaintiffs Perry, Scott, and Weare meet the criteria to be issued a COR under T.C.A. §§ 40-29-201, *et seq*. They have no permanently disqualifying felonies; have served their

---

[2] Pincites to Defendants' Memorandum in support of their Motion for Summary Judgment ("Br.") correspond to the page number of that document, not to the page numbers in the ECF footer. However, for all other docket citations, pincites refer to the page number in the ECF footer.

5

sentences, have paid court costs and restitution, and are current in child support obligations.[3] SOF ¶¶ 1-4, 10-16, 21-24. Mr. Gray may have outstanding court costs, but when he was refused a COR, he received no appealable denial or statement of reasons explaining which of his LFOs are court costs; he was simply told, incorrectly, that he would have to pay off additional fines. *Id.* ¶ 8. Defendants' failure to afford Mr. Gray a procedure to apply for a COR and receive a statement of reasons for denial inflicts cognizable harm because it affects his concrete interest in restoring his right to vote. *See Amiri*, 818 F. App'x at 526 n.4 (finding plaintiff had standing to bring procedural claim seeking only "information related to the denial of [a] visa application" because it would affect a concrete interest, even though the applicant could again be found ineligible); *Willner v. Comm. on Character & Fitness*, 373 U.S. 96, 102 (1963) (holding bar applicant denied admission on character and fitness grounds had standing to seek a statement of reasons).

Even if Defendants' new "first step" were valid (it is not), Individual Plaintiffs' procedural injuries would not be remote or speculative. Br. at 9. The Election Division admits that there is no required order for requesting a COR and obtaining a pardon or restoration of full citizenship rights—that is, the new "first step" apparently need not happen first. SOF ¶¶ 144-46. And the process for requesting a COR "remains unchanged." ECF 175 at 8. Thus, Individual Plaintiffs' claims with respect to the process for requesting a COR remain imminent.

And finally, even if Defendants were correct that Plaintiffs must have satisfied the first step to have standing (they are not), at least one Plaintiff, Ms. Scott, has standing under this misguided theory. She has successfully petitioned a court for restoration of full rights of citizenship, meets

---

[3] Plaintiff Perry's child support obligations were erroneously assessed and terminated as of August 1, 2023. SOF ¶ 4.

6

the COR eligibility criteria under T.C.A. § 40-29-202, and has faced procedural hurdles in requesting a COR. SOF ¶¶ 10-16. This is enough for a Case or Controversy under Article III.

## B. TN NAACP Has Standing to Challenge Tennessee's Voting Rights Restoration Process.

Plaintiff TN NAACP also has standing. An organization may have Article III standing as a representative of its members or based on injury to itself. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*., 600 U.S. 181, 199 (2023). TN NAACP has both representational and direct organizational standing to challenge Tennessee's rights restoration process in Counts 1-3.

### 1. TN NAACP has representational standing.

An organization has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000)). TN NAACP readily satisfies these elements. First, Plaintiff Scott is a TN NAACP member and has standing to challenge Defendants' administration of the COR process. *See supra*. Second, TN NAACP's "attempt to remedy these injuries" and ensure its members have a pathway to restore their voting rights (that complies with constitutional safeguards) is "central to [its] purpose" of eliminating race-based discrimination by promoting voter registration and expanding political participation. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *see* SOF ¶ 28. Third, resolving and remedying Counts 1-3 do not require each affected member's participation: the claims concern Defendants' conduct

generally, and seek injunctive and declaratory relief, affecting all similarly situated TN NAACP members. *See* Doc. 102 at 49. TN NAACP may therefore sue on its members' behalf.

### 2. TN NAACP has direct organizational standing.

An organization has standing if it has suffered or will suffer an injury in fact caused by the defendant that is redressable. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). To establish direct organizational injury in fact, a plaintiff must show a "concrete and demonstrable injury" to its activities. *Id.* at 379. In *Havens*, the Supreme Court held "there can be no question" that showing is made where a defendant's conduct has "perceptibly impaired" its ability to carry out its activities by causing a "drain on [its] resources." *Id.*; *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013).

The Supreme Court recently reaffirmed the ongoing force of the *Havens* standing framework in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) (*AHM*). The *AHM* Court explained that an organization establishes injury when it shows the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities" and cited *Havens* as an example. *Id.* at 395. By contrast, the medical association plaintiffs in *AHM* could not establish standing "simply by expending money to gather information and advocate against" the FDA's actions that they challenged. *Id.* at 394-5. The Court distinguished the lack of standing for the *AHM* plaintiffs from the *Havens* plaintiff, which "not only was an issue-advocacy organization, but also operated a housing counseling service" and had standing because the defendant's actions impaired its core activities. *Id*. Here, TN NAACP has set forth specific facts, in declarations of multiple officers, that establish its organizational standing under *Havens* and *AHM*. *See* SOF ¶¶ 25-36. These undisputed facts, which must at summary judgment be "taken to be true," are sufficient to establish TN NAACP's standing. *Lujan*, 504 U.S. at 561. As was true for the *Havens* plaintiff,

Defendants' "actions directly affect[] and interfere[] with [TN NAACP's] core business activities," *AHM*, 602 U.S. at 395: specifically, assisting voter registration and participation.

TN NAACP is a nonpartisan, nonprofit organization whose mission is to eliminate race-based discrimination, with a particular focus on voting rights. SOF ¶ 26. Its core activities are assisting and mobilizing individuals to register and turn out to vote. *Id.* ¶ 28. TN NAACP runs registration drives, tabling at events, door-to-door canvassing, texting, and word-of-mouth outreach—all aimed at maximizing voter registration and turnout. *Id.* ¶¶ 29-30. During these efforts, TN NAACP frequently encounters individuals who are disenfranchised due to a felony conviction because the Black and brown communities TN NAACP serves are disproportionately disenfranchised. *Id.* ¶ 31. TN NAACP also receives regular requests for assistance from individuals seeking to regain their right to vote. *Id.*

Defendants' administration of a COR process without due process and equal treatment "directly affect[s] and interfere[s] with" TN NAACP's efforts to register voters in furtherance of its goal to mobilize and register as many individuals as possible, including individuals with disenfranchising felony convictions. *AHM*, 602 U.S. at 395. When TN NAACP encounters individuals who lost the right to vote due to a felony conviction, volunteers must dedicate significant time and resources—above and beyond typical voter registration assistance—to help the individual navigate the state's byzantine and ever-shifting COR process. *Id.* ¶ 32. Because recipients of TN NAACP's assistance are directed to submit their COR requests to unknown or unwilling officials without any formal application procedure, are arbitrarily refused CORs without explanation, are erroneously denied, and are provided no opportunity to appeal, TN NAACP volunteers spend time following up with COR seekers, helping them determine their eligibility, connecting with legal counsel, and traveling to various government offices get their COR forms

9

filled out by willing officials. *Id.* ¶ 33. The lack of uniformity in Defendants' acceptance and treatment of COR requests across counties also increases the cost and volunteer burden of TN NAACP's public education efforts. *Id.* ¶ 34. Defendants' recent changes to the COR process making it even more burdensome for the recipients of TN NAACP's assistance further frustrate its efforts to register and mobilize those who have lost the right to vote. *Id.* ¶ 35.

TN NAACP mirrors the plaintiff in *Havens* and has standing for the same reasons the *Havens* plaintiff did. The *Havens* plaintiff both engaged in issue advocacy and operated a housing counseling service, and the unlawful provision of false information to its employees by an apartment complex owner about apartment availability "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers." 455 U.S. at 379. TN NAACP operates voter assistance services, analogous to a housing counseling service—in fact, TN NAACP is *primarily* a direct service rather than issue advocacy organization. SOF ¶¶ 28-29; *see also TN NAACP v. Lee*, 105 F.4th 888, 905 (2024) (acknowledging that TN NAACP is "in the business of registering voters—not merely gathering information and advocating against the law").

Defendants' unlawful failure to provide a meaningful and non-arbitrary COR process has perceptibly impaired TN NAACP's ability to provide its core voter registration services. First, TN NAACP has been and will continue to be unable to register and mobilize individuals with felony convictions without incurring substantial costs and devoting substantial resources to helping them navigate Defendants' convoluted and lengthy process. SOF ¶ 32. And second, Defendants' actions directly interfere with TN NAACP's voter registration assistance by draining the organization's limited resources, forcing it to divert resources that would otherwise be used to register and mobilize additional voters. If Defendants were to administer a COR process that afforded its

constituents with due process and equal treatment, TN NAACP would spend less time guiding its constituents through a labyrinthian COR process and instead spend those resources on registering and mobilizing more voters. *Id.* ¶ 33. Thus, TN NAACP could register more voters with the same amount of time and resources upon Defendants ceasing their unlawful actions.

These injuries are "actual" and "imminent" and "not speculative" because TN NAACP's harms are ongoing. TN NAACP branches across the state have plans to continue conducting voter registration events and will thus need to field inquiries from COR seekers. *Id.* ¶ 30. So long as Defendants' unlawful actions continue, TN NAACP's voter registration and mobilization efforts will continue to be impaired. Thus, "there can be no question that [TN NAACP] has suffered injury in fact," *Havens*, 455 U.S. at 379, caused by Defendants' unlawful administration of the COR process and redressable by a court order. TN NAACP's standing is not based on resources it expends to advocate against Defendants' COR process, and its standing is not based solely on a "diversion-of-resources" or mere "pocketbook" harm. *See TN NAACP*, 105 F.4th at 905-06.[4] As the *Havens* plaintiff did, and as *AHM* confirms, TN NAACP has direct organizational standing.

## II. Defendants Are Not Entitled to Summary Judgment as to Plaintiffs' Procedural Due Process Claims (Counts 1 & 2).

To prove a procedural due process violation, a plaintiff must show that there is a constitutionally protected interest at stake and that additional procedures are necessary to protect that interest. *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021). To determine what procedures are necessary, courts must apply the Supreme Court's well-established three-factor test

---

[4] The fact that TN NAACP is not itself subject to Defendants' COR process is no bar to its standing. The recipients of TN NAACP's assistance *are*, and as the facts show, TN NAACP volunteers stick by these individuals through the hurdles they face in restoring their right to vote. *See, e.g.*, Ex. 29 ¶¶ 13-14, 19; Ex. 30 ¶¶ 15-18; Ex. 32 ¶¶ 12-19. *See also TN NAACP*, 105 F.4th at 905 (recognizing that "'unregulated' parties [may] sue a defendant even though the defendant's conduct harmed those parties indirectly").

in *Mathews v. Eldridge*, which balances the private interest affected, the risk of erroneous deprivation under the current procedures and the probable value of additional procedural safeguards, and the costs or burdens to the state. 424 U.S. 319, 335 (1976). Defendants fail to show there are no genuine disputes of fact meriting summary judgment under this standard.

### A. Plaintiffs Have Protected Liberty Interests at Stake.

The threshold question in assessing due process claims is whether Plaintiffs have a protected liberty or property interest. At stake here are protected liberty interests, which "can arise either from the Constitution itself or from state law." *Mikel v. Quin*, 58 F.4th 252, 260 (6th Cir. 2020). In this case, Plaintiffs have been deprived of both a state-created liberty interest in obtaining a COR and a constitutional liberty interest in voting rights restoration.

### 1. Plaintiffs have a state-created liberty interest in seeking a COR.

A state-created liberty interest arises when a state places "substantive limitations on official discretion" by "establishing 'substantive predicates' to govern official decisionmaking" and by "mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Tony L. By & Through Simpson v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995). Courts look for "explicitly mandatory language" requiring a substantive outcome if certain substantive criteria are met. *Id.* This analysis hinges on a close examination of the language of relevant state law. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989).

Tennessee's statutory scheme governing voting rights restoration plainly creates a state-created liberty interest in requesting and being issued COR. The eligibility criteria for a COR are outlined in T.C.A. § 40-29-202, which requires receipt of a pardon or final discharge from custody or supervision and payment of restitution, court costs unless declared indigent, and child support. Section 40-29-203(a) in turn provides that a COR "*shall* be issued" by the pardoning, incarcerating, or supervising authority upon request of a "person eligible to apply for a voter

12

registration card and have the right of suffrage restored, pursuant to § 40-29-202." This use of "shall," explicitly mandatory language, leaves an issuing authority *no* discretion to refuse a COR request if the requestor is eligible under § 40-29-202 and has not been convicted of a permanently disenfranchised crime under § 40-29-204. The COR issued by that authority "*shall* be sufficient proof that the person . . . is no longer disqualified from voting." T.C.A. § 40-29-203(c) (emphasis added). A validly issued COR indicates that a person has regained their right to vote.

### a. Plaintiffs have a liberty interest as applicants for a COR.

Defendants' contention that Plaintiffs do not have a liberty interest as "applicants" for a COR lacks merit. Br. at 15. While in certain contexts applicants for benefits have been found to lack protected interests, neither the Supreme Court nor the Sixth Circuit has ever held that applicants *categorically* cannot have a protected interest in the benefit they aim to secure. In fact, the Sixth Circuit has specifically held that applicants can have property interests in benefits for which they "hope to qualify." *Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004) (health care coverage); *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996) (social security benefits). Further, the only cases Defendants cite are those in which an applicant lacked a *property* interest in a monetary benefit or a property-use license/permit, far afield from the liberty interest at stake here.[5]

---

[5] *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60 (1999) (workers' compensation claimants did not have a property interest in forcing private insurers to pay for disputed medical treatments because state law "expressly limit[ed] an employee's entitlement to 'reasonable' and 'necessary' medical treatment, and require[d] that disputes over the reasonableness and necessity of particular treatments be resolved *before* an employer's obligation to pay—and an employee's entitlement to benefits—arise."); *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (clinic lacked property interest in waiver of Ohio's transfer agreement requirement for licensure of ambulatory surgical facilities but did have property interest in continued operation); *Wojcik v. City of Romulus*, 257 F.3d 600, 615 (6th Cir. 2001) (secured creditor and prospective buyer of bar did not have property interest in transfer of an entertainment permits and liquor license under Michigan law); *Sanderson v. Vill. of*

13

Plaintiffs' interest in obtaining a COR sufficient to undo the state's restraint on their freedom to participate in the franchise is more akin to that of parole applicants. "The Supreme Court has recognized a right to due process on the part of parole applicants who can point to a statute saying that prisoners 'shall' be released under certain conditions[.]" *Harper v. Sec'y of Health & Hum. Servs.*, 978 F.2d 260, 263 (6th Cir. 1992) (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 (1979)). The Court has explained that although states may constitutionally incarcerate individuals upon valid conviction without providing any possibility for parole, when a parole statute uses mandatory language to require parole upon satisfying standards or criteria that limit a decisionmaker's discretion, the state "create[s] an 'expectancy of release,' which is a liberty interest entitled to [due process] protection." *Board of Pardons v. Allen*, 482 U.S. 369, 371 (1987); *see also Mayes v. Trammell*, 751 F.2d 175, 177 (6th Cir. 1984) ("[A] state may, through the wording of its statutes and policies, create such an expectation of parole as to amount to a liberty interest. The protections of the due process clause then attach.").

The same principle applies to Plaintiffs. In Tennessee, felony disenfranchisement, like incarceration, is a "restraint on liberty" and the "freedom to act." *May v. Carlton*, 245 S.W.3d 340, 346 (Tenn. 2008). Although the state may constitutionally disenfranchise an individual upon conviction of an infamous crime, the language of § 40-29-203 mandates issuance of a COR sufficient to restore voting rights upon satisfaction of certain criteria, thereby limiting the issuing authorities' discretion and creating an expectancy of release from disenfranchisement. This

---

*Greenhills*, 726 F.2d 284 (6th Cir. 1984) (no property interest in license for poolhall but could have liberty interest in choosing what business to run); *Clair v. N. Kentucky Indep. Health Dist.*, 239 F. App'x 997 (6th Cir. 2007) (no legitimate claim of entitlement to food service permit where state law gave agency "significant degree of discretion" in issuing them); *Jon Jon's, Inc. v. City of Warren*, 700 F. App'x 436 (6th Cir. 2017) (no property interest in obtaining or transferring liquor license).

14

statutory expectancy entitles Plaintiffs and all COR applicants to due process protections in requesting a COR. *Allen*, 482 U.S. at 371. Their status as applicants is irrelevant.

Additionally, Plaintiffs need not be certain of their eligibility to have a liberty interest protected by due process, as Defendants contend. Br. at 16. In *Allen*, the Supreme Court held that a statute can, by its terms, vest applicants with a liberty interest and due process rights in seeking a pardon even when the eligibility criteria are broad and subjective, making it impossible for an applicant to know or demonstrate with certainty that they will be successful. *See* 482 U.S. at 381. The relevant question is whether the interest at stake for Plaintiffs in seeking additional procedures is a state-created liberty interest, not whether the Plaintiffs would certainly be granted that interest if the procedural protections they seek were in place. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process . . . does not depend upon the merits of a claimant's substantive assertions."); *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (noting that welfare recipients in *Goldberg* had a claim of entitlement to payments based on statutory criteria even though the recipients had not yet shown they were, in fact, eligible).

In any event, none of the Individual Plaintiffs' claims to a COR rest on vague hope. None have permanently disenfranchising convictions, and all have completed their terms of sentence. Contrary to Defendants' factual claims, Plaintiffs Perry, Scott, and Weare do not owe court costs or restitution and are eligible for a COR. *Id.* ¶¶ 3, 12-13, 23. Mr. Tournier does not owe restitution, and he has not received any determination as to whether his remaining LFOs are court costs under Tennessee law. *Id.* ¶ 19. Mr. Perry also disputes that he had outstanding child support obligations at the time he sought a COR. *Id.* ¶ 4. Even if these facts were relevant to determining the existence of a liberty interest, they are genuinely disputed, and summary judgment should be denied.

### b. Defendants' new requirements do not negate Plaintiffs' liberty interest in seeking a COR.

In July 2023, Defendants began imposing a new requirement for requesting CORs and restoring voting rights. *See* Br. at 2, 5-6; SOF ¶ 68. Under this new procedure, Defendants refuse to issue CORs sufficient to restore voting rights unless the requestor proves that they have received a pardon or have had their full rights of citizenship restored ***and*** has satisfied the statutory eligibility criteria in § 40-29-202. *Id.* ¶ 69 Given the rarity and burden of obtaining pardons and court orders restoring full citizenship rights, this new requirement makes it exceedingly difficult for COR-eligible individuals to request and be issued a COR. *Id.* ¶ 134-43.

This new requirement is at odds with the plain language of Tennessee law and has no legal bearing on whether Plaintiffs have a state-created liberty interest in a COR. *Thompson*, 490 U.S. at 461. The only "substantive predicates" required to obtain a COR under § 40-29-203 are those listed in § 40-29-202, subject to the exceptions for permanently disenfranchising crimes listed in § 40-29-204. *Tony L.*, 71 F.3d at 1185. By requiring COR requestors to satisfy additional criteria not found or referenced in § 40-29-203, Defendants' new procedures contradict its express mandate that CORs "shall be issued" to any requestor that satisfies § 40-29-202's eligibility criteria.

Further, the Tennessee Supreme Court's recent decision in *Falls v. Goins*, 673 S.W.3d 173 (Tenn. 2023), in no way compels this new "first step" requirement, contrary to Defendants' assertions. In *Falls*, the question was whether a Tennessean with an out-of-state state conviction who was granted clemency by that state's governor after establishing residence in Tennessee was required to meet the COR eligibility criteria, including payment of court costs and restitution, before regaining the right to vote in Tennessee. *Falls*, 673 S.W.3d at 176. Mr. Falls argued that he did not have to meet the COR eligibility criteria or obtain a COR to have his voting rights restored because out-of-state clemency exempted him from disenfranchisement under the controlling

16

statutory provision, § 2-19-143(3), which disenfranchises those convicted of out-of-state felonies unless they have been pardoned or restored their rights of citizenship under Tennessee or other state law. The state maintained that Mr. Falls was disenfranchised regardless of that exemption and that to restore his right to vote he would have to demonstrate that he met the COR criteria regardless of his out-of-state pardon. The court ruled against Mr. Falls, holding that his pardon, obtained *after* moving to Tennessee, was insufficient to restore his right to vote under § 2-19-143(3). And, upon reading that provision with eligibility criteria in § 40-29-202, the court concluded Mr. Falls also had to qualify for and obtain a COR under § 40-29-203. *Id.* at 183-84.

The court unambiguously cabined its holding to "these facts and these facts only." *Id.* at 178. Thus, the "two-step" process Defendants cite in their account of the case refers only to what is required of citizens in Mr. Falls' position: those who were convicted in another state but did not secure clemency in that state until after they established residency in Tennessee. *Id.* The state court was neither presented with nor did it consider any question as to the requirements for obtaining a COR for a person with Tennessee or federal conviction. Indeed, the court expressly declined to consider even a hypothetical scenario in which Mr. Falls had obtained clemency before moving to Tennessee. *Id.*

Defendants' imposition of the pardon or full restoration of citizenship requirement on all COR requestors is at odds not only with the plain language of § 40-29-203 and *Falls*, but also the legislature's intent in enacting the COR statute. *See Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1117 (6th Cir. 1981) (relying on "close reading of the legislative history" to determine the existence of a liberty interest). Before the COR was created in 2006, the available avenue to restore the right to vote, for most convictions, was to seek a pardon or petition a court to restore full rights of citizenship pursuant to T.C.A. § 40-29-101 *et seq*. SOF ¶¶ 49. With the adoption of the COR statute

in 2006, the Legislature sought to create a separate administrative process to restore the right to vote, distinct from the existing patchwork procedures for petitioning a court for restoration of *all* citizenship rights, which the Legislature recognized to be overly complex, costly, and burdensome for those only seeking to restore voting rights. *Id.* ¶¶ 55-56. Rather than replace the existing procedures for restoration of citizenship rights by court petition, the Legislature opted to add the COR process as a streamlined alternative just for restoring the right to vote, requiring only satisfaction of those eligibility criteria set out in the statute. *Id.* ¶ 57 Defendants' own training materials indicate their longstanding view that restoring voting rights by COR is a less onerous *alternative* to restoration of citizenship rights by court petition. *Id.* ¶ 134. Defendants' new requirement thus contradicts two decades of practice and does not negate that Tennessee law creates a liberty interest in obtaining a COR sufficient to restore voting rights. At best, there is a genuine dispute of a material fact regarding whether and how Defendants' imposition of an unlawful procedure affects Plaintiffs' state-created liberty interests.

At any rate, even if the new procedures were valid, Plaintiffs would still have a liberty interest because restoration of citizenship rights is not wholly discretionary under Tennessee law. For Tennesseans with felony convictions between July 1, 1986 and July 1, 1996, restoration of citizenship rights is in fact non-discretionary. T.C.A. § 40-29-105(b); SOF ¶ 52. For all convictions thereafter, filing a petition creates a presumption that full rights of citizenship shall be restored unless certain evidence is presented. T.C.A. § 40-29-105(c); SOF ¶ 53; *see Mayes*, 751 F.2d at 178 (holding that a liberty interest existed where Tennessee's then-existing parole statutes, which were eventually amended, created a presumption of release). Thus, Plaintiffs have a state-created liberty interest in requesting and being issued COR irrespective of Defendants' belated imposition of additional requirements.

### 2. Plaintiffs have a constitutional liberty interest in restoration of voting rights.

In addition to a state-created liberty interest in seeking a COR, Plaintiffs also have a constitutional liberty interest in restoration of their voting rights. The Supreme Court has ordered an expansive view of liberty protected by the Due Process Clause, explaining that it encompasses not only freedom from physical restraint but the freedom to exercise wide array of constitutional rights, as well as "those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (citations omitted) ("In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed."). Regaining the right to participate in the franchise—a right described as "preservative of *all* rights"—is plainly within liberty's broad ambit. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (emphasis added).

Defendants object that "disenfranchised felons do not have a fundamental right to vote." Br. at 22. This is beside the point. Constitutional liberty interests extend beyond fundamental rights. *Roth*, 408 U.S. at 572. And here the question is whether Plaintiffs have a constitutional liberty interest in *restoration* of that right triggering protection under the Due Process Clause. Neither case cited by Defendants addresses this question. *See Wesley v. Collins*, 791 F.2d 1255, 1259 (1968) (challenging Tennessee's felony disenfranchisement statute as racially discriminatory); *Johnson v. Bredesen*, 624 F.3d 742, 744-45 (6th Cir. 2010) (challenging Tennessee's substantive criteria for voting rights restoration on their face). On the other hand, in a case challenging Kentucky's voting rights restoration process as unconstitutionally arbitrary, the Sixth Circuit held that disenfranchised Kentuckians did have a cognizable, legal interest in restoration of their voting rights. *Lostutter v. Kentucky*, No. 21-5476, 2021 WL 4523705 at *3 (6th Cir. Oct. 4, 2021) ("Given that the restoration of Plaintiffs' right to vote remains subject to the

Governor's discretion and [the Executive Order] did nothing to disrupt Plaintiffs' personal stake in challenging this, granting relief could make a difference to their legal interests.").

Furthermore, the Supreme Court has affirmatively described the right to vote as among the liberties protected by the Fourteenth Amendment. *See Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968) (describing "the right of qualified voters . . . to cast their votes effectively" as one of "our most precious freedoms"); *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (describing the right to cast an effective ballot as one of two "interwoven strands of 'liberty'" interests at stake in voting cases) (citing *Williams*, 393 U.S. at 30-31); *see also Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973) (recognizing an associational right to vote that is subject to due process); *NAACP v. Alabama*, 357 U.S. 449, 460 (1958) ("It is beyond debate that the freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment."). Lower courts have also overwhelmingly held that the right to vote is protected by due process. *See, e.g.*, *Cook v. Randolph Cnty.*, 573 F.3d 1143, 1152 (11th Cir. 2009); *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 n.5 (4th Cir. 2002); *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) ("Beyond debate, the right to vote is a constitutionally protected liberty interest.").

### B. The Due Process Clause Requires Defendants to Provide Additional Procedural Safeguards in Administering CORs.

To determine what additional procedures must be provided, courts must balance the three *Mathews* factors: (i) the private interest, (ii) the risk of erroneous deprivation and the value of additional procedural safeguards, and (iii) the cost to the government. *See* 424 U.S. at 335. In the Sixth Circuit, these factors are balanced "less as a three-way see-saw, and more as a two-step template." *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018). First, courts must determine whether the risk of an erroneous deprivation is "too high"; if so, then at least some

20

amount of due process is required. *Id.* at 800. Then, "courts must weigh the remaining factors to determine how much more ought to be provided. Where the liberty . . . interest is significant and the cost to the government of providing additional, valuable process is low, then greater procedures must be implemented." *Id.*

Summary judgment should be denied because Defendants fail to engage with the relevant standard, let alone show that there are no genuine disputes of material fact under its highly fact-dependent inquiry; rather, factual disputes abound. The record is replete with evidence that the existing COR process creates a high risk of erroneous deprivation in COR issuance, and Defendants offer no evidence that the requested procedures impose any burdens outweighing Plaintiffs' important interest in voting rights restoration. Defendants instead attempt to sidestep the relevant standard by recasting Plaintiffs' claim as a facial challenge. But this too fails.

### 1. The question of what process is due is a fact-intensive, context-dependent inquiry, and there are genuine disputes of material fact.

Under the *Mathews* test and the Sixth Circuit's framework, the risk of erroneous deprivation under the current procedures must be assessed and balanced against the cost to the government of providing additional, valuable process. Because this inquiry is contextual and fact-intensive, it is inappropriate for resolution on summary judgment. *See Greenholtz*, 442 U.S. at 12 ("It is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands. . . . Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error.") (internal citations omitted).

Plaintiffs have built a substantial record showing that the current COR procedures create an unreasonably high risk of erroneous deprivation, including two expert reports, numerous

depositions, and documentary evidence. *See* SOF. Defendants, on the other hand, make no attempt to assess the risk of erroneous deprivation and proffer no expert testimony to defend their procedures. Instead, Defendants offer just four barebones assertions about how the COR process works, which are disputed and do not indicate the presence of constitutionally adequate procedures. *See* ECF 277, Pls. Resp. Defs. Stmt. Undisputed Material Facts, ¶¶ 33-36. They claim that "[p]arole and probation officers ('PPOs') fill out and issue certificate of restoration forms to eligible offenders." *Id.* ¶ 33. But substantial evidence shows that PPOs routinely refuse to issue CORs, often only partially complete the forms, and frequently make errors in initially determining whether a COR seeker is eligible. *Id.*; *see also* SOF ¶¶ 85, 93-97, 114-15, 121-24. Testimony of TDOC officials and PPOs, and the forms and policies themselves, further indicate that the instructions are deeply inadequate to ensure uniform application of the statutory criteria, contrary to Defendants' claim that "PPOs have detailed instructions." ECF 276 ¶ 34. Defendants also assert that a person who has lost their right to vote can receive a blank COR form upon discharge or later obtain one—but this does nothing to enable eligible Tennesseans to request and be issued a COR sufficient to restore their voting rights. *Id.* ¶¶ 35-36. Defendants cannot point to anything in the record supporting a finding of constitutionally adequate procedures as required under the Sixth Circuit's procedural due process test. Summary judgment is therefore inappropriate.

### 2. Defendants' COR procedures create a serious risk of erroneous deprivation, and their new requirements only heighten this risk.

Turning to the applicable standard, the first step in the Sixth Circuit's procedural due process inquiry is to determine whether there is a legitimate risk of erroneous deprivation. *Hicks*, 909 F.3d at 800. The record shows that various deficiencies in Defendants' COR procedures result in a "too high" risk of erroneous deprivation. *Id.* This risk has only intensified since Defendants' July 2023 procedural changes.

22

The question of whether a procedural safeguard is required by due process is not about the state's errors in one case but "the risk of error inherent in the truthfinding process as applied to the generality of cases." *Mathews*, 424 U.S. at 344; *see also Jones v. Comm'r of Soc. Sec.*, 2011 WL 1527159, at *7 (E.D. Tenn. 2011). Courts have recognized several safeguards as hallmarks of due process: access to an impartial decisionmaker, a written decision based on uniform rules, a statement of reasons for adverse decisions, an expedient decision, and an opportunity to be heard. *Mathews*, 424 U.S. at 325 n.4 (citing *Goldberg*, 397 U.S. at 267-71); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (emphasizing that the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner"). Defendants' COR procedures lack all these basic guardrails against erroneous deprivation, and thus fewer people in Tennessee have their voting rights restored than are eligible, likely only about 9.1%. SOF ¶ 77. This rate is low relative to restoration and registration rates in other states and is at least partially attributable to "systematic failures within the rights restoration process." *Id.* ¶ 77-78.

Defendants' administration of the COR process creates a high risk that an eligible person will be erroneously deprived of a COR in several ways. First, there is no uniform procedure—e.g., an application—for potentially eligible individuals to request a COR, creating difficulties with even initiating the COR process and identifying the appropriate decisionmaker to whom to direct a COR request. *Id.* ¶¶ 79-92. Next, there is no procedure requiring the officials statutorily responsible for fielding COR requests to provide an affirmative or negative determination of a person's eligibility. *Id.* ¶¶ 93-102. Additionally, there is no procedure requiring relevant officials to explain a decision not to issue a COR, leaving applicants unaware of how to or when they will become eligible and unable to identify errors. *Id.* ¶ 103-09. Nor is there any state-level guidance or regulation to help TDOC and county officials uniformly interpret and apply the statutory

eligibility requirements. *Id.* ¶¶ 110-18. Eligible Tennesseans who submit CORs to the Election Division are often denied for immaterial errors or omissions that have nothing to do with their eligibility. *Id.* ¶ 119-28. Finally, there is no appeal process for individuals who believe they have been erroneously denied. *Id.* ¶ 129-32.

Defendants' changes to COR procedures in July 2023—namely the addition of a new extra-legal administrative requirement to secure a pardon or court restoration of citizenship rights— further intensify the risk of erroneous deprivation in issuance of CORs. *Id.* ¶¶ 133-77. The new administrative prerequisite is a virtually insurmountable barrier for most members of the putative class to obtain CORs. *Id.* ¶¶ 134-43. Furthermore, Defendants' shifting sands approach to voting rights restoration—making up and changing rules whenever they please—makes it impossible for eligible individuals to know whether their COR applications will be accepted at any given time, and itself increases the risk of erroneous deprivation. *See* ¶¶ 155-65, 172-75, 176-77.

### 3. The cost to Defendants of providing additional process is low and far outweighed by the significance of Plaintiffs' interests at stake.

To determine whether the procedures Plaintiffs request are due, the Court must balance the significance of the interest at stake for Plaintiffs, the value of the procedures, and the government's interest in avoiding the procedures. *See Hicks*, 909 F.3d at 800. "Where the liberty or property interest is significant and the cost to the government of providing additional, valuable process is low, then greater procedures must be implemented." *Id.*

The interest of Plaintiffs, and the tens of thousands of similarly situated Tennesseans, in being able to request and be issued a COR sufficient to regain their right to vote is exceedingly significant. "The right to vote is a 'precious' and 'fundamental' right." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 670 (1966)). "Other rights, even the most basic, are illusory if the right to vote is undermined."

24

*Wesberry v. Sanders,* 376 U.S. 1, 17 (1964); *see also Yick Wo,* 118 U.S. at 370 (the right to vote is "preservative of all rights"). Defendants offer no evidence that this important interest does not merit the procedural guardrails Plaintiffs seek.

The administration of a uniform application process would give each potentially eligible Tennessean a place to request a COR with a guarantee that the decisionmaker who receives the request will determine the applicant's eligibility and not simply refuse the request. And requiring issuance of formal decisions on COR requests based on valid criteria with a notice of reasons for denials would provide applicants information necessary to assess whether they have been erroneously denied. *See Silver v. New York Stock Exch.*, 373 U.S. 341, 366 (1963) ("[T]he affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits from occurring.") (internal quotation marks and citations omitted); *Jergens v. Ohio Dep't of Rehab. & Corr. Adult Parole Auth.*, 492 F. App'x 567, 571 n.5 (6th Cir. 2012) (reliance on unlawful criteria "could constitute a due-process violation"). Uniform procedures for interpreting the COR requirements, especially with respect to court cost and restitution requirements, would reduce arbitrariness in COR refusals and denials. *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of the government[.]"). And an opportunity to appeal or seek administrative review of a COR decision would allow applicants to rectify any errors. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("The fundamental requisite of due process of law is the opportunity to be heard."). The probable value of these procedures is high because otherwise there is no reliable means to request a COR, rendering an individual's entitlement to one under law illusory.

25

On the other end of the balance, Defendants have offered no compelling evidence that the costs to the state of incorporating the basic elements of due process into the COR process are high. By contrast, Plaintiffs' expert Dr. Selin points out that other states with felony disenfranchisement regimes offer a uniform application for people to make requests without having to hunt for officials to certify a COR form, which lowers the cost to the state by reducing the number of administrators involved. SOF ¶ 186. Alabama, Kentucky, Virginia, and Wyoming circumvent the inefficiencies of decentralized procedures at the outset by having citizens fill out and submit applications to begin the eligibility verification and/or rights restoration process. *Id.* ¶ 187. Tennessee's process, then, is unnecessarily costly because it involves an outsized number of administrators, including TDOC, county election officials, state health officials, and county courts. *See id.* ¶¶ 186-87. And the cost of compliance is comparably low against the exceedingly high stakes of the liberty interest involved, especially given that implementation of these procedures is neither novel nor untested. At minimum, there is a genuine dispute as to the cost for the State to provide these procedures such that summary judgment is improper.

### 4. Plaintiffs do not challenge Tennessee's rights restoration laws, but rather Defendants' procedurally deficient administration.

Rather than address the constitutional adequacy of their procedures for voting rights restoration under the relevant standard, Defendants instead attempt to reclassify Plaintiffs' due process claims as "a facial challenge [to] the generally applicable re-enfranchisement regime as enacted by the General Assembly." Br. at 20. Defendants rely on the Eleventh Circuit's decision in *Jones v. Governor of Florida*, 975 F.3d 1016 (11th Cir. 2020), to contend that Plaintiffs have received all the process they are due from the legislative process. But Defendants misunderstand the fundamental differences between the two cases.

In *Jones*, disenfranchised Floridians challenged the legislature's requirement that individuals with past felonies must pay all legal financial obligations before having their right to vote restored, enacted after voters passed a statewide ballot initiative restoring the right to vote to individuals who had completed their sentences. *Id.* at 1025. The *Jones* plaintiffs had completed their sentences but not paid off all LFOs and would have been re-enfranchised by the ballot initiative but for the legislature creating the additional monetary requirements. *Id.* at 1027. The *Jones* plaintiffs were deprived of the right to vote by legislative action and the Eleventh Circuit found that action did not lack due process because the legislative process—as in the democratic process by which legislators drafted, considered, and passed the LFO requirement—has procedural safeguards inherent. *Id.* at 1048; *accord Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 217 (6th Cir. 2011) (en banc) ("'The legislative process provides all the process that is constitutionally due' when [an] alleged injury results from a legislative act 'of general applicability'.") (internal citation omitted). Thus, the Eleventh Circuit *en banc* found that the *Jones* plaintiffs' procedural due process challenge to the legislature's action depriving them of the right to vote failed. *Jones*, 975 F.3d at 1049.

Here, by contrast, Plaintiffs do not claim to have been deprived of a COR and the right to vote by legislative action, rather that they were *granted* those interests by the legislative process when the Legislature *created* a statutory right to voting rights restoration in 2006. The Legislature spoke clearly: a person who meets the voting rights restoration criteria "may request, and then shall be issued" a COR from Defendants that is "sufficient proof that the person . . . is no longer disqualified from voting." T.C.A. § 40-29-203(a), (c). The record shows it is not the law itself but Defendants' procedurally deficient administration that denies Plaintiffs and other similarly situated individuals access to these rights without due process.

27

Moreover, unlike in *Jones*, Plaintiffs challenge Defendants' administrative procedures not the substantive statutory criteria. The *Jones* plaintiffs sought to enjoin the LFO requirements on the grounds that it was inherently unadministrable because LFO records are so inaccessible and poorly maintained. *See Jones*, 975 F.3d at 1068 (Jordan, J., dissenting). Plaintiffs here stake no such claim. For example, Plaintiffs do not argue that the legislature's requirement to pay restitution and court costs are unconstitutional, rather they argue that Defendants' inadequate procedures can and do lead to individual COR seekers being erroneously denied because, among dozens of other problems, officials often wrongly determine that a fine is a court cost.

Try as they might, Defendants cannot twist Plaintiffs' claims into something they are not. Plaintiffs do not challenge a legislative act, neither the eligibility criteria for rights restoration nor "how the General Assembly designed the re-enfranchisement framework." Br. at 20. Defendants' choices not to apply constitutionally mandated procedures in making each COR issuance decision is not legislation or policy but a pattern of repeated administrative conduct when making individualized determinations as to each COR seeker, including Plaintiffs and members of the putative class. The various other cases Defendants cite where plaintiffs challenged legislative acts are therefore inapposite. *See Kaminski v. Coulter*, 865 F.3d 339, 348 (6th Cir. 2017) (challenging city's decision as to health-care benefits for all city retirees); *Smith*, 641 F.3d at 216-17 (challenging school board's budgetary decision); *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 598 (6th Cir. 2003) (challenging library's no-shoes policy); *Pickney Bros., Inc. v. Robinson*, 1999 WL 801514, at *4 (6th Cir. 1999) (challenging sewage disposal board's licensing requirements). Nor do Plaintiffs allege here that Defendants are violating state law. Br. at 21. Plaintiffs instead assert straightforward procedural due process claims: the process Defendants use to determine whether to issue individuals a COR lacks procedures that the Due Process Clause

28

requires. Defendants' attempt to recast this claim as a facial challenge to Tennessee's rights restoration laws fails, and the Court should proceed to determine what procedures are due based on the facts found at trial.

### III. Defendants Are Not Entitled to Summary Judgment as to Plaintiffs' *Bush v. Gore* Claim (Count 3).

Defendants are not entitled to summary judgment on Count 3 because the record demonstrates that Defendants' administration of the COR statutes results in a system where similarly situated Tennesseans—convicted of the same crime and who have served the same sentence and met their relevant legal financial obligations—can be granted or denied access to the right to vote based solely on the county of their felony conviction or residence, or the person to whom they direct their COR request. Such arbitrary and disparate treatment of similarly situated persons seeking to access the franchise violates the Equal Protection Clause under any level of scrutiny.

### A. Plaintiffs' Equal Protection Claim is Subject to Heightened Scrutiny Under *Bush v. Gore*.

"[O]nce a state legislature vests its citizens with election rights, those rights are fundamental and are protectable by the First and Fourteenth Amendments." *Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016); *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curium) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). Accordingly, states must ensure "the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote. *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curium); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[B]efore th[e] right (to vote) can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.") (internal citation omitted). Equal protection entails an "obligation to avoid arbitrary and

29

disparate treatment of the members of [the] electorate" that results in "valu[ing] one person's vote over that of another." *Bush*, 531 U.S. at 104-05. This "obligation to avoid arbitrary and disparate treatment" applies to a variety of rules affecting voting and with equal force to state procedures for voting rights restoration, which determine whether individuals disqualified from voting due to a felony conviction may once again participate in the franchise. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.") (quoting *Bush*, 531 U.S. at 104).

Defendants concede that *Bush v. Gore* claims are subject to heightened scrutiny. Br. at 23. But they wrongly claim that this heightened scrutiny does not apply here because the COR process, they say, does not implicate the fundamental right to vote, relying on *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010). However, *Johnson*, which concerned a challenge to the *substantive* eligibility criteria for CORs on behalf of ineligible voters who are indigent, is not controlling here. *Id.* at 745. Plaintiffs do not challenge the substantive eligibility criteria to obtain a COR. Instead, they challenge the arbitrariness of the COR *process* on behalf of those who are potentially eligible. Since the state guarantees eligible individuals a statutory right to a COR and thereby access to the right to vote, it must administer that process in a manner that does not arbitrarily deny these rights to similarly situated potentially eligible applicants. *See Bush*, 531 U.S. at 104; *see also Stein*, 672 F. App'x at 569-70.

Voter registration provides a helpful analog: states are not required to enact voter registration systems, but when they do, they must be administered uniformly. *See Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) (Barkett, J., concurring) ("[A state's voter] registration scheme [was] 'not a process with sufficient guarantees of equal treatment'

30

because it is completely devoid of specific standards to ensure that the right to vote is available equally to all potential voters") (quoting *Bush*, 531 at 105-07). So too here: the Constitution does not require Tennessee to create a voting rights restoration process, but since it has, the system must be administered uniformly.

The record reflects a genuine dispute as to whether Defendants' application of the COR process results in arbitrary and disparate treatment based solely on where an individual requestor lives or seeks a COR. As an initial matter, Defendants have flat out admitted to treating COR-seekers differently depending on their county of residence. In July 2023, knowing that they were about to upend the existing rights restoration process, the Elections Division purposefully approved COR applications from Tennesseans who lived in certain counties while holding onto applications from eligible individuals in other counties until after the policy change, at which point they denied those individuals based on the newly created standards. SOF ¶¶ 158-59. This alone constitutes a facial *Bush v. Gore* violation. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 466, 478 (6th Cir. 2008) (holding that a failure to provide "[]uniform standards, processes, and rules" violates equal protection guarantees under *Bush v. Gore*); *see also Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 49 (S.D.N.Y. 2020) (finding state violated equal protection when it applied policy known to result in arbitrary treatment of voters).

Even apart from that, however, Defendants' failure to provide adequate statewide guidance and oversight as to even the most basic procedures for Tennessee's COR process—for example, when CORs should be issued and which officials are responsible for that task—leads to arbitrary and unequal results for similarly situated Tennesseans. SOF ¶ 110. There are no uniform rules or training for officials who fill out CORs as to what constitutes "court costs" for purposes of voting rights restoration, resulting in significant variation in how officials who fill out CORs assess court

31

costs from county to county. *Id.* ¶¶ 111-15. There are no uniform rules as to when a determination of "indigency" excuses an individual from having to pay court costs, resulting in variation across officials. *Id.* ¶¶ 116-17. Nor are there uniform rules as to what types of child support debts are disqualifying. *Id.* ¶ 118. Which officials complete which part of the COR form also varies widely and randomly by county. *Id.* ¶ 184. There is a lack of training, oversight, and feedback to ensure that when PPOs fill out CORs, that they do so correctly, resulting in arbitrary denials for reasons unrelated to eligibility. *Id.* ¶¶ 180-82, 185. And there is no systematic tracking of the outcome of COR requests, and thus no official way for mistakes to be discovered or rectified. *Id.* ¶ 100. Thus, the evidence shows that whether an individual receives a COR sufficient to restore voting rights can depend solely on where they live, where they are convicted, or the office they visit.

In the same way that Florida's "use of standardless manual recounts," *Bush,* 531 U.S. at 103, and Ohio's disjointed voting system, *Brunner*, 548 F.3d at 478, deprived their citizens of the right to vote based on where they lived, Defendants here have also failed to provide statewide uniform standards and procedures to ensure the non-arbitrary treatment of COR applicants. Because the state's procedures subject potential voters to arbitrary and disparate treatment, *Bush v. Gore* requires heightened scrutiny of those procedures.

**B.  Defendants' Application of the COR Process Fails Any Level of Scrutiny.**

As discussed above, Defendants' COR process lacks "specific standards to ensure its equal application" necessary to meet the state's obligation "to avoid arbitrary and disparate treatment" of COR applicants, and therefore cannot satisfy any level of scrutiny, including rational basis review. *Bush*, 531 U.S. at 105-06. And under any standard, factual disputes bar summary judgment.

Defendants cursorily point to "sav[ing] taxpayer resources" and "eas[ing] administrative burdens" as governmental interests served by their application of the COR process. Br. at 25-26. However, they offer *no evidence* to support the contention that providing uniform rules and

standards non-arbitrary COR outcomes would cause a budgetary or administrative strain. On the other hand, Plaintiffs offer evidence demonstrating precisely the opposite: Defendants' application of the COR process neither saves taxpayer resources nor eases administrative burdens. SOF ¶¶ 178-79. In fact, Plaintiffs present evidence that a centralized, streamlined process would likely save taxpayer money and administrative resources. *Id.* ¶¶ 186-88.

Furthermore, Defendants' claim that PPOs are best positioned to fill out CORs because they are "more familiar" with the requestor's circumstances and more accessible to answer questions about the application process is at odds with the evidence. Br. at 26. As a matter of TDOC policy, PPOs are not required to fully certify COR forms, and PPOs refuse to do so. SOF ¶¶ 93-97. Mr. Tournier never received a response the PPOs from whom he requested a COR. *Id.* ¶¶ 18, 97. PPOs are not more "familiar with" (or willing to become familiar with) the circumstances of individuals' convictions, especially out-of-state or federal convictions, or the COR criteria that most frequently poses a barrier to eligibility, payment of court costs and restitution. *Id.* ¶¶ 114-15, 185. Indeed, PPOs send COR seekers to find other more willing officials, often in court clerk's offices. *Id.* ¶¶ 85, 93, 184. The evidence simply does not support Defendants' hollow justifications for maintaining a standardless COR process. At minimum, there are genuine disputes of fact as to the propriety of their asserted governmental interests, an issue best left for factfinding at trial.

Even applying rational basis review, summary judgment is inappropriate. To survive rational basis review, Defendants must show that the COR process is "rationally related to legitimate government interests." *Johnson*, 624 F.3d at 746; *see also Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). The record is replete with evidence demonstrating the arbitrary and disparate treatment of COR applicants based on where they live or were convicted, *see supra*, but devoid of any

evidence that this state of affairs is rationally related to any legitimate governmental interest. There is no legitimate government interest in a voting rights restoration system that lacks basic standards, rules, and oversight needed to avoid arbitrary treatment of COR seekers based on location.

Therefore, Defendants are not entitled to summary judgment as to Count 3.

## IV. Plaintiffs' Requested Relief is Proper.

While Defendants allege that Plaintiffs impermissibly seek for this Court to rewrite state law, *see* Br. at 31-34, this is not so. Plaintiffs do not seek to rewrite state law, rather, they seek an injunction requiring Defendants' COR procedures to comply with the standards of due process. Courts routinely "craft appropriate and specific remedies in ballot-access and voting-rights cases" to ensure that the defendants' procedures pass constitutional and legal muster. *Esshaki v. Whitmer*, 813 F. App'x 170, 172 (6th Cir. 2020) (collecting cases). And the cases cited by Defendants do not dispute this fact, as the courts in those courts issued broader relief than was necessary. *See Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006); *Horne v. Flores*, 557 U.S. 433, 448 (2009); *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) (per curiam) ("*Thompson I*"); *Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) ("*Thompson II*").

Here, Plaintiffs' requested injunction is "no broader than necessary to remedy the harm at issue," *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002), because it would remedy the deprivation of Plaintiffs' due process rights. Because the Legislature has conferred a liberty interest to certain Tennesseans in the form of CORs, "it may not constitutionally authorize the deprivation of such an interest." *Lillard v. Burson*, 933 F. Supp. 698, 703 (W.D. Tenn. 1996). Therefore, Defendants' deprivation of Plaintiffs' procedural due process rights necessitates this Court's injunction without infringing on the Legislature's domain. This is because "[t]he right to due process is conferred not by legislative grace, but by constitutional guarantee." *Id*.

If any party seeks to re-write state law without legislative approval, it is Defendants. Defendants have used the Tennessee Supreme Court's decision in *Falls v. Goins* to create an impermissible "two-step process" that Tennesseans with past felony convictions must navigate before they can restore their voting rights. *See* Br. at 2, 5-6. But *Falls* does not supersede the Legislature's establishment of the COR process as a streamlined alternative procedure to restore voting rights restoration, distinct from the existing, more onerous avenues, like obtaining a pardon or court-ordered restoration of full citizenship rights. *Supra* Part II.A.1.b. *Falls* provides no basis for Defendants' attempt to overwrite Tennessee's voting rights restoration laws.

Finally, Defendants claim that Plaintiffs seek to dictate how Tennessee officials conduct their own elections. *See* Br. at 32-33. Not so. Plaintiffs do not seek to alter who the Legislature has chosen to disenfranchise due to past felony conviction, *cf. Richardson v. Ramirez*, 418 U.S. 24, 54 (1974),[6] or how the state runs its elections. *Cf. Thompson I*, 959 F.3d at 812; *Thompson II*, 976 F.3d at 620. As stated above, Plaintiffs seek nothing more than for Defendants' COR procedures to comport with the standards of due process *because* the Legislature created a liberty interest in CORs. And to the extent there is merit in Defendants' allegation that Plaintiffs' requested injunction would affect the conduct of the State's elections, which Plaintiffs dispute, "[t]he assertion that a state's power to manage elections is absolute even when that authority implicates other constitutional rights . . . is at odds with governing precedent." *Esshaki*, 813 F. App'x at 172.

## CONCLUSION

Defendants' Motion for Summary Judgment as to Counts 1-3 should be denied.

---

[6] Defendants mischaracterize *Richardson v. Ramirez*, which stood for the proposition that states may disenfranchise people with past felony convictions without violating the Equal Protection Clause, not that "whether and in what circumstances to allow felons re-enfranchisement is a decision committed to [a state's] discretion as it designs its elections." Br. at 33. Defendants cannot use *Richardson* to support their violations of due process.

35

Dated:  August 1, 2024

Keeda Haynes, BPR No. 031518
Free Hearts
2013 25th Ave. N,
Nashville, TN 37208
(615) 479-5530
keeda@freeheartsorg.com

Phil Telfeyan
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org


* Admitted pro hac vice

Respectfully submitted,

/s/ *Charles K. Grant*
Charles K. Grant, BPR No. 017081
Denmark J. Grant, BPR No. 036808
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
211 Commerce Street, Suite 800
Nashville, TN 37201
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
cgrant@bakerdonelson.com
dgrant@bakerdonelson.com

Blair Bowie*
Danielle Lang*
Alice Huling*
Valencia Richardson*
Aseem Mulji*
Ellen Boettcher*
Kate Uyeda, BPR No. 040531
Kathryn Huddleston*
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
Bbowie@campaignlegal.org
Dlang@campaignlegal.org
Ahuling@campaignlegal.org
VRichardson@campaignlegal.org
Amulji@campaignlegal.org
EBoettcher@campaignlegal.org
KUyeda@campaignlegal.org
KHuddleston@campaignlegal.org


*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

        I hereby certify that on August 1, 2024, a copy of the foregoing document was filed electronically.  Notice of this filing will be served by operation of the Court's electronic filing system to counsel for parties below. Counsel for the parties may access these filings through the Court's electronic filing system:

DAWN JORDAN (BPR #020383)
Special Counsel
dawn.jordan@ag.tn.gov

ANDREW C. COULAM (BPR #030731)
Deputy Attorney General
Andrew.Coulam@ag.tn.gov

DAVID M. RUDOLPH (BPR #13402)
Senior Assistant Attorney General
david.rudolph@ag.tn.gov

ZACHARY BARKER (BPR #035933)
Assistant Attorney General
Zachary.barker@ag.tn.gov

ROBERT W. WILSON (BPR # 034492)
Assistant Attorney General
Robert.Wilson@ag.tn.gov

Office of the Tennessee Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202

*Attorneys for State Defendants*

                                    /s/ *Charles K. Grant*
                                    Charles K. Grant