**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: June 05, 2025

Mr. Zachary Lewis Barker
Office of the Attorney General
of Tennessee
500 Dr. Martin L. King Boulevard
Suite 3214
Nashville, TN 37219

Ms. Ellen Boettcher
Campaign Legal Center
1101 14th Street, N.W.
Suite 400
Washington, DC 20005

Ms. Blair S. Bowie
Ms. Alice Clare Campbell Huling
Ms. Danielle Marie Lang
Campaign Legal Center
1101 14th Street, N.W.
Suite 400
Washington, DC 20005

Mr. Charles Kevin Grant
Mr. Denmark Grant
Baker, Donelson, Bearman, Caldwell & Berkowitz
1600 West End Avenue
Suite 2000
Nashville, TN 37203

Ms. Dawn M. Jordan
Office of the Attorney General
of Tennessee
500 Dr. Martin L. King Boulevard
Suite 3214
Nashville, TN 37219

Mr. James Matthew Rice
Office of the Attorney General
of Tennessee
500 Dr. Martin L. King Boulevard
Suite 3214
Nashville, TN 37219

Ms. Valencia Richardson
Campaign Legal Center
1101 14th Street, N.W.
Suite 400
Washington, DC 20005

Ms. Kate Uyeda
Campaign Legal Center
1101 14th Street, N.W.
Suite 400
Washington, DC 20005

Re: Case No. 24-5546, *TN State Conf of the NAACP, et al v. William Lee, et al*
Originating Case No. : 3:20-cv-01039

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Lynda M. Hill

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0148p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, on behalf of itself and its members,

*Plaintiffs-Appellees*,

*v.*

WILLIAM BYRON LEE, et al.,

*Defendants*,

MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; TRE HARGETT, in his official capacity as Secretary of the State of Tennessee,

*Defendants-Appellants*.

No. 24-5546

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-01039—William Lynn Campbell, Jr., District Judge.

Argued: January 14, 2025

Decided and Filed: June 5, 2025

Before: BUSH, LARSEN, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Philip Hammersley, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Danielle M. Lang, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellee. **ON BRIEF:** Philip Hammersley, Zachary Barker, Dawn Jordan, J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Danielle M. Lang, Blair S. Bowie, Alice C.C. Huling, Kathryn Huddleston, Valencia Richardson, Ellen Boettcher, Kate Uyeda, CAMPAIGN LEGAL CENTER, Washington, D.C., Charles K. Grant, Denmark J. Grant, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Nashville, Tennessee, for Appellee.

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 2     (4 of 20)

No. 24-5546          Tenn. Conference of the NAACP, et al. v. Lee, et al.          Page 2

## OPINION

MURPHY, Circuit Judge. Tennessee grants the right to vote only to some convicted criminals. When processing voter-registration forms, then, state officials must distinguish between eligible and ineligible felons. To do so, the officials have required some felon applicants to include additional records with their registration forms that confirm their eligibility. The Tennessee State Conference of the NAACP asserts that this "Documentation Policy" violates the National Voter Registration Act (NVRA). The district court agreed and facially enjoined the policy. Yet the NAACP failed to establish its Article III standing to sue. The Documentation Policy does not directly regulate the NAACP. And although the NAACP generally alleges that the policy has led it to spend resources to help eligible felons register to vote, the organization did not introduce any specific facts showing that the policy threatened an imminent injury. Indeed, the NAACP did not identify a single voter that it has helped or planned to help. We thus reverse.

I. Background

*Voter Eligibility*. The Tennessee Constitution allows its legislature to deny the right to vote to those convicted of certain crimes: "[T]he right of suffrage . . . shall never be denied to any person entitled thereto, except upon a conviction by a jury of some infamous crime, previously ascertained and declared by law, and judgment thereon by court of competent jurisdiction." Tenn. Const. art. I, § 5. But this voting ban does not kick in until the legislature passes a law identifying the offenses that qualify as "infamous." *See Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983).

In the past 55 years, the Tennessee General Assembly has followed three different felon-disenfranchisement rules. First, before January 15, 1973, the General Assembly identified 21 specific offenses that would forfeit voting rights. *See Crutchfield v. Collins*, 607 S.W.2d 478, 480–82 (Tenn. Ct. App. 1980); 1972 Tenn. Pub. Acts 1111–13. Second, between January 15, 1973, and May 17, 1981, the General Assembly treated no offenses as "infamous."

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 3   (5 of 20)

No. 24-5546    *Tenn. Conference of the NAACP, et al. v. Lee, et al.*    Page 3

Resp., R.181, PageID 2895.  Third, since May 18, 1981, the General Assembly has treated all in-state felonies as infamous as well as all federal and out-of-state crimes that would qualify as felonies under Tennessee law.  *See Falls v. Goins*, 673 S.W.3d 173, 176 n.1, 179 (Tenn. 2023); Tenn. Code Ann. §§ 2-19-143(2)–(3), 40-20-112 (2024).

Since 2006, most felons also could restore their voting rights by obtaining a Certificate of Voting Rights Restoration.  *See* Tenn. Code Ann. §§ 40-29-201 to 40-29-205 (2024); *Falls*, 673 S.W.3d at 179 & n.6.  Felons who met the requirements could apply for a "voter registration card" using a "certificate of voting rights restoration form" that Tennessee's Coordinator of Elections prepared.  Tenn. Code Ann. § 40-29-205 (2024); *see* Goins Decl., R.151-1, PageID 1092.

*Registration Forms*.  Under the NVRA, voters may register to vote using one of two forms.  52 U.S.C. § 20505(a)(1)–(2).  States must "accept and use" a "mail voter registration application form" that the Election Assistance Commission (or EAC) creates.  *Id.* §§ 20505(a)(1), 20508(a)(2); *Arizona v. Inter Tribal Council of Ariz., Inc.* (*ITCA*), 570 U.S. 1, 5 & n.1 (2013).  This form (which we will call the "Federal Form") looks the same for all States.  *ITCA*, 570 U.S. at 5.  But it includes state-specific instructions that the EAC adopts with state input.  *See id.* at 5–6; 52 U.S.C. § 20508(a)(2).  Separately, States may "use" their own "mail voter registration form" (which we will call the "State Form").  52 U.S.C. § 20505(a)(2).  This State Form still must satisfy "all of the criteria" required for the Federal Form.  *Id.*; *see id.* § 20508(b).

Tennessee has opted to use both the Federal Form (as the NVRA requires) and a State Form (as the NVRA permits).  If convicted felons use the Federal Form to register, state election officials will not know "from the face of the form" if the felons are eligible to vote because it does not require them to list their prior convictions.  Resp., R.181, PageID 2909.  That said, the EAC has adopted a Tennessee-specific instruction that discusses felony convictions:

> To register in Tennessee you must: . . . not have been convicted of a felony, but if convicted, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction.  For more information about this process, call 877-850-4959 or visit https://sos.tn.gov/restoration.

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 4     (6 of 20)

No. 24-5546          *Tenn. Conference of the NAACP, et al. v. Lee, et al.*          Page 4

Fed. Form, R.156-11, PageID 2509. Felon applicants also must swear or affirm that they meet Tennessee's "eligibility requirements" under penalty of perjury. *Id.*, PageID 2508.

Tennessee's State Form, by contrast, has changed over time. Resp., R.181, PageID 2901. After the November 2020 election, Tennessee adopted its current version. *Id.*, PageID 2905–06. The State Form includes the following statement about felony convictions:

> If you have had a felony conviction, your eligibility to register and vote depends upon the crime you were convicted of and the date of your conviction. To assist in processing your application, provide the required information in box 4 and any responsive documents you have. For more information about this process, call 1-877-850-4959 or visit sos.tn.gov/restoration.

State Form, R.156-10, PageID 2503. Box 4, in turn, includes questions for applicants to answer. It first asks a "yes" or "no" question: "Have you ever been convicted of a felony? (If expunged, answer 'no')[.]" *Id.* If applicants answer "yes," this box includes space for them to identify the crime, the date of conviction, and the place of conviction. *Id.* The box then asks a second "yes" or "no" question: "Have you received a pardon or had your voting rights restored?" *Id.* If applicants answer "yes," the box lastly instructs them to "provide copy of document." *Id.*

*Processing the Forms*. Tennessee's Coordinator of Elections may adopt a "uniform procedure" to verify the eligibility of individuals convicted of crimes. *See* Tenn. Code Ann. § 2-2-139(c) (2024). Beginning at least in 2014, Tennessee followed a broad Documentation Policy. Under this policy, officials would reject the State Forms of *all* applicants who indicated that they had been convicted of a felony if these applicants did not provide "other documentation" proving their eligibility. Lim Dep., R.156-4, PageID 2404; *see* Resp., R.181, PageID 2909–11. Election officials would likewise reject the Federal Forms of applicants if the officials learned through other channels that the applicants had been convicted of a felony. Resp., R.181, PageID 2911–12.

In July 2023, well after this litigation had begun, the Coordinator of Elections narrowed the Documentation Policy to "avoid the unnecessary rejection" of felon applicants. Goins Decl., R.151-1, PageID 1093. This change helped two groups. It first affected individuals convicted of felonies before January 15, 1973. Mem., R.151-2, PageID 1095–96. The Coordinator of Elections instructed election officials to approve the applications of all felons in this group who

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 5   (7 of 20)

No. 24-5546            *Tenn. Conference of the NAACP, et al. v. Lee, et al.*            Page 5

indicated that they were not convicted of one of the 21 infamous crimes that existed at that time. *Id.* The change next affected individuals convicted of felonies during the grace period between January 1973 and May 1981. *Id.*, PageID 1096. The Coordinator of Elections again instructed election officials to approve the applications of these felons since they remained eligible. *Id.*

County election officials must follow a certain process when they reject applications because the applicants have been convicted of a felony but have not provided the required documentation. The officials must tell the applicants the "reason" for the rejection. Tenn. Code Ann. § 2-2-125(a) (2024). They must also alert them of a right to appeal to the county election commission and give them the "appeal form" for doing so. *Id.* § 2-2-125(b).

*This Litigation*. In December 2020, the Tennessee Conference of the NAACP and several individuals sued, among others, Tennessee's Coordinator of Elections and Secretary of State (collectively, "Tennessee"). Compl., R.1, PageID 1. This appeal concerns Count 6. In that count, the NAACP alone (not the individual plaintiffs) argued that the NVRA barred the Documentation Policy requiring felons to provide proof of eligibility with the Federal and State Forms. Am. Compl., R.102, PageID 102–03. After both sides sought summary judgment on this count, the district court ruled for the NAACP. *See Tenn. Conf. of NAACP v. Lee*, 730 F. Supp. 3d 705, 740 (M.D. Tenn. 2024). The court first held that the NAACP had standing to challenge the policy. *Id.* at 725–27. It reasoned that the documentation requirement made it more "costly" for the NAACP to help felons register and thus "diverted" the NAACP away from other activities. *Id.* Turning to the merits, the court held that the policy violated the NVRA. *Id.* at 736–40.

Before the 2024 election, the district court issued a permanent injunction against the policy. The court declared that the policy "of rejecting valid, timely submitted mail in voter registration forms . . . based solely on an indication that the applicant has a past felony conviction and requiring the applicant to provide additional documentary proof of eligibility before being placed on the voter rolls" violated the NVRA. Inj., R.237, PageID 3825. And it enjoined election officials "from enforcing, applying, or implementing" this policy against all applicants. *Id.*, PageID 3825–26.

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 6     (8 of 20)

No. 24-5546          *Tenn. Conference of the NAACP, et al. v. Lee, et al.*          Page 6

Although the court entered a permanent (not a preliminary) injunction, it did not issue a final judgment because other claims remained pending. Still, Tennessee had the right to appeal the injunction. *See* 28 U.S.C. § 1292(a)(1); 16 Charles A. Wright et al., *Federal Practice and Procedure* § 3924, at 168–70 (3d ed. 2012). The State thus filed a notice of appeal and a motion to stay the injunction pending appeal. We granted a stay. *See Tenn. Conf. of NAACP v. Lee*, 105 F.4th 888, 907 (6th Cir. 2024) (per curiam). The parties have now completed their briefing.

Since that time, the General Assembly has substantially amended the laws governing voting by convicted felons. *See* Pub. Ch. No. 298, 2025 Tenn. Pub. Acts ___. Among other changes, this law restores the rights of all felons convicted before January 15, 1973. It also creates a new court-petitioning procedure for other felons to regain their voting rights. Tennessee is "still evaluating" how the changes affect its voter-registration policies. Notice, 6th Cir. R.54-1, at 3.

## II. Article III Standing

As part of this interlocutory appeal, we have jurisdiction to review all decisions that "underlie" the district court's "injunction," including its decision that the NAACP proved its standing to sue at the summary-judgment stage. Wright, *supra*, § 3924, at 170; *id.* § 3921.1, at 49–52; *see ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 496 (6th Cir. 2022). We can resolve this appeal based on that standing question alone. And because we can decide standing and mootness issues in any order, we need not consider what effect (if any) the General Assembly's recent legislation has on the continued justiciability of this suit. *See In re 2016 Primary Election*, 836 F.3d 584, 587–88 (6th Cir. 2016).

### A. "Organizational" Standing

The U.S. Constitution protects liberty by dividing governmental powers both horizontally (between the legislative, executive, and judicial branches) and vertically (between the federal government and the States). *See Bond v. United States*, 564 U.S. 211, 220–24 (2011); *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 536–37 (6th Cir. 2021). Article III vests the "judicial Power" in the federal courts. U.S. Const. art. III, § 1. This grant of authority does not allow courts to act like a Council of Revision by preemptively screening all new laws passed

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 7   (9 of 20)

No. 24-5546            *Tenn. Conference of the NAACP, et al. v. Lee, et al.*            Page 7

by democratically elected legislators. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009). It instead limits our review power to "Cases" and "Controversies." U.S. Const. art. III, § 2. To satisfy that jurisdictional requirement, a plaintiff who files a complaint in court must establish its "standing" to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing, in turn, requires the plaintiff to show an injury attributable to the defendant's conduct and redressable by the requested relief. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Courts often must apply this three-part standing test when plaintiffs request an injunction against the enforcement of a law or regulation. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407–09 (2013); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). To seek that "forward-looking relief," plaintiffs must first show that they will likely suffer an injury from the challenged conduct. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). And not just any injury will do. Plaintiffs, for example, cannot sue based on the "psychological" distress they may suffer from a law they dislike. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Rather, the alleged injury must resemble the types of harms that litigants have traditionally gone to court over. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). So only "concrete" and "particularized" injuries—such as economic or physical harms—will suffice. *Id.* at 423, 425. Because an injunction seeks to stop future harms from occurring, plaintiffs also must show that this type of cognizable injury is "imminent," which requires them to establish that it is "*certainly impending*." *Clapper*, 568 U.S. at 409 (citations omitted).

Plaintiffs next must show that this imminent injury "likely will be caused by" the defendant's enforcement of the challenged law or regulation. *All. for Hippocratic Med.*, 602 U.S. at 382. When a law regulates a plaintiff (which must alter its conduct), this causal showing does not pose much difficulty. *Lujan*, 504 U.S. at 561–62. Sometimes, though, a plaintiff seeks to enjoin a law that regulates "*someone else*" because the plaintiff believes that the law will indirectly affect it too. *Id.* at 562. Such an unregulated party must show more to sue because it must trace its injuries to the enforcement of the law (rather than the decisions of third parties not before the court). *Id.* The Supreme Court has identified examples of when unregulated parties

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 8     (10 of 20)

No. 24-5546          Tenn. Conference of the NAACP, et al. v. Lee, et al.          Page 8

can satisfy this tracing element. *See All. for Hippocratic Med.*, 602 U.S. at 384–85. Suppose a law regulates a supplier. Retailers who buy from the supplier might have standing to challenge the law if it causes them "downstream . . . economic injuries" (say, the law leads the supplier to charge the retailers higher prices). *See id.* at 384; *but cf. Ammex, Inc. v. United States*, 367 F.3d 530, 533–34 (6th Cir. 2004). Or suppose a law eliminates a park. Nearby residents might have standing to challenge the law if they regularly hike there. *See All. for Hippocratic Med.*, 602 U.S. at 385.

At one time, we read this causation element not to create much of an obstacle for unregulated parties. Our cases allowed an entity to sue a defendant over an action that the defendant took against a third party if the entity voluntarily spent "resources" to challenge that action. *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576–77 (6th Cir. 2013); *see Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547–49 (6th Cir. 2021); *Ne. Ohio Coal. for the Homeless v. Husted* (*NEOCH*), 837 F.3d 612, 624 (6th Cir. 2016). We, for example, held that a nonprofit could sue a newspaper over discriminatory real-estate advertisements because the nonprofit diverted "resources to investigate and negate the impact of these advertisements." *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991).

We based this diversion-of-resources theory of standing on the Supreme Court's decision in *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982). There, three individuals and Housing Opportunities Made Equal (HOME) sued Havens Realty under the Fair Housing Act. *See id.* at 366–67. The complaint alleged that Havens had "steer[ed]" racial minorities away from its apartments. *Id.* at 366–67 & n.1 (citation omitted). Havens had told two of the individual plaintiffs (both of whom were African American and one of whom was a HOME "tester") that it had no vacancies. *Id.* at 368. But it had told the third individual plaintiff (a white "tester" for HOME) that it had apartments available. *Id.* The Supreme Court held that the complaint adequately pleaded a past injury showing HOME's standing to seek damages from Havens. *Id.* at 378–79. The complaint alleged that HOME had spent "significant resources" (its employees' time) to eliminate Havens's discrimination. *Id.* at 379 (citation omitted). And the complaint alleged that Havens's false statements to one of HOME's employees had harmed

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 9   (11 of 20)

No. 24-5546        Tenn. Conference of the NAACP, et al. v. Lee, et al.        Page 9

HOME's business of placing clients in housing through "counseling and other referral services." *Id.* (citation omitted).

As we have since recognized, though, the Supreme Court in *Alliance for Hippocratic Medicine* disavowed our diversion-of-resources theory. 602 U.S. at 393–96; *see Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) (order). There, pro-life medical associations sued the FDA over its decision to make an abortion drug more available. *All. for Hippocratic Med.*, 602 U.S. at 376–77. The associations argued that they had standing because they "incurr[ed] costs to oppose FDA's actions." *Id.* at 394. The FDA's conduct led "the associations to conduct their own studies" on the drug so that they could "better inform" the public about it. *Id.* They also spent money on "public advocacy and public education" about the risks of the drug at the expense "of other spending priorities." *Id.* The Court held that these activities fell short. *Id.* at 394–96. It reasoned that a plaintiff could not establish standing merely by spending "money to gather information and advocate against the defendant's action." *Id.* at 394. It also rejected the claim that *Havens* had found standing based on this type of diversion of resources. *Id.* at 395. The Court instead interpreted *Havens* as allowing HOME to sue because Havens's false statements had "interfered with HOME's core business activities": providing "counseling and referral services" to homeseekers. *Id.* at 395. It thus viewed HOME's injury as analogous to a retailer's injury when it buys a manufacturer's defective good. *Id.* The medical associations, by comparison, had not alleged "any similar impediment" to their businesses. *Id.*

Although *Alliance for Hippocratic Medicine* limited *Havens*, we find the Court's rationale somewhat unclear. To start, which of standing's three elements did the medical associations fail to meet? The Court did not say. And the answer is not obvious. The associations arguably met standing's *injury* element because "a monetary injury" satisfies Article III and they identified economic harms. *See id.* at 381, 394. They also arguably met standing's *causation* element because they asserted a but-for causal relationship between their costs and the FDA's actions (that is, the associations would not have spent the resources but for the FDA's decision to allow greater access to the drug). *See id.* at 394; *see also Burrage v. United States*, 571 U.S. 204, 210–11 (2014).

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 10     (12 of 20)

No. 24-5546          *Tenn. Conference of the NAACP, et al. v. Lee, et al.*          Page 10

Perhaps the Court impliedly incorporated "proximate cause" standards into Article III. *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 677 (6th Cir. 2022) (Nalbandian, J., concurring). Its reasoning suggested that the associations' *voluntary decision* to spend time and money opposing the FDA's actions broke any causal link between their expenditures and the challenged actions. *See All. for Hippocratic Med.*, 602 U.S. at 394–95; *cf. Clapper*, 568 U.S. at 415–17. In other words, the Court found that the associations had suffered a nonactionable "self-inflicted" injury—not an actionable FDA-inflicted one. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020).

If so, how can we reconcile this reasoning with the Court's earlier suggestion that a retailer likely would have standing to challenge a law that regulates a supplier if the law caused the supplier to charge the retailer higher prices? *See All. for Hippocratic Med.*, 602 U.S. at 384. One could similarly describe the retailer's decision to buy at the higher prices as a *voluntary* one and thus the retailer's higher costs as "self-inflicted" harms. *Buchholz*, 946 F.3d at 866. One possible distinction might rest on whether the plaintiff spends the money for reasons *other than* "opposing" the defendant's challenged action and not solely as a "response" to it. *All. for Hippocratic Med.*, 602 U.S. at 395. A retailer buying a higher-priced good from a supplier presumably does so to operate a business—not to oppose a law. Likewise, HOME in *Havens* suffered informational harms to its "core business activities" (which required it to provide accurate housing information) apart from its efforts to oppose Havens's discrimination. *Id.*; *Havens*, 455 U.S. at 379. According to the Supreme Court, by contrast, the medical associations did not identify any similar informational harms to their "advocacy businesses" from the FDA's actions. *All. for Hippocratic Med.*, 602 U.S. at 395.

At day's end, the Court in *Alliance for Hippocratic Medicine* made clear that organizations can sometimes have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms. *See id.* at 383–85. But the Court also made clear that organizations cannot "spend [their] way into standing" by voluntarily using resources to counter the government action. *Id.* at 394. And it left unclear the line that divides spending that satisfies Article III from spending that does not. Perhaps this lack of clarity is inevitable given the nature of this causation inquiry. As the Court also explained,

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 11   (13 of 20)

No. 24-5546            Tenn. Conference of the NAACP, et al. v. Lee, et al.            Page 11

standing's causation element can pose "line-drawing difficulties" that often depend on a case's specific facts. *Id.* at 384.

## B. The NAACP's Standing

This case proves the difficulties. The NAACP challenges Tennessee's Documentation Policy under the NVRA. But the NAACP is not "an object of" that policy. *Lujan*, 504 U.S. at 561. Rather, the policy applies to "*someone else*": individuals with criminal convictions. *Id.* at 562. It requires these individuals to submit records showing their eligibility to vote when they turn in their voter-registration forms. Because the policy does not regulate the NAACP, it must overcome a "substantially more difficult" burden to establish its standing. *Id.* (citation omitted).

The NAACP attempts to meet its burden with the following factual allegations. According to the NAACP's president, it exists to end discrimination and achieves this goal primarily by "[p]romoting voter registration and turnout" at elections. Sweet-Love Decl., R.156-2, PageID 2356. The NAACP has used its volunteers' "time" and its "limited monetary resources" in its registration efforts. *Id.* Its staff and volunteers provide "public education" about how to register, and they encourage registration at "community outreach events" across Tennessee. *Id.* They also "continue to work with individuals" they meet to ensure that the individuals register. *Id.* Thus, when applicants with felony convictions must "present additional paperwork" with their registration forms, the NAACP will "divert significant resources from other" activities to help these applicants. *Id.*, PageID 2357. Its president explained that volunteers have "taxied" applicants to public offices "to troubleshoot" registration issues. *Id.* Volunteers have also helped the applicants prove their eligibility by seeking "old court records that are not easily accessible," and the volunteers have sometimes used their personal funds to pay for these documents. *Id.*, PageID 2357–58. The president added that the NAACP would prefer to devote these volunteer resources to "other mission-furthering activities." *Id.*, PageID 2358.

Do these facts suffice after *Alliance for Hippocratic Medicine*? As we said at the stay stage, we are not sure. *See NAACP*, 105 F.4th at 904–05. On the one hand, the NAACP spends time and money to assist voters with felony convictions for reasons other than to "*oppose*" the

Case: 24-5546    Document: 64-2    Filed: 06/05/2025    Page: 12    (14 of 20)

No. 24-5546         Tenn. Conference of the NAACP, et al. v. Lee, et al.         Page 12

Documentation Policy. *All. for Hippocratic Med.*, 602 U.S. at 394 (emphasis added); *cf. Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024). It has been helping citizens register to vote for the last 25 to 50 years—well before Tennessee adopted that policy. *See* 2d Sweet-Love Decl., R.192-1, PageID 3236. And just as a law regulating a supplier can impose "economic" costs on "downstream" businesses, the Documentation Policy's requirements on registration applicants could be said to increase the costs of the NAACP's preexisting registration efforts. *All. for Hippocratic Med.*, 602 U.S. at 384.

On the other hand, the NAACP *voluntarily* decided to shift resources to help applicants with convictions "in response to" the Documentation Policy. *Id.* at 395; *cf. Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1180 (9th Cir. 2024), *vacated for rehearing en banc by* 130 F.4th 1177 (9th Cir. 2025). So one could describe its costs as "self-inflicted" just as much as the costs of the medical associations in *Alliance for Hippocratic Medicine*. *Buchholz*, 946 F.3d at 866. And if *Alliance for Hippocratic Medicine* requires parties only to identify some expense apart from their opposition efforts, the decision would impose a mere paper standing barrier. Indeed, the medical associations arguably spent time and money educating women about the risks of the abortion drug apart from their opposition to the FDA's deregulation of that drug. *See* Br. for Respondents at 44, in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) (Nos. 23-235, 23-236), 2024 WL 811351. Just as the NAACP says it is in the business of facilitating voter registration, the medical associations could have said they were in the business of facilitating life. *All. for Hippocratic Med.*, 602 U.S. at 376. And just as the NAACP says it spends resources to register voters, the associations likely could have said that they spend resources to convince women to give birth rather than use the abortion drug. The NAACP thus may well read *Alliance for Hippocratic Medicine* as establishing nothing more than a game of semantics—something we are loath to do.

Ultimately, though, we need not decide this legal issue because the NAACP failed to prove its standing on more fact-specific grounds. A plaintiff must plead and prove its standing in the same way that it must plead and prove the elements of its claims. *See Lujan*, 504 U.S. at 561; *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44. At the summary-judgment stage, then,

Case: 24-5546    Document: 64-2    Filed: 06/05/2025    Page: 13    (15 of 20)

No. 24-5546         *Tenn. Conference of the NAACP, et al. v. Lee, et al.*         Page 13

the NAACP must introduce evidence setting forth "specific facts" that establish its standing (if we accept those facts as true). *Somberg v. McDonald*, 117 F.4th 375, 378 (6th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561). And the NAACP may not rely on "[c]onclusory allegations" to meet this evidentiary burden. *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022).

*Summers* provides a good example of these standards. There, Earth Island Institute (among other environmental groups) challenged federal regulations excluding small forest projects from notice-and-comment rules. 555 U.S. at 490–91. Earth Island claimed that it had standing because of its "members' recreational interests in the national forests." *Id.* at 494. The Court disagreed on the ground that the organization had failed to show an "imminent" injury. *Id.* at 495–96. Earth Island had identified only a single member who had any general "intention to visit the national forests" someday in the future. *Id.* at 496. But this general desire did not show an imminent injury because Earth Island failed to identify any specific park the member intended to visit, when he intended to visit the park, or whether the regulations would negatively affect this (unidentified) park at the (unidentified) time. *Id.* at 495–96. The Court also rejected the view that an organization can prove its standing by showing a "statistical probability" that a regulation would affect at least one of its members given its large size and its members' usual activities. *Id.* at 497–98.

For two reasons, the NAACP's allegations here suffer from similar imminence problems. *First*, the NAACP's president asserted *generally* that it has used its resources in the past to help applicants with prior convictions register to vote. And one way to help show imminent future harm is to show past exposure to the same kind of harm from the same defendant. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164–67 (2014). But it did not introduce into the summary-judgment record a single "*specific*" example of any actual costs incurred. *Somberg*, 117 F.4th at 378 (emphasis added) (quoting *Lujan*, 504 U.S. at 561); *see Fair Elections*, 770 F.3d at 460. The NAACP did not "identify" even one applicant with a prior felony conviction whom it had previously helped. *Summers*, 555 U.S. at 495. It did not identify this applicant's prior convictions or the reasons why the applicant was eligible to vote. The NAACP also did not identify what it had done to assist this applicant or when it had undertaken those efforts. Nor did it show that any prior need to track down an applicant's criminal records had been caused by the

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 14   (16 of 20)

No. 24-5546          *Tenn. Conference of the NAACP, et al. v. Lee, et al.*          Page 14

Documentation Policy rather than by, say, an applicant's failure to remember the dates of prior convictions. *Cf. Murthy*, 603 U.S. at 59. Given these evidentiary deficiencies, the NAACP's conclusory claims look nothing like the facts alleged in *Havens*—which detailed the precise incident for which HOME sought damages. 455 U.S. at 368–69. We thus doubt that the NAACP's allegations even sufficed to show "[p]ast exposure" to the allegedly "illegal" Documentation Policy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)).

*Second*, and besides, the NAACP's generic allegations describe an alleged "past injury" to its organizational resources. *Summers*, 555 U.S. at 495. Unlike in *Havens*, however, the NAACP does not seek damages for this *past* harm. *See* 455 U.S. at 378. It instead seeks an injunction against *future* harm. So it must show "a real and immediate threat of repeated injury." *Murthy*, 603 U.S. at 58 (quoting *O'Shea*, 414 U.S. at 496). And the generic allegations of past harm can serve only as "a launching pad for a showing of imminent future injury." *Id.* at 59. Yet those allegations require us to speculate about when (if ever) the Documentation Policy will cause the NAACP to expend resources to assist voters. *See Shelby Advocs. for Fair Elections v. Hargett*, 947 F.3d 977, 981–82 (6th Cir. 2020) (per curiam). Here again, the NAACP did not identify any specific individuals covered by the Documentation Policy whom it planned to help. At most, the NAACP's allegations suggest it may help such an individual at some point down the road. Yet "[s]uch 'some day' intentions"—without concrete details—do not establish an imminent injury as a matter of law. *Lujan*, 504 U.S. at 564. And the NAACP cannot rely on a "statistical probability" theory of standing tied to the claim that it will likely encounter applicants with felony convictions who need its help at its regularly scheduled community events. *Summers*, 555 U.S. at 497–98.

Considering this issue from the remedy perspective further confirms the need for specific facts to establish imminence. The Supreme Court has made clear that the "plaintiff's remedy must be 'limited to the inadequacy that produced [its] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Yet how could we limit the NAACP's injunction to its imminent injury (the economic costs from helping specific applicants) if the NAACP does not identify the applicants? As we said at the stay stage, the district court

Case: 24-5546   Document: 64-2   Filed: 06/05/2025   Page: 15   (17 of 20)

No. 24-5546         *Tenn. Conference of the NAACP, et al. v. Lee, et al.*         Page 15

could avoid this problem only by granting a "*universal* injunction" barring Tennessee from enforcing the Documentation Policy against anyone—including those whom the NAACP did not plan to help. *NAACP*, 105 F.4th at 906. Apart from whether courts have the constitutional power to award relief to nonparties, this fact further shows the need for indirectly harmed plaintiffs to identify the directly harmed parties from whom their injuries will flow. Without those allegations, the plaintiffs can assert only "speculative fears" that they may suffer harm. *Shelby*, 947 F.3d at 982.

In response, the NAACP suggests that standing requires only an "identifiable trifle" of an injury. *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973) (citation omitted). So, for example, a $1.50 poll tax qualifies as a cognizable injury. *See id.* This argument mistakes the *concreteness* element of Article III standing with its *imminence* element. Yes, injuries causing small "monetary harms" (or "[v]arious intangible harms") can be sufficiently concrete to allow a lawsuit. *TransUnion*, 594 U.S. at 425; *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021). But plaintiffs seeking injunctive relief still must show that those small (or intangible) injuries are "imminent"—that they are sufficiently likely to occur as a result of the defendant's conduct—to obtain an injunction. *See Clapper*, 568 U.S. at 409–15. And here, we hold that the NAACP failed to satisfy this imminence element. So its discussion of the distinct concreteness element is beside the point.

We end with a separate note of caution. An Article III injury must not just be concrete, particularized, and imminent, but also "an invasion of a *legally protected* interest[.]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (emphasis added) (quoting *Lujan*, 504 U.S. at 560). Justice Thomas would treat this latter element as categorical. *See All. for Hippocratic Med.*, 602 U.S. at 397–98 (Thomas, J., concurring). But the Court's doctrine of third-party standing sometimes loosens the element by allowing a plaintiff whose legal rights have not been violated to assert the rights of third parties—as long as the plaintiff has suffered a concrete, particularized, and imminent injury. *See id.* at 393 n.5 (majority opinion); *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

Tennessee's briefing implicated these distinct standing issues. It attempted to distinguish *Havens* on the ground that the Documentation Policy (whether lawful or unlawful) did not

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 16     (18 of 20)

No. 24-5546     *Tenn. Conference of the NAACP, et al. v. Lee, et al.*     Page 16

violate the NAACP's *own* "legal rights" under the NVRA. Appellant's Br. 24. Rather, Tennessee suggests that the NAACP seeks to invoke the rights of the applicants affected by that policy. In *Havens*, by contrast, the Court made clear that the Fair Housing Act gave everyone (including HOME) "a legal right to truthful information about available housing." 455 U.S. at 373; *see Fair Elections*, 770 F.3d at 460 n.1. These arguments raise an important question: Whose rights does the NAACP even attempt to enforce in this suit? If its own rights, it might have to show that its conduct "fall[s] within the zone of interests protected by" the NVRA. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). That law allows "[a] person who is aggrieved by a violation" to sue. 52 U.S.C. § 20510(b)(1). Should this text cover a nonprofit engaged in registration outreach? To establish its standing (as compared to the merits), the NAACP would at least have to establish an "arguable" claim that it can assert its own rights. *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489–90 (6th Cir. 2021) (citation omitted).

If not, the NAACP might then have to show that it can satisfy the separate test for third-party standing. *See Kowalski*, 543 U.S. at 130. That test would require the NAACP to show both that it has a "'close' relationship" with applicants and that some "hindrance" impedes their ability to assert their rights. *Id.* (citation omitted). And the Court has looked negatively on plaintiffs who try to enforce the rights of "hypothetical" third parties. *Id.* at 127, 130–31. Yet we can leave these questions for another day since we can resolve this appeal on imminence grounds alone.

All told, the summary-judgment record "lacks evidence from which 'a rational trier of fact'" could conclude that the NAACP faces an imminent injury. *Lemaster v. Lawrence County*, 65 F.4th 302, 309 (6th Cir. 2023) (citation omitted). The NAACP's evidence thus could not *withstand* Tennessee's motion for summary judgment. *See id.* And the district court erred twice over by *granting* summary judgment to the NAACP. Recall that the NAACP has the burden to prove its standing. *See Lujan*, 504 U.S. at 561. So it could obtain summary judgment in its favor only if it "affirmatively introduce[d] evidence of such weight that no rational jury could disagree with it." *Lemaster*, 65 F.4th at 310. The NAACP fell well short of this demanding standard.

Case: 24-5546     Document: 64-2     Filed: 06/05/2025     Page: 17     (19 of 20)

No. 24-5546            *Tenn. Conference of the NAACP, et al. v. Lee, et al.*            Page 17

\* \* \*

The parties lastly debate the proper resolution of this appeal: Should we order the district court to grant Tennessee's summary-judgment motion due to the NAACP's failure to introduce enough evidence of its standing? Or should we allow the NAACP to supplement the record on remand with evidence that it developed later? *See* Appellee's Br. 21 n.6. If this case had reached us after a final judgment, we likely would have directed the district court to enter summary judgment for Tennessee. A party generally cannot submit new evidence to "retroactively" fix a standing problem if the party did not present enough evidence "at the time of judgment[.]" *Summers*, 555 U.S. at 495 n.\*; *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990). Here, though, the district court issued an interlocutory decision. And district courts generally have discretion to reevaluate those decisions at any time before a final judgment. *See* Fed. R. Civ. P. 54(b); 18B Charles A. Wright et al., *Federal Practice and Procedure* § 4478.1, at 680–82 (3d ed. 2019). We thus will leave this remedial choice (between granting summary judgment to the State or permitting NAACP to supplement the record) in the district court's capable hands. That court may also assess what effect the State's new voting law has on this case in the first instance.

We reverse the grant of summary judgment to the NAACP, vacate the permanent injunction, and remand for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5546

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, on behalf of itself and its members,

    Plaintiffs - Appellees,

v.

WILLIAM BYRON LEE, et al.,

    Defendants,

MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; TRE HARGETT, in his official capacity as Secretary of the State of Tennessee,

    Defendants - Appellants.

FILED
Jun 05, 2025
KELLY L. STEPHENS, Clerk

Before:  BUSH, LARSEN, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment to the NAACP is REVERSED, the permanent injunction is VACATED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk